## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| OAK CLIFF RECYCLING, INC., | CASE NO.   3:23-CV-399 |
| Plaintiff, | JUDGE |
| vs. | |
| DADE AUCTIONS, INC., | |
| Defendant. | |

## COMPLAINT TO VACATE ARBITRATION AWARD

COMES NOW, Movant, Oak Cliff Recycling, Inc. ("Petitioner" or "Oak Cliff") and files this its Motion to Vacate Arbitration Award, and for good cause, would show unto this Honorable Court as follows:

### I.
### SUMMARY OF APPLICATION

1.      Oak Cliff seeks an Order from the Court vacating the Arbitration Award issued in the underlying Arbitration between Oak Cliff and Dade Auctions, Inc. The basis for vacating the Award stems from R.C. 2711.10 to 27.11.14 and Ohio case law which states that an Arbitrator's award may be vacated if the award violates well-defined public policy. Oak Cliff asserts that the Arbitrator violated well-defined public policy by ordering Oak Cliff to pay money to Dade Auctions, Inc. based on a penalty clause, rather than a valid liquidated damages clause. The Award thumbs its nose at an important and well-defined public policy and should be vacated in its entirety.

## II.
### FACTUAL BACKGROUND

2.　　On September 20, 2020, Oak Cliff Recycling, Inc. and Dade Auctions, Inc. ("Dade") entered into an Auction Listing Agreement ("Listing Agreement"). The terms of the Listing Agreement under section 17 mandated that any dispute under the Listing Agreement be determined and adjudicated by binding arbitration in accordance with Title 9 of the U.S. Code and the Commercial Arbitration Rules of the American Arbitration Association in effect. A copy of the contract and arbitration agreement are attached to this Motion as Exhibit A.

3.　　After the parties entered into the above contractual relationship, disputes arose between the parties. The Listing Agreement was entered into largely due to Dade's sales call to Oak Cliff in an attempt to assist in selling a massive automobile shredder owned by Oak Cliff (the "Shredder") worth hundreds of thousands of dollars.  Dade learned that Oak Cliff was selling the shredder based on an industry contact, and Dade sought to make a commission on a sale of the shredder.

4.　　The Listing Agreement provides that Oak Cliff would provide the Shredder to Dade on a consignment basis.  Oak Cliff owned the Shredder, but Dade had the exclusive right to sell the Shredder on Oak Cliff's behalf during the pendency of the Listing Agreement. *See* Exhibit A, Section 1. The Listing Agreement called for Dade to retain a 10% commission if it was able to sell the Shredder.  *Id.* at section 4.

5.　　The Listing Agreement further contains a seemingly open-ended contract renewal clause.  The first paragraph of the Listing Agreement reads:

> This Agreement is made and entered into as of September 15, 2020, by and between Oak Cliff Recycling, Inc. ("Seller") and Dade Auctions, Inc. ("Consignee"). **This agreement expires 180 days after your digital signature date, per terms below, and shall automatically renew for the same term until the sales transaction is completed,** or cancellation notification from the Seller whichever occurs earlier.

Cancellation notice from the Seller must occur 15 days prior to the end of the Agreement to effectively cancel the contract renewal."

*Id*. at page 1, par. 1.

6.     Further, included under Section 5 of the Listing Agreement is a provision touted as a "liquidated damages" provision which reads:

> **Any cancellation or termination prior to the listing agreement expiration for any reason, will incur a 20% fee of the listed value or Fair Market Value** as determined by Dade Auctions, to you as the seller.

*Id*. at section 5.

7.     The Listing Agreement calls for Dade to receive 10% of the sale price as commission in the event it sells the Shredder versus a 20% penalty to be paid by Oak Cliff if Oak Cliff terminates prematurely.  *Id*., generally.

8.     From September 15, 2020, to September 1, 2021, Dade did not present Oak Cliff with **any** legitimate offers on the Shredder.

9.     On September 1, 2021, Oak Cliff's representative emailed Dade's "information" email account info@dadeauctions.com stating that Oak Cliff "would like to notify [Dade] that [he] want[ed] to remove the shredder that [he has] listed with [Dade] from [Dade's] listings." Oak Cliff emailed this account because this account provided him monthly reports of the activity for his listing with Dade.

10.     Dade alleges that Oak Cliff's email above constitutes a violation of the early termination clause because Oak Cliff notified Dade a mere six (6) days after the renewal clause kicked in. Dade alleges that Oak Cliff had to terminate on or before August 26, 2021, for termination to be timely.

