AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| Dade Auctions, Inc. | ) | **Case No: 01-21-0016-7725** |
| Claimant, | ) | |
| v. | ) | **INTERIM AWARD** |
| Oak Cliff Recycling, Inc., | ) | |
| Respondent. | ) | |
| | ) | |

Cary Cooper, having been designated as the Arbitrator in accordance with the September 15, 2020, agreement captioned "Dade Auctions Equipment Listing and Consignment Agreement for Auction and Buy It Now Listings" ("Agreement"), between Dade Auctions, Inc., and Oak Cliff Recycling, Inc., and having been duly sworn and having heard the allegations and the proofs of the Parties, hereby Awards as follows:

## Jurisdiction

This dispute arises under the Agreement, which grants authority for arbitration of disputes under the Commercial Arbitration Rules of the American Arbitration Association. By agreement of the Parties and the Order of the Arbitrator, the Federal Arbitration Act applies to this arbitration procedurally, and Ohio law applies substantively to the arbitration.

## Procedural History

Dade Auctions, Inc. ("Dade Auctions" or "Dade") filed this arbitration on October 4, 2021, seeking $135,000 in damages and recovery of its attorney fees and costs alleging that Oak Cliff Recycling, Inc. ("Oak Cliff") beached the Agreement. On May 25, 2022, Oak Cliff filed its Amended Answer and Counterclaim denying Dade Auctions' claim and seeking to recover its attorney fees and costs.

The Parties engaged in discovery and exchanged information. Counsel also filed a written stipulation of uncontested facts.

The final hearing was held remotely on August 8, 2022. Party representatives were present and represented by legal counsel. A court reporter recorded the

1

proceedings and provided a transcript to counsel and to the Arbitrator. Each Party called one witness and each witness testified and was cross-examined by opposing counsel. Each party offered exhibits.

Counsel for each party filed a closing brief, and the record was closed effective September 15, 2022.

**The Gist of the Dispute**

Dade Auctions, an equipment broker, agreed to assist Oak Cliff with the sale of an automotive shredder that Oak Cliff used in its steel recycling business. In exchange, for a successful sale Oak Cliff agreed to pay Dade 10% of the sale proceeds.

On September 1, 2021, Oak Cliff emailed a notice cancelling the Agreement and directing Dade to terminate the listing. Under the terms of the Agreement, however, the notice was untimely and ineffective to cancel the Agreement.

Dade Auctions now seeks, under ¶ 5 of the Agreement, to recover $135,000, which is 20% of the $675,000 sale price set by Oak Cliff at the time. Dade asserts that the parties contemplated and agreed on a 20% fee, that the 20% fee comprises a 10% seller's fee and a 10% buyer's fee, and that the fee is liquidated damages for Dade's loss of opportunity to sell the shredder.

In defense, Oak Cliff asserts that the stipulated amount of 20% constitutes an unlawful penalty under Ohio law and that Dade is not entitled to any relief.

The Agreement contains, among other things, the following provisions:

- Listing this equipment on other sites or with other brokers is cause for early termination of this contract and listing and will incur a 20% fee of the listed value or fair Market Value as determined by Dade Auctions. (¶ **1. Consignment.**)

- Seller hereby authorizes Consignee to sell any or all of the Equipment listed on Exhibit A attached hereto in the ordinary course of Consignee's business on Seller's behalf, and further agrees that Consignee shall retain 10% of the sale as a consignment fee for Consignee's sale of such Equipment. (¶ **4. Sale of Equipment Fee; Allocation of Proceeds; Payments to Seller Upon Sale.**)

- Any cancellation or termination prior to the listing agreement expiration for any reason, will incur a 20% fee of the listed value

2

or Fair Market Value as determined by Dade Auctions, to you as seller. **(¶ 5. Commitment to Sell, Exclusivity and Early Termination of Auction and Listing.)**

- In the event of loss of equipment while a binding offer has been accepted by the Seller, the Seller hereby agrees to subrogate the consignee to the insurance proceeds in an amount equal to the fee due to the consignee by both the Buyer and Seller. **(¶ 8. Risk of Loss or Damage.)**

- The prevailing party shall be entitled to reimbursement for all expenses incurred in collecting the above scheduled fees including attorney fees, arbitration cost and court cost. **(¶ 17. Arbitration.)**

The principal focus of both the evidence and arguments of Counsel was whether the above stated reference to a 20% fee in **¶ 5 Commitment to Sell, Exclusivity and Early Termination of Auction and Listing** is a lawful liquidated damages provision or an unlawful penalty under Ohio law.