11.  Dade demanded its 20% penalty fee pursuant to the liquidated damages/penalty clause. Oak Cliff declined to pay Dade. Dade instituted the arbitration proceeding as is required under the Listing Agreement.

12.  On October 11, 2021, the parties proceeded to arbitration as provided in the arbitration agreement. Arbitrator Cary Cooper was selected as the Arbitrator in this matter

13.  After considering the pleadings, papers, briefs and evidence presented to him, the arbitrator delivered a signed, written Interim award on October 17, 2022. *See* Exhibit B. The interim award found in favor of Dade as follows: (a) $135,000 against Oak Cliff and in favor of Dade plus interest at the rate permitted under Ohio law from the date of the Interim order until paid in full; and (b) attorney's fees and costs to Dade upon showing by Dade regarding the amount of reasonable and necessary fees.

14.  On December 5, 2022, the Arbitrator followed up the Interim Award and issued a Final Award which compensated Dade for its attorney's fees and costs. *See* Exhibit C.

### III.
### JURISDICTION & VENUE

15.  Petitioner is incorporated under the laws of the state of Texas with its principal place of business in Oak Cliff, Texas.

16.  Respondent is incorporated under the laws of the state of Ohio with its principal place of business in Maumee, Ohio.

17.  The arbitration hearing was held via zoom through Arbitrator Cary Cooper's office located at Four Seagate, Eighth Floor, Toledo, Ohio, 43604.

18.  The Arbitration Award contains several decisions issued by the Arbitrator. One of the Arbitrator's decisions is that Dade Auctions is awarded $135,000 to be paid by Oak Cliff.

19.    The Award also requires Petitioner to pay the reasonable and necessary attorney's fees of Dade in the amount of $8,000.

20.    Combined with the Award amount and Respondent's attorney's fees, the amount in controversy far exceeds $75,000 exclusive of costs and interest.

21.    Since Petitioner is a citizen of Texas and Respondent is a citizen of Ohio, there exists complete diversity of citizenship between the parties.

22.    Therefore, this Court has subject matter diversity jurisdiction pursuant to 28 U.S.C. § 1332.

23.    Further, a district court may exercise original federal jurisdiction over any civil action "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

24.    Under Section 1331, federal question jurisdiction exists when a plaintiff's well-pleaded complaint demonstrates that (a) "federal law creates [one or more] cause[s] of action" alleged by plaintiff or (b) "plaintiff's right to relief [under one or more causes of action] necessarily depends on resolution of a substantial question of federal law."  *Bd. of Comm'rs of S.E. La. Flood Protection Authority-East v. Tenn. Gas Pipeline Co. L.L.C.,* 850 F. 3d 714, 721 (5th Cir. 2017); *see also Singh v. Duane Morris LLP*, 538 F. 3d 334, 337-338 (5th Cir. 2008); *Broder v. Cablevision Systems Corp*., 418 F. 3d 187, 194 (2d Cir. 2005).

25.    In this instance, the contract made basis of this Complaint states that "any controversy…shall be decided and settled by binding arbitration in accordance with Title 9 of the U.S. Code (United States Arbitration Act)." *See* Exhibit A section 17. Therefore, there exists a federal question with respect to the United States Arbitration Act and provisions contained therein regarding vacation of arbitration awards.

## IV.
## LEGAL AUTHORITY

26.     While Ohio courts presume validity and give deference to arbitration awards, *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.*, 49 Ohio St.3d 129 (1990), (overturned on other grounds), a reviewing court may vacate an award if the moving party establishes the arbitration award is defective based on one or more reasons set forth in R.C. § 2711.10. *See White v. Fitch*, 2015-Ohio-4387, ¶7, 2015 WL 6393911 (8th Dist.) (citing *Goodyear Tire v. Local Union No. 200*, 42 Ohio St.2d 516, 330 N.E.2d 703, 708 (1975)). Section 10(a) of the Federal Arbitration Act ("FAA") also authorizes courts to vacate an arbitration panel's decision, similar to those under R.C. 2711.10, when any of its four grounds are met.[1]

27.     Although the party seeking to vacate an arbitration award bears the burden of proving one of the applicable grounds for overturning an award, *see Sasaki v. McKinnon*, 124 Ohio App.3d 613, at 119, 707 N.E.2d 9 (8th Dist. 1997), when the facts support any one of the provisions of R.C. § 2711.10 or the FAA § 10, vacation of an arbitration award is warranted. *See, e.g., Internatl. Bhd. of Teamsters, Local 519 v. U.P.S., Inc.,* 335 F.3d 497, 509 (6th Cir.2003) (ordering that the award be vacated based on fraud); *Close v. Motorists Mut. Ins. Co.*, 21 Ohio App.3d 288, 486 N.E.2d 1275 (10th Dist. 1985) (affirming order to vacate an arbitration award because another lawyer in the arbitrator's firm represented one of the parties).