**Stipulated Facts**

As noted above, the Parties entered into a written stipulation of facts as follows:

1. Oak Cliff Recycling, Inc. (Hereinafter "Oak Cliff") listed an item for sale on Dade Auctions, Inc's (Hereinafter "Dade") auction site.

2. Oak Cliff admits it entered into the Listing Agreement with Claimant on September 15th, 2020.

3. Said listing agreement automatically renewed for another 180-day period on or about March 14th, 2021.

4. The listing agreement renewed for a second 180-day period on September 10th, 2021.

5. In order to terminate, the plain language of the listing agreement required written notice 15 days prior to renewal.

6. 15 days prior to September 10th, 2021, was August 26th, 2021.

7. Oak Cliff provided notice of termination on September 1st, 2021.

3

8. There is an early termination penalty included in the Listing Agreement made basis of this Arbitration.

9. The Listing Agreement contains a provision that penalizes Oak Cliff in the amount of 20% of the listed value of the auction item should early termination occur.

10. Benjie Smith – on behalf of Oak Cliff – sent an email on September 24th, 2021, to Dade stateing "we do not have any commitments as we speak."

11. On October 15th, 2021, Benjie Smith – on behalf of Oak Cliff, stated in an email – with respect to prospective purchaser Marty Feinberg – "I have avoided him for months. He has been told I do not want to sell my shredder as my listing agreement with Dade doesn't exist anymore."

12. Dade pursues this arbitration to collect a 20% penalty to which Dade believes it is entitled.

13. The only relief Dade seeks in this arbitration is an award of the 20% penalty of $135,000 to which Dade believes it is entitled plus interest thereon, attorneys' fees, and arbitration costs.

**Background and Summary of Claims**

Dade Auctions, of Toledo, Ohio, is in the brokerage business and maintains a website for the listing and sale of equipment used in the salvage, recycling, and waste industry to customers worldwide. Dade Auctions, in business since 1985, represents the interests of sellers, buyers, and sometimes both the buyer and the seller of the equipment. Dade Auctions also publishes a monthly newspaper for the salvage, recycling, and waste industry that it distributes to some 28,000 of its subscribing customers.

A sister corporation, Dade Capital, has engaged in financing the purchase of new and used equipment in the salvage, recycling, and waste industry for 38 years.

Oak Cliff, located in Waxahatchie, Texas, is in the business of buying and selling steel scrap, and preparing the steel for sale to mills for recycling. Oak Cliff has been in business for about 22 years.

David Fournier, Sr., a current Board member of Dade Auctions and Dade Capital, and the former President of both companies, testified for Dade Auctions.

4

Benjie Smith, the owner and President of Oak Cliff, testified for Oak Cliff.

Although Fournier and Smith had never met personally before entering into the transaction resulting in this arbitration, they had done business together on the telephone over the course of several years going back to the early 2000's. These prior business transactions were with Dade Capital and involved only financing for Oak Cliff's purchases of equipment from third parties.

The transaction leading to this arbitration was the first transaction between Dade Auctions and Oak Cliff respecting the website listing for the purchase or sale of equipment.

Fournier testified that in the summer of 2020, he received a telephone call from a customer suggesting that Fournier may want to call Smith because Smith had some equipment that he wanted to sell.

Fournier called Smith and based on the discussion Smith decided to list Oak Cliff's large Harris-built automobile shredder for sale on the Dade Auctions' website. Oak Cliff originally purchased the shredder new from the manufacturer in 2012.

Fournier testified that he explained Dade Auctions' listing services for the sale of Oak Cliff's shredder, including the terms of the listing Agreement. Fourier testified that he could not recall everything that he discussed with Smith but stated that it is his practice, and of all salespeople at Dade, to discuss the entire contract including the seller's and buyer's premiums or fees. (Tr. 21-22, 95).