28.     The Ohio Supreme Court has recognized that, if an arbitrator's interpretation of a collective bargaining agreement violates public policy, the resulting award is unenforceable. *S.W.*

---

[1] The Sixth Circuit finds that an arbitrator has exceeded its scope within the meaning of Section 10(a)(4) when an award: (1) conflicts with express terms of the agreement; (2) imposes additional requirements not expressly provided for in the agreement; (3) is not rationally supported by or derived from the agreement; or (4) is based on "general considerations of fairness and equity" instead of the agreement's exact terms. See *Beacon Journal Pub. Co. v. Akron Newspaper Guild, Local No. 7,* 114 F.3d 596, 600 (6th Cir. 1997).

*Ohio Regional Transit Auth*., 91 Ohio St.3d at 112, 742 N.E.2d 630, *citing W.R. Grace & Co. v. Local Union 759, Internatl. Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *see also Fraternal Order of Police, Lodge 8 v. Cleveland*, 8th Dist. Cuyahoga No. 102565, 2015-Ohio-4188, 2015 WL 5867410, ¶ 25.

29.     To vacate an arbitration award as being contrary to public policy, the public policy must be "well defined and dominant" and "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id*., *quoting W.R. Grace & Co*. at 766, 103 S.Ct. 2177; *see also FOP, Lodge* 8 at ¶ 25.

30.     R.C. 2711.13 requires that a motion to vacate an arbitration award be filed no later than "three months after the award" is made. Under Ohio law, the arbitrator's "Final" award issued on December 5, 2022 starts the three-month clock for a motion to vacate an arbitration award. *Donini v. Fraternal Ord. of Police*, 2009-Ohio-5810, ¶¶ 5-11 (a party complies with R.C. 2711.13 if that party files a motion to vacate within three months of a "final" award). For purposes of this motion, the Interim Award and Final Award are deemed as one and simply entitled, the "Award."

**V.**

**ARGUMENT**

**THE AWARD SHOULD BE VACATED BECAUSE IT VIOLATES PUBLIC POLICY.**

**A.     The Basis Of The Arbitrator's Award To Dade.**

31.     The basis of the award to Dade stems from Section 5 of the Listing Agreement touted as a "liquidated damages" provision which reads:

> **Any cancellation or termination prior to the listing agreement expiration for any reason, will incur a 20% fee of the listed value or Fair Market Value** as determined by Dade Auctions, to you as the seller.

> Exhibit A, section 5.

---

32.     Section 5 of the Listing Agreement calls for Dade to receive 10% of the sales price as commission in the event it sells the Shredder versus a 20% penalty to be paid by Oak Cliff if Oak Cliff terminates prematurely. Exhibit A, section 5.

33.     From September 15, 2020, to September 1, 2021, Dade did not present Oak Cliff with **any** legitimate offers on the Shredder.

34.     On September 1, 2021, Oak Cliff's representative emailed Dade's "information" email account stating that Oak Cliff "would like to notify [Dade] that [he] want[ed] to remove the shredder that [he has] listed with [Dade] from [Dade's] listings."

35.     Dade alleged that Oak Cliff's email constituted a violation of the early termination clause because Oak Cliff notified Dade a mere six (6) days after the renewal clause kicked in. According to Dade, Oak Cliff must have terminated the Listing Agreement on or before August 26, 2021 in order to avoid the penalty clause in Section 5.

36.     Dade demanded its 20% pursuant to Section 5 of the Listing Agreement.  Oak Cliff declined to pay Dade.  Dade instituted this arbitration proceeding as is required under the Listing Agreement. In Dade's demand for arbitration, it provided a brief description of the dispute:

> The respondent listed an item for sale on the claimant's auction site, the terms and conditions of which provide for auto listing renewals unless the listing party provides timely notice of it's intent to terminate the listing. The party failed to provide said timely notice. Early termination of a listing **resulted in a penalty** equal to 20% of the listed value – in this instance $135,000 – which equals 20% of the $675,000 list price.