The shredder would remain at Oak Cliff's place of business in Texas and Dade would advertise the equipment, together with pictures and a description of the shredder in its listings, published on the internet and monthly to some of its 55,000 customers worldwide. Smith set the sale price for the Harris shredder at $750,000.

Based on the discussions with Smith, Fournier prepared the listing Agreement and emailed it to Smith for review, comment, and signature. Smith signed the listing Agreement electronically and returned it to Dade Auctions, effective September 15, 2020.

Upon receiving the signed listing Agreement, Dade Auctions prepared the listing document which included a complete description of the Harris shredder together with pictures and other information describing the shredder provided by Smith, and Dade Auctions sent a copy of the listing document to Oak Cliff for review and approval.

After receiving Oak Cliff's approval of the listing document, Dade Auctions published the listing document on its website "live" and sent monthly notices of the live

listing to customers. Fournier testified that Dade Auctions continued to list the Harris shredder in its publications, in its monthly newspaper and on the internet, and gave priority to the Harris shredder over smaller pieces of equipment. And Dade Auctions sent monthly reports including the live listing to Oak Cliff.

Fournier testified that when the listing document "went live" on the internet, the system generated and sent a thank-you email and a link to the live listing document to Smith at Oak Cliff and encouraged Smith to review it for accuracy. (Tr. 35).

Fournier explained when the website was activated or "went live" the program added information including instructions to potential buyers on how to use the website including the use of "buttons" to push to "Buy Now", "To make an Offer", "To ask Questions", and to "Arrange an Inspection". (Tr. 63).

The activated program also adds information advising potential buyers that if they go through the website to buy the shredder, they must pay a buyer's fee or premium amounting to 10% of the purchase price, thus informing not only the potential buyers of the buyers' fee but also anyone who looks at the website, including the seller. (Tr. 30-32).

According to Fournier, Dade Auction's marketing methods have been successful in the past. In response to a question on cross-examination as to how many automotive shredders Dade had sold in the last five years, Fournier said that Dade had sold between 15 and 20 over the past five years for prices ranging from $5,500,000 down to $500,000. (Tr. 108).

Oak Cliff's counsel cross-examined Fournier about Exhibit R-5, a copy of the four-page listing document containing pictures and information about the shredder. In response to counsel's question, "this is the exact listing from Dade's website; is that correct, sir", Fournier said "no". Fournier then explained that Exhibit R-5 was only a screenshot of the listing document after Oak Cliff directed Dade Auctions to take-down the listing because Oak Cliff decided it no longer wanted to sell the shredder but had other plans. (Tr. 60-66).

Fournier also explained that the word "ended" in the upper righthand corner of the first page of Exhibit R-5 signified that the website service provider had deactivated or had taken down the website program. Fournier further explained that when the service provider deactivates the website all information respecting instructions to potential buyers together with the "buttons" discussed above, as well as the reference to the buyer's premium is deleted from the website. The only thing left is a copy of the original listing document with the "ended" notation as shown on Exhibit R-5. (Tr. 61-63).

6

The Agreement provides for an initial term of 180 days and for automatic renewals of 180 days until the sale is completed or until Oak Cliff gives a cancellation notice 15 days before the end of the Agreement.

Oak Cliff did not give a 15-day notice of cancellation of the initial 180-day term and the Agreement auto-renewed for a second 180-day term beginning on March 14, 2021 and running through September 14, 2021.

Although Dade Auctions did not receive any offers to purchase the shredder during the first term Dade did receive some requests during both the first and second terms of the Agreement from people expressing interest in inspecting the shredder. Dade forwarded those inspection requests to Oak Cliff.

One such request for inspection came to Dade Auctions on September 18, 2020, Exhibit 4, pages 38 and 39 of Dade's exhibits. The request was from Bill Tigner of Industrial Service Solutions-Recycling Technologies. Dade Auctions forwarded the request to Sheldon Smith, Benjie's Smith's son, who also worked for Oak Cliff, asking Sheldon Smith to call Bill Tigner and schedule an inspection. Dade also sent a copy of Bill Tigner's inspection request to Benjie Smith. Sheldon Smith responded to Dade Auctions the same day, September 18, 2020, stating that he had already scheduled the inspection visit for Bill Tigner to inspect the shredder. See Exhibit 4. (Tr. 162-65).