*See* Exhibit D (emphasis added)

37.     After the conclusion of the hearing, the Arbitrator issued his Interim Award and stated that the liquidated damages provision was intended to and does fairly compensate Dade for its loss of the benefit of the bargain and the fee was not to punish Oak Cliff. *See* Exhibit B page

---

13. The Arbitrator made this conclusion despite a strong public policy disfavoring penalty clauses masquerading as liquidated damages clauses. The award should be vacated because the Arbitrator completely disregarded a well-defined and dominant precedent not only in the state of Ohio, but across the United States.

**B.**     **The Award Completely Disregards Well-Defined Public Policy.**

38.     Complete freedom of contract is not permitted for public policy reasons. *Lake Ridge Acad. v. Carney*, 66 Ohio St. 3d 376, 381, 613 N.E.2d 183, 187 (1993) One such circumstance is when stipulated damages constitute a penalty. *Id*. Because the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach, "[p]unitive damages are not recoverable for a breach of contract <u>unless the conduct constituting the breach is also a tort for which punitive damages are recoverable</u>." *Id*. quoting 3 Restatement of the Law 2d, Contracts (1981) 154, Section 355. "Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy." *Id*. at 157, Section 356, Comment a.

39.     A punitive remedy is one that subjects the breaching party to a liability "<u>disproportionate to the damage which could have been anticipated</u> from breach of the contract[.]" 5 Williston on Contracts (3 Ed.1961) 668, Section 776. "The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." *Lake Ridge Acad. v. Carney*, SUPRA at 187-88*quoting Garrett v. Coast & S. Fed. S. & L. Assn.* (1973), 9 Cal.3d 731, 739, 108 Cal.Rptr. 845, 850, 511 P.2d 1197, 1202. A penalty is designed to coerce performance by punishing nonperformance; its principal object is not compensation for the losses suffered by the nonbreaching party.

40.     For example, in *Cad Cam, Inc. v. Underwood*, the plaintiff was a company engaged in the business of computer assisted design (CAD). 36 Ohio App. 3d 90, 521 N.E.2d 498 (2d Dist. Montgomery County 1987). Plaintiff hired defendant and provided him with training and skills related to plaintiff's business. The defendant entered into a covenant not to compete, containing a liquidated damages clause requiring him to pay the equivalent of one-half his annual salary if he accepted employment from any other company engaged in CAD following severance. Upon breach, plaintiff sought to enforce the liquidated damages clause. In affirming the trial court's ruling in favor of defendant, the court of appeals agreed that the liquidated damages clause was an unenforceable penalty. Covenants not to compete that present an unreasonable restraint on trade are contrary to public policy and void. The court of appeals held that the record presented sufficient evidence from which the trial court could have reasonably found that the liquidated damages clause was manifestly unconscionable, unreasonable, and disproportionate in amount. Specifically, the trial court was justified in finding that the amount defendant was required to pay for the breach was not reasonably proportional to the loss likely to be suffered by the plaintiff. **<u>Because the liquidated damages clause was a penalty and an unreasonable restraint on trade, the restrictive covenant was contrary to public policy</u>**. *Id*.

41.     Under Ohio law, whether a particular liquidated damages provision is enforceable is a determination that must be made on a case-by-case basis based on the particular facts of the case.  *Samson Sales, Inc. v. Honeywell, Inc*. (1984), 12 Ohio St.3d 27, 465 N.E.2d 392; *see also Cad Cam, Inc. v. Underwood* (1987), 36 Ohio App.3d 90, 96, 521 N.E.2d 498, 503. Those facts, rather than what the parties may have said in their agreement, are determinative. *Id.*

42.     As a threshold matter, "reasonable compensation for actual damages is the legitimate objective of such liquidated damages provision and where the amount specified is

manifestly unequitable and unrealistic, courts will ordinarily regard it as a penalty." *Samson Sales*, 12 Ohio St.3d at 28.

43.     The Ohio Supreme Court has set forth the following test to determine whether a particular contract is a liquidated damages provision or an unenforceable penalty:

> Where the parties have agreed on the amount of damages ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

*Samson Sales*, 12 Ohio St.3d 27 (citing *Jones v. Stevens* (1925), 112 Ohio St. 43, 146 N.E. 894).

44.     Therefore, (1) reasonable compensation must be the legitimate objective of the provision, (2) it must be ascertained by estimation and adjustment, (3) the damages must be uncertain as to amount and difficult of proof, (4) the contract must not be manifestly unconscionable, unreasonable, and disproportionate in amount, and (5) it must be consistent with the intention of the parties.  The elements of the test are stated in the conjunctive, and, in order to be an enforceable provision, Dade must meet **ALL** elements of the *Samson Sales* test.  *State Auto Ins. Co. v. Sonitrol of Cleveland, Inc.* (1987) 8th Dist. No. 54186, 1987 WL 25749, at *3, Appendix A.