On May 5, 2021, Oak Cliff notified Dade Auctions that Oak Cliff wanted to reduce the asking price for the shredder from $750,000 to $675,000. Fournier testified that Smith told him that Oak Cliff had already purchased new equipment to replace the Harris shredder and that Smith also wanted to amend the listing document to show that Oak Cliff would dismantle the shredder and load it on trucks for a buyer. Dade Auctions lowered the price and changed the listing as Oak Cliff requested; see Exhibit R-5 at p. 2. (Tr. 40-42).

Four months later, on September 1, 2021, Smith sent a notice to Dade Auctions, saying that Oak Cliff wants to remove the shredder from the listing because he, Smith, wants "to do something else with the equipment." (Tr. 37).

Oak Cliff's notice cancelling the Agreement, however, was not timely made and therefore ineffective to terminate the Agreement and preclude auto-renewal for a third term. In order to cancel the Agreement at the end of the second term, i.e. September 10, 2021, Oak Cliff had to give notice on or before August 26, 2921. But Oak Cliff's September 1, 2021, notice was six days late. The notice, therefore, was not effective to cancel the agreement. And by its terms, the Agreement renewed for a third term for 180 days through March 9, 2022.

Oak Cliff, however, refused to go forward with a new third term and directed Dade Auctions to take down the listing document.

7

During cross-examination of Fournier, Oak Cliff's legal counsel introduced Exhibit R-6, a single document showing an email from Dave Fournier, Jr., Counsel for Dade Auctions, to Smith, and an email reply from Smith to Fournier, Jr. Both emails are dated October 15, 2021. (Tr. 72-76).

Fournier, Jr.'s email states that Dade has been working with a potential buyer, Marty Feinberg, who is interested in buying Oak Cliff's shredder. Fournier, Jr. further states that if Feinberg and Oak Cliff can agree on a price, Dade will relist the shredder and that Oak Cliff's obligation will only be to pay the 10% seller's fee plus Dade's then current fees and costs incurred in the Arbitration. Fournier, Jr.'s email also states that Feinberg will agree to pay a 5% buyers' fee of the sale price to be agreed upon by Oak Cliff and Feinberg. (Id.)

Smith's October 15, 2021, reply email stated that he has avoided Feinberg "for months". Smith's email further states that he, Smith, told Feinberg that Smith does "not want to sell [sic] shredder as my listing agreement with Dade doesn't not [sic] exist anymore," and that he, Smith, "has other plans for the shredder."

Although Smith never testified what his "other plans" were, he testified on direct examination at the August 8, 2022, final hearing, that he sold the shredder for $375,000 "about 35 days ago", which would have been about July 1, 2022. Smith said that he "had to just dump it and get something a little bit better that just scrap price for it". Smith also testified on direct examination that the eventual buyer first approached him in about March or April of 2022. But in response to a question on cross examination asking if Oak Cliff sold the shredder on March 1, 2022, or "somewhere back in there." Smith said he didn't recall the exact date. (Tr. 146, 151).

Also, in response to questions by Oak cliff's counsel on direct examination, Smith testified (Tr. 150-151) as follows:

> Q. And the buyer on this, and we're not going to talk about who the buyer is. It doesn't matter and I don't know if it's private. But the buyer on this was not somebody that came to you as a result of the auction being listed previously with Dade, correct?
> A. That's correct.
> Q. And when did this buyer first approach you? I mean, you sold it about 35 days ago, you said. But how long ago did the buyer approach you? I'm not asking how you find the buyer, but when did you and the buyer first communicate? Not when they approached you but how did you first communicate?
> A. Well, don't hold me to this but I want to say they first approached me, you know, first of March, somewhere in there. Maybe April.
> The Arbitrator: What year, sir? What year?

8

The Witness: Of this year, '22. Sorry.

On cross-examination, Dade's counsel asked Smith who purchased the shredder. Smith said he couldn't recall the name of the company and that he could only recall that the buyer was out of Houston. In response to a series of questions by Dade's counsel as to whether the name Bill Tigner "rings a bell" Smith said that he didn't know but thinks he may have heard the name before. Dade's counsel then mentioned the name Industrial Service Solutions, and Smith said maybe that's it but that he couldn't remember. (Tr. 155-56).