> ### i.     *The Primary Objective of Dade's Liquidated Damages Provision Was Not Reasonable Compensation.*

45.     Under Ohio law, where a liquidated damages provision "was arrived at for some purpose other than compensation, the sum stipulated will be held to be a 'penalty [sic] rather than liquidated damages.'" *Jolley v. Georgeff* (1952), 110 N.E.2d 23, 49 O.O. 354. As the Ohio Supreme Court found, parties are free to contract in advance for damages "as long as the provision

does not disregard the principle of compensation." *Lake Ridge*, 66 Ohio St.3d at 381; citing 3 RESTATEMENT OF CONTRACTS at 157, Section 356, comment a.

46.    Here, the primary objective of the liquidated damages provision was not reasonable compensation, but, instead, a penalty.  In fact, Dade stated as much in its demand for arbitration wherein it states, "…early termination of a listing resulted in a **penalty** equal to 20% of the listed value." Exhibit D. This constitutes an admission from the outset of this proceeding that Dade instituted this arbitration to collect its 20% penalty for Oak Cliff's early termination.  Also, had Dade sold the Shredder, Dade would only be entitled to 10% commission from Oak Cliff.  Dade cannot collect more from Oak Cliff as a liquidated damages penalty than Dade would be entitled to collect had Dade sold the Shredder, especially when the alleged "breach" that triggers Section 5 does not amount to a tort that would award punitive damages.  Awarding such liquidated damages is an inequitable windfall.

47.    Further, when Dade's corporate representative, Dave Fournier, Sr., testified at the hearing about the proposed liquidated damages clause, he ADMITS that the liquidated damages provision is indeed a penalty:

```
15· · · · · · · Q.· · All right.· And, in fact, you agreed in
16· · · · · ·your deposition testimony, I would hope you would
17· · · · · ·agree today, that you approved and, in fact,
18· · · · · ·agreed with all of the contents of this demand
19· · · · · ·for arbitration, correct?
20· · · · · · · A.· · Correct.
```

*Final Hearing Testimony of Dave Fournier, Sr*. at 89, lines 15-20 (Exhibit E).

```
15· · · · · · · Q.· · "In this instance, $135,000, which
16· · · · · ·equals 20 percent of the $675,000 list price."
17· · · · · · · · · · Did I read that right?
18· · · · · · · A.· · Yes.
19· · · · · · · Q.· · Thank you.· And this is the only basis
```

20· · · · · ·for Dade's demand for arbitration, correct?
21· · · · · · A.· · Well, that's a brief description of why
22· · · · · ·we're here.

*Id.* at page 90, lines 15-22.

48.      Mr. Fournier further admits to the penalty clause in his deposition prior to the

hearing because the demand for arbitration states "early termination of a listing resulted in a

penalty equal to 20% of the listed value"[2]:

9        (Exhibit No. 1 marked for identification)
10       Q.  (BY MR. AUSTIN)  And have you reviewed this
11   demand before, Mr. Fournier?
12       A.  Yes.  Yeah.  Yes.
13       Q.  And you're familiar with its contents?
14       A.  Yes.
15       **Q.  And you agree with its contents?**
**16       A.  Yes.**
17       Q.  Okay.
18       A.  Yeah, in that contract.
19       **Q.  Is there anything that you would like to change**
**20   in the demand?**
**21       A.  No.**

*See* Exhibit F, page 9, lines 9-21.

14       Q.  And then here in the middle, it says a brief
15   description of the dispute.  So I'll read that for the
16   arbitrator.
17          It says, "The Respondent listed an item for
18   sale on the claimant's auction site, the terms and
19   conditions of which provide for auto listing renewals
20   unless the listing party provides timely notice of its
21   intent to terminate the listing.  The party failed to
22   provide said timely notice.  Early termination of a
23   listing resulted in a penalty equal to 20 percent of the
24   listed value.  In this instance, $135,000, which equals
25   20 percent of the $675,000 list price."

[2] Exhibit D.

1      Do you agree that's what that -- is that -- do

2  you agree that that's an accurate statement as to why

3  DADE demanded arbitration?

**4    A.  At a minimum, yes.**


5    Q.  Okay.  And you would agree that DADE initiated

6  this arbitration to pursue a **<u>20 percent penalty</u>** against

7  Oak Cliff; right?

**8    A.  Yes.**

*Id*. at pages 10-11, lines 10-25, 1-8.