In response to more questions as to whether Tigner was the buyer Smith said he thinks he talked to Tigner but not sure – maybe that's him. At one point Smith told Dade's counsel that it was none of his business who bought the shredder. (Tr. 159).

Counsel posed a fresh set of questions, and Smith identified the buyer as Bill Tigner. (Id.)

Smith said that to his best recollection he had not met Tigner through Dade Auctions or Dade Capital. Smith also said that he was not aware that Tigner sent an email asking to inspect the shredder in September 18, 2020 as discussed above respecting Exhibit 4. Smith also said that if he knew Tigner had requested an inspection on September 18, 2020, Smith, had no recollection it.

On redirect, Smith said that Mike Tigner worked for Industrial Service Solutions Technologies, and that he knew it was the company that manufactured the control system for Oak Cliff's shredder in this case. Smith also said that:

> ... And I (Smith) guess he (Mike Tigner) knew that I was trying to sell the machine, so he had somebody to sell it to so here we go. So I sold it to him. (Tr. 172-73).

Smith testified that he initially contacted Fournier because he had a shredder to sell and knew that Fournier sold equipment. Smith said the only thing Fournier told him was that the contract would be for six months, and that Smith would have to pay a 10% fee if the shredder sold. Smith said the discussion was loosey-goosey. (Tr. 130). Smith said he received, read, and signed the Agreement but that he probably did not read it as carefully as he should have. (Tr. 131). Smith said Fournier never mentioned the buyer's fee, and that he, Smith, never saw or received a copy of the "live" listing, that he never looked it up on the website, and that he never saw any monthly reports. (Tr. 137, 174-75).

Dade Auctions initiated this Arbitration on October 4, 2021, against Oak Cliff alleging that Oak Cliff breached the Agreement and seeks to recover liquidated damages

9

of $135,000 (20% of the then listed sale price of the shredder) as provided in the Agreement, plus attorney fees and costs.

Oak Cliff denies that it breached the Agreement, asserts that the Agreement's stipulated damage provision for 20% of the listed purchase price is an unlawful penalty under Ohio law, and seeks to recover its attorney fees and costs as the prevailing party.

**Discussion and Decision**

As noted above, ¶ 5 of the Agreement provides as follows:

> Any cancellation or termination prior to the listing agreement expiration for any reason, will incur a 20% fee of the listed value or Fair Market Value as determined by Dade Auctions, to you as seller.

The determinative issue here is whether this provision in ¶ 5 of the Agreement is a lawful liquidated damages provision or an unlawful penalty under Ohio law.

Ohio courts have long held that "whether a particular sum specified in a contract is intended as a **penalty** or as **liquidated damages** depends upon the operative facts and circumstances surrounding each particular case." *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St. 3d 27, 29 (1984) (bold emphasis in original), and citing *Jones v. Stevens*, 112 Ohio St. 43 (1925). The Court also noted in *Samson Sales* that "reasonable compensation for actual damages is the legitimate objective of such liquidated damage provisions and where the amount specified is manifestly inequitable and unrealistic, courts will ordinarily regard it as a penalty. *Samson Sales* at 28.

In *Samson Sales*, the Court adhered to the three-part test described in *Jones v. Stevens*, as follows:

> "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as **liquidated damages** and not as **penalty**, if the damages would be (1) uncertain as to amount and difficult of proof, and it (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and it (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof."

10

The Court in *Samson Sales* also stated that "whether a particular sum specified in a contract is intended as a **penalty** or as **liquidated damages** depends upon the operative facts and circumstances surrounding each particular case." (*Samson Sales*, at 28-29, emphasis in original).

Oak Cliff asserts that the 20% damages provision does not meet any of the three requirements of *Samson Sales* and that the 20% provision is an unenforceable penalty under Ohio law. The Arbitrator, however, disagrees with Oak Cliff's position for the following reasons:

### (1) The damages in this case are uncertain as to amount and difficult of proof.

The uncertainty of the damages arises from the uncertainty of the market value and the amount that a willing buyer will pay for the shredder at any given time. And in fact, the evidence here demonstrated that uncertainty as to value and price – Oak Cliff's original listing price was $750,000; Oak Cliff later dropped its asking price to $675,000; and eventually accepted $375,000, an amount that Smith characterized as "barely above scrap value."