49.    In *Cad Cam, Inc.*, the court affirmed the trial court's decision that the liquidated damages provision was an unenforceable penalty partly because one intention of the provision was to ensure that the employee did not go to work for a competitor. 36 Ohio App. 3d at 92. In reaching its conclusion, the court noted that:

> There was evidence in the record on at least one occasion the same witness had admitted, at a deposition, that one intention of Section 8 [the liquidated damage provision] was 'to advise and warn other companies that in the event they steal ***[Cad Cam's] employee, they will have to make a token payment for those employees.' That admission is more consistent with Section 8 bearing a penalty to secure enforcement of a covenant not to compete, than with Section 8 being a provision for reimbursing Cad Cam for the expenses of training its employees in the event of the employee's having derived some post-Cad Cam employment benefit from the training. We conclude that the trial court could reasonably find, from this record, that the purpose of Section 8 was to ensure that Cad Cam's employee did not leave Cad Cam's employ and go to work for a competitor.

*Id.*

50.    In other words, to be enforceable, the primary objective of the liquidated-damages provision must be <u>reasonable compensation</u> and <u>not to punish the promisor</u>.  As was the case in *Cad Cam*, the instant provision is for another purpose other than reasonable compensation, as Dade admits.  The record in this case shows that the objective of Dade's liquidated damages provision was to punish Oak Cliff for violating a confusing renewal clause with a debilitating guarantee to

Dade that it would not only receive its 10% commission from Oak Cliff for the transaction but also an <u>additional</u> 10% simply for early termination. The Arbitrator's award should be vacated because the evidence shows that he completely disregarded a well-defined public policy in awarding Dade "liquidated damages" under Section 5 of the Listing Agreement.

### ii.    Dade's Liquidated Damages Provision Was Not Ascertained by Estimation and Adjustment.

51.    When the contract provision "fails to evince a conscious intention of the parties to consider, estimate, or adjust the damages that might reasonably flow from the negligent breach of the agreement" it constitutes an unenforceable penalty. *Samson Sales*, 12 Ohio St.3d at 29. The process of real estimation and adjustment is an essential part of the process by which parties may arrive at an enforceable liquidated damages provision.  And where, as here, no such process occurs, the resulting provision is void. Thus, where a provision mechanically determines the amount of liquidated damages solely by reference to amounts due over the term of a contract, without any effort to estimate actual damages and adjust the provision to reflect that estimation, the provision fails as a matter of law.

52.    The court in *Easton Telecom* reached precisely this result.  There, the liquidated damages clause required customers to immediately pay the full cost for the monthly fee for the remaining months on their contracts, without any reduction for present value, in the event the customer terminated their phone service with plaintiff, a telecommunications provider. *Easton Telecom Servs., L.L.C. v. CoreComm Internet Grp., Inc.,* 216 F. Supp. 2d 695, 698 (N.D. Ohio 2002). The court held that because there was no evidence of real "estimation and adjustment" between the parties – rather, the liquidated damages provision was generic language placed in standard contracts of plaintiff – plaintiff failed to satisfy the threshold test articulated in *Samson* and the provision was an unenforceable penalty and void under Ohio law. *Id*.

---

53.     The liquidated damages provision in this case is likewise a generic provision placed in Dade's contracts, without any estimation or adjustment. Like the contract in *Eastern Telecom*, Dade chose simple and expedient over what is lawful in determining liquidated damages solely by reference to what commission it was entitled to receive, plus an additional 10% for a breach. *See* Exhibit A.  The history and structure of the provision make clear that the provision is not, and could never, be the result of estimation and adjustment. In fact, Mr. Fournier makes that point clear in his deposition wherein he states that this provision, and the Listing Agreement on the whole, was gathered from information about Dade's competitors and not drafted with different scenarios in mind. *See* Exhibit F, pages 31-32, lines 17-25, 1-6.  Mr. Fournier admits that the liquidated damages is a penalty.  Thus, the liquidated damages provision is an unenforceable penalty. This constitutes a party admission of this point that the Arbitrator failed to consider in his award. The Arbitrator completely failed to consider competent evidence that the Dade admits Section 5 is a penalty. This completely disregards Ohio public policy to keep out penalty clauses in contracts. For these reasons, the Award should be vacated.