In cases where the amount to be paid may vary from time to time, such as in the case for the sale of real estate, Ohio law recognizes that the amount of a sales commission fixed by the parties will be treated as liquidated damages. See *Norpac Realty Co. v. Schackne*, 107 Ohio St. 425 (1923); *Kurtz v. Western Property, LLC*, 2011 W.L. 6916196, 2011-Ohio-6726 (10th Dist., Franklin, 2011); *Triangle Properties, Inc. v. Homewood Corporation*, 3 N.E. 3d 241 (2013), 22013-Ohio-392641, (10th Distr. Franklin, 2013). And given the uncertainty and changing nature of the sale price for a used shredder, the same rule applies in this case as the damages are uncertain as to amount and difficult of proof.

Looking at the contract at the time it was made, as the Arbitrator is required to do, the Parties' agreed to fix damages for a breach by Oak Cliff as a percentage of the listed value, as a reasonable way to set the liquidated damages. Oak Cliff determined the original list price and Oak Cliff was able to reduce its asking price in an effort to induce a potential sale.

### (2) The contract, as-a-whole, is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties.

The parties themselves fixed the damages at 20% of the purchase price. Fournier testified that at the time the contract was made Dade's standard seller's fee was 10% of the sale price, and the standard buyer's fee was also 10% of the sale price. Oak Cliff set

11

the original price that it wanted to sell the shredder for and had control over what it would accept as the purchase price for its shredder. And Oak Cliff reduced its listing price on one occasion.

The Agreement states in two places that if Oak Cliff breaches the Agreement, it must pay a fee of 20% of the listed value. (¶¶ 1, 5) The Agreement also states in ¶ 4 that the Seller's fee is to be 10%. And in ¶ 8, **Risk of Loss or Damage,** the Agreement provides that in the event of loss of the shredder while an offer has been accepted, the Seller must subrogate Dade Auctions to any insurance proceeds to an amount equal to the fee due to Dade *by both the Buyer and Seller (italics added).*

Coupling the above provisions in the Agreement with Fournier's credible testimony respecting Dade's standard business procedures and his practice of discussing the terms of the Agreement with potential sellers and with Smith in particular, the Arbitrator cannot say that the amount of the liquidated damages is so disproportionate in amount as to justify the conclusion that it does not express the true intent of the parties.

### (3) The contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach of the contract.

In light of all the evidence, including the backgrounds and experiences of the parties in the salvage, recycling, and waste industry, the testimony and exhibits of the parties respecting the facts, the events leading up to the discussions and making of the Agreement, the Arbitrator concludes that damages of $135,000, which is 20% of the listed sale price of the shredder at the time of the breach, does indeed reflect the intention of the parties.

Oak Cliff argues that the 20% fee should be treated as a penalty because Dade's Arbitration Demand uses the word "penalty". The Demand states, in part, that the Agreement automatically renews for a new 180-day term unless Oak Cliff gives timely notice to terminate, and that failure to give timely notice "resulted in a penalty equal to 20% of the listed value". Oak Cliff also points out that on cross-examination, Fournier agreed with everything stated in the Arbitration Demand, (Oak Cliff Post Hearing St. at 3-4).

The Arbitrator notes that the parties used the word "penalty" in their written stipulated facts numbered 8, 9, 12, and 13, see pp. 3-4, above. Neither party referred to or commented on the "penalty" references in the written Stipulations, in their briefs or at the August 8, 2022, final hearing. The Arbitrator will treat the references to the word "penalty" in the Stipulations the same as the use of the word "penalty' in the Arbitration Demand.

Under Ohio law, use of the word penalty "is some evidence, though not conclusive evidence" of the parties' intentions. *Easton Telecom Services, L.L.C. v. CoreComm Internet Group, Inc.,* 216 Fed. Supp. 2d 695 (N.D. Ohio, 2002). Whether a liquidated damages provision "is an unenforceable penalty is a matter of law to be determined by the Court in light of all the circumstances. (Id., at 699, and nt.5). For the reasons discussed above, the Arbitrator finds that the clause is an enforceable liquidated damages clause under Ohio law, and that use of the word "penalty" in the Arbitration Demand and in the Stipulation of Facts is not conclusive evidence of the parties' intentions.