### iii.     *Dade's Liquidated Damages Provision Is Unconscionable and Unreasonable in Amount.*

54.     A liquidated damages provision must not be "so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties." *Samson Sales*, 12 Ohio St.3d at 29.  "Where the amount specified is manifestly inequitable and unrealistic, courts will ordinarily regard it as a penalty." *Id*. at 28. If anything, Oak Cliff only owed Dade a 10% commission if Dade successfully sold the Shredder. Here, the 20% liquidated damages/penalty clause fails as a matter of law because it bears no relation to the actual damages Dade would have suffered, if any, as a result of Oak Cliff's early termination.

---

55.    To be enforceable, a liquidated damages provision must not only be "reasonable at the time of formation;" it must "bear[] a reasonable (not necessarily exact) relation to actual damages." *Lake Ridge*, 66 Ohio St.3d at 382.  Ohio courts, therefore, routinely find that where a liquidated damages provision is so disproportionate to actual damages incurred, the clause is unconscionable and unenforceable. Thus, for example, where a party's actual damages were negligible and the liquidated damages provision provided for one-half of annual compensation, that provision was unrealistically out of proportion to the actual damages and was therefore unenforceable. *Cad Cam*, 36 Ohio App.3d at 94. Similarly, where a liquidated damages provision that required payment of $40,000 on a $45,000 note, and the actual damages were $11,250, the court held the provision unconscionable. *Courtad v. Winner* (May 1, 2002), 9th Dist. No. 20630, 2002-Ohio-2094, 2002 WL 971778, at *4. Or where the liquidated damages provision provided for $7,696 in damages and the actual damages were $1,588, the court found the provision bore no reasonable relation to actual damages and was unenforceable. *K & A Cleaning Inc. v. Materni* (April 21, 2006), 6th Dist. No. L-05-1293, 2006-Ohio-1989, 2006 WL 1047477, at *1.  The opposite is also true; when the liquidated damages provision is manifestly lower than the damages suffered it is an unenforceable penalty.  In a case where the liquidated damages clause was for $250 and the damages suffered were $7,500, the court held the provision unenforceable.  *See State Auto*, 1987 WL 25749, at *3.

56.    In *Cad Cam*, an arbitrary formula tied to compensation generated a stipulated damage amount that bore no reasonable relationship to the employer's actual damages.  36 Ohio App.3d at 94.  That is also the case here.

57.    On September 15, 2020, the Oak Cliff executed the Listing Agreement.  On March 14, 2021, the Listing Agreement automatically renewed for 180 days because neither side

terminated. The next 180 period commenced and was set to renew on September 10, 2021. Under the terms of the Listing Agreement, for Oak Cliff to properly terminate the agreement it should have notified Dade on or before August 26, 2021, at least 15 days before September 10, 2021. On September 1, 2021, a mere six (6) days after the automatic renewal, Benjie Smith informed Dade via email that Oak Cliff terminated the Listing Agreement.

58.     Dade's alleged actual damages are confined to a SIX (6) day window from August 26, 2021, to September 1, 2021, wherein Dade believed the Listing Agreement was in effect, but Oak Cliff terminated it.  By seeking 20% of the listed sale price for the Shredder, Dade seeks not only its full commission of 10% under the Listing Agreement but also an additional 10% from Oak Cliff for an "early" termination that was SIX (6) days after the deadline Oak Cliff had to terminate. The $135,000 Dade seeks is double what it would have been entitled to receive <u>from Oak Cliff</u> had Dade sold the Shredder for the list price of $675,000.  There was never even any legitimate evidence that Dade could have sold the Shredder for $675,000, and in that entire one year period when the Listing Agreement was in effect, Oak Cliff did not have one single legitimate offer on the Shredder.  So, not only should the Arbitrator not awarded $135,000 based on in being a penalty, the Arbitrator should not have awarded $135,000 because it is based on a sale price that is pure conjecture at best.  In fact, after Oak Cliff terminated the Listing Agreement, the evidence established that on or about March 1, 2022 Oak Cliff sold the Shredder for $375,000.

```
9     Q -- a part of your life. And you sold it
10    for $375,000. You're going to take a loss. You
11    said that it keeps you -- essentially, it keeps
12    you up having to worry about how nmuch you're
13    going to lose. And now you're trying to tell me
14    that you don't know who you sold it to?
15    A. Bill Tigner.
```

Exhibit F, page 161 lines 9-15.