And as noted below, the damages are to be determined based on the listed value at the time of the breach, here $675,000 as of September 2021.

Oak Cliff's sale of the shredder for $375,000, sometime in the spring or summer of 2022 was for a price that Smith described as "barely above scrap value", which low price may well have been due to pressure on Smith to sell, which pressure may likely have been of Smith's own making. Smith testified that he had agreed with the City of Waxahatchie that he would not use the large Harris shredder and that he needed to move it out to make way for a new shredder that he had purchased and needed to install in the same location. (Tr. 129, 132-33,135).

Fournier testified that the purpose of the 20% early termination fee in ¶ 5 of the Agreement is to make Dade whole if the Agreement is terminated early by the seller. (Tr. 32). According to Fournier, the fee is "what my losses are if I don't sell the piece of equipment," and "the opportunity that I have lost by the customer cancelling the contract." (Tr. 103,106). Otherwise stated, when Oak Cliff directed Dade to shut-down the listing Oak Cliff breached the Agreement, and Dade's damages included not only the loss of opportunity to earn the seller's fee but also the loss of opportunity to earn the buyer's fee – which damages were both foreseeable and the direct result of Oak Cliff's breach of the listing Agreement.

Based on all the operative facts and circumstances the Arbitrator concludes that the liquidated damages provision was intended to and does fairly compensate Dade for its loss of the benefit of the bargain; the fee is not to punish Oak Cliff.

**Damages**

As discussed above, the Arbitrator has determined that ¶ 5. **Commitment to Sell, Exclusivity, and Early Termination of Auction and Listing,** is a lawful liquidated damages clause under Ohio law.

Oak Cliff further contends that Dade is not entitled to any damages for the stated reason that Dade had only a six-day window for determining its damages, and since the

13

shredder was not sold within that six- day window Dade sustained no damages. (Oak Cliff Post Hearing St. at 9). Oak Cliff's notion of a limited six-day window is apparently based on the fact that Oak Cliff's termination notice was six days late and at a time when Dade "believed the Listing Agreement had renewed when it had not." (Id.). In other words, Oak Cliff's theory is that Dade did not sustain damages within the six days and therefore is not entitled to any damages. Oak Cliff's notion and argument of a six-day window is without merit.

In *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376 (1993), as here, the defendant did not exercise the contractual right to terminate an agreement within the time permitted in the contract. And the Ohio Supreme Court held that such contracts are to be treated like option contracts, and a party can only exercise its option in the manner provided in the contract. (Id. at 379-80).

The Court in *lake Ridge Academy* held that if the defendant misses the window of opportunity to exercise the right to terminate, the right to terminate is lost. Oak Cliff missed the date to exercise its option and the Agreement renewed for an additional 180-day term. Instead of performing its obligation to continue to list the shredder for sale under the renewed contract, Oak Cliff refused to continue the listing and directed Dade to shut-down the listing, in breach of the new 180-day term of the Agreement.

Dade Auctions is entitled to recover damages determined as of the date of Oak Cliff's breach of the Agreement, September 2021, when the listed sale price fixed by Oak Cliff was $675,000. Thus, the amount of the liquidated damages is 20% of $675,000, amounting to liquidated damages of $135,000.

## Interim Award

The Arbitrator finds that Respondent Oak Cliff Recycling, Inc. breached the Agreement and Awards damages against Respondent and in favor of Claimant Dade Auctions, Inc. as follows:

a) $135,000 against Oak Cliff Recycling, Inc. and in favor of Dade Auctions, Inc., plus interest at the rate permitted under Ohio law from the date hereof until paid in full; and
b) For attorney fees and costs.

Dade Auctions is to submit its request for attorney fees and costs, including a detailed statement of the legal services provided, the date the service was provided, the time devoted to the service provided, the rate charged, and to itemize its costs and expenses. Dade's request is to be filed and a copy served on Respondent's counsel on or before October 31, 2022. Respondent may file a response on or before November 14, 2022.

This Interim Award will remain in full force and effect until the Arbitrator renders a Final Award. The Interim Award is in full settlement of all claims and counterclaims referenced herein. The Arbitrator retains jurisdiction to decide the issue of Attorney Fees and Costs.

IT IS SO ORDERED.
October 17, 2022.

_____
Cary R. Cooper
Arbitrator