59.     Additionally, in Dade's discovery responses, Oak Cliff asked Dade to describe with particularity why Dade believed it was entitled to damages in this case. Dade responded with the following:

> "See Section 5 of the listing agreement, which states, 'any cancellation or termination prior to the listing agreement expiration for any reason, will incur a 20% fee of the listed value or Fair Market Value as determined by Dade Auctions, to you as the seller. Further, the actions of Oak Cliff –as shown by the Affidavit of Marty Feinberg executed on or about 1/13/2022 and previously provided to counsel for Oak Cliff –indicates that the early termination of the Contract frustrated Dade's ability to realize the reasonable expectation of its efforts."

*See* Exhibit G, Interrogatory No. 18.

60.     Accordingly, Dade admits that its only measure of damages Dade contemplated recovering was the liquidated damages provision in section 5 of the Listing Agreement, and Dade made no effort to calculate or even bother to determine what actual damages are in this case. For these reasons, the Award should be vacated.

## THE AWARD SHOULD BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS BY DEFINING THE "VALUE" OF THE SHREDDER

61.     Under R.C. 2711.10, a Court shall make an order vacating the award if the arbitrator exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. R.C. 2711.10 (D).[3]

62.     In this instance, the Award is based solely on the Arbitrator's calculation of $675,000 multiplied by 0.20 for a 20% "penalty" of $135,000. *See* Exhibit B. During Dade's presentation of evidence, Dade never established (i) the "listed value" of the Shredder or (ii) the

---

[3] The same standard applies in 9 U.S.C.A. Section 10: "Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." 9 U.S.C.A. § 10(4).

market value of the Shredder. There was zero evidence that $675,000 was the true <u>value</u> of the Shredder, and the $675,000 on Dade's auction listing was nothing more than a List <u>Price</u> that Oak Cliff sought for the Shredder. *See* Exhibit H, Dade Auctions Website Listing for the Shredder. There was, in fact, NEVER a "listed value" of the Shredder, and to the extent there was a "fair market value" of the Shredder, the "fair market value" must be recognized as the actual sale price of $375,000. The Arbitrator did nothing more than use an arbitrary List Price which in no way established "listed value" (which never existed in the first place) or a "fair market value" as set forth in the Section of the Listing Agreement.

63.     It is clear that the Arbitrator exceeded his powers and made an imperfect award because he imposed additional requirements on Oak Cliff by establishing that Dade's "Listed Value" actually meant "fair market value," when it is clear that the two terms are not the same meaning. Similar circumstances occurred in *Community Mem. Hosp. v. Mattar* wherein the Arbitrator's award was vacated because he imposed additional requirements on a doctor which established his sole cause for termination. (Ohio App. 6 Dist., 01-06-2006) 165 Ohio App.3d 49, 844 N.E.2d 894, 2006-Ohio-25. The same applies here. The Arbitrator cannot unilaterally decide <u>with no evidence</u> that the "value" of the Shredder equates to Dade's one-sided definition of the "Listed Value" contained on the Listing Agreement.

64.     The value of the Shredder is the fair market value established by the actual sale price of $375,000. The Arbitrator should not have considered the $675,000 price as the "Listed Value" or the "Fair Market Value" because that number was neither. He made an imperfect award which exceeded his authority

## VI.
### CONCLUSION

65.    The award issued by the Arbitrator violates the well-defined Ohio public policy concerning the inclusion of penalty clauses in contracts. The facts laid out in prior sections establish that the Arbitrator's decision to make his Award to Dade based solely on Section 5 of the Listing Agreement constitutes a penalty as construed against Oak Cliff. According to Ohio case law, Oak Cliff cannot be penalized for a "breach" when that conduct that amounts to the "breach" is inconsistent with the type of conduct which would amount to a separate tort justifying punitive damages. Additionally, the Arbitrator made such an imperfect award under R.C. 2711.10 (D) that it must be vacated due to his unilateral decision to impose additional requirements on Oak Cliff by establishing the "value" of the Shredder as Dade's "Listed Value" rather than the fair market value of the Shredder. For these reasons, the Arbitrator's award should be vacated.

Respectfully submitted,

*/s/ Christopher E. Cotter*
Christopher E. Cotter (84021)
ccotter@ralaw.com
Roetzel & Andress, LPA
222 South Main Street
Akron, OH  44308
330.376.2700

Lidia B. Ebersole (90509)
lebersole@ralaw.com
Roetzel & Andress, LPA
One SeaGate, Suite 1700
Toledo, OH  43604
419.242.7985

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing has been filed electronically on February 28, 2023. Notice of this filing will be sent by operation of the Court's Electronic Filing System.  Parties may access this filing through the Court's system.


*/s/ Christopher E. Cotter*
One of the Attorneys for Defendant