AMERICAN ARBITRATION ASSOCIATION

- - - - -

| | |
|---|---|
| DADE AUCTIONS, INC., | ) Case No. |
| | ) 01-21-0016-7725 |
| Claimant, | ) |
| | ) |
| vs. | ) Arbitrator Cary |
| | ) R. Cooper |
| OAK CLIFF RECYCLING, INC., | ) |
| | ) |
| Respondent. | ) |

- - - - -

August 8, 2022
10:05 a.m.

Reported By:
U.S. Legal Support
888-644-8080

Christine Zarife Green, RPR, CRI, Notary Public

1          REMOTE APPEARANCES:

2

3              On behalf of the Claimant:
                     DENNIS E. SAWAN, ESQ.
4                    Sawan & Sawan, LLC
                     416 N. Erie Street
5                    Suite 200A
                     Toledo, OH  43604
6                    419-900-0955
                     des@sawanandsawan.com
7

8

9              On behalf of the Respondent:
                     BRANCH M. SHEPPARD, ESQ.
                     JONATHON W. AUSTIN, ESQ.
10                   Galloway, Johnson, Tompkins,
                     Burr & Smith
11                   1301 McKinney Street
                     Suite 1400
12                   Houston, TX  77010
                     713-599-0700
13                   bsheppard@gallowaylawfirm.com
                     jaustin@gallowaylawfirm.com
14

15                        - - - - -

16

17

18          ALSO PRESENT:

                     David Fournier
19                   Benjie Smith
                     Daniel Schreimann
20

21                        - - - - -

22

23

24

25

1                         I N D E X

2                                          Page   Line

3        REMOTE APPEARANCES.....................  2      1

4

5        INDEX OF EXHIBITS.....................  4      1

6

7
         Direct Examination of David...........  13     20
8        Fournier, Sr. By Mr. Sawan
         Cross-Examination of David Fournier, ..  53     2
9        Sr. By Mr. Sheppard
         Redirect Examination of David .........  118    16
10       Fournier, Sr. By Mr. Sawan
         Direct Examination of Benjie Smith.....  126    2
11       By Mr. Sheppard
         Cross-Examination of Benjie Smith......  154    25
12       By Mr. Sawan
         Redirect Examination of Benjie Smith...  176    12
13       By Mr. Sheppard

14

15
16       REPORTER'S CERTIFICATE................. 191     2

17

18                    EXHIBIT CUSTODY:

19         Original Exhibits Retained by Counsel

20

21                     - - - - -

22

23

24

25

1                    INDEX OF EXHIBITS

2        NUMBER              DESCRIPTION          Page   Line

3    Exhibit 1         Dade Auctions Equipment ....  28     4
                       Listing and Consignment
4                      Agreement For Auction and
                       Buy It Now Listings
5
     Exhibit 2         May 5, 2021 Email..........  42    18
6
     Exhibit R-5       Shredder Listing on Dade's .  60     4
7                      Site

8    Exhibit R-6       October 25, 2021 Email......  72     7

9    Exhibit R-7       WhatsApp Messages...........  78    19

10   Exhibit R-1       Demand For Arbitration......  87     3

11   Exhibit R-3       September 1, 2021 Email.....  116     3

12   Exhibit 4         Email String...............  163     1

13

14                          - - - - -

15

16

17

18

19

20

21

22

23

24

25

1              THE ARBITRATOR:  We're here this

2        morning, let the record show, for a final hearing

3        in this case, Dade Auctions v. Oak Cliff.  I've

4        had all the pleadings filed.  Outstanding, I

5        think, with respect to hearing exhibits that was

6        filed on behalf of Dade Auctions, and there have

7        been objections to those exhibits.  It's been

8        well briefed.

9              I'm going to take that under advisement

10       for now and make a ruling with respect to the

11       admission of those exhibits, as part of the file

12       resolution.  Is that acceptable to counsel?

13             The joint stipulations that have been

14       filed by the parties, I'd like to get agreement

15       on the admission of the joint stipulations.  Is

16       counsel in agreement on those, that they may be

17       submitted as a part of the record?

18             MR. SAWAN:  Yes.

19             MR. SHEPPARD:  Yes.  Numbers 1 through

20       13, that's correct.

21             THE ARBITRATOR:  All right.  Thank you.

22       I think that's it for now.  I guess we're ready

23       to proceed.  And I don't know if counsel wants to

24       make an opening argument or not.  I don't know

25       that it's necessary.

1              I think the facts are pretty -- fairly

2      straightforward.  So unless counsel wishes to

3      make an opening statement, why don't we go ahead

4      with the evidence filed by the Claimant or to be

5      submitted by Claimant, Dade Auctions.

6              Mr. Sawan --

7              MR. SAWAN:  I think we've agreed that we

8      can dispense with opening statements.  The less

9      you hear from us, the more you hear from our

10     clients.  It's probably the best.

11             THE ARBITRATOR:  Mr. Sheppard, are you

12     in agreement?

13             MR. SHEPPARD:  Yes, sir, that's correct.

14     I would ask, if I may, Mr. Cooper, with respect

15     to the exhibits and the objections that we had, I

16     don't know if Mr. Sawan intends to admit certain

17     exhibits during -- or seek to admit certain

18     exhibits during the direct examination.

19             But I guess those issues are going to

20     come up during the examination.  So I'm not sure

21     how you want to address that, if you're going to

22     take that under advisement.

23             MR. SAWAN:  For sake of simplicity,

24     some, I may not even reference at all.  And so

25     depending on, sort of, the way in which direct

1          goes, some I'll use, some I may not.  So I think

2          the need for Mr. Cooper to rule on everything

3          right now, it may make more sense just wait until

4          I attempt to admit them.

5                    THE ARBITRATOR:  Very well.  Mr. Sawan,

6          your first witness.

7                    MR. SAWAN:  Yes, sir.  Before I do that,

8          I did not see a prehearing brief of the

9          Respondent, and I just want to ensure that that

10         was not -- because one was filed and just not

11         sent to me or clarify --

12                   MR. SHEPPARD:  We sent one.  We sent one

13         to everybody.  Let me see.

14                   Mr. Cooper, you got it, right?

15                   THE ARBITRATOR:  What paper are we

16         speaking about?

17                   MR. SHEPPARD:  He's talking about the

18         prehearing brief.

19                   THE ARBITRATOR:  Yes.  What's the

20         question about it?

21                   MR. SAWAN:  Yeah, I don't believe I

22         received one.

23                   THE ARBITRATOR:  You were not served?

24                   MR. SAWAN:  Unless I missed it.

25                   MR. SHEPPARD:  Let me see.  It was due

1          on the 3rd.

2                    MR. SAWAN:  Wednesday, that's correct.

3                    MR. SHEPPARD:  Yeah, I sent it at 5:51

4          p.m. on the 3rd.

5                    MR. SAWAN:  Can you please forward that

6          to me?

7                    MR. SHEPPARD:  Sure.

8                    MR. SAWAN:  I don't believe I received

9          it.

10                    THE ARBITRATOR:  Is this the first time

11          you raised -- you didn't raise this before?

12                    MR. SHEPPARD:  No.  We have the -- what

13          do you call it?  The email response -- auto

14          response thing that it was received, but I'm

15          sending it again here.

16                    MR. SAWAN:  An auto response saying it

17          was received?

18                    MR. SHEPPARD:  No, not from you.  Well,

19          I guess not received, but the one that says it

20          was delivered.  Whichever that auto response is.

21                    MR. SAWAN:  I see Mr. Cooper says he

22          received mine at 4:43 p.m., (unintelligible)

23          5:08, and then I don't see anything after that.

24                    MR. SHEPPARD:  I just resent it.

25                    And then I also sent it -- Jonathon,

1      this is the one I sent in two emails too, isn't

2      it?

3              MR. AUSTIN:  Yeah.  It looks like Dennis

4      was CC'd on them.  I can forward them.

5              THE ARBITRATOR:  Certification does show

6      a service.  Mr. Sawan, I'm not going to -- what's

7      your pleasure with respect to presenting your

8      evidence this morning?  Subject to getting the

9      pretrial served on you, upon completion of the

10     hearing.  The opportunity to come back and

11     present additional evidence, if necessary, or do

12     you want to reset this now until you get served?

13             MR. SAWAN:  That's a good question.  I

14     mean, I hate to present something that's

15     incomplete or is not responsive to their

16     argument.  And I'm still, by the way, not getting

17     this email.  I don't know why.

18             MR. SHEPPARD:  I don't know why.  And

19     Mr. Cooper, this is the first we're hearing of

20     this at 9:15 on Monday morning.  I mean, this was

21     served, not in one email, but actually two

22     emails.  And I don't know why we're just hearing

23     it now, frankly.

24             MR. SAWAN:  I mean, it could have been

25     just the same that you didn't file a prehearing

1       brief.  He said the parties could if they wanted

2       to.

3               MR. SHEPPARD:  You know we're going to

4       file something.

5               MR. SAWAN:  I didn't assume that you

6       did.  I'm still not getting it, by the way.  I

7       still have not gotten it.

8               MR. AUSTIN:  Dps@sawanandsawan, right?

9               MR. SAWAN:  That's my dad's, not me.

10      Des.  There's never been dps used in this case

11      one time.

12              MR. AUSTIN:  That's where this is going.

13              MR. SHEPPARD:  That's the only email, I

14      think, we've ever used, isn't it?

15              MR. SAWAN:  Completely not true.

16              MR. SHEPPARD:  I've got dps -- dps is

17      your dad, you said?

18              MR. SAWAN:  That's correct.

19              MR. SHEPPARD:  Was your dad ever on any

20      of these emails?

21              MR. SAWAN:  Was he what?

22              MR. SHEPPARD:  Was your dad ever on any

23      of these emails?

24              MR. SAWAN:  No.  He's never been

25      involved in this case at all.

1          MR. SHEPPARD:  I don't know why I have

2     dps then here.  That's where -- yeah, it shows

3     Dennis P. Sawan.  And that's not you, that's your

4     dad?

5          MR. SAWAN:  That's correct.  Dennis Paul

6     Sawan.

7          THE ARBITRATOR:  Dennis, you did not

8     receive the brief; is that correct?

9          MR. SAWAN:  That's correct.

10          THE ARBITRATOR:  What do you want to do?

11          MR. SAWAN:  If I can just get -- if I

12     can just see it real quick, I would be able to

13     probably tell you.

14          MR. SHEPPARD:  I just sent it again to

15     des.

16          MR. SAWAN:  Then I should receive it

17     then.  Hold on.

18          THE ARBITRATOR:  You want to take 15

19     minutes or 30 minutes?

20          MR. SAWAN:  Yeah.  I mean, I may not

21     even need that long.  I mean, I think I generally

22     can anticipate what their arguments are going to

23     be, but I just wanted to make sure that there's

24     nothing in there that's -- so, yeah, as soon as I

25     get it, perhaps just recess for ten minutes, just

1           let me look it over real quick.

2                     THE ARBITRATOR:  Let's do that.  Why

3           don't we take ten minutes.

4                     MR. SAWAN:  But before we do that, let

5           me just actually receive it.

6                     THE ARBITRATOR:  All right.  That's

7           fine.

8                     MR. SHEPPARD:  I just sent one of two

9           and two of two again.  I wouldn't have gotten

10          your dad's email address if he wasn't in here

11          somewhere.  I never emailed him before.

12                    MR. SAWAN:  Maybe he was CC'd at some

13          point.  I don't know.  But he's never been

14          involved in this case, obviously.

15                    THE ARBITRATOR:  Let's take ten minutes,

16          and why don't you report back, Dennis.

17                    MR. SAWAN:  Okay.  I just received

18          everything so give me a chance to review this and

19          I'd like to come back at 10:26.  9:26 for you

20          guys.

21                       (A recess was taken.)

22                    THE ARBITRATOR:  Back on the record.

23          Mr. Sawan, what is your pleasure?  Mr. Sawan, can

24          you hear me?  Your microphone is off.

25                       (Discussion held off the record.)

1          THE ARBITRATOR:  Go ahead.

2          MR. SAWAN:  I've had a chance to

3     belatedly review the prehearing brief.  After

4     review and consultation with my client, I don't

5     think that any of the arguments included in that

6     prehearing brief are necessarily unexpected by

7     me.  Much of which was covered in our prehearing

8     brief already.  So I think in the interest of

9     (intelligible), let's just move this thing

10    forward.

11         THE ARBITRATOR:  Thank you very much.

12    You want to call your first witness, please?

13         MR. SAWAN:  I do.  Thank you.  We call

14    Dave Fournier, Sr.

15         THE ARBITRATOR:  Mr. Fournier, would you

16    raise your right hand, please.

17         DAVID FOURNIER, SR., of lawful age,

18    having been first duly sworn, was examined and

19    testified as follows:

20         THE ARBITRATOR:  You may proceed.

21    DIRECT EXAMINATION OF DAVID FOURNIER, SR.

22    BY MR. SAWAN:

23    Q.    Can you please state and spell your name

24    for the record?

25    A.    David, D-A-V-I-D; J, John; Fournier,

1       F-O-U-R-N-I-E-R.

2            Q.    And what is your occupation, currently?

3            A.    Currently, I am a board member of Dade

4       Capital and Dade Auctions.

5            Q.    And just for the sake of clarity, what

6       does Dade Capital do?

7            A.    Dade Capital, for the last 38 years, has

8       financed equipment for the salvage, recycling,

9       and waste industry.  And for a period of time, we

10      sold used equipment for the industry.  And Dade

11      Auctions is a selling site, particularly for the

12      salvage, recycling, and waste industry, or used

13      equipment.

14           Q.    And if you take me through a little bit

15      of a history of the Dade Auctions website, I'd

16      appreciate it.

17           A.    Dade Auctions' website was premiered

18      about five years ago, and it is set up as an

19      auction site.  It is also set up as a selling

20      site, where a buyer, not necessarily an auction

21      buyer, but an auction -- or a user can buy pieces

22      of equipment from sellers in the sellers

23      recycling and waste industry around the world.

24                 And it is a self-help site, whereby we

25      have a contract with a seller to sell his

1    equipment for him, and we have registered users

2    that sign up on Dade Auctions' site and buy the

3    equipment directly from the seller.

4         Q.    And so, basically, Dade Auctions could

5    represent the interests of either a seller, a

6    buyer, or both; is that correct?

7              MR. SHEPPARD:  Objection.

8         A.    That is correct.

9              MR. SAWAN:  What's that?

10        A.    That is correct.

11             MR. SAWAN:  Branch, did you --

12             MR. SHEPPARD:  That's all right.  I'll

13   move on.

14             MR. SAWAN:  Very well.

15        Q.    Dave, I will ask you, just for the sake

16   of the record, that you just pause for a moment

17   to permit Mr. Sheppard to interject with an

18   objection, if he's so inclined.

19             I will try to ask my questions such that

20   I don't cause an objection.

21             And Dave, when Dade Auctions represents

22   a seller to a transaction, how much does the

23   seller have to pay upon successful sale?

24        A.    Ten percent.

25        Q.    And, similarly, when Dade Auctions

1   represents the interest of a buyer to a

2   transaction, how much does Dade Auctions charge

3   to the buyer of a successful transaction?

4       A.    That is -- in this case -- in this case,

5   it was ten percent.

6       Q.    Okay.  And so in total, Dade Auctions'

7   business model is to receive 20 percent of the

8   total sale price of a typical transaction?

9               MR. SHEPPARD:  Objection.  It

10  mischaracterizes the testimony.

11              THE ARBITRATOR:  Overruled.

12      A.    At that point in time, yes.  We've

13  changed that slightly.  At this point, our

14  business model for the buyer side of things has

15  changed.

16      Q.    But at the relevant time period --

17      A.    Correct.

18      Q.    -- of the contract in this case, it

19  would have been 20 percent total?

20      A.    That is correct.

21      Q.    And to put a finer point on it, had the

22  particular shredder at issue been sold, subject

23  to the agreement with Mr. Smith, Dade would

24  derive an amount equal to 20 percent of the total

25  transaction cost?

1        A.      That is correct.

2                MR. SHEPPARD:  Objection.  Leading.

3        A.      That is correct.

4                MR. SHEPPARD:  Is that overruled,

5        Mr. Cooper?

6                THE ARBITRATOR:  Objection is overruled.

7        Q.      Okay.  A couple other foundational

8        questions about Dade Auctions.

9                Where does Dade Auctions render

10       services?

11       A.      Internationally.

12       Q.      And how long have you specifically been

13       in the salvage, recycling machinery business?

14       A.      Since 1985.

15       Q.      In your capacity with Dade Auctions,

16       what are your roles and duties?

17       A.      Less now than they used to be.  But at

18       the time of this transaction, I was president of

19       Dade Capital and I was president of Dade

20       Auctions.

21               And it is overseeing all of the

22       functions of the sales and gathering of

23       equipment.  We have 55,000 customers in our

24       database in the salvage, recycling, and waste

25       industry, primarily in the United States.

1          And so it's continuously contacting

2      those customers through various aspects of

3      advertising.  We additionally house American

4      Recycler Newspaper, the largest newspaper

5      publication in the industry.

6          It goes out on a monthly basis to about

7      28,000 customers in the industry.  And so it's a

8      coordination effort between all of the operating

9      -- operations of Dade Capital, Dade Auctions,

10     American Recycler, placing advertisements,

11     working with our customers, answering a lot of

12     questions with regard to equipment.

13          It is very complex and it is very

14     specific to one industry.

15     Q.    I'll ask a couple specific questions

16     about your role as president of Dade Auctions for

17     this relevant time period.

18          Were you responsible for overseeing

19     contract formation for sellers?

20     A.    Yes.

21     Q.    Were you responsible with communication

22     with sellers?

23     A.    Yes.

24     Q.    Were you responsible for being an

25     intermediary between potential buyers and

1     sellers?

2          A.    Dennis, yes, but we have so many buyers

3     and sellers.  And within this organization, we

4     sell and we list equipment on a daily, weekly,

5     monthly basis.  And so we have a sales manager,

6     we have a business manager, we had myself.

7               So we have salespeople here that answer

8     questions that buyers -- potential buyers are

9     calling and asking.  No one does it all.  It is a

10    very complex business.

11         Q.    I understand that.  So I guess I'll ask

12    it a different way then.  Did you oversee those

13    subordinates, so to speak?

14         A.    Absolutely.

15         Q.    Okay.  And in your role as president of

16    Dade Auctions, did you have occasion to meet

17    Benjie Smith?

18         A.    I've never met Benjie Smith.  We've

19    talked many times on the phone, emails, et

20    cetera, but I've never met Benjie Smith.

21         Q.    Assume that I mean "met" in the sense of

22    communicating with.

23         A.    Yes.  In that case, yes.

24         Q.    Not in the physical.  Okay.  And can you

25    recount, for the record, how that came to be --

1        A.      No.

2        Q.      -- that you had communication?

3        A.      Benjie and Oak Cliff go back with Dade

4        Capital for many years, probably early 2000.  And

5        we initially -- and I think the only thing that

6        we've done with Oak Cliff and Benjie Smith has

7        been provide financing for various projects for

8        him.

9                And I believe this is the first time

10       we've had a piece of equipment that was sold for

11       Benjie, or attempted to sell.

12       Q.      And, specifically, what was the type of

13       equipment, if you recall?

14       A.      That we were financing?

15       Q.      No, no, that you were selling.

16       A.      This was a large metal shredder that was

17       built by Harris.

18       Q.      And how did it come to pass that

19       Mr. Smith asked you about selling this shredder?

20       A.      We work with a lot of the sales reps

21       from all the manufacturers out there in the

22       industry, and I received a call from the Sierra

23       rep, Frank Baker, who said Benjie is selling his

24       shredder, you might want to give him a call, and

25       so I did.

1        Q.    And after that, I presume that you had a

2        conversation with him about the way in which the

3        contracts work with Dade, correct?

4        A.    Yes.  Correct.  We have that with every

5        customer.

6        Q.    And what was the nature of that

7        conversation?

8        A.    The nature of the conversation is how

9        the system worked.  What he wanted to accomplish,

10       as far as the sale with the -- how our contract

11       worked, what he was obligated to pay, based on

12       success -- a successful sale, what we were going

13       to do, and the pricing that he initially -- and

14       terms that he wanted to sell his shredder under.

15       Q.    And when you're talking about those

16       terms, do you recount, also, a conversation about

17       the buyer side in the sale?

18       A.    Dennis, I'm not sure what the question

19       is, as far as the buyer side of the sale.

20       Q.    Did you have a conversation with

21       Mr. Smith about how the buyer also pays ten

22       percent in the event of a successful sale?

23       A.    Dennis, I don't remember those -- that

24       specific conversation, but I can tell you that

25       that conversation is held with virtually every

1    customer that signs a sales contract.  And I

2    can't imagine that I wouldn't have had that with

3    Benjie.

4        Q.    Okay.  And also the buyer's terms that

5    include that ten percent fee are listed on the

6    Dade Auctions website; is that correct?

7        A.    Absolutely, they are.  Dennis, it is

8    stated right on the listing on the website, on

9    each particular piece of equipment that's listed

10   on the site, what the buyer's premium is.

11       Q.    And you sent Mr. Smith a copy of that

12   listing various times while it was active; is

13   that correct?

14       A.    That is correct.  Actually, when the

15   equipment is first listed, the seller gets a

16   notification from the system.  The system

17   generates these automatically.

18            So as soon as the listing is posted, the

19   seller gets a thank you with -- for listing and

20   it also has a link directly to the listing so

21   that all they have to do is click on the listing,

22   view the listing, read the listing, see the

23   pictures.  Everything that has been generated for

24   that particular listing will be available to him

25   on the site immediately.

```
 1          Q.    And in this specific instance, related
 2     to the Harris shredder that brings us here today,
 3     there was a buyer's premium on that listing; is
 4     that correct?
 5          A.    There was, absolutely.
 6          Q.    And that was, as far as you know, listed
 7     on the listing that was approved by Mr. Smith?
 8          A.    Mr. Smith does not approve of the
 9     buyer's premium.  Dade assesses the buyer's
10     premium.
11          Q.    Right, I understand that.  But the
12     listing, itself, that's front-facing potential
13     buyers, includes that buyer's premium on it,
14     correct?
15          A.    Absolutely.  Yes.  Yes.
16          MR. SHEPPARD:  Judge, we're going to
17     object to this line of questioning.  The
18     documents speak for themselves.
19          THE ARBITRATOR:  Overruled.  Go ahead.
20          Q.    I lost my train of thought.
21          So I'll make this a little simpler,
22     Dave.  Before a listing is published publicly or
23     contemporaneously with the listing, the seller is
24     provided a copy of that listing; is that correct?
25          A.    Yes.
```

1          Q.    And in this particular instance,

2      Mr. Smith was provided a copy of that listing?

3          A.    Correct.  He signed the contract with

4      the listing, yes.

5          Q.    Right.  But I'm talking about the

6      specific listing on the website.

7          A.    Correct.

8          Q.    Okay.  He was given an opportunity to

9      review it?

10          A.    Dennis, not only was he given an

11      opportunity to review it at that time, but we

12      produce an asset management report that goes out

13      to Mr. Smith -- all of our sellers every month.

14              He got an asset management report for

15      anything they have listed on the site, with a

16      very detailed explanation of what happened during

17      the month, and a direct link to every piece of

18      equipment.

19              So Mr. Smith, every month, received an

20      indication of how many people viewed that --

21      whether there were any contact made by buyers,

22      whether there was any offer made, what the offer

23      was, and a link to that site so they may review

24      it.

25          Q.    And that direct link to that website

1      would have included a statement stating that the

2      buyer would pay a ten percent premium in the

3      event of the sale of the Harris shredder; is that

4      correct?

5              MR. SHEPPARD:  Objection.  Leading.

6              THE ARBITRATOR:  I'm going to overrule

7      the objection.  You may answer the question.  But

8      don't lead the witness, please.

9         A.    Dennis, I hate to ask you to re-ask a

10     leading question, so restate it and I'll answer

11     it.

12        Q.    Okay.  I won't even ask you in a leading

13     way.  What was included in the direct link to the

14     listing on the website?

15        A.    The link took him directly to the

16     listing, which included a complete description of

17     everything that was being offered, that was given

18     to us by the seller, all the pictures that were

19     provided by the seller, a description -- or an

20     indication that there was --

21              Oh, there is an opportunity to buy it

22     now, which means that the customer had -- if

23     there is a buyer there that wanted to push the

24     button, they could buy it immediately on the

25     spot.

1          There's an opportunity to make an offer

2     to the customer.  There's an opportunity to ask

3     the customer questions.  There's an opportunity

4     to request an inspection.  So there are multiple

5     things that a potential buyer can do to get the

6     attention of the seller.

7          Q.    Does anybody who looks at the listing

8     also see the ten percent buyer's premium?

9          A.    Yes, they always do.

10         Q.    So we're talking a lot about a contract

11    that was entered into.  I'm going to attempt to

12    share my screen.  And, Dave, just for your -- for

13    sake of simplicity, you got all of the exhibits

14    and they're all Bates numbered at the top.

15         So if you prefer to look at the physical

16    version in front of you, it's Bates numbered 040.

17    Just for the sake of simplicity here, can

18    everyone see my screen?

19         A.    I got it.  I'm good with what you have

20    there.

21         Q.    I'm showing you what has been Bates

22    stamped as 041, which I will refer to moving

23    forward as Exhibit 1.

24         A.    Correct.

25         Q.    Are you familiar with this document,

1          Dave?

2               A.    I am.

3               Q.    And what is it?

4               A.    That is the listing contract that Oak

5          Cliff, Benjie Smith signed initially when we

6          listed the shredder for sale.

7               MR. SAWAN:  And for sake of simplicity,

8          Mr. Sheppard, would you just stipulate to the

9          authenticity of this listing agreement, which I

10         believe was also included by you in your

11         exhibits?  Or do you want me to go through the

12         whole --

13              MR. SHEPPARD:  No, I think that's fine.

14         Is that labelled with an exhibit number?  I can't

15         tell.

16              MR. SAWAN:  It's not as of this moment,

17         no.  It will be -- but for reference, it's Bates

18         Number 040 to 046.

19              MR. SHEPPARD:  I just ask that you get

20         it admitted before talking about it.

21              MR. SAWAN:  Okay.  Well, in light of

22         that stipulation as to the authenticity, I would

23         move to admit this as 1, the contract.

24              THE ARBITRATOR:  Any objection?

25              MR. SHEPPARD:  No objection.

1          THE ARBITRATOR:  Exhibit 1 will be

2     admitted.  Thank you.

3               - - - - -

4          (Exhibit 1, Dade Auctions Equipment

5          Listing and Consignment Agreement For

6          Auction and Buy It Now Listings, was

7          marked for identification purposes.)

8               - - - - -

9          Q.   All right.  Dave, the next set of

10    questions will reference what has now been marked

11    as Exhibit 1, which is the contract that you

12    referenced.

13          Dave, when was this entered into?

14          A.   September 15, 2020.

15          Q.   And what is your understanding of when

16    the term ends?

17          A.   All of our contracts, unless stipulated

18    upfront, have an auto renewal.  The majority of

19    our sellers allow it to auto renew because they

20    want the listing to remain active.

21          And this particular contract was set for

22    180 days, to auto renew with a 15-day

23    notification period, if they chose to cancel the

24    listing.

25          Q.   And that auto renew term is bolded in

1      this contract; is that correct?

2          A.    Yes.

3          Q.    Under this contract that was entered

4      into on September 15, 2020, who was the seller?

5          A.    The seller was Oak Cliff Recycling in

6      Waxahachie, Texas.

7          Q.    And who was the representative at the

8      time?

9          A.    That was Benjie Smith.

10         Q.    Who was the consignee?

11         A.    That was Dade Auctions, and represented

12     by Andrew Fournier.

13         Q.    And Andrew works for Dade Auctions,

14     correct?

15         A.    Andrew does.  He was vice president.

16         Q.    And the specific item at issue was what?

17         A.    It was a Harris auto shredder, metal

18     shredder, specifically, with all the downstream

19     and upstream.  It was a fairly complete system.

20         Q.    And the original price that it was

21     listed at was what?

22         A.    750,000.

23         Q.    Did it remain at 750,000 --

24         A.    It did not, no.

25         Q.    Did they charge any particular listing

1          fee?

2                 A.    No.

3                 Q.    But in some circumstances, it does, I

4          presume, correct?

5                 A.    Yes.

6                 Q.    But this one, it chose not to?

7                 A.    Correct.

8                 Q.    Okay.  The section in here entitled

9          "Commitment to sell, exclusivity and early

10         termination of auction and listing"; is that

11         correct?

12                A.    Absolutely.

13                Q.    What's your understanding of that term,

14         which is Section 5?

15                MR. SHEPPARD:  Judge -- excuse me.

16         Mr. Cooper, I'm going to object to what his

17         understanding of it is.  The document speaks for

18         itself and he doesn't need to be interpreting the

19         document.

20                MR. SAWAN:  Sir, we're here to determine

21         what the parties knew and understood about the

22         contract.

23                THE ARBITRATOR:  Overruled.  Go ahead.

24                A.    The commitment to sell is an exclusive

25         commitment that we have everyone that is a seller

1    sign.  Previously, with a lot of brokers in the

2    industry, you never knew where your equipment was

3    going to be listed or show up.

4           So we determined that if we were going

5    to have a good site, where all equipment that was

6    listed there was available -- in other words, if

7    somebody hit the "buy now" button, that piece of

8    equipment was actually there for sale and was --

9    would belong to them.

10          And the same thing with making an offer.

11   No one wants to make an offer on a piece of

12   equipment that may or may not be there.  So this

13   was a must in our system.  It had to be exclusive

14   for that particular reason.

15          Same thing with termination.  We spend a

16   lot of money, on an annual or monthly basis,

17   advertising the equipment that's on our site in

18   various means, both digitally and physically.

19          And so we need to know what equipment is

20   actually available so we're not wasting space in

21   publications and time with people that want to

22   buy something that's not there.

23      Q.    So in the event that somebody does

24   cancel or terminate prior to the listing

25   expiration, what is the result?

1          A.     We have a termination fee for that.     An

2     early termination fee, which is designed to make

3     us whole or potentially giving us the opportunity

4     to sell that piece of equipment during that

5     contract term.

6          Q.     When you say "make us whole," what do

7     you mean?

8          A.     Well, that means that we would have

9     collected the seller's fee for selling the piece

10    of equipment, and we would have been able to

11    collect the buyer's fee if the equipment was

12    actually for sale and buyable on the internet.

13         Q.     And that 20 percent fee is bolded in the

14    contract terms; is that correct?

15         A.     That absolutely is.

16         Q.     And Mr. Smith, on behalf of Oak Cliff,

17    had an opportunity to review this prior to

18    signing it?

19              MR. SHEPPARD:  Mr. Cooper, I'm going to

20    object because it's mischaracterizing the

21    evidence.  It's not a 20 percent fee.  The only

22    thing in the contract, it says it is a 20 percent

23    early termination.

24              It's a ten percent commission listed in

25    the contract.  And I think there's some confusion

1          going on here.

2                    MR. SAWAN:  What confusion?

3                    THE ARBITRATOR:  Go ahead, Mr. Sawan.

4                    MR. SAWAN:  Yeah, let me just -- I'll

5          strike the last question and come back to that.

6          Q.    It says in the contract that any

7          cancelation or termination prior to the listing

8          agreement expiration will incur a 20 percent fee;

9          is that correct?

10         A.    That is correct.

11         Q.    And that provision was bolded in the

12         contract, correct?

13         A.    That is correct.

14         Q.    And as far as you know, Mr. Smith, on

15         behalf of Oak Cliff, was given an opportunity to

16         review this contract --

17         A.    The contract had to be reviewed in order

18         to be signed.  It was signed electronically.  And

19         the listing does not go up until we get the

20         contract signed back from the seller.

21         Q.    Just for the record, I'm not sure -- it

22         does say that, in the contract, it requires that

23         the arbitrated matter in dispute (indiscernible)

24         with the arbitrator and the American Arbitration

25         Association; is that correct?

1    A.    That is correct.

2    Q.    That's where we are today, correct?

3    A.    Yes.

4    Q.    I also see that there's an exhibit

5    attached to this contract.  What's the purpose of

6    the exhibit?

7    A.    This is a scriptor.  It tells us what

8    the customer is selling and what we are going to

9    post in the listing.  He has to review that.  He

10   has to review the information in there and agree

11   that that is the information that we post in the

12   listing, it's true and accurate.

13   Q.    And going back up to Page 4 of Exhibit

14   1.  Did Mr. Smith, in fact, sign?

15   A.    Mr. Smith electronically signed the

16   agreement, correct.

17   Q.    I'm going to move on from this one.

18   Once the agreement is signed, Dave, what happens

19   next?

20   A.    The agreement is received back in the

21   offices here.  And, previously, we would have

22   received, from the seller, pictures and

23   information that was relevant to a potential

24   buyer, and that information is the information we

25   are going to post with the listing.

1              So the information that we received,

2       relevant to the machine and the pictures, would

3       be given to the sales manager, and the sales

4       manager would then create a listing and make the

5       listing live.

6              At that point in time, the system would

7       generate a thank you message, email that goes to

8       the seller with the indication that there is a

9       listing now that's live.

10             And he would also be provided then with

11      a link to that listing and encouraged to review

12      it for accuracy.

13      Q.    And in this instance, a listing was

14      generated, with respect to the Harris shredder,

15      correct?

16      A.    That's correct.

17      Q.    And do you know, approximately, how long

18      that listing was up on the Dade Auctions website?

19      A.    I believe that there were -- let's see.

20      There were two extensions on the listing.

21      Q.    Okay.  So two 180-day periods?

22      A.    That's correct.

23      Q.    So the contract started on September 1

24      of 2022 and went 180-day period auto renew,

25      correct?

1          A.    That's correct.

2          Q.    And then it went one other 180-day

3     period and auto renewed, as well, correct?

4          A.    That's correct.

5          Q.    So the issue arose in this third

6     renewal; is that correct?

7          A.    That is correct.

8          Q.    Do you recall, specifically, when the

9     contract called to auto renew the third time?

10         A.    Not specifically, but we certainly can

11    scroll through the documents and look at it.

12         Q.    Well, it's been stipulated to, so I

13    think I can tell you this, though I'll leave that

14    to Mr. Sheppard to object as he sees fit.

15              MR. SHEPPARD:  Objection.  Leading.

16              THE ARBITRATOR:  What is the stipulation

17    you're referring to?

18              MR. SAWAN:  Specifically, the

19    stipulation related to the dates.  I believe it's

20    Number 3, 4, 5, and 6.

21              THE ARBITRATOR:  Okay.  Well, the

22    stipulation is evidence, so can we just move on

23    with the questioning.

24              MR. SAWAN:  I just want to relate to him

25    the dates that he isn't so certain on.  But I

1          suppose if it's already evidence, that isn't

2          necessary.  I'll move on.

3               Q.    Dave, your understanding is that the

4          listing did renew for a third period of time; is

5          that correct?

6               A.    That's correct.

7               Q.    And subsequent to that renewal, you

8          review or a member of Dade Auctions received

9          notice that Mr. Smith wanted to terminate that

10         agreement, correct?

11              A.    Yes.  Mr. Smith sent the asset

12         management report that he was provided that month

13         back with a note on it that said "I want to

14         terminate the listing agreement."

15              Q.    And what was the response of Dade

16         Auctions?

17              A.    Well, we said that he had not provided

18         us due notification within the period of time

19         that we agreed to in the contract.

20              Q.    And after that, what happened?

21              A.    Mr. Smith insisted that he had

22         terminated the contract properly, and that's when

23         we involved our counsel at the time, which was my

24         son, and Dennis, you.

25              Q.    And, Dave, I did read the prehearing

1       brief briefly before this, and I wonder how you

2       would respond to the argument that you didn't use

3       your best effort to try to sell this equipment,

4       either pre or post attempted termination by

5       Mr. Smith.

6           A.    I can tell you that we used our best

7       efforts because, first of all, we earn no dollars

8       unless we attempt to use our best efforts.  And

9       this is a fairly large piece of equipment, and

10      the return would have been significant.

11              And so one of the things that we do with

12      our larger pieces of equipment is prioritize

13      their advertising.  So our best efforts, I can

14      assure you, were front and center.

15          Q.    And I appreciate that, generally.  But

16      more specifically, what did you do with respect

17      to this Harris shredder?

18              MR. SHEPPARD:  Mr. Cooper, we're going

19      to object on the basis of relevance, because the

20      only basis of this arbitration is the termination

21      -- excuse me.  Early termination, which triggered

22      the alleged 20 percent penalty clause that Dade

23      is seeking here.

24              What happened with respect to the sale

25      and what they did or didn't do is not relevant to

1          the situation of the seller's penalty that Dade

2          is trying to seek.

3                    MR. SAWAN:  Mr. Cooper, if I could

4          respond.  The law in Ohio states that in order

5          for a penalty to be unenforceable, which is what

6          the Respondents claim, needs to be proven that

7          it's manifestly inequitable and unreasonable.

8          And all of this goes to the reasonableness --

9                    THE ARBITRATOR:  Overruled.  You may

10          answer.

11          A.    Please repeat the question.

12          Q.    Something along the lines of,

13          specifically, with respect to the Harris

14          shredder, what type of things did you do to use

15          your best effort to sell?

16          A.    I believe that we assembled and provided

17          you with many -- all of the adverting that we did

18          with respect to that particular shredder.  It was

19          advertised heavily in publications.  Our

20          publication being one.

21                    It was advertised heavily on the

22          internet.  We provided -- we use Google Words and

23          we pay a substantial amount of money every month

24          to track and use Google Words to do -- I'm not --

25          I'm not the guy to be talking to, within this

1    organization, about how we go about digitally

2    assigning Facebook and Google Words and all that.

3         But I know we heavily prioritize large

4    pieces of equipment like this.  It's expensive.

5    It takes -- when we do that, we push other pieces

6    to the side and prioritize the larger pieces,

7    like Mr. Smith's piece of equipment.

8         Q.   And at some point, would the price

9    change from the original contract price?

10        A.   It was.  Mr. Smith called me and said,

11   "I've got to sell this thing.  I've got a piece

12   of equipment coming in to replace it.  It's a

13   large Sierra shearer, so I need to do something

14   with this and make it move faster, more

15   attractive to a buyer."

16        So he reduced the price to 675, I think

17   it was, from 750.  But, additionally, he agreed

18   to dismantle the piece of equipment at his cost

19   and load it onto the buyer's trucks and equipment

20   as an additional incentive.

21        Q.   And, Dave, do you have the Bates

22   numbered exhibits in front of you?

23        A.   I have them up on my screen, yes.

24        Q.   I'm going to ask you to go to Bates

25   Number 21, which I'm going to note as Exhibit 2.

1          But before I show it to the arbitrator, I'm going

2          to ask you a question about it.

3               A.    I'm on it.

4               Q.    Okay.  Do you --

5                     MR. SHEPPARD:  I request that you put it

6          on the screen.  Is that okay, Mr. Cooper?

7                     MR. SAWAN:  I'm fine with that.  I was

8          merely only trying to not show something unless

9          it's been admitted.

10                    MR. SHEPPARD:  That's okay.  I want to

11         know what it is.  What did you say, Page 2?

12                    MR. SAWAN:  21.

13                    MR. SHEPPARD:  21.  Okay.

14                    MR. SAWAN:  I'll show it, that's fine.

15                    MR. SHEPPARD:  No, no, that's okay.

16         Hold on.  All right.  Go ahead.

17              Q.    Do you recognize the document that's

18         Bates Number 21?

19              A.    I do.

20              Q.    And was this an email that was sent to

21         you?

22              A.    This was an email that I sent to Benjie

23         after our discussion about reducing the price and

24         what needed to be changed in the listing.

25              Q.    Okay.  And what was the date of this?

1           A.     May 5, 2021.

2           Q.     And that would have been during the

3     second renewal period?

4           A.     Correct.

5           Q.     And is this a true and accurate

6     depiction of the email you sent to Benjie?

7           A.     Yes, it is.  And it also has a link

8     within it that Mr. Smith could click on and go

9     and see the changes that were actually made.

10              MR. SAWAN:  And with that, I would move

11     to admit Exhibit 2.

12              MR. SHEPPARD:  Object on relevance

13     grounds.

14              THE ARBITRATOR:  Overruled.  Exhibit 2

15     will be admitted.

16              MR. SAWAN:  Thank you, sir.

17                       - - - - -

18              (Exhibit 2, May 5, 2021 Email, was

19              marked for identification purposes.)

20                       - - - - -

21           Q.     Can you see that, Dave?

22           A.     I can.

23           Q.     Okay.  And if you could, please, read

24     what it says.  Read the first paragraph.

25           A.     "Per our discussion, I have reduced the

1    price of the shredder and included disassembly

2    and loading.  I changed some of the information

3    in the description to indicate a fast sale is in

4    order.  I also took away the "make offer" button,

5    at least for now until we see what kind of

6    results we get.  We will do --

7    Q.    That's fine.  Why did you take away the

8    "make offer" button?  What was that about?

9    A.    Because it was reduced in price, Benjie

10    and I discussed the fact that it was -- at the

11    time, what we thought was a pretty stellar deal.

12         It should have attracted a buyer based

13    on the price and based on the additional cost or

14    work that Benjie was willing to do, which is a

15    cost to him, hiring a crane and labor to

16    disassemble and load the equipment.

17         So by taking away the "make offer"

18    button, we pretty much were saying this is a good

19    deal, hit the "buy now" button because we don't

20    think we want to go any lower than that.

21    Q.    And, notably, in this arbitration,

22    you're seeking a 20 percent fee of the lower

23    price, not the $750,000 initial listed price; is

24    that correct?

25    A.    That's correct.

1      Q.    And in here, also, as you said, you

2      included a link to the listing, correct?

3      A.    Yes, sir.

4      Q.    And had he clicked on that listing, it

5      would have shown a ten percent buyer premium?

6            MR. SHEPPARD:  Object.  Leading.

7      Q.    What did it include, when you click on

8      that link?

9      A.    It included all the original listing

10      information, except for the fact that --

11            MR. SHEPPARD:  Mr. Cooper, we're going

12      to object to this, as well, because the best

13      evidence rule, the listing itself is the best

14      evidence here, not the testimony of the witness.

15            THE ARBITRATOR:  Unless you ask specific

16      questions, I don't see the need to read these

17      documents into the record.

18            MR. SAWAN:  Okay.

19            THE ARBITRATOR:  I can read a lot faster

20      than he can talk.

21            MR. SAWAN:  Very well.  I'll move along.

22            THE ARBITRATOR:  Thank you.

23      Q.    All right.  I'm going to move onto after

24      the attempted termination of Mr. Smith.  Dave,

25      did Dade Auctions take any effort to try to

1       salvage that relationship and get this thing

2       sold?

3               MR. SHEPPARD:  Objection.  Relevance.

4               THE ARBITRATOR:  You may answer.  Go

5       ahead.

6        A.     The answer is yes.  First of all, we had

7       been working with several folks that wanted to

8       get in and see the piece of equipment, but we

9       were not getting any response from Benjie.

10              We had a customer that wanted to -- was

11      interested in purchasing the equipment and

12      actually was working with his utility company to

13      get the power that was necessary for it, and

14      Benjie knew this.

15              And subsequent to us getting involved

16      with this litigation, we had a customer that we

17      wanted to bring in to resolve this problem, to

18      see if we couldn't mitigate these -- this

19      particular situation and make Benjie happy and

20      bring a customer in.

21              And he was in Arizona, and we were told

22      that it was still available and we requested

23      pictures to get him in.  Benjie Smith provided

24      pictures of this for our customer.  And when our

25      customer called a few days later to get in, we

1        were told it was sold.  And we actually found out

2        that it was sold prior to that.

3            Q.    I want to ask you a couple further

4        questions, Dave.

5                Do you think that 20 percent is

6        disproportionate to what you would have stood to

7        gain from the sale?

8                MR. SHEPPARD:  Objection.  Calls for

9        speculation.

10               THE ARBITRATOR:  Could you restate the

11       question, please?

12               MR. SAWAN:  Yeah.

13           Q.    What did you expect to gain from the

14       potential sale of this equipment?

15               MR. SHEPPARD:  Objection.  Calls for

16       speculation.  It didn't sell and everything is

17       negotiable.

18           Q.    I'll ask it a different way then.  What

19       did the contract call for in the event of a

20       successful sale, Dave?

21           A.    Well, the contract --

22               MR. SHEPPARD:  Objection.  I want to

23       make sure we're talking about which contract.

24       The contract with the seller or the contract with

25       the potential buyer?

1              MR. SAWAN:  Both.

2              MR. SHEPPARD:  The contract with respect

3        to the buyer, because there is no contract with

4        the buyer.  There was no buyer.

5              MR. SAWAN:  Well, okay.  Let's explore

6        that then.

7         Q.    Who is Marty Feinberg?

8              MR. SHEPPARD:  Objection.  Relevance.

9        The only issue in this arbitration, Mr. Cooper,

10       is the ten percent -- or excuse me, the 20

11       percent penalty clause based on early

12       termination.  It has nothing to do with any kind

13       of buyers or any issue such as that.

14             MR. SAWAN:  Your Honor, I go back to --

15       it needs to be proven that it is equitable and

16       reasonable.  And all of this provides context to

17       how reasonable it is.

18             THE ARBITRATOR:  What is your question?

19             MR. SAWAN:  Who is Marty Feinberg?

20             MR. SHEPPARD:  Objection as to

21       relevance.

22             THE ARBITRATOR:  The objection is

23       overruled.  You may answer who this person is.

24        A.    Marty Feinberg is a customer of ours who

25       was very interested and intended to purchase

1        the --

2                MR. SHEPPARD:  Objection.  That's

3        speculative, Mr. Cooper.

4                THE ARBITRATOR:  Go ahead, finish your

5        answer.

6        A.   He was working with his utility company

7        to provide power -- enough power to operate

8        this --

9                MR. SHEPPARD:  Objection.  Hearsay.

10               THE ARBITRATOR:  Let's -- please don't

11       interrupt the answer.  I ruled that he may answer

12       it.  Let him finish his answer and then we can

13       decide to either strike it or leave it in,

14       please.  Thank you.

15       Q.   Dave, I will -- let me tighten this up a

16       little bit, because I think we're going to hear

17       some objections.  Let me parse this out.

18               You had direct communications with

19       Mr. Feinberg; is that correct?

20               MR. SHEPPARD:  Objection.  Leading.

21       Q.   Did you ever have a conversation with

22       Mr. Feinberg?

23       A.   I've had many, many conversations with

24       Mr. Feinberg, emails and the like, yes.

25       Q.   And generally speaking, in the event

1        that a buyer were to come to the Dade Auctions

2        website, you would obtain a ten percent buyer's

3        fee from them; is that correct?

4            A.    That is correct, in this case.

5            Q.    And that would have been true for

6        Mr. Feinberg, as well?

7            A.    That is correct.

8                 MR. SHEPPARD:  Objection.  Leading.

9                 THE ARBITRATOR:  Go ahead.

10           Q.    Would that have --

11                THE ARBITRATOR:  Would you rephrase your

12       question, please, and don't lead the witness.

13           Q.    Did Mr. Feinberg come through the Dade

14       Auctions website?

15           A.    That is how -- yes, he did.  That's how

16       he knew there was a piece of equipment that he

17       was -- that would have worked for him.

18           Q.    And what are the payment obligations

19       when someone comes through the Dade Auctions

20       website?

21                MR. SHEPPARD:  Objection.  Relevance.

22       Dade, too broad.  We're not talking about the

23       Dade Auctions website.  We're talking about this

24       case.

25           Q.    And more specifically, what are the

1      obligations of any potential buyer that comes

2      through the Dade Auctions website, specific to

3      this Harris shredder that forms the basis of this

4      litigation?

5          A.    As so stated in every listing, they are

6      obligated to purchase through the Dade website

7      and they are also obligated to pay the buyer

8      premium that is listed in that listing.

9          Q.    And I'll move along on this line of

10     questioning.  But my final question:  Did

11     Mr. Smith ever directly tell you that he ignored

12     a potential buyer?

13         A.    Yes.

14             MR. SHEPPARD:  Objection.  Relevance.

15             THE ARBITRATOR:  Objection is sustained.

16         Q.    Is it important that parties notify you

17     before they withdraw a piece of equipment from

18     the listing?

19         A.    Yes.

20         Q.    Why?

21         A.    Our advertising and our advertising

22     budgets are set up in advance.  And so if we are

23     advertising equipment that is not available, then

24     that space that could have been allocated to that

25     piece of equipment no longer available is a

1    wasted space.

2              So we need time, in advance, to -- and

3         notification in advance so that we can plan our

4         advertising campaigns and advertising budgets and

5         all of the views and pictures that go along with

6         it, whether it's digital, online, social media,

7         physical, and production -- hard copy production.

8         Q.    Okay.  And, finally, you're asking this

9         arbitrator to issue an order requiring Oak Cliff

10        to pay you a 20 percent fee of $675,000; is that

11        correct?

12        A.    That is correct, yes.  No.  Please

13        restate that for me.

14        Q.    You're asking this arbitrator for an

15        order requiring Oak Cliff to pay you an amount

16        equal to 20 percent of $675,000?

17              MR. SHEPPARD:  Objection.  Leading.

18        Objection.  Leading.

19              THE ARBITRATOR:  Overruled.  Go ahead,

20        you can answer.

21        A.    Correct.

22              MR. SAWAN:  I have no further questions.

23              THE ARBITRATOR:  Anything further,

24        Mr. Sawan?  Are you finished?

25              MR. SAWAN:  I'm done.

1           THE ARBITRATOR:  Thank you.

2           Mr. Sheppard, you may cross-examine.

3           MR. SHEPPARD:  Yes, sir.  Thank you.  I

4      want to show you -- can I share the screen,

5      Mr. Cooper?

6           THE ARBITRATOR:  I'm sorry?

7           MR. SHEPPARD:  Can I share the screen?

8           THE ARBITRATOR:  Oh, yes.  Please.

9      Thank you.

10          MR. SHEPPARD:  Actually, let me ask this

11     of Mr. Cooper or counsel.  Counsel, I'm looking

12     to admit Pages 13 through 16 of your production

13     as an additional exhibit, which I think was part

14     of your exhibits.

15          Any opposition to that?

16          MR. SAWAN:  You said Bates 13 through

17     16?

18          MR. SHEPPARD:  Yes.

19          MR. SAWAN:  One moment.  Yes, that's

20     okay.

21          MR. SHEPPARD:  Okay.  I'm going to share

22     the screen, Mr. Cooper.

23          THE ARBITRATOR:  Please.  Thank you.

24          MR. SHEPPARD:  Mr. Cooper, are you able

25     to see that?

1           THE ARBITRATOR:  I am, yes.

2     CROSS-EXAMINATION OF DAVID FOURNIER, SR.

3     BY MR. SHEPPARD:

4         Q.    And Mr. Fournier, are you able to see

5     that?

6         A.    Yes, I can.

7         Q.    Let me see if I can blow this up.  Can

8     you see it bigger if I blow it up on my screen?

9     I can't see what you see.

10        A.    Yes.  It's perfectly fine.  I am

11    following this on my other screen, as well.

12        Q.    Very good.  Mr. Fournier, I want to ask

13    you about this.  And if we can, for the record,

14    I'd seek to admit Dade's Bates Number 13 through

15    16.

16            MR. SHEPPARD:  And Jonathon, if you can

17    make a note of this so that we can send this to

18    the court reporter and to AAA, as Exhibit R-5.

19    We'd move to admit this as Exhibit R-5.

20            Is it admitted, Mr. Cooper?

21            THE ARBITRATOR:  R-5 is four pages, you

22    said?

23            MR. SHEPPARD:  Yes.  Thank you.

24            THE ARBITRATOR:  Any objection?

25            MR. SAWAN:  No, sir.  Other than I don't

1          know that it's necessarily complete, as I see on

2          right side of the document.

3                    MR. SHEPPARD:  This is the way we got it

4          from Dade, or from you, Counsel.

5                    THE ARBITRATOR:  What's the objection?

6                    MR. SAWAN:  Well, it just appears to be

7          incomplete.  If you look at the top there, it

8          would be cut off on the side there.

9                    MR. SHEPPARD:  This is how Dade produced

10         it.

11                   THE ARBITRATOR:  Yeah, this is what you

12         gave us.  I'm looking at the copies that you

13         sent.

14                   MR. SAWAN:  I'm not denying that I gave

15         it to you.

16                   THE ARBITRATOR:  I'm sorry?

17                   MR. SAWAN:  I'm not denying that I gave

18         it to you.  It looks like there may be --

19         certainly, I have no objection to it being

20         admitted, subject to the understanding that --

21                   THE ARBITRATOR:  Well, wait a minute.

22         These are exhibits that you submitted.  So what's

23         the problem with them?

24                   MR. SAWAN:  Nothing, other than I'm just

25         simply merely pointing out that there may be

1          additional information underneath.

2                  THE ARBITRATOR:  Underneath what?

3                  MR. SAWAN:  You see "ended" and it's cut

4          off on the right side?

5                  THE ARBITRATOR:  I don't understand.  If

6          you scroll down --

7                  MR. SAWAN:  Well, it's right there --

8          yes, but I don't have control over it.  But you

9          see at the top there, there's a box in the top

10         right corner.

11                 MR. SHEPPARD:  This is what he's

12         referring to, where my cursor is.

13                 THE ARBITRATOR:  Okay.  It says "enter."

14                 MR. SAWAN:  No, I believe it says

15         "ended."  I just don't know what else might be

16         beneath that.

17                 THE ARBITRATOR:  Well, I have a Dade

18         document.  What do you have?  You submitted these

19         documents.

20                 MR. SAWAN:  I understand that.

21                 THE ARBITRATOR:  So what's your

22         objection to them?

23                 MR. SAWAN:  Well, I don't know -- I

24         guess, let me wait until he -- let me wait until

25         he asks the question.  I have no objection.

1               MR. SHEPPARD:  Well, I'm seeking to

2       admit it, Judge -- I mean, Mr. Cooper.  I can't

3       ask the question until it's admitted.

4               MR. SAWAN:  I guess my objection, in

5       general, is incompleteness.  And I understand

6       that I produced this --

7               THE ARBITRATOR:  How about if we do

8       this, could we proceed with this, then will you

9       send a complete copy to Mr. Sheppard, AAA, and to

10      me, as soon as you can?

11              MR. SAWAN:  Assuming -- I don't know

12      where this came from, necessarily.  So, yes, I

13      will endeavor to try and find one that has all

14      that information but --

15              MR. SHEPPARD:  And Mr. Cooper, we would

16      object to that as this is well beyond discovery

17      and we're already into hearing here.  And now

18      we'd be caught by surprise if we have a separate

19      document.  So we would object to any additional

20      documents --

21              MR. SAWAN:  He's simply asking for

22      another version.

23              MR. SHEPPARD:  Well, another version

24      might include --

25              THE ARBITRATOR:  I think we're trying to

1          make -- one person at a time, as Christine will

2          confirm.

3                    I think we're trying to make a mountain

4          out of a molehill.  What is the problem with this

5          exhibit?

6                    MR. SAWAN:  My assumption, Mr. Cooper,

7          is he's going to go through this and say there's

8          no ten percent buyer's premium on this.  If that

9          is what's being offered, to prove that there is

10         no -- he was never notified of it.

11         Incompleteness matters.  That's all.

12                   THE ARBITRATOR:  And what is your

13         objection?  It either shows something or it

14         doesn't.  It's your -- you submitted this.

15                   MR. SAWAN:  But I'm not offering it for

16         any -- I didn't offer it at all.  But I'm

17         certainly not offering it for the purpose I think

18         he's offering it for.  The purpose he's trying to

19         offer it for is to show that --

20                   MR. SHEPPARD:  Objection.  Mr. Cooper,

21         he doesn't know what we're offering it for.

22                   MR. SAWAN:  Why don't you tell me then.

23                   MR. SHEPPARD:  I don't have to tell

24         anybody any of that.

25                   THE ARBITRATOR:  Mr. Sawan, this is an

1      exhibit that you submitted.  What, if anything,

2      is your objection to it?

3              MR. SAWAN:  Depending on the way in

4      which he seeks to use this, the incompleteness --

5              THE ARBITRATOR:  Well, it says what it

6      says.  Is there some material information that

7      you claim is cut off on the right?

8              MR. SAWAN:  I don't know.  How could I

9      say that?  I don't know.

10             THE ARBITRATOR:  Why did you submit this

11     if you don't know what it says?

12             MR. SAWAN:  I know what it says.  I just

13     don't know what it doesn't say.  There's

14     different reasons I may have offered it, I guess

15     is what I'm suggesting, where completeness

16     wouldn't have much mattered.  But anyway, I

17     guess --

18             THE ARBITRATOR:  So what is the nature

19     of your objection, if you have one?

20             MR. SAWAN:  Incompleteness.

21             THE ARBITRATOR:  What is incomplete

22     about the exhibit that you introduced into this

23     proceeding?

24             MR. SAWAN:  Insofar as that is going to

25     be used by defense counsel to negate some

1    material fact, or is being offered as a 100

2    percent showing of everything that was in that

3    listing, then I don't know if that's what it is.

4            MR. SHEPPARD:  He submitted it,

5    Mr. Cooper.  This is fully admissible without any

6    additional evidence or any additional efforts to

7    produce another version of this.

8            We're well beyond that at this point.

9    It's 100 percent admissible.  It's their exhibit,

10   for goodness sake.

11           MR. SAWAN:  Okay.

12           THE ARBITRATOR:  Mr. Sawan, is it your

13   contention that the document says something, that

14   you produced, that is not showing it?

15           MR. SAWAN:  I don't know -- I don't

16   think it does, Your Honor.

17           THE ARBITRATOR:  You say you don't think

18   it does.  Why are you objecting?

19           MR. SAWAN:  I'll withdraw my objection.

20           THE ARBITRATOR:  Thank you.  Go ahead,

21   Mr. Sheppard.

22           MR. SHEPPARD:  Thank you.  And just so

23   we're clear for the record, this Exhibit R-5 is

24   admitted into evidence?

25           THE ARBITRATOR:  Yes, it will be

1          admitted.

2                    MR. SHEPPARD:   Thank you, Mr. Cooper.

3                           - - - - -

4                    (Exhibit R-5, Shredder Listing on Dade's

5                    Site, was marked for identification

6                    purposes.)

7                           - - - - -

8          Q.    Mr. Fournier, can you see this on your

9     screen?

10         A.    I can.

11         Q.    And Mr. Fournier, this is the exact

12    listing from Dade's website; is that correct,

13    sir?

14         A.    No, sir.

15         Q.    No, sir?

16         A.    No, sir.

17         Q.    This is not the listing from Dade's

18    website?

19         A.    It is the listing -- if you would scroll

20    back up to the top.

21         Q.    Yes.

22         A.    And if you look at the little box

23    everybody has been complaining about, that

24    doesn't have a D at the end, it says "ended."

25                    This is a screenshot, or this is

1     information that our system produces after a

2     listing has been removed from the website as

3     active.  It is no longer active.  It is now

4     ended.

5          So when this was sent, we had no longer

6     -- because we had taken it down because of the

7     litigation that was going on and the fact that we

8     could not get a buyer.  Not that we couldn't get

9     a buyer, but because we couldn't get someone in

10    there to look at it because of the contract that

11    was going on right now, we dropped it off of our

12    site so we didn't have to deal with it any longer

13    and we went into litigation.

14         This picture right here on my screen,

15    that says "ended", is a history of what happened,

16    and it is exact wording and it is exact pictures

17    of the listing when it was up.  But as you see,

18    there are no active buttons or there is no other

19    way to address a sale on this.

20         So what you're looking for is the ten

21    percent on here.  That's gone because there is no

22    opportunity for a buyer, at this point in time,

23    now that it's ended, to make an offer, to make a

24    sale, to buy this piece of equipment.  So all of

25    that information is gone.  It is not a listing.

1          It is a history.

2          Q.    Well, what you said in your testimony

3     with Mr. Sawan was that the listing would show a

4     ten percent buyer premium.  But if you look at

5     this entire listing, the listing is here, a

6     description, a list price, an end date, a start

7     date, quantity available --

8          A.    That's history.

9          Q.    -- an item number.  Hold on a minute.

10    Equipment ID, location Texas, details and

11    restrictions, shredder plant layout, shredder

12    plant layout elevations, shipping weights and

13    dimensions, Harris shredder brochure.

14               This is the description of the item.

15    Complete ferrous shredding system, as listed

16    herein.  It's got a serial number.  There is not

17    one single thing on this document, that Dade

18    produced, that says that there is a ten percent

19    buyer premium on this document production,

20    correct, sir?

21         A.    On this document production, that is

22    correct, because that is --

23         Q.    No.  You've answered the question.

24               THE ARBITRATOR:  Just a moment.

25    Mr. Sheppard, please let him finish his answers.

1           Don't interrupt, please.

2                   MR. SHEPPARD:  Yes, sir.  Go ahead.

3           A.    This is not a listing.  Not only is

4      there no buyer's premium on here, sir, but there

5      is no way to buy it.  There are no buttons.

6      There are no interactive buttons on this.  This

7      is merely a history of a listing after it's been

8      taken down.

9                   All other activities, all buttons, buy

10     it now, make an offer, ask a question, inspection

11     button, all those are gone.  This is just a

12     history.  A shot of what was done, what was up

13     there, but no way to buy it, sell it, ask

14     questions.

15                  So there is no need, at this point in

16     time, to even discuss what the buyer's premium is

17     because you can't buy it.

18          Q.    But this is what the listing said --

19     just all the verbiage here, this four-page

20     document, this is what the listing said when it

21     was up on the website.  Whether you click on a

22     button or not, this is what the listing said,

23     correct?

24          A.    That's what the listing said minus --

25     yes, that's what the listing said.

1          Q.    Okay.  And the listing, itself, does not

2          reference a buyer premium, true?

3          A.    It did when it was up and active.

4          Q.    So this is not an accurate

5          representation of what you produced to Oak Cliff

6          in this litigation, correct?

7                MR. SAWAN:  Objection.

8                THE ARBITRATOR:  I don't understand your

9          question.  Could you repeat it, Mr. Sheppard?

10               MR. SHEPPARD:  Yes, sir.

11         Q.    This is not an accurate representation

12         of what was on the listing page that Dade

13         produced in this litigation, is that what you're

14         saying, Mr. Fournier?

15         A.    Once the equipment is taken down and is

16         no longer active, I cannot produce an actual

17         listing page that had all of the other detail.

18         It is impossible.  The system reverts to history.

19         Q.    So let me ask it this way:  The listing

20         here, under additional documents, and it has PDFs

21         here of these documents, location, equipment,

22         item number, quantity available, end date, start

23         date, list price, description, this is what would

24         have been there originally that is not changed,

25         correct?  Obviously, this one is here now.  It

1       was there when the auction was active, correct?

2              A.    That is correct.

3              Q.    Okay.  Now, this particular description,

4       if you click on this particular item on your

5       website, this listing, in this fashion, and I'm

6       saying if it was active, it would come up in this

7       manner, correct?

8              A.    It would come up with a lot more

9       opportunity to buy a piece of equipment.  That is

10      just the description.

11             Q.    That's what I'm talking about.  Just the

12      description.

13             A.    Correct.

14             Q.    Correct.  Okay.  And in the description

15      itself, I think your testimony with Mr. Sawan was

16      that every auction or every listing has a buyer

17      premium listed in the auction.  Well, there is no

18      buyer premium listed in what is produced in this

19      document, true?

20             A.    That is correct.

21             Q.    Now --

22             A.    It's only a history.

23                   MR. SHEPPARD:  Objection.

24      Nonresponsive.

25                   MR. SAWAN:  Object to form.

1          THE ARBITRATOR:  Could you not speak

2     over one other, please.

3          Do you have a new question,

4     Mr. Sheppard?

5          MR. SHEPPARD:  Yes.

6     Q.    And so Mr. Fournier, nothing that you

7     produced in this arbitration shows that any buyer

8     is entitled to a ten percent premium on the sale

9     of this shredder, correct?

10    A.    Once a piece of equipment is no longer

11    active, there are no other opportunities to

12    purchase it, and, therefore, the balance of the

13    information is all I can provide you.

14         If you take a look at any one of our

15    listings on our website, each and every listing

16    that is active has the opportunity to do multiple

17    things with it, including buying it, but it also

18    has a buyer's premium.

19         Once we drop this off of active and it

20    went to history, all that information -- if it's

21    not active, you can no longer buy it, therefore,

22    all of that information and the opportunity to

23    buy it and the description of what you would pay

24    to buy it is gone.  It's lost.  It's only in

25    history.

1          MR. SHEPPARD:  Objection.

2      Nonresponsive.  That wasn't my question,

3      Mr. Cooper.  I can have the court reporter read

4      it back, if necessary.

5          THE ARBITRATOR:  You don't need to read

6      it back.  I understand the question and I

7      understand his answer.

8      Q.    The question was --

9          THE ARBITRATOR:  Well --

10          MR. SHEPPARD:  I'm sorry, Mr. Cooper.

11      Go ahead, sir.

12          THE ARBITRATOR:  I understood your

13      question to be:  Do you have a piece of paper

14      that has been introduced in this case that says a

15      buyer's premium is due on every listing?  Is that

16      your question?

17          MR. SHEPPARD:  Well, on this listing in

18      particular.

19          THE ARBITRATOR:  Yes.  Okay.

20      Q.    And I would take it that the answer is

21      no, correct, Mr. Fournier?

22      A.    The buyer's premium does not show on

23      this information that you've received on your

24      screen.

25      Q.    And, in fact, it's not produced --

1    there's been no document produced that shows that

2    any buyer is going to be subject to a ten percent

3    buyer premium, correct?

4         A.    We have not produced it because it is

5    not available once it is delisted.

6         Q.    And so the only thing that Mr. Cooper

7    can do here is in this arbitration is rely on

8    your testimony?

9              THE ARBITRATOR:  I'm sorry, could you

10   repeat that?

11             MR. SHEPPARD:  Yes, sir.

12        Q.    The only thing that Mr. Cooper can do in

13   this arbitration, Mr. Fournier, is to rely solely

14   on your testimony that there is a ten percent

15   buyer premium; is that right?

16        A.    There are additional things that he can

17   rely on.  First of all, there is absolutely no

18   piece of equipment on our website right now that

19   has -- that is listed on our website that does

20   not have a buyer's premium.  Therefore, this had

21   a buyer's premium.  We wouldn't do it for free.

22        Q.    You're not doing it for free.  You're

23   getting a ten percent commission from the seller,

24   correct?

25        A.    But we also get a ten percent commission

1    from the buyer.

2         Q.    According to what your testimony is,

3    right?

4         A.    Please review the information on our

5    website.

6         Q.    I'm not talking about your website.  I'm

7    talking about on this auction, specifically, sir,

8    you have not produced anything in this

9    litigation, other than what your testimony is,

10   that says that there is a ten percent buyer

11   premium, correct?

12        A.    That's correct.

13        Q.    Okay.  Buyer premiums are always

14   negotiable, aren't they, sir?  Even if there was

15   a buyer's premium, it's certainly negotiable in

16   any instance, right?

17        A.    Life is negotiable, sir, but not in this

18   case.

19        Q.    It was always going to be a ten percent

20   buyer premium, according to your testimony?

21        A.    Well, I think that's -- that's a

22   question that we certainly can't answer because

23   we didn't have the opportunity to negotiate it.

24             MR. SHEPPARD:  Give me a moment,

25   Mr. Cooper, if you don't mind, please.

1           THE ARBITRATOR:  Yes.

2           MR. SHEPPARD:  Thank you.

3           THE WITNESS:  May I ask for a

4      five-minute break?

5           THE ARBITRATOR:  Yeah, that would be

6      fine.  Let's take five minutes and collect our

7      thoughts and then come back on the record.

8                (A recess was taken.)

9           THE ARBITRATOR:  Back on the record,

10      please.  Mr. Sheppard.

11           MR. SHEPPARD:  Thank you.

12      Q.    Mr. Fournier, we're back on the record

13      after a short break.  And just so I understand

14      your testimony, it's your testimony that while

15      negotiable, it is a ten percent buyer premium

16      across the board that Dade pursues with its

17      buyers on any auction, correct?

18      A.    At that time, yes.

19      Q.    Okay.  Any instance where you see where

20      Dade would deviate from the ten percent buyer

21      premium that you keep on referencing?

22      A.    Not at that time.

23           MR. SHEPPARD:  May I share the screen,

24      Mr. Cooper?

25           THE ARBITRATOR:  Sorry?

1           MR. SHEPPARD:  May I share the screen?

2      Do I need to ask you, by the way?  Do I need to

3      ask you about that or may I just share when I

4      want to share?

5           THE ARBITRATOR:  Please do.  I'm sorry.

6           MR. SHEPPARD:  Okay.  Do you want me to

7      keep asking you or may I share when I want to

8      share, Mr. Cooper?

9           THE ARBITRATOR:  Yes, you may share your

10     screen.

11          MR. SHEPPARD:  No, my question was:  Do

12     you want me to keep asking you if it's okay to

13     share?

14          THE ARBITRATOR:  No, you don't need to

15     do so.  Just indicate, for the record, that you

16     are sharing.

17          MR. SHEPPARD:  It's like asking the

18     judge, "May I approach the witness?"  Thank you.

19          Actually, before I share and publish the

20     document, I want to seek admission as Exhibit

21     R-6.  It's Page 3 of Mr. Sawan's and Dade's

22     document production.  Any objection there,

23     Counsel?

24          MR. SAWAN:  No, sir.

25          MR. SHEPPARD:  All right.  Mr. Cooper,

1          we would seek admission.  And Jonathon, you could

2          make a note of this so we can get these produced

3          better later.

4                    I would seek admission of Dade document

5          production Page 3 as Exhibit Number R-6.

6                    - - - - -

7                    (Exhibit R-6, October 25, 2021 Email,

8                    was marked for identification purposes.)

9                    - - - - -

10                   THE ARBITRATOR:  That is at the top,

11         from Benjie Smith, October 15, 2021; is that the

12         page?

13                   MR. SHEPPARD:  Correct.  And I can share

14         the screen on that.  We can submit that as R-3

15         and have it labeled.  I'm sorry, R-6.

16                   THE ARBITRATOR:  Exhibit is admitted

17         without objection.  Thank you.

18                   MR. SHEPPARD:  Thank you.  Now I'm going

19         to share, Mr. Cooper.  Thank you.

20              Q.   Mr. Fournier, are you able to see

21         Exhibit R-6, which is Page 3 of Dade's document

22         production?

23              A.   Yes, I am.

24              Q.   And Page 3, there's an email from you at

25         the bottom, and then --

1      A.    Our counsel.

2      Q.    Dave Fournier, Jr.?

3      A.    Yes.

4      Q.    Not Dave Fournier, Sr.?

5      A.    Correct.

6      Q.    That's you, right?  So you're Dave

7    Fournier, Sr. and this is from Dave Fournier, Jr.

8      A.    Correct.

9      Q.    That's your son?

10     A.    That's my son.

11     Q.    Gotcha.  Either way, this says

12    "Mr. Smith," and that's directed to Benjie Smith,

13    correct?

14     A.    Yes.

15     Q.    If you go down to the fourth paragraph

16    down, that I've highlighted here, and it states,

17    "If you and Mr. Feinberg can agree upon sale

18    price, we are willing to re-list the shredder

19    through our website so that Mr. Feinberg can

20    complete the sale at your agreed upon price.

21    This would limit your expense to ten percent on

22    the final sale price, plus our cost incurred in

23    filing arbitration, and Mr. Feinberg would bear

24    another five percent in the form of a buyer's

25    premium."

1                    Did I read that correctly?

2                    MR. SAWAN:  Hold on one second.  I'm

3          going to object because that's an offer of

4          settlement.

5                    MR. SHEPPARD:  Mr. Cooper, that's not

6          what this is presented for.  There's no

7          settlement figures on here.  It doesn't say

8          "confidential settlement purposes only."  This

9          has nothing to do with any kinds of settlement.

10                    THE ARBITRATOR:  Well, let me ask you

11          this:  Is this one of the documents that was

12          offered by the Claimant, Dade?

13                    MR. SAWAN:  As a potential exhibit, Your

14          Honor, but was not -- I did not seek admission.

15                    MR. SHEPPARD:  He produced it as an

16          exhibit he was going to admit.

17                    MR. SAWAN:  But I didn't admit it.

18                    THE ARBITRATOR:  Let me finish.  My

19          question is:  Irrespective of what it is and what

20          it is not, you offered the document, initially,

21          in this case and produced it?

22                    MR. SAWAN:  That's correct, I produced

23          it.  Yes.  I did not offer it as an exhibit.  I

24          did not seek its admission.  It is being offered,

25          currently, I think, for a fundamentally different

1       reason, which is to use settlement negotiations

2       in an attempt to limit or (indiscernible) as to

3       what the agreement between the parties were.

4               MR. SHEPPARD:  Mr. Cooper, it's already

5       admitted.  He didn't object, and now he wants to

6       object.

7               THE ARBITRATOR:  I'm going to overrule

8       your objection at this time, and you may proceed,

9       Mr. Sheppard.

10              MR. SHEPPARD:  Thank you, Mr. Cooper.

11          Q.   So the question is, in Paragraph 4 here,

12      your son, Dave Fournier, Jr., who is counsel for

13      Dade, stated that Marty Feinberg -- and this is

14      back in October of -- October 15, 2021.

15              When, in fact, did -- do you recall

16      when, in fact, Dade initiated the arbitration?

17          A.   I do not.

18          Q.   Give me one moment.  I'll tell you

19      exactly when.

20              THE ARBITRATOR:  It was filed October 5.

21              MR. SHEPPARD:  I see that.

22              THE ARBITRATOR:  October 4, '21.

23          Q.   All right.  And so we've got, on October

24      15, in the fourth paragraph here, Dave Fournier,

25      Jr. telling Benjie Smith that Dade would accept a

1      five percent buyer premium.  So, in fact, sir, it

2      is negotiable; is it not?

3          A.    At the time that we put the contract

4      together, it was not.  This is an encouragement

5      for parties to get together and resolve this

6      issue before we go to arbitration.

7          Q.    It was already in arbitration, at this

8      point.  You already filed the arbitration.

9          A.    I understand that, but here we are.  And

10     if we would have been able to resolve this ahead

11     of time, it would have cost all parties a lot

12     less.

13         Q.    Just one moment.  Do you recall a

14     gentleman by the name of William Dagostin?

15             MR. SHEPPARD:  And for the court

16     reporter, that's D-A-G-O-S-T-I-N.

17         Q.    Do you recall him?

18         A.    Yes.  He's from Brazil.

19         Q.    And, in fact, he had been offered a five

20     percent buyer premium, correct?

21         A.    I cannot recall.

22             MR. SHEPPARD:  I'm going to move for

23     admission of Exhibit R-7.  It is Page -- let me

24     pull it up here -- 49.  I'm sorry.  Page 48 of

25     Dade's document production and exhibits.

1            Any objection, Counsel?

2            MR. SAWAN:  Yeah, I'll object to

3       relevance.  I just don't see why it matters what

4       somebody might, theoretically, have paid on a

5       buyer's premium.  The point of liquidating

6       damages provision is we don't know what would

7       have happened.  Otherwise, we wouldn't be

8       pursuing liquidated damages.

9            MR. SHEPPARD:  We would move for

10      admission of Exhibit R-7, which is Page 48 of

11      Dade's document production, Mr. Cooper.

12           THE ARBITRATOR:  You're referring to a

13      particular line?  Just for my edification.

14           MR. SHEPPARD:  Yes, sir.  Of course.  It

15      is the -- let me see.  I guess it goes over to

16      Page 49, as well.  It's kind of part of the

17      description.  But it's toward the bottom of the

18      page.  And these are WhatsApp.  I think it's

19      WhatsApp messages between William Dagostin and

20      Dade over a five percent buyer premium that

21      William Dagostin was offering.

22           MR. SAWAN:  Also, Mr. Cooper, it looks

23      like that was also with respect to a different

24      exhibit.  The testimony is that it was

25      non-negotiable with respect to this piece of

1          equipment.  I also don't understand why it's

2          relevant what somebody -- what they may have done

3          with another piece of equipment.

4                    MR. SHEPPARD:  And it is relevant to the

5          extent that Mr. Fournier is saying it's ten

6          percent across the board but, clearly, it's not.

7          It goes to credibility.  It goes to impeachment

8          purposes, Mr. Cooper.

9                    THE ARBITRATOR:  You're offering both

10         Pages 48 and 49 or just 48?

11                   MR. SHEPPARD:  We probably ought to do

12         48 and 49 because it carries over a little bit.

13         As R-7.

14                   THE ARBITRATOR:  I'm going to admit the

15         exhibit, R-7, which is Pages 48 and 49, over the

16         objection of Dade Auctions.

17                   MR. SHEPPARD:  Thank you, sir.

18                   - - - - -

19                   (Exhibit R-7, WhatsApp Messages, was

20                   marked for identification purposes.)

21                   - - - - -

22             Q.    All right.  Mr. Fournier, can you see

23         that on the screen there, sir?

24             A.    I can.

25             Q.    Toward the bottom of Page 48, you're

```
1          having -- and this is you, correct, Dave
2          Fournier, Sr.?
3               A.    This is.
4               Q.    Okay.  And you're having some -- they're
5          like text messages, but it's through an
6          application called WhatsApp, right?
7               A.    That's correct.
8               Q.    And this is a WhatsApp text message
9          communication between you and William Dagostin,
10         correct?
11              A.    Correct.
12              Q.    And here you're talking about, in
13         November -- this is November 9, 2021, you're
14         talking about a five percent buyer premium,
15         correct?
16              A.    Correct.
17                    MR. SAWAN:  Mr. Cooper, I'm going to
18         object, again, on relevance.  This is after the
19         formation of the contract and after the contract
20         at issue here has come and gone.
21                    MR. SHEPPARD:  And, Mr. Cooper, there is
22         not a single thing in the contract between Dade
23         and Oak Cliff regarding any buyer premium.
24                    So it's not relevant to the contract at
25         all.  It's what the negotiations are between
```

1          buyer and Dade.  But the contract has nothing to

2          do with a buyer premium.

3                    MR. SAWAN:  Mr. Cooper, it's a different

4          buyer and different piece of equipment at a

5          different time.

6                    THE ARBITRATOR:  Is this a different

7          piece of equipment, is that what you're saying?

8                    MR. SAWAN:  Correct.  $525,000 piece of

9          machinery in Arkansas USA.

10                   MR. SHEPPARD:  That's fine, Mr. Cooper,

11         but they produced it.  I think it's certainly

12         worth bringing into it here, as to testimony when

13         he said there's no negotiations on ten percent

14         buyer premium.  That's clearly the case.  It

15         might even go down to zero.  They're still

16         getting ten percent from the seller.  It's like a

17         real estate commission.

18                   THE ARBITRATOR:  Well, for whatever it's

19         worth, I'm going to overrule the objection.  And

20         it's my understanding that it's for a different

21         piece of equipment; is that correct?  And the

22         line above that --

23                   MR. SHEPPARD:  Correct.

24                   THE ARBITRATOR:  -- they're talking

25         about, certainly, a different price.

1              Where does this document show that this

2      is a different piece of equipment?

3              MR. SHEPPARD:  It references 3500 HP

4      motor.

5              THE WITNESS:  May I speak?

6              THE ARBITRATOR:  Yeah.  If somebody can

7      clarify this, I would appreciate it.

8              THE WITNESS:  Just the policy, line,

9      Arkansas USA, it says a Universal 74 x 104.  We

10     are speaking about a totally different shredder

11     that the Brazilian customer came in to see, as

12     well as the shredder that Benjie had, which is a

13     Harris 60 by 90 shredder.  This is entirely

14     different.

15             MR. SHEPPARD:  I just have a couple

16     questions about this, Mr. Cooper.  May I proceed,

17     sir?

18             THE ARBITRATOR:  This document shows the

19     willingness to discount the buyer's premium on a

20     different machine; is that correct?  I'm just

21     trying to understand what it is.  Whether it's

22     relevant or not relevant.  It's being offered.

23     I'd like to understand what it is.

24             MR. SHEPPARD:  Well, I mean, frankly,

25     it's Mr. Fournier's text messages.  But it does

1          show that the buyer's premium is, in fact,

2          negotiable, when Mr. Fournier says it is not.

3                    MR. SAWAN:  Specifically with respect to

4          a different piece of equipment, in a different

5          part of the United States, with a different

6          seller, at a different time frame.  But yes,

7          sure.

8                    THE ARBITRATOR:  All right.  I

9          understand what it is.  I'm going to overrule the

10         objection to its admission and it will be

11         admitted for background information.

12                   MR. SHEPPARD:  Thank you.

13         Q.    So Mr. Fournier, your testimony was that

14         buyers' premiums are ten percent and not

15         negotiable, right?

16         A.    And I also said at that time.  And the

17         answer is yes, at that time, that's the buyer's

18         premium, when we started this contract and what

19         was up on the internet was a buyer's premium of

20         ten percent, when we had this contract started.

21                   We have changed our buyer's premium

22         subsequent to this, and it is now a graduated

23         scale based on pricing.  And this fell into the

24         pricing -- Mr. Smith was still under the old

25         contract, and that's how we left the buyer's

1      premium on each and every piece of equipment.

2              It was based on the timing of the

3      contracts.  So the buyer's premium is not

4      negotiable -- was not negotiable.  Have we ever

5      thrown a deal under the bus because of a buyer's

6      premium?  Yeah, we've been stuck a couple of

7      times.  We've been stuck a couple of times.

8              But the fact of the matter is, if you go

9      out and look at our website right now, you will

10     see that we have a graduated scale on buyer's

11     premium, and this was changed after we made those

12     internal changes on buyer's premium.

13         Q.   Okay.  Now, if you look at the

14     contract --

15              MR. SHEPPARD:  And Mr. Cooper, we would

16     move to admit -- I think it's already in

17     evidence.

18              MR. SAWAN:  It's already in evidence,

19     Exhibit 1.

20              MR. SHEPPARD:  Okay.

21         Q.   And this is Exhibit R-2.  I don't think

22     we need two of them in the record, since we

23     already have the contract as Exhibit 1.

24              You said Exhibit 1, Counsel?

25              MR. SAWAN:  That's correct.  I'll

```
1            stipulate that R-1 and Exhibit 1 are the same.
2                   MR. SHEPPARD:   Thank you.
3            Q.    Looking at the listing agreement, the
4            contract between Dade and Oak Cliff, there is not
5            a single term in this contract that says that
6            there is a buyer premium that a buyer will pay,
7            correct, sir?
8            A.    Correct.
9            Q.    Okay.  The only thing in that contract,
10           in Exhibit 1, is that Oak Cliff will pay a ten
11           percent commission, correct, if it sells?
12           A.    That's correct.  It is a seller's
13           contract, not a buyer's contract.
14           Q.    Okay.  And it's a ten percent commission
15           of the sale price, right?
16           A.    Yes, sir.
17           Q.    And the sale price is always negotiable.
18           It's worth as much as somebody is going to pay
19           for it, correct?
20           A.    That's correct.
21           Q.    All right.  And you had contact -- I'm
22           going to switch gears on you here and just talk a
23           little bit about the background.  You, in fact,
24           had reached out to Oak Cliff because, as you had
25           said, you had heard that Oak Cliff was selling
```

1          its shredder, correct?

2              A.    That's correct.

3              Q.    And how did you contact Oak Cliff?  By

4          phone?  By email?  By text message?  What was it?

5              A.    In that case, more than likely, I would

6          have called Benjie because that is not a

7          discussion that you have in an email and I hate

8          typing.

9              Q.    Okay.  How long after that initial

10         conversation was the contract formed?

11             A.    I can't answer that.  That would be

12         speculative.

13             Q.    Fair enough.  Do you recall whether you

14         went through any of the specific terms of Exhibit

15         1, which is the listing agreement, with Mr. Smith

16         when you were speaking with him on the phone?

17             A.    I don't recall that, specifically.  I

18         think I stated that earlier, that that is a

19         procedure that we all go through here.  All

20         salespeople go through the terms of the contract

21         with the seller.

22             Q.    Would any other person at Dade have had

23         conversations with Mr. Smith about the formation

24         of the listing agreement or would that just have

25         been you?

1          A.    More than likely.  And the answer to

2     that is we have many people here, and if

3     Mr. Smith called in and got a hold of someone

4     else, he could have spoken with somebody about a

5     particular item that he was interested in

6     discussing.  More than likely, it was me because

7     I had the relationship with Benjie.

8          Q.    That relationship, as you stated before,

9     and I think it's -- Mr. Smith will testify, that

10     relationship goes back many, many years, right?

11          A.    It does.

12          Q.    And mostly on the financing side, but

13     this was the first time that Mr. Smith had ever

14     listed anything for sale with Dade.  But over the

15     years, it had been a good relationship, correct?

16          A.    Correct.

17          Q.    And if I may ask you, sir, what are you

18     looking at there on your screen?

19          A.    I'm looking at another -- I was going to

20     tell you exactly how far it went back.

21          Q.    Well, I'd request that you not look at

22     anything on your screen as I'm asking you

23     questions here.  If there's a document I want you

24     to review, I'll show it to you.

25               MR. SHEPPARD:  Is that okay, Mr. Cooper?

```
 1            THE ARBITRATOR:  Yes.

 2            - - - - -

 3            (Exhibit R-1, Demand For Arbitration,

 4            was marked for identification purposes.)

 5            - - - - -

 6      Q.    I am going to put up on the screen here

 7    Exhibit R-1.  And Mr. Fournier, you don't have

 8    anything up on your screen right now that you're

 9    reading from or reviewing or receiving any kind

10    of messages during your testimony, are you, sir?

11      A.    The only thing I have up is the

12    information that you have in your possession.

13      Q.    Okay.  Sharing with you Exhibit R-1.

14    Are you able to see that?

15      A.    I am.

16      Q.    And this is Dade's demand for

17    arbitration, correct?

18      A.    Yes.

19      Q.    And you've reviewed -- let me move the

20    Zoom box over here.  Give me one second.  There

21    we go.

22            And you've reviewed this demand before

23    it was filed, correct?

24      A.    More than likely, at this point in time,

25    my son did, yes.
```

1          MR. SAWAN:  And Mr. Cooper, I'm going to

2     object to the relevance of this.

3          MR. SHEPPARD:  Mr. Cooper, it's their

4     demand for arbitration.

5          THE ARBITRATOR:  Yeah.  Objection

6     overruled.

7     Q.    All right.  And the first page here is

8     the letter initiating the arbitration.  And then

9     the second page and third page here are the AAA,

10    American Arbitration Association, Commercial

11    Arbitration Rules, Demand For Arbitration, right,

12    sir?

13    A.    Correct.

14    Q.    And you reviewed this before it was

15    filed with AAA, correct?

16    A.    I assume my son did.

17    Q.    All right.  And, in fact, it was Dade,

18    and specifically you that demanded arbitration

19    and that this be filed, correct?

20    A.    Yes.  I assume through my son, yes.

21    Q.    Well --

22    A.    Who was our corporate attorney at that

23    time.

24    Q.    Okay.  And so let me just clarify for

25    the record.  You're speaking on behalf of Dade,

1        as the corporate representative of Dade, correct?

2             A.    Yes, I am.

3             Q.    And so as the corporate representative,

4        I mean, a company such as Dade or Oak Cliff or

5        even our law firm, Mr. Sawan's law firm, the

6        company can't speak for itself.  It doesn't have

7        a voice.  But they have to have a person speaking

8        for it.  You're that person, correct?

9             A.    Correct.

10            Q.    And so Dade, in fact, approved and

11       ratified the commercial arbitration rules, demand

12       for arbitration here at Page 2 of Exhibit R-1,

13       correct?

14            A.    Correct.

15            Q.    All right.  And, in fact, you agreed in

16       your deposition testimony, I would hope you would

17       agree today, that you approved and, in fact,

18       agreed with all of the contents of this demand

19       for arbitration, correct?

20            A.    Correct.

21            Q.    Now, if we look down at the description

22       here.  This box that I've just shaded.  Do you

23       see that?

24            A.    Yes.

25            Q.    And it says, "The Respondent listed an

1          item for sale on the Claimant's auction site, the

2          terms and conditions of which provide for auto

3          listing renewals unless the listing party

4          provides timely notice of its intent to terminate

5          the listing."

6                    Not a well-written sentence, but did I

7          read that correctly?

8          A.    Yes, you did.

9          Q.    "The party failed to provide said timely

10         notice.  Early termination of a listing resulted

11         in a penalty equal to 20 percent of the listed

12         value."

13                   Did I read that correctly?

14         A.    You did.

15         Q.    "In this instance, $135,000, which

16         equals 20 percent of the $675,000 list price."

17                   Did I read that right?

18         A.    Yes.

19         Q.    Thank you.  And this is the only basis

20         for Dade's demand for arbitration, correct?

21         A.    Well, that's a brief description of why

22         we're here.

23         Q.    Okay.

24         A.    The box is only so big.

25         Q.    The statement is accurate as to why Dade

1       was seeking arbitration, correct?

2          A.   Assuming yes, that there is a time to

3       expose the balance of the information, why we're

4       here.

5          Q.   Well, why we're here is the 20 percent

6       penalty clause that's listed under brief

7       description of the dispute, correct?

8          A.   Well, the fact of the matter is it

9       wasn't a penalty.  It's part of the contract.

10      And it's a misstatement, penalty.

11          Q.   But you agreed to all the terms and all

12      the description in this demand for arbitration,

13      is what you just testified to, correct?  It's

14      listed as a penalty, but now you're trying to

15      backtrack on that and say that it's not, because

16      a penalty is unlawful in Ohio; isn't it, sir?

17          A.   I have no idea.  That's why I have

18      attorneys.

19          Q.   Okay.  And I want to go back to --

20          MR. SAWAN:  Hold on.  Your Honor, I'm

21      going to object to a number of things there.

22      Number one, the term "penalty" in the vernacular

23      is inconsequence for a breach.  An unenforceable

24      penalty is a term of art that you need to

25      determine.

1           Mr. Fournier lacks the capacity in which

2      to make a legal determination as to the

3      enforceability of the 20 percent fee, and so I

4      object to the line of questioning.

5           MR. SHEPPARD:  I'm not going to ask

6      another question about it.  He's already said he

7      doesn't know.

8           THE ARBITRATOR:  The objection will be

9      overruled.

10          MR. SHEPPARD:  And if I may impose on

11     Jonathon Austin.  Do we have -- where did we save

12     the page out of the deposition, Jonathon?

13          MR. AUSTIN:  I can email it to you real

14     quick.

15          MR. SAWAN:  Where he said he didn't want

16     to make any changes?

17          MR. SHEPPARD:  No.

18          MR. SAWAN:  I think it will go a lot

19     faster if you tell me what it is.  I can

20     stipulate to a lot of it, probably.

21          MR. SHEPPARD:  I have to pull up the

22     deposition.  Jonathon, do you have it there where

23     you can pull it up real quick?

24          MR. AUSTIN:  Yeah.  I can give you the

25     line.

1          MR. SHEPPARD:  And I'm talking about the

2     acknowledgment that we talked about this morning.

3     Well, actually, that's in our reply, Mr. Cooper.

4          MR. AUSTIN:  Page 25, 14 through 23.

5          MR. SHEPPARD:  Yes.  Page 25 of Dave

6     Fournier, Sr.'s deposition, Mr. Cooper.  Page 25,

7     lines 14 through 23.

8          I want to make clear, if I may,

9     Mr. Cooper, that the only thing we are dealing

10    with in this arbitration is what's listed in

11    brief description here.  Because what Dade is

12    trying to do is squeeze in other avenues for

13    damages.

14          And in Page 25, lines 14 through 23, we

15    have an acknowledgment and stipulation from

16    Mr. Sawan that this is, in fact, the case.  And

17    so any effort to try and squeeze in any other

18    avenue of damages is improper, and we would

19    object to any admission or any testimony in an

20    effort to bring that in.

21          MR. SAWAN:  Mr. Cooper, I have no

22    problem with that.  The fact of the matter is the

23    liquidated damages provision is being used

24    because he can't prove other damages, and that's

25    the point.

1            We don't know what this would have sold

2        for.  We don't know what the buyer's premium

3        would have been.  I mean, I agree with them a

4        hundred percent in a lot of their lines of

5        questioning.  That's why liquidated damages

6        provisions exist.

7            Q.    Okay.  So any testimony that

8        Mr. Fournier is trying to squeeze in here about

9        other forms of damages, the only damages,

10        Mr. Fournier, that Dade is seeking is $135,000

11        based on this 20 percent, as it states here, in

12        the demand for arbitration, this 20 percent

13        penalty, correct, sir?

14            A.    Correct.

15            THE ARBITRATOR:  Is the deposition to be

16        marked and entered into the record as evidence in

17        the hearing here?

18            MR. SHEPPARD:  No, sir.  We didn't plan

19        on that.

20            THE ARBITRATOR:  I'm sorry?

21            MR. SHEPPARD:  We did not plan on that.

22        I don't think it needs to be.

23            THE ARBITRATOR:  Are you offering the

24        pages?

25            MR. SHEPPARD:  No, sir.  I don't need

1          to, at this time, based on Mr. Sawan's

2          stipulation that $135,000 is all they're seeking.

3                    THE ARBITRATOR:  Okay.  Thank you.

4          Q.    Just to encapsulate and move on, you

5          agree that Dade initiated this arbitration to

6          pursue the 20 percent penalty against Oak Cliff,

7          correct, sir?

8          A.    Yes.  To collect what the contract

9          allows us to collect for a breach.

10         Q.    And it's only a breach based on early

11         termination, right, sir?

12         A.    No, sir.

13         Q.    Okay.  Well, let's talk about that.  Let

14         me ask it this way:  The 20 percent penalty

15         clause only goes into effect if there is an early

16         termination, right?

17         A.    If there's a breach of the contract.

18         Q.    Pulling up Exhibit 1, the Dade Auctions

19         listing agreement.  Do you see that,

20         Mr. Fournier?

21         A.    Yes.

22         Q.    Are you able to see that entire contract

23         or is it cut off because of the Zoom information

24         on this side?  Or you see the whole thing?

25         A.    I see enough of the language.

```
 1              Q.    Very good.  I want to scroll down to
 2         section -- which section is it, Jonathon?
 3                    MR. AUSTIN:  5.
 4                    MR. SHEPPARD:  5, yes.
 5                    MR. AUSTIN:  Fourth sentence.
 6                    MR. SHEPPARD:  Yep.  Here we go.  I'm
 7         highlighting here -- whoops, trying to highlight.
 8              Q.    Can you see that shading there,
 9         Mr. Fournier?
10              A.    I can.
11              Q.    "Any cancelation or termination prior to
12         the listing agreement expiration, for any reason,
13         will incur a 20 percent fee of the listed value
14         or fair market value as determined by Dade
15         Auctions to you, as the seller."
16                    Did I read that correctly?
17              A.    You did.
18              Q.    And it's not related to any termination
19         -- or excuse me.  It's not related to any breach.
20         It's related, solely, to any cancelation or
21         termination prior to the listing agreement
22         expiration, correct, sir?
23              A.    Correct.
24              Q.    So that's different from what you
25         testified to a moment ago, that it was for any
```

1          breach, right?  It's not for any breach, is it?

2                    MR. SAWAN:  Objection.  Lacks capacity.

3                    MR. SHEPPARD:  He can read the contract.

4          It's his own contract, Mr. Cooper.

5                    THE ARBITRATOR:  I understand.  It says

6          what it says.  What's the problem with that?

7                    MR. SHEPPARD:  Well, it's contrary to

8          his testimony from a moment ago, that it was for

9          any breach.  It's not just any breach.  It's only

10         for early termination or cancelation.

11                   MR. SAWAN:  It's irrelevant if we're not

12         pursuing the other damages.  And I don't know why

13         it matters what happens in the event of any other

14         breach.

15                   MR. SHEPPARD:  It goes to credibility

16         and reliability and impeachment of the witness,

17         Mr. Cooper.

18                   THE ARBITRATOR:  Objection overruled.

19                   MR. SHEPPARD:  I can ask it again, just

20         for clarity's sake.

21              Q.    This 20 percent penalty clause is only

22         for cancelation or a termination prior to the

23         listing agreement expiration for any reason,

24         correct, sir?

25              A.    That's what that says.  That's not what

1          my understanding of this entire contract states.

2              Q.    Well, it's Dade's contract, right?

3              A.    It's Dade's contract.

4              Q.    Dade wrote it and Dade used it in every

5          listing agreement it has, right?

6              A.    That's correct.  But I cannot address

7          all the legality of it.

8              Q.    Well, it's not a legality, sir.  This is

9          just one basic sentence that is just an

10         interpretation of the English language; is it

11         not, sir?

12             A.    It is.  That's what it says.

13             Q.    And so it's not for any breach, like you

14         testified to a minute ago.  It's only for early

15         termination, correct?

16             A.    It's my misunderstanding of the contract

17         in its totality.

18             Q.    Okay.  And here, in this instance, the

19         only reason Dade initiated this arbitration was

20         because Oak Cliff, at least in Dade's mind,

21         terminated the agreement outside the allowable

22         window, which in Dade's opinion triggered the 20

23         percent penalty clause, correct, sir?

24             A.    No, sir.  There was a substantial amount

25         of additional -- that was involved in the

1    termination -- or the filing of this.

2    Q.    But the only reason Dade is entitled to

3    a 20 percent penalty is for the early

4    termination, is what you just testified to,

5    correct?

6    A.    Yes, sir.

7    Q.    Okay.  And according to the demand for

8    arbitration, $135,000 is the 20 percent penalty

9    that Dade seeks, based on early termination,

10   correct?

11   A.    According to this sentence, apparently.

12   Q.    All right.  Going back to Exhibit 1

13   that's here on the screen.  It's R-2, but it's

14   really just Dade 1.  We'll just reference it as

15   Dade 1, so there's not a confusion here.  Let's

16   talk about the actual agreement in this

17   arbitration.

18        And if you go to the first paragraph

19   here.  The first -- or excuse me, the second

20   sentence, "This agreement expires 180 days after

21   your digital signature date, per the terms below,

22   and shall automatically renew for the same term

23   until the sales transaction is completed."

24        Did I read that correctly, sir?

25   A.    You did.

1        Q.    Okay.  So it's an automatic renewal

2        every 180 days, right?

3        A.    Correct.

4        Q.    And then it would expire only when there

5        is timely cancelation given, right?

6        A.    Or a sale.

7        Q.    Correct.  And so proper cancelation,

8        under the agreement, must mean 15 days before the

9        expiration of 180 days, correct?

10       A.    Correct.

11       Q.    And if not, then the auction could just

12       go on forever, right?

13       A.    Yes, sir.

14       Q.    It would just be an indefinite auction.

15       And, in fact, Dade doesn't do anything internally

16       to do anything to the website.  It just stays on

17       the website, correct?

18       A.    Yes, sir.

19       Q.    I'm sorry?

20       A.    Yes, sir.  It stays on the website.  It

21       doesn't mean that we don't do anything

22       internally.  We continue to try to sell it.

23       Q.    Okay.  Well, let me ask it this way and

24       let me break it down.  It stays on the website,

25       right?

1          A.     Yes.

2          Q.     And you don't do anything to the website

3     to change the auction listing or update the

4     auction listing upon the renewal, unless the

5     seller decides it wants to add or delete

6     something to the auction, correct?

7          A.     That's correct.

8          Q.     You don't send out any new blasts on

9     Facebook or any other kind of social media,

10    correct, if it renews?

11         A.     No need to.  We continuously advertise

12    it.

13         Q.     On the website?  On Facebook?  It's

14    always there.  Once it's listed once, it's there

15    and you're done, right?

16         A.     No, absolutely not.  There are new

17    listing that go out.  We create new listings.

18    If, for instance, this was -- and when the

19    listing was changed by Benjie, there were

20    different blasts that went out to notify people

21    that it was -- the price was lowered, that things

22    had changed with it.

23              There's constant restructuring of our

24    ads to try to get buyers interested in the piece

25    of equipment.

1          Q.    Okay.  But -- and those changes were

2          made on the second renewal, correct?

3          A.    Yes, they were.

4          Q.    Right.  And on this third renewal, which

5          is the renewal we're all fighting about today,

6          there was no changes that Mr. Smith made to the

7          auction, other than his email to Dade saying that

8          he's canceling the listing, correct?

9          A.    That's correct.

10          Q.    And so the changes you were referencing

11          and blasts that would have gone out were only

12          upon the second renewal when Mr. Smith did, in

13          fact, make those changes, drop the price, and a

14          couple other things, right?

15          A.    Right.

16          Q.    Okay.  Thank you.

17               We talked about Section 5, right, which

18          is the clause about the 20 percent.  I'll

19          highlight this again here because we're going to

20          talk about it.

21               What this really amounts to, what I've

22          highlighted here in Section 5, "Any cancelation

23          or termination, prior to the listing agreement

24          expiration for any reason, will incur a 20

25          percent fee of the listed value."

1              That really amounts to a punishment,

2       does it not, sir?

3              MR. SAWAN:  Objection.

4       A.    No, sir.

5              MR. SAWAN:  Go ahead.

6       A.    No, sir.

7       Q.    It's a measure of security in lieu of

8       actual damages, right?

9       A.    I don't understand the question.

10      Q.    Well, a 20 percent penalty clause for

11      liquidated damages isn't necessarily what your

12      actual damages are, correct?

13      A.    It's what my -- it's what my losses are

14      if I don't sell the piece of equipment.  It's

15      what my opportunity is if I don't sell the piece

16      of equipment.

17      Q.    But your actual damages -- you know the

18      difference between actual damages and liquidated

19      damages?

20             MR. SAWAN:  Objection.  We're not

21      looking for actual damages.

22             THE ARBITRATOR:  Is there a question

23      pending?

24             MR. SHEPPARD:  Yes, sir.  Yes.  The

25      question was if he understood the difference

1    between liquidated damages and actual damages.

2         A.    I do.

3         Q.    Okay.  And actual damages are what you

4    would have incurred, and that number is

5    verifiable and you can figure it out, right?

6         A.    Yes.

7         Q.    Okay.  And so this provision, in fact,

8    disregards damages that were actually suffered by

9    Dade based on early termination, correct?

10             MR. SAWAN:  Objection.  Calls for

11   speculation.  We don't know what the actual

12   damages are.  That's the point.

13             MR. SHEPPARD:  That's not the question,

14   Mr. Cooper.

15             THE ARBITRATOR:  Overruled.  You may

16   answer the question.

17        A.    Please repeat it.

18        Q.    Yes, sir.  The provision here,

19   highlighted in Section 5, disregards actual

20   damages suffered by Dade upon early termination,

21   correct?

22        A.    I don't know how we determine actual

23   damages, frankly.

24        Q.    Okay.  So let's -- well, that wasn't

25   really my question, sir.  The liquidated damages

1          clause, Section 5 on the screen, does not take

2          into account actual damages, correct?  Let me ask

3          it that way.

4               A.    It does not.

5               Q.    All right.  So let's just talk

6          hypothetically.  Say a party canceled the

7          contract 14 days before the expiration of the 180

8          days, instead of 15 days.  One day late.

9                    And you contend that the damages are

10         still 20 percent of the sale price or the listed

11         sale price, correct?

12              A.    Correct.

13              Q.    And there's no other damages, other than

14         that 20 percent, right?

15              A.    Well, we don't know that for a fact.  It

16         could have sold on the last day.  If somebody

17         hits the "buy now" button that last day, I mean,

18         it's all hypothetical.  And then I'd have earned

19         all of my commissions for all of the previous

20         days that it was listed.

21              Q.    And if nobody clicked "buy it now," on

22         Day 14, when it was terminated, instead of Day

23         15, then there's no damages, right?

24              A.    So I think that's what contracts are all

25         about.  That's why we're here.  That's --

1            MR. SHEPPARD:  Objection.

2       Nonresponsive.

3            MR. SAWAN:  Let him answer, please.

4            MR. SHEPPARD:  I'm sorry.  I thought he

5       finished.

6            MR. SAWAN:  No.

7       A.    That's what we're talking about here.

8       The opportunity that I have lost by the customer

9       canceling the contract, and the fact that this is

10      a specific opportunity for anyone to come along.

11           And by the way, we have had many

12      customers hit the "buy now" button, and I have a

13      customer that hit a "buy now" button for 1.2

14      million dollars.

15           So at any point in time, during this

16      contract, or during the last remaining days of

17      any contract, is a loss.  It's undeterminable.

18      Q.    And the contract, in this instance, was

19      canceled six days after the 15 days started to

20      run, correct?

21           MR. SAWAN:  Objection.  Relevance, and

22      it was stipulated to.

23           THE ARBITRATOR:  I think it is pretty

24      clear.

25           MR. SHEPPARD:  Okay.  I can move on,

1          Mr. Cooper.

2              Q.    And Mr. Fournier, just so we're clear

3          for the record, Oak Cliff canceled the contract

4          before the next 180 days actually renewed,

5          correct?  Before the 180 days began, correct?

6              A.    He did.

7              Q.    Okay.  And in that time, between Day 15

8          and the six-day gap there, nobody hit "buy it

9          now," correct?

10             MR. SAWAN:  Objection.  Relevance.

11             THE ARBITRATOR:  Overruled.  You may

12         answer.

13             A.    No one --

14             Q.    I'm sorry, I missed your answer.

15             A.    No one.

16             Q.    Okay.  Sorry.  Thank you.

17             No one made an offer in writing to buy

18         the piece of equipment, the shredder, in that

19         six-day period, correct?

20             A.    No one.

21             Q.    And there was no pending offer, written

22         offer on the table that all Mr. Smith had to do

23         was sign on the dotted line to get the equipment

24         sold in that six-day period, correct?

25             A.    No one.

1          Q.    You testified with Mr. Sawan that Dade

2     auctions all sorts of equipment across the

3     industrial spectrum; is that correct?

4          A.    In the salvage industry, yes.

5          Q.    Is there anything in particular that

6     Dade sells more than any other item or is it

7     pretty equal across the board?

8          A.    We sell a lot of different equipment,

9     yes.  It's not particular.

10          Q.    And a shredder, such as this shredder

11     that Oak Cliff was trying to sell, has a very

12     limited market, correct?

13          A.    Yes.  Definitely.

14          Q.    In the last five years, how many auto

15     shredders do you think Dade has auctioned?

16          A.    Auto shedders, 15 to 20.

17          Q.    And sale prices will vary from listing

18     to listing; is that correct?

19          A.    Yes.  From 5 and a half million dollars

20     down to 500,000.

21          Q.    And you're just talking equipment across

22     the board or you're just talking auto shredders?

23          A.    Auto shredders.

24          Q.    So that 20 percent penalty clause can

25     fluctuate based solely on what Dade believes the

1          items to be worth; is that fair?

2              A.    No.  What the customer has listed those

3          items at.

4              Q.    All right.  Well, let's go back to the

5          contract.  You still see my highlighted section

6          there, right, sir?

7              A.    Yes.

8              Q.    All right.  "Any cancelation or

9          termination prior to the listing agreement

10         expiration, for any reason, will incur a 20

11         percent fee of the listed value or fair market

12         value, as determined by Dade Auctions to you, as

13         the seller," right?

14             A.    That's correct.

15             Q.    Okay.  So listed value or fair market

16         value, Dade could put either number on this 20

17         percent penalty clause, correct?

18                 MR. SAWAN:  Objection to relevance.

19         We're not putting any number.  We're putting 20

20         percent fee of the listed value.  I don't know

21         why any of this matters.

22                 MR. SHEPPARD:  Well, fair market value

23         and list value are two different things.  I'm

24         trying to get to that point --

25                 MR. SAWAN:  I'll stipulate that those

1          could be two different things.

2                    THE ARBITRATOR:  Could you restate your

3          question, please?

4                    MR. SHEPPARD:  Yes.  I'll have to ask

5          the court reporter to go back and read it, if she

6          doesn't mind.

7                    (Thereupon, the record was read.)

8                    MR. SAWAN:  My objection is to

9          relevance.

10                   THE ARBITRATOR:  Go ahead.  You may

11         answer.  Overruled.

12         A.    The answer is yes but certainly not what

13         we did.

14         Q.    And Dade gets to choose which dollar

15         amount it seeks under this 20 percent penalty,

16         whether it's a fair market value or whether it's

17         the listed value, correct?

18         A.    That's what that states.

19         Q.    Okay.  And so here, isn't it true, sir,

20         that the measure of damages that Dade would be

21         looking at, when it believed that the contract

22         was in effect, but in fact Mr. Smith had

23         terminated it, in that six-day window, between

24         the automatic renewal and the time it was in fact

25         terminated, isn't it true that damages -- you're

1        looking at those damages that would have been

2        incurred in that six-day period, correct?

3             MR. SAWAN:  Objection.

4        A.    I don't know that to be a fact.

5        Q.    Well, that's when your damages would be

6        incurred, in that six-day period, right?

7             MR. SAWAN:  Objection.  Capacity.  How

8        does he know how to value a case?

9             MR. SHEPPARD:  It's his case,

10       Mr. Cooper.

11            THE ARBITRATOR:  Yeah, I understand.

12       You're asking him for a question of fact or --

13            MR. SHEPPARD:  Yes, sir.  Yes.  I mean,

14       I'm asking what -- that Dade's damages would be

15       limited to that six-day window of when they

16       thought it would have renewed automatically

17       versus when Mr. Smith actually canceled it.

18            MR. SAWAN:  It's a legal argument to the

19       metric of damages in a lawsuit.

20            MR. SHEPPARD:  It's not a legal

21       argument.

22            MR. SAWAN:  It's not Mr. Fournier's

23       case.  It's my case.  He's my client.

24            MR. SHEPPARD:  It's not a lawyer to make

25       that argument.  It's facts.  Damages are facts,

1           not law.

2                    THE ARBITRATOR:  Well, what he can

3           recover is a question of law.  And, perhaps, the

4           question mixed fact and law.  Are you asking him

5           for a legal conclusion?

6                    MR. SHEPPARD:  No, sir.  I'm only asking

7           facts.  What measure of damages Dade would have

8           had in that six-day period.

9                    MR. SAWAN:  He's testified repeatedly,

10          Mr. Cooper, that he --

11                   THE ARBITRATOR:  There's two different

12          questions.  If you can ask him if you really add

13          these up over the period of time, should you

14          divide the number by 180 days, so each day is

15          worth a certain amount; is that what you're

16          asking him?

17                   It sounds to me it's awful close to

18          asking him for a conclusion of law of what he's

19          entitled to recover or not.

20                   MR. SHEPPARD:  Let me ask it in a

21          different way.

22               Q.    Mr. Fournier, in that six-day period,

23          Dade did not incur any expenses in connection

24          with Oak Cliff's auto shredder auction or

25          listing, correct?

```
1              A.    Not that I'm aware of.

2              Q.    In fact, in your deposition, Page 18,

3        lines 7 through 10, the question was asked by

4        Mr. Austin, who is on the Zoom with us, so really

5        it would be six days of anticipation of having

6        the contract when you don't actually have the

7        contract, right?  And the answer was correct.  Do

8        you recall that testimony?

9              A.    That's correct.

10             Q.    Okay.  And there's no expenses that have

11       incurred, like you testified to.  So I can move

12       on from that.

13                   And if you sold the shredder in that

14       six-day period, Dade would have only been

15       entitled to a ten percent commission from the

16       seller, correct?

17             A.    From the seller, correct.

18             Q.    But you're seeking the 20 percent

19       liquidated damages, right?

20             A.    Yes, sir.

21             Q.    And so, really, from the seller's side,

22       and I'm strictly talking just the seller's side,

23       that's a ten percent increase on the seller's

24       side if there's an early cancelation, right?

25             A.    Correct.
```

1          Q.    Okay.  And from the seller's side,

2     there's really no way to describe that additional

3     ten percent, other than a penalty that the seller

4     would have to pay, correct?

5               MR. SAWAN:  Objection, as he calls for a

6     legal conclusion.

7               THE ARBITRATOR:  Objection is sustained.

8               MR. SAWAN:  Thank you.

9          Q.    Wouldn't you agree, sir, that both the

10    seller and Dade also bear the risk together of

11    whether the piece of equipment sells or not?

12              MR. SAWAN:  Objection.  Relevance.

13              THE ARBITRATOR:  Overruled.  You may

14    answer.

15         A.    Please repeat the question.

16         Q.    Yes, sir.

17              Both the seller and Dade bear the risk

18    of whether the piece of equipment sells or not,

19    correct?

20         A.    Sir, you said a mouthful.  That is

21    absolutely correct.

22         Q.    Okay.

23         A.    You have to have the cooperation of the

24    seller in order to sell something.

25              MR. SHEPPARD:  Objection to the

1      nonresponsive portion after "correct."

2              THE ARBITRATOR:  Objection is overruled.

3      The answer may stand.

4          Q.   Let me show you --

5              MR. SHEPPARD:  Actually, I'm going to

6      move to admit Exhibit R-3.  I'm not sure if

7      Mr. Sawan would have any objections to that.

8              MR. SAWAN:  What is R-3?

9              MR. SHEPPARD:  R-3 is the September 1,

10     2021 email between Oak Cliff and Dade.

11             MR. SAWAN:  Do you have a Bates number

12     or is this on your exhibits?

13             MR. SHEPPARD:  It's our exhibit.

14             MR. SAWAN:  You can just put it on the

15     screen.

16             MR. SHEPPARD:  There it is.

17             MR. SAWAN:  No objection.

18             MR. SHEPPARD:  I would move to admit

19     Exhibit R-3.  Mr. Cooper, are you there?

20             THE ARBITRATOR:  You're asking to admit

21     this exhibit?

22             MR. SHEPPARD:  Yes, there you are.  Yes,

23     I'm moving to admit Exhibit R-3.

24             THE ARBITRATOR:  Okay.  Exhibit will be

25     admitted.

1                   MR. SHEPPARD:  Thank you.

2                   - - - - -

3                   (Exhibit R-3, September 1, 2021 Email,

4                   was marked for identification purposes.)

5                   - - - - -

6          Q.    And Mr. Fournier, you can see R-3 on the

7     screen, right, sir?

8          A.    Yes, I can.

9          Q.    And this is an email dated September 1

10    of 2021?

11         A.    Yes.

12         Q.    And the contract was entered into on

13    September 15 of 2020, correct?

14         A.    Yes.

15         Q.    And it's Dade's position that this email

16    was, in fact, six days late, right?

17         A.    Yes.

18         Q.    Which caused the 20 percent liquidated

19    damages penalty clause to go into effect,

20    correct?

21         A.    Correct.

22         Q.    So based on this email of September 1,

23    almost -- a little over a month later, about a

24    month and four days or five days, Dade, in fact,

25    instituted this proceeding solely to collect

1          $135,000, 20 percent liquidated damages based

2          solely on this six-day late termination of the

3          listing agreement, correct?

4              A.    That wasn't entirely true.  That is part

5          of the reason, yes.

6              Q.    But that's the only reason that was

7          stipulated to by your attorney in the -- your

8          deposition, and the only thing that's listed in

9          the demand for arbitration, correct?

10                  MR. SAWAN:  Objection.  We are only

11         seeking damages for that fee provision.  As to

12         why they chose to arbitrate, that is not what he

13         said.

14             Q.    Let me ask it this way:  The only basis

15         to get the 20 percent liquidated damages was for

16         the termination and only the termination, right,

17         Mr. Fournier?

18                  MR. SAWAN:  Asked and answered.

19                  THE ARBITRATOR:  Yeah, I'm going to

20         sustain the objection.

21                  MR. SHEPPARD:  That's fine.

22                  THE ARBITRATOR:  You seem to be beating

23         this one to death.

24                  MR. SHEPPARD:  I'll move on.

25                  I think I'm getting close, and I may be

1          at the end.  Mr. Cooper, may I have about five

2          minutes to look over my notes?

3                    THE ARBITRATOR:  Certainly.  Of course.

4                    MR. SHEPPARD:  Do you mind if we take a

5          break for about five minutes?

6                    THE ARBITRATOR:  That's fine.  Let's

7          take five minutes and come back on the record.

8                      (A recess was taken.)

9                    THE ARBITRATOR:  Back on the record.

10         Mr. Sheppard.

11                   MR. SHEPPARD:  I have nothing.

12                   THE ARBITRATOR:  Mr. Sawan, any

13         questions?

14                   MR. SAWAN:  I will be brief.

15                   THE ARBITRATOR:  Thank you.

16         REDIRECT EXAMINATION OF DAVID FOURNIER, SR.

17         BY MR. SAWAN:

18            Q.   Mr. Fournier, you talked to Mr. Sheppard

19         about the contract at issue here, which is marked

20         as Exhibit 1; is that correct?

21                   MR. SHEPPARD:  His audio is not working.

22                   (Discussion held off the record.)

23            Q.   Mr. Fournier, you had discussed with

24         Mr. Sheppard the contract; is that correct?

25            A.   Yes.

1          Q.     And you can see my screen, where I'm

2          showing you Exhibit 1, correct?

3          A.     Yes.

4          Q.     And I'd like you to read, for the

5          record, Section 19.

6          A.     "Entire agreement, prior arrangements."

7          Q.     Just the first sentence is fine.

8          A.     "This agreement and terms and conditions

9          then in effect at www.dadeauctions.com

10         represents the entire agreement of the parties

11         with respect to the matters contemplated herein."

12         Q.     That's good enough.

13         A.     All right.

14         Q.     I assume by the statement in that

15         section that there are terms and conditions on

16         Dade Auctions' website; is that correct?

17         A.     There are.

18         Q.     And those terms and conditions govern

19         both the seller and buyer; is that correct?

20                MR. SHEPPARD:  Objection.  Leading.

21         Q.     Do those terms and conditions cover both

22         the seller and buyer?

23         A.     Yes.

24                MR. SHEPPARD:  Objection.  Calls for

25         legal conclusion.

1                    THE ARBITRATOR:  Overruled.  You may

2        answer.

3             A.    Yes.

4             Q.    And the buyer's terms and conditions,

5        what do those say?

6             A.    The buyer's terms and conditions outline

7        the -- what the buyer is entitled to do and not

8        to do, how he must proceed.  And, also, that

9        there is a penal -- or a buyer's premium to

10       purchase each piece of equipment.

11            Q.    And what is the premium in those buyer's

12       terms and conditions?

13            A.    Ten percent.

14                  MR. SHEPPARD:  Objection.  Evidence not

15       in the record.

16                  MR. SAWAN:  Mr. Cooper, this document

17       here references another document.  It says that

18       those terms and conditions apply as if they were

19       included in that contract.

20                  Opposing counsel has had this contract

21       for probably close to a year now and could have

22       simply looked up the terms and conditions.

23                  MR. SHEPPARD:  And, Mr. Cooper, the

24       evidence is not in the record.  There's nothing

25       in the record, other than the listing agreement

1          or the listing agreement and the listing, itself,

2          which was already introduced as Exhibit R-5.

3                    And there's nothing in the record and

4          nothing in evidence, whatsoever, that talks about

5          this dadeauctions.com listing, other than what is

6          admitted as Exhibit R-5.

7                    MR. SAWAN:  Which references additional

8          terms and conditions.

9                    MR. SHEPPARD:  And there's nothing in

10         the record at all as to these additional terms

11         and conditions.

12                    THE ARBITRATOR:  There has been

13         testimony today concerning that, as well as the

14         document.  In any event, I'm not sure -- could

15         you repeat your question?  What is your question

16         again?

17         Q.    The terms and conditions then in effect

18         on dadeauctions.com, at the time of this

19         contract, included a buyer's premium of ten

20         percent; is that correct?

21                    MR. SHEPPARD:  No.  And, Mr. Cooper, the

22         best evidence rule requires him to present this

23         evidence in the form of a document itself.

24         Mr. Fournier cannot come in here and testify to

25         that.  If he's saying "it says what it says,"

1          none of that is in the record today.

2                    THE ARBITRATOR:  He has given some

3          testimony on either direct or cross-examination

4          respecting the listing agreement --

5                    MR. SHEPPARD:  And the best evidence

6          rule says that that is inadmissible testimony and

7          hearsay because he is talking about something

8          that is not in the record and trying to talk

9          about a document when it's not in the record.

10                   MR. SAWAN:  It references it in this

11         agreement, that we have talked about at nauseam.

12         This statement from opposing counsel was that

13         there was no mention whatsoever of a ten percent

14         buyer premium, which is just not true.

15                   MR. SHEPPARD:  And there's no evidence

16         in the record, it was never produced, and we

17         don't have it.  We've never had it.

18                   THE ARBITRATOR:  Well, the record that's

19         been testified to today came in either without

20         objection or objection being overruled.  The

21         record is what it is.

22                   And I'm not sure I understand what this

23         question is about.  The contract does speak for

24         itself.  And I don't know what you're asking.

25                   MR. SAWAN:  I'm simply asking whether

1          the terms and conditions referenced in Exhibit 1,

2          which was admitted without objection, speaks to

3          the buyer's premium of ten percent.

4                    MR. SHEPPARD:  And the answer is no

5          because the document speaks for itself.  And it

6          doesn't.  And I think he's trying to put words

7          into Mr. Fournier's mouth --

8                    MR. SAWAN:  You can see the --

9                    THE ARBITRATOR:  Now, hold it,

10         gentlemen.  I'm going to sustain further

11         questions along this line as what is or is not in

12         the record, at this point.  And we're going to

13         move on.

14                   Do you have another question?

15    Q.    There's been a suggestion during cross

16         that you are being unreasonable, Mr. Fournier.

17         What do you think?

18                   MR. SHEPPARD:  Objection.

19         Mischaracterizes the testimony and the line of

20         questions.

21                   THE ARBITRATOR:  What is -- could you

22         read back --

23                   MR. SHEPPARD:  It's also vague.

24                   THE ARBITRATOR:  Read the question back,

25         please.

1                    (Thereupon, the record was read.)

2                    MR. SHEPPARD:  Objection.  Calls for

3          speculation.  I've never made that representation

4          on cross-examination.

5                    MR. SAWAN:  You suggested that six days

6          is de minimis harm and that this arbitration

7          never should have been brought.  I think the man

8          should be able to defend it.

9                    THE ARBITRATOR:  Go ahead, you may

10         answer.  Do you understand the question?

11                   THE WITNESS:  I understand the question.

12                   THE ARBITRATOR:  Go ahead and answer it,

13         please.

14            A.    The answer to the question is absolutely

15         not.  We perform a great service here.  We need

16         to be paid for the service.  The reason that we

17         have contracts and the reason that all of this is

18         put together right now, as a contract, is because

19         the situation with brokers can't be trusted.

20                   MR. SHEPPARD:  Objection to the

21         nonresponsive portion after the word "no."

22                   THE ARBITRATOR:  Overruled.

23                   THE COURT REPORTER:  I'm sorry.  Did you

24         say "because the situation with the brokers can't

25         be trusted"?

1            THE WITNESS:  That's correct.

2            THE ARBITRATOR:  Objection will be

3       overruled.  The answer may stand.

4            MR. SAWAN:  I have no further questions.

5            THE ARBITRATOR:  Thank you.

6            Mr. Sheppard, anything?

7            MR. SHEPPARD:  No, sir.

8            THE ARBITRATOR:  Thank you very much.

9            Mr. Sawan, do you have any additional

10      evidence, further witnesses?

11            MR. SAWAN:  No, sir.

12            THE ARBITRATOR:  So we're finished with

13      the principal case?

14            MR. SAWAN:  Correct, sir.

15            THE ARBITRATOR:  Mr. Sheppard, do you

16      have any witnesses?

17            MR. SHEPPARD:  Yes, sir.  We do want to

18      call Mr. Benjie Smith.

19            THE ARBITRATOR:  Thank you.  Mr. Smith,

20      can you hear me okay?

21            THE WITNESS:  Yes, I can hear you.

22            BENJIE SMITH, of lawful age, having been

23      first duly sworn, was examined and testified as

24      follows:

25            THE ARBITRATOR:  Mr. Sheppard, you may

1       proceed.

2           DIRECT EXAMINATION OF BENJIE SMITH

3       BY MR. SHEPPARD:

4           Q.    Would you please introduce yourself to

5       the arbitrator?

6           A.    Yeah.  My name is Benjie Smith.  I'm the

7       owner and president of Oak Cliff Recycling.  I've

8       lived in the Dallas area my whole life.  That's

9       about it.

10          Q.    Okay.  And if you could, what is your

11      role?  Has it always been president of Oak Cliff?

12          A.    Yes.  Always.  It's been in existence

13      since, I think, the year 2000, or it might have

14      been 1999.  I've been president from the get-go.

15          Q.    And owner, as well, right?

16          A.    Right.

17          Q.    What is it, exactly, that Oak Cliff

18      does?

19          A.    Scrap metal recycling.  We buy scrap

20      metal from other scrap dealers off the street,

21      have equipment that we run scrap through that

22      processes it for mill delivery.

23          Q.    And it was Dade that instituted this

24      arbitration proceeding, correct?

25          A.    Say that again.

1          Q.    It was Dade that instituted this

2          arbitration proceeding, right?

3          A.    Yes, that's correct.

4          Q.    And you heard Mr. Fournier's testimony

5          about Oak Cliff's prior relationship with Dade,

6          right?

7          A.    Yes.

8          Q.    Could you elaborate a little bit on that

9          and tell Mr. Cooper about the relationship that

10         Oak Cliff had with Dade in the past?

11              MR. SAWAN:  Relevance.  What's it

12         matter?

13              THE ARBITRATOR:  Overruled.  You may

14         answer.

15         A.    Go ahead?

16         Q.    Yes, you can answer.

17         A.    Okay.  Sorry.  Yeah, I've dealt with him

18         for (indiscernible) exactly how many years then.

19         I think it's 15, 16 years, something like that.

20              It was more in terms of me getting help

21         with someone to find financing for pieces of

22         equipment that I might have been looking for to

23         put in my scrap operation.  I've never had any

24         relationships with him over this selling a piece

25         of equipment.  And I honestly -- I've always had

1          a really, really great relationship with the guy.

2                  I mean, we've never got into it.  Never

3          even had cross words over any kind of -- anything

4          we've ever done.  I mean, so the fact that I'm

5          sitting here right now is really surprising to

6          me.  It's just too bad.  I guess things like this

7          happen.  But I don't know.  I don't know what

8          else to say.

9              Q.    Have you had -- or have you entered into

10         any other listing agreement, similar to this one,

11         with any other company, other than Dade, in

12         selling a piece of equipment?

13             A.    No, this is it.  I mean, I pretty much

14         -- when I buy a piece of equipment, I use it up,

15         you know what I'm saying.

16             Q.    You use it up and you scrap it.

17             A.    There you go.

18             Q.    All right.  I want to show you Exhibit

19         1, Petitioner's Exhibit 1, which is the listing

20         agreement.  Share the screen here.

21                 Are you able to see that, Mr. Smith?

22             A.    Yes.

23             Q.    And if you could, can you tell

24         Mr. Cooper what events occurred with respect to

25         the shredder that ultimately resulted in Oak

1    Cliff entering into this agreement with Dade to

2    sell the shredder.  If you could just explain the

3    background, basically, so Mr. Cooper understands

4    it.

5        A.   Yeah.  Basically, I bought this machine

6    new from Harris, I think it was back in 2012 or

7    something like that.  And I started having a

8    little problem with the thing, buyers and things

9    like that.  And I had to make an agreement with

10   the City of Waxahachie that I would quit

11   operating it.

12            And to be honest with you, it's probably

13   the best thing that ever happened to me because I

14   wasn't making good money with it anyway.  So

15   anyway, I called up Dave because I'd always had a

16   great relationship with him in the past, and I

17   know that's what they do, is advertise and sell

18   scrap processing equipment to different people

19   across the country and the world, for all that

20   matter.

21            So anyway, I called him up, said, "Dave,

22   I need to get rid of this thing.  I'd like to

23   list it.  How do you work this out?"  And he told

24   me how much -- well, at first he said, "How much

25   you want for it?"

1          And I said, "Well, I think I should be

2      able to get X dollars for it."  And he was -- he

3      just said that, well, they had to do a six-month

4      agreement.  That's the way it was told to me, a

5      six-month agreement.

6          So I said, "Fine.  Let's get it out

7      there."  And we put a price tag on it and got the

8      thing out on the street and whatnot.

9          And these pieces of equipment like this

10     are very hard to sell.  I mean, there's not just

11     a whole lot of people out there that spend that

12     much money on a piece of equipment or even want

13     to take on something like this.  You know, I wish

14     I wouldn't have done it now, but it's too late

15     now.

16         So anyway, I knew they sold shredders

17     and things like that so I let him list the thing.

18     And, of course, the conversation is really pretty

19     loosey-goosey.  And maybe that's part of the

20     problem, why we're all sitting here today.

21     Because I wasn't really -- he didn't get into a

22     whole lot of detail on here is the way we do our

23     contracts and, you know, like this buyer's

24     agreement and all that stuff like that.

25         We never even talked about anything like

1          that.  The only thing we talked about is how long

2          the agreement was going to be for and how much I

3          wanted to try to get for it, and so be it.

4                    So they send the contract and

5          everything.  And I'll admit, I probably didn't

6          read the thing as detailed as I should have.

7          But, you know, I didn't think I had to because I

8          had a long-time relationship with this guy.  I

9          didn't think I needed to get into that kind of

10         stuff, that we'd never be doing this kind of

11         stuff like we're sitting here today.  So take it

12         for what you think.

13              Q.   Thank you, Mr. Smith.

14                   And the agreement does, in fact, speak

15         for itself, right, sir?

16              A.   Well, yeah, I guess it does.

17              Q.   And that's the agreement that you

18         signed, that's Exhibit 1.  It says what it says,

19         right?

20              A.   Yes.

21              Q.   All right.  And at the time, when you

22         signed the agreement, you did read the agreement,

23         right?

24              A.   Yes.

25              Q.   Okay.  And at least at the time you

1          thought you understood what the terms were,

2          correct?

3              A.    Yes.  I just didn't think I need to

4          worry about it all that much, but I guess that

5          was where I made a mistake.

6              Q.    Now, in the first section -- are you

7          able to see, on the screen there, the first

8          section here?

9              A.    Yes.

10             Q.    All right.  And first part of this --

11         give me one second.  This agreement expires 180

12         days after your digital signature date per the

13         terms below, and shall automatically renew for

14         the same term until the sale transaction is

15         completed, correct, sir?

16             A.    Yes.  That's the way it started.

17             Q.    All right.  And before you signed the

18         agreement, did Dade explain to you the impact of

19         the provision in Section 5 here, about this 20

20         percent early termination?

21             A.    No.  I honestly don't recall having any

22         conversation with him at all about that.

23             Q.    Okay.  Did they explain to you what the

24         commission Dade would receive in the event the

25         equipment sold?

1           A.      Ten percent.

2           Q.      And that was part of the conversation

3      you had with Mr. Fournier?

4           A.      Yes, which was very limited.

5           Q.      Now, before you signed the agreement,

6      were you aware that you could, in fact, terminate

7      the agreement any time you chose?

8           A.      Well, I mean, like I said, we never even

9      talked about that.  I just assumed if it sold,

10      you know, it would terminate.  And, I mean, I

11      needed to sell the thing because I had this new

12      piece of equipment coming and I needed the

13      foundation that this thing was sitting on for the

14      new machine, so I could get it installed and

15      everything to keep my business going full blast.

16          Q.      So let me ask it this way:  When you

17      signed the agreement, what was your understanding

18      of when the agreement had to be terminated, if

19      you were, in fact, going to terminate it as the

20      seller?

21          A.      Within 15 days of the renewal time.

22          Q.      Which did you believe that renewal time

23      to be six months?

24          A.      I believed it was going to be six

25      months.  And, obviously, it was written at 180

1    days, and that's where this five or six-day

2    argument we're all wrestling around here with,

3    that's coming into play.  Because I believed it

4    to be a six-month contract and the contract was

5    written as 180 days.  So that's what caused a lot

6    of the confusion here, in my opinion.  But maybe

7    I shouldn't say that.

8        Q.    And so it's really not a six-month

9    contract.  It's, essentially, five and a half,

10   six days short of six months, correct?

11       A.    Yes.

12       Q.    But you understand the 180 days to be a

13   six-month deal?

14       A.    That's the way I looked at it, but I

15   guess I shouldn't have made that assumption.

16       Q.    So you understood when it renewed the

17   second time, correct?  You knew it had renewed,

18   right?

19       A.    Yes.

20       Q.    And then this was the third time that

21   the contract was coming up for renewal; is that

22   correct?

23       A.    Yes.

24       Q.    And then you thought by -- or let me ask

25   it this way:  Did you think by terminating it on

1      September 1, 2021, that you were doing this

2      timely?

3            MR. SAWAN:  Objection to relevance.  I'm

4      not sure why it matters what his intention was.

5            THE ARBITRATOR:  I guess he can tell us

6      what he thought.  Go ahead, you may answer.

7        A.    Yes, I thought that was -- I was doing

8      it conforming to the agreement that we had.

9        Q.    It wasn't anything malicious about it,

10     correct, sir?

11       A.    No.  I needed to get this machine out of

12     there because my new equipment was being

13     delivered, like, real soon.  So I've got to take

14     it off the market.  Forget trying to get some

15     money out of it.  I just got to get it out of the

16     way so I can put the new equipment in there and

17     keep the business rolling.

18       Q.    And at that time, when you terminated,

19     you didn't have a buyer for it yourself, correct?

20       A.    No.

21       Q.    That is correct?

22       A.    That is correct.  I had no buyer.  And

23     back then I never had a buyer.

24       Q.    And did you understand that you had to

25     terminate the agreement 15 days before the date

1          of the automatic renewal?

2               A.    Yes.

3               Q.    And --

4               A.    I thought I was doing that.

5               Q.    Okay.  Dade never explained to you how

6          the 180-day period worked, and when you had to

7          terminate and when you had to let it renew?

8               A.    No.  My conversation with Dade Capital

9          after the initial listing was very, very, very

10          limited.  As a matter of fact, hardly

11          nonexistent.

12               Q.    Did he ever tell you about a ten percent

13          buyer premium?

14               A.    No.

15               Q.    As the seller, would you have any basis

16          to go onto the listing and click on "buy it now"

17          yourself?

18               A.    No.  I was trying to sell it, not buy

19          it.

20               Q.    Right.  You're the seller, not the

21          buyer, so you have no reason to click on "buy it

22          now," right?

23               A.    I wish I didn't have that one.

24               Q.    And did the listing agreement -- not the

25          listing agreement, but the listing itself, on

1          Dade Auctions' page, or Dade's listing sales

2          page, did it include any reference to a buyer

3          premium on the page, itself?

4          A.     Not that I was aware of.

5          Q.     Okay.  Did Dade ever go over with you

6          the portion of the contract here that's

7          highlighted on the screen, that states any

8          cancelation or termination, prior to the listing

9          agreement expiration, for any reason, will incur

10         a 20 percent fee of the listed value or fair

11         market value, as determined by Dade?

12         A.     No.  They didn't go over anything like

13         that or hardly any other thing about the

14         contract.

15         Q.     Okay.  So I think you testified as to

16         why you -- well, let me ask it this way:  Why did

17         you cancel the agreement with Dade?

18         A.     Well, because like I previously said

19         there, I had a new shearer coming from Sierra.

20         That's another scrap machine manufacturing

21         company.  I had a new shearer coming that I was

22         going to place in the spot on the yard where the

23         shredder was located.

24         Q.     And so it was coming and you needed to

25         get that out of there, basically, right?

1    A.    That's what I was trying to do, but it's

2    a slow process.

3    Q.    And it's not just something that you can

4    move overnight and put on a bed of an 18-wheeler,

5    correct?

6    A.    No.  It takes quite a few truckloads to

7    get that thing out of there.

8    Q.    And if you could --

9    MR. SHEPPARD:  And Mr. Cooper, I'll ask

10   you this.  You've seen the pictures of this

11   equipment, or would you like us to elaborate, for

12   your purposes, on what this equipment actually

13   looks like and how big it is.

14   THE ARBITRATOR:  Well, I'll take your

15   word for it that you can't put it on a truck.

16   MR. SHEPPARD:  Okay.

17   Q.    I want to share with you, just for a

18   second here -- and I'm just going to put this on

19   the screen.  One sec.  Here we go.  I lost it.

20   One second.  Here we go.

21   I'm going to share my screen with you,

22   Mr. Smith.  Are you able to see that?

23   A.    Yes.

24   Q.    Okay.  And how many stories is this

25   shredder?

1          A.    How tall is that?  I would say, roughly,

2          35, 40 foot.

3          Q.    And then the base of this, where it's

4          sitting with the columns there, those steel

5          columns, that's the foundation that you're

6          speaking of that --

7          A.    Yes.

8          Q.    -- you needed --

9          A.    Concrete.

10          Q.    Concrete pillars, concrete base?

11          A.    Yes.

12          MR. SAWAN:  Mr. Cooper, I'm going to

13          object, again, to relevance, just for the sake of

14          time.  We'll stipulate that it's a large piece of

15          equipment.  I don't know the reasons why he had

16          to move it much matter here.

17          MR. SHEPPARD:  I'm just trying to get a

18          little bit of background, Mr. Cooper.  I think

19          it's certainly --

20          THE ARBITRATOR:  I think it's fine.  Go

21          ahead.

22          MR. SHEPPARD:  Thank you.

23          Q.    And so this is not something that can

24          just continue to sit there, correct, Mr. Smith?

25          A.    Well, no.  I mean, I don't need it

1          sitting there.  I need to get it out of there,

2          put something in there that's more possibly a

3          more profitable operation than that thing is.

4               Q.   Yes, sir.  So in other words, and I'll

5          just encapsulate it by saying this:  This is a

6          massive piece of equipment that's a very large

7          undertaking to remove?

8               A.   It's very difficult to disassemble it,

9          to load it, to haul it.  Limited amount of people

10         that want to buy it.  All bad stuff.

11              Q.   Gotcha.  I'm going to share the screen

12         and show you what's marked as Exhibit R-3.  It's

13         already in evidence.  Can you see that,

14         Mr. Smith?

15              A.   Yes.

16              Q.   And this is an email from you to Dade,

17         dated September 1, 2021, terminating the

18         agreement, correct?

19              A.   That's what the intentions were, yes.

20              Q.   And do you know, at the time, when you

21         did this on September 1, 2021, that Dade had any

22         intention of ever pursuing a 20 percent penalty

23         clause for you delisting this shredder?

24              A.   No.  I had no idea that I'd ever get

25         into the situation that we're sitting here

1          talking about right now, or anything else.  I

2          mean, it's crazy.  I never thought anything like

3          this would come up.

4                Q.    And you terminated on September 1, 2021.

5          But, of course, as always, and sometimes it's

6          unfortunate, hindsight is usually 20/20, right?

7                A.    Yes.

8                Q.    So doing the mathematics, now that you

9          know this, termination arguably should have been

10         by August 26, not September 1; is that correct?

11               A.    That's six days before that, and that's

12         the difference between looking at something,

13         like, from September 1, would it be March 1 or

14         something like that.  That's what I would look

15         at, something, you know, as it were six months.

16         But when the document was written, they wrote it

17         up as 180 days.

18                     And, I mean, their whole document is

19         kind of ambiguous.  It's very hard for -- I mean,

20         you legal guys can read those things and

21         understand it right to the, you know, first time

22         through.

23                     But someone like myself, I probably got

24         to read it four sometimes before it makes sense

25         to me.  And their contracts are written to, like,

1          set me up for failure like this.  And I'm very

2          disappointed in the whole situation.

3               Q.    And if you think that -- well, and I

4          know you believe that Dade did not incur any

5          damages.  But if they had, is it your factual

6          opinion that those damages would be easy to

7          calculate?

8                    MR. SAWAN:  Objection.  Calls for a

9          legal conclusion, even if he tries to say

10         factually.

11                    THE ARBITRATOR:  Overruled.  You may

12         answer.

13              A.    Okay.  I'm sorry to make you do this,

14         but would you repeat that question again.  I'm

15         sorry.

16              Q.    Yes, sir.  And we certainly know that

17         you don't believe that Dade incurred any damages.

18         But if they had incurred damages, do you

19         personally believe that those damages would be

20         easy to calculate over that six-day period,

21         between the time that it should have been

22         terminated and the time that you did, in fact,

23         terminate?

24              A.    I would think so.  It's such a short

25         period of time.  I mean, not a whole lot can go

1       wrong there.

2           Q.    And as you heard Mr. Fournier's

3       testimony, nothing did go wrong, right?

4           A.    Right.  Unless (indiscernible) and I

5       don't think that happened, so I don't see any

6       damages, myself.

7           Q.    Listing agreement didn't change, right?

8           A.    No.

9           Q.    That is right?

10          A.    No, the listing agreement did not

11      change.

12          Q.    Right.  The listing agreement didn't

13      change.  You didn't try to add or delete -- or

14      let me ask it this way:  Did you try to add or

15      delete anything for this third renewal?

16          A.    No.

17          Q.    You just wanted to terminate, right?

18          A.    I just needed to get it out of there

19      because I had a bigger fish to fry.

20          Q.    Understood.  And so if the shredder

21      sold, you understood that you would pay a ten

22      percent commission out of the sale price that you

23      would receive, correct?

24          A.    That's correct.

25          Q.    But then if you terminated early, and

1       Dade invoked this termination penalty, Dade

2       would, in fact, receive more from you as the

3       seller than it otherwise would receive if it sold

4       and they got their ten percent commission,

5       correct?

6           A.    Okay.  I'm sorry, but can you say that

7       again, please?

8           Q.    Yes.  That was kind of a long-winded

9       question.  Let me ask it again.

10          A.    Okay.

11          Q.    Dade would receive ten percent if the

12      piece of equipment sold and they get ten percent

13      of the sale price, correct?

14          A.    Yes.

15          Q.    And then if you, in fact, terminated the

16      agreement early, they would get more from you, as

17      the seller, based on your early termination, than

18      they would if the equipment had sold, correct?

19          A.    Yes.

20          Q.    What, in your estimation, what is your

21      -- strike that.

22              Do you feel as if you were taken

23      advantage of by this 20 percent penalty clause?

24              MR. SAWAN:  Objection.

25              THE ARBITRATOR:  Overruled.  You may

1      answer.

2              THE WITNESS:  It's okay to answer?

3              THE ARBITRATOR:  Yes.

4         A.    Yes, I think that is taking advantage of

5      someone.  When I gave them a year, year and a

6      half, whatever it is, to make a sale, make a

7      commission on the thing.

8              Well, you know, you don't collect

9      commission on a piece of real estate unless you

10     close it, you go to the title company.  That's

11     the only way you get commission.  So why would I

12     pay somebody for not providing something?

13        Q.    Do you think it's punitive?

14             MR. SAWAN:  Objection.  Calls for a

15     legal conclusion.

16             THE COURT REPORTER:  What was the

17     question?

18        Q.    The question was:  Do you think it's

19     punitive?

20        A.    Yes, I do think it's punitive.

21        Q.    I want to switch gears just briefly.

22     And I think that Mr. Fournier's testimony may

23     have been misinformed.  You recall his testimony

24     where he said that you terminated because you had

25     a buyer or you already sold it.

1          Is that accurate in any way?

2          A.    That is so inaccurate, it's not even

3    funny.  I've never had a buyer.  I've never even

4    been anywhere close to selling it.

5          Q.    And so -- and that was at the time you

6    terminated, and we'll get to that.  Let me ask

7    this question:  Did you ever, in the full year

8    that this was listed through Dade, did you ever

9    get one single written legitimate offer out of

10   this listing?

11         A.    No, I did not get anything.

12         Q.    Not a single one?

13         A.    Not a single offer.

14         Q.    Okay.  Now, fast-forward to present.

15   Have you been able to sell the shredder?

16         A.    Yes, about 35 days ago, I finally got

17   someone I could just dump it and get something a

18   little bit better than scrap price for it.

19         Q.    Okay.  And how much did you, in fact,

20   sell it for?

21         A.    Well, the sale price is actually

22   $375,000, but I have to disassemble it, load it

23   out, all that -- two different locations.  The

24   furthest away from me would be Mobile, Alabama.

25              So I doubt that I'll end up with a whole

1          lot when the dust settles on the thing, because

2          I've got to move it because I've been putting off

3          -- I mean, Sierra delivered my new shearer.  It's

4          been sitting on the ground for five months,

5          waiting for me to get this thing out of the way.

6          But I've kind of hesitated to do that until we

7          settle all of this stuff, so here we are.

8               Q.    And so have you started disassembling it

9          yet?

10              A.    Yes.

11              Q.    And have you determined how many

12         truckloads that that's going to take to haul that

13         equipment completely off of your lot?

14              A.    Well, yes.  I was just kind of looking

15         back and going over what -- how many trucks it

16         took to bring it in.  And best I can tell, I

17         think it took about 10 or 12, you know, like,

18         heavy-haul trucks to get everything delivered.

19         So I'm assuming it will take me that much to get

20         it out of there.

21              Q.    Okay.  Have you determined how much cost

22         it is going to be to disassemble and haul that

23         off?

24              A.    Not really, because it puts me in a bad

25         mood.  No, I shouldn't joke right now.  But

1          anyway, I mean, it's got to be 250, $300,000, by

2          the time I disassemble it, load it out, haul it

3          to at least two different locations.

4               Q.    That includes labor, as well as to

5          dismantle, correct?

6               A.    Yes.

7               Q.    And so at the end of the day, if you

8          sold this shredder for $375,000, do you have any

9          indication that you are going to net anything

10         meaningful out of this $375,000 gross sale?

11              A.    Right --

12                    MR. SAWAN:  Objection.  Relevance.  Not

13         sure how much it matters.

14                    THE WITNESS:  Do I answer?  Did you say

15         answer that?

16                    MR. SAWAN:  Let's wait for Mr. Cooper.

17                    THE ARBITRATOR:  Go ahead.

18                    MR. SHEPPARD:  I think he said you can

19         answer, right, Mr. Cooper?

20                    THE ARBITRATOR:  Yes.

21              A.    Okay.  Well, I'm just, honestly, pulling

22         something out of the sky.  But it's negligible.

23         I don't know what you -- I don't know what the

24         definition of something reasonable is.  50, 60,

25         $70,000, maybe.

1          Q.     And so --

2          A.     That's hard for me to say that under

3     oath but, I mean, I feel like that's fairly

4     accurate.

5          Q.     Thank you for that, and I certainly

6     appreciate your candor.  Did you think that --

7     well, after the first renewal, you reduced the

8     price to 675 or 675,000, correct?

9          A.     I think that's accurate, yes.

10         Q.     Okay.  And so it certainly didn't sell

11    at the 750,000.  And then you already testified

12    that during that second period or the first

13    period, you didn't get a single offer at the 675.

14              And so when you go back to -- let me

15    stop sharing this.  But when you go back to

16    Exhibit 1, which is the contract, you go down to

17    Section 5.  Let me share the screen here.  Go

18    back to this penalty clause.

19              "Any cancelation or termination prior to

20    the listing agreement expiration, for any reason,

21    will incur a 20 percent fee of the listed value

22    or fair market value, as determined by Dade

23    Auctions."

24              Do you have any reason to believe that

25    $375,000 was not fair market value for this

1      equipment?

2           A.    Well, nothing more than the fact that I

3      hadn't got any offers to beat that.  So, I mean,

4      I don't just throw money around like it's water.

5      I wish I could have got the 650 or 675 or

6      whatever it is.  If you can't get anybody's name

7      on the line, what good is it?  It's worth

8      nothing.  It's what someone is willing to pay and

9      that's it.

10          Q.    And so at the end of the day, if this

11     sold for $375,000, again, it's worth only as much

12     as somebody is going to pay for it, like

13     Mr. Fournier agreed to, right?

14          A.    Yes.

15          Q.    And, in fact --

16          A.    Of course, you have to take into

17     consideration what the disassembly, loading out,

18     freight, and all that.  So, I mean, that 375 is

19     going away fast.

20          Q.    Yes, and that was going to be my next

21     question.  Is that the only way you were able to

22     get the equipment sold, was by agreeing to

23     disassemble and haul?

24          A.    Yes.

25          Q.    And the buyer on this, and we're not

1       going to talk about who the buyer is.  It doesn't

2       matter and I don't know if it's private.  But the

3       buyer on this was not somebody that came to you

4       as a result of the auction being listed

5       previously with Dade, correct?

6           A.    That's correct.

7           Q.    And when did this buyer first approach

8       you?  I mean, you sold it about 35 days ago, you

9       said.  But how long ago did the buyer approach

10      you?  I'm not asking how you find the buyer, but

11      when did you and the buyer first communicate?

12      Not when they approached you, but how did you

13      first communicate?

14          A.    Well, don't hold me to this but I want

15      to say they first approached me, you know, first

16      of March, somewhere in there.  Maybe April.

17              THE ARBITRATOR:  What year, sir?  What

18      year?

19              THE WITNESS:  Of this year, '22.  Sorry.

20          Q.    I want to talk to you about Exhibit R-1,

21      and I'll share the screen here.  Can you see

22      that, Mr. Smith?

23          A.    Yes.

24          Q.    All right.  Now, if you go down to Page

25      2.  And here, this is where Dade seeks the

1          $135,000, 20 percent penalty, correct, sir?

2          A.    Yes.

3          Q.    All right.  Now, in a perfect world, had

4      the shredder successfully sold during the term of

5      the agreement, Dade would be entitled to their

6      commission, which was ten percent from the seller

7      on whatever the sale price is.  Let's just say,

8      for argument's sake -- let's say you sold it in a

9      perfect world for $675,000.

10         A.    Right.

11         Q.    They would only be entitled to

12     $67,500 --

13              MR. SAWAN:  Objection.  Leading.

14     Leading.  Leading.

15         A.    Correct.

16              MR. SHEPPARD:  I can re-ask it.

17         Q.    Mr. Smith, if everything had sold in a

18     perfect world, during the term of the agreement,

19     how much would Dade be entitled to receive from

20     the sale price, if it sold at $675,000?

21         A.    67,500.

22         Q.    And if the shredder had sold for less,

23     they'd only be entitled to ten percent of

24     whatever that lesser amount was; is that right?

25         A.    That's correct.

1          Q.    But since it didn't sell, and you

2     terminated the agreement, Dade now somehow wants

3     $135,000 from Oak Cliff, as a penalty, as opposed

4     to, at the most it could have gotten from Oak

5     Cliff, like you said, was 67,5, correct?

6               MR. SAWAN:  Objection.  Leading.  And

7     he's testifying, at this point.

8               MR. SHEPPARD:  I can ask it a different

9     way.

10              THE ARBITRATOR:  I think we've all read

11    the contract and understand it pretty well, at

12    this point.  But go ahead, you may answer the

13    question, Mr. Smith.

14         A.    Okay.  Once again, would you repeat it

15    one more time, please?  I'm sorry.

16         Q.    Yes, sir.

17              MR. SHEPPARD:  Madam Court Reporter,

18    would you mind re-reading that to him, please.

19              (Thereupon, the record was read.)

20         A.    That's correct.  It's very disappointing

21    to me, though, that that company, after the

22    relationship that I've had with them for years --

23              MR. SAWAN:  Move to strike the

24    nonresponsive answer, Your Honor.

25         A.    I don't know.  It's just very

1          disappointing to me.

2                    MR. SAWAN:  Move to strike.

3                    THE ARBITRATOR:  Yeah, I don't think the

4          question is before you.  Motion to strike is

5          granted.

6                    MR. SHEPPARD:  I have nothing further,

7          Mr. Cooper.

8                    THE ARBITRATOR:  Thank you.

9                    Mr. Sawan, any questions?

10                   MR. SAWAN:  I do.

11                   THE ARBITRATOR:  Before we get started

12         here, I don't know how long it's going to take.

13         Ms. Green, how are you holding up?

14                   THE COURT REPORTER:  I'm good.

15                   THE ARBITRATOR:  Okay.  Well, we're

16         going to keep going then.  Thank you.

17                   MR. SHEPPARD:  And Mr. Cooper, may I

18         just ask you for a 60-second break?

19                   THE ARBITRATOR:  Yes.

20                    (A recess was taken.)

21                   THE ARBITRATOR:  Mr. Sawan, you may

22         proceed.  Mr. Sawan?

23                   MR. SAWAN:  Yes, sir.

24                   THE ARBITRATOR:  Yes, you may proceed.

25                   CROSS-EXAMINATION OF BENJIE SMITH

1       BY MR. SAWAN:

2           Q.    Mr. Smith.

3           A.    Yes.

4           Q.    My name is Dennis Sawan, I represent

5       Dade Auctions.  I don't believe you and I have

6       had the opportunity to talk; is that fair?

7           A.    Right.  Okay.

8           Q.    You testified that you have now, after

9       considerable efforts, sold the shredder, the

10      Harris shredder; is that correct?

11          A.    Yes.

12          Q.    Who did you sell it to?

13          A.    You're going to think I'm crazy, but I

14      can't recall.  I just -- I mean, I don't remember

15      what the name of the company was.  They're out of

16      Houston.  That's all I know.

17          Q.    Bill Tigner ring a bell?

18          A.    Bill?

19          Q.    Tigner.

20          A.    I don't know.  I can't, honestly, answer

21      that.  The name does seem like I've heard that

22      before, but I can't remember where.

23          Q.    What about Industrial Service Solutions?

24          A.    Maybe that's it.  I can't remember.  I

25      mean, I'm not trying to avoid answering your

1       question.  But, I mean --

2           Q.    You have no idea who Bill Tigner is?

3       I'll remind you that you're under oath.

4           A.    I've talked -- that's fine.  I've talked

5       to him before, but -- wait.  Well, maybe that is

6       the guy.  I don't know.  I mean, I hope I'm

7       telling you right right there.  And I don't want

8       to lie under oath, obviously.  Maybe that is him.

9           Q.    And you don't know who, after years and

10      arbitration, you don't have any idea who you sold

11      this to or who you talked to.  That's what you

12      want us to believe?

13          A.    Arbitration --

14              MR. SHEPPARD:  Objection.

15      Argumentative.

16          A.    -- doesn't have anything to do with who

17      I remember, who I don't remember.  But I'm not

18      sure what you're asking.

19          Q.    Let me ask you a different way, sir.

20      You said you sold this on what, March 1, 2022?

21          A.    I don't recall even the exact date.

22      Somewhere back in there, yes.

23          Q.    And you're still in the process of

24      selling it.  You're moving it to Mobile, Alabama;

25      is that right?

1    A.    That's where I've got to move some of

2    it, yes.

3    Q.    And you have no idea who you're moving

4    it for, you haven't talked to anybody about where

5    it's going, you have no clue.

6    A.    I told you --

7    MR. SHEPPARD:  Objection.

8    Argumentative.

9    A.    -- Mobile, Alabama --

10    MR. SHEPPARD:  Hold on, hold on, hold

11    on.  Mischaracterizes his testimony.  That's not

12    what he testified to.

13    THE ARBITRATOR:  Stop.  Let's not have

14    speaking objections until you say "objection,"

15    please.

16    MR. SHEPPARD:  Yes, sir.

17    THE ARBITRATOR:  It really screws up the

18    record when three people are talking at the same

19    time.  I'd appreciate it, and so would Ms. Green,

20    I'm sure.  One at a time.

21    What's the objection to the record?

22    MR. SHEPPARD:  Yes, sir.  The objection

23    is argumentative, it mischaracterizes his

24    testimony, and is harassing the witness.

25    THE ARBITRATOR:  It's cross-examination.

1          Overruled.  You may answer the question, if you

2          recall what it was.

3                    MR. SAWAN:  And, Mr. Cooper, for

4          purposes of flow, if we could just have an

5          admonishment to Mr. Sheppard that this is cross.

6          It's going to be argumentative, to a certain

7          extent.

8                    THE ARBITRATOR:  Yes.

9                    MR. SHEPPARD:  Well, argumentative to

10          the extent that it's not harassing the witness

11          and not putting words in his mouth, and trying to

12          tell him he's a liar.

13                    THE ARBITRATOR:  Well, we'll take them

14          one at a time, folks.

15                    Ms. Green, could you read the question

16          back, please.

17              (Thereupon, the record was read.)

18                    THE ARBITRATOR:  Well, as I thought,

19          we'll have to start over again.  Mr. Sawan, would

20          you repeat your question or ask a new one.

21                    MR. SAWAN:  I'll try, Mr. Cooper.  It

22          breaks the stride a little.

23          Q.    How are you communicating with the

24          interested buyer in Mobile, Alabama?

25          A.    I don't think that's where the buyer is.

1          And, I mean, the buyer is out of Houston.  It

2          very well may be that Bill Tigner guy.  But I

3          just -- I mean, I guess I was just afraid you

4          were putting words in my mouth.  So if you want

5          to say it's Bill Tigner, say it's Bill Tigner.  I

6          mean, I think that's his name.

7          Q.    I'm not the one who sold it, sir.  I

8          need you to tell me who bought it.

9          A.    Well, it's none of your business.  I

10         don't think it has anything to do with --

11               MR. SAWAN:  Objection.  Objection.

12         Objection.  Mr. Cooper, will you please instruct

13         the man to answer the question?

14               THE ARBITRATOR:  Mr. Smith, answer the

15         question, please.

16         A.    Okay.  Bill Tigner.  I mean --

17         Q.    Is it Bill Tigner --

18         A.    -- but I hope I am, because I don't want

19         to be telling you something under oath that's not

20         true, but I guess so.  Bill Tigner then.

21               THE ARBITRATOR:  Could you spell his

22         last name for me, please?

23               THE WITNESS:  He seems to know him

24         better than I do, I think.  Let him spell it.

25         Q.    I didn't sell him any equipment, sir.

1       A.    Well, I didn't take him out to dinner

2       for two months either.  So I don't know the guy

3       anymore than I do you.  I mean, you act like -- I

4       mean, I've got people that work for me that

5       say --

6              MR. SHEPPARD:  Hold on, hold on, hold

7       on.

8       A.    -- until these guys move this stuff.

9       And they move it and send it wherever the buyer

10      tells them to send it, and that's about it.

11             THE ARBITRATOR:  Mr. Smith, I have a

12      question.  This is the arbitrator.  I'm asking

13      how that gentleman spells his last name.

14             THE WITNESS:  You're asking me that?

15             THE ARBITRATOR:  Yeah, if you know.

16             THE WITNESS:  I don't know.  I'm

17      guessing at it, like you're going to be, I guess.

18      T-I-G-N-E-R, is that the way -- that's the way it

19      sounds out.  I guess that's what it is.

20             THE ARBITRATOR:  Okay.  Thank you.

21      Q.    I want to be very certain here,

22      Mr. Smith, I'm not the one suggesting Mr. Tigner

23      bought this.  I need your testimony.  What I know

24      doesn't matter.  You're under oath.  You need to

25      answer the question.

1           Who did you sell the equipment to?

2           A.    I'm trying and you're trying to make an

3     idiot out of me.  I mean, come on --

4           Q.    That's not my question, sir.  You're not

5     answering my question.  You just sold a piece of

6     machinery, that was subject to a year-long

7     contract in which you said this was --

8           A.    Well, no, it wasn't.

9           Q.    -- a part of your life.  And you sold it

10    for $375,000.  You're going to take a loss.  You

11    said that it keeps you -- essentially, it keeps

12    you up having to worry about how much you're

13    going to lose.  And now you're trying to tell me

14    that you don't know who you sold it to?

15          A.    Bill Tigner.

16          Q.    Thank you.

17          A.    Is that his first name?

18          Q.    Thank you.  Okay.

19                Now, you also testified that you did not

20    meet Mr. Tigner through Dade Auctions, correct?

21          A.    I did not.

22          Q.    And that's --

23          A.    To my best recollection, I did not meet

24    him through Dade Capital.

25          Q.    To the best of your recollection,

1          correct?

2               A.    That's right.

3               Q.    Who is Shelton Smith?

4               A.    That's my son.

5               Q.    And he works for Oak Cliff?

6               A.    Yes.

7               Q.    And what does he do for Oak Cliff?

8               A.    He markets scrap that we buy, and buys

9          scrap from different customers that we buy stuff

10         from.

11              Q.    And did he have occasion to discuss the

12         potential sale with Dade Auctions?

13              A.    No, I don't think he did.

14              Q.    I'm going to show you what's been marked

15         as Exhibit 38.  Bates 38.  It's going to be

16         marked as an exhibit.  I believe I'm at 4 now.

17                    MR. SHEPPARD:  Before you publish it,

18         let me look at it.

19              A.    Bates 38?

20              Q.    38, 39.

21                    MR. SHEPPARD:  Give me a minute.  I

22         looked at it.

23                    MR. SAWAN:  Do you want me to show it?

24                    MR. SHEPPARD:  Go ahead.

25                         - - - - -

1                    (Exhibit 4, Email String, was marked for

2                    identification purposes.)

3                    - - - - -

4          Q.    I'm showing you what's been marked as

5     Bates 0038 and 39.  Do you see that, Mr. Smith?

6     I will stop after you read it.  I just want to

7     make sure you see my screen.

8          A.    I can see it scrolling, yes.

9          Q.    And I'm going to mark this as Exhibit 4,

10    I believe is where we're at right now.

11              Mr. Smith, you're here in your capacity

12    as a corporate representative for Oak Cliff,

13    correct?

14         A.    Say that again.

15         Q.    You're the corporate representative for

16    Oak Cliff?

17         A.    Yes.

18         Q.    So you speak on behalf of the company?

19         A.    Yes.

20         Q.    All right.  And this is an email that

21    appears to have been sent from Dade Auctions to

22    shelton@oakcliffmetals.com, correct?

23         A.    Okay.

24         Q.    Is that correct?

25         A.    Yes.

1    Q.    And Shelton is an employee of Oak Cliff?

2    A.    Yes.

3    Q.    And in it, it says, "Hello, Benjie

4    Smith."  That's you, correct?

5    A.    Yes.

6    Q.    "I'd like to inspect the Harris 60 X 90

7    shredder."  Yes?

8    A.    Okay.

9    Q.    Name, Bill Tigner.

10    A.    Okay.

11    Q.    The gentleman that you ultimately sold

12    this item to.

13    A.    Okay.  So be it.

14    Q.    And this is on September 18, 2020.

15    A.    When?

16    Q.    September 18, 2020.

17    A.    Well, I mean, I don't remember the guy,

18    to be honest with you.  But whatever, you take it

19    like you want.

20    Q.    Whatever, I can take it how I want.

21    Well, let me ask you how you take it.  Because

22    the way I take it is that somebody came through

23    Dade Auctions and, ultimately, you sold it to

24    them.

25    A.    Well, I disagree with that.

1          Q.    Why do you disagree?  What part --

2          A.    I mean, I get tire kickers that come

3     down there and look at scrap.  They look at

4     everything I've got, even to buy the company.

5     And I don't -- I mean, I take them as a dime a

6     dozen until I get --

7          Q.    Until you get a sale?  Right.  But you

8     got a --

9               MR. SHEPPARD:  Let him finish his

10     answer, please.

11          Q.    You got a signature on the dotted line,

12     right?

13          A.    Yes.  Here about 35 days ago.

14          Q.    From somebody who originated from the

15     Dade Auctions website.

16          A.    Well, I don't know about that.

17          Q.    Conveniently after the listing had been

18     terminated by you.

19          A.    Well, what does that mean?

20          Q.    It means if we can't trust you on one

21     side, why should we trust anything you say?

22               MR. SHEPPARD:  Objection.

23     Argumentative.

24               MR. SAWAN:  It goes to credibility.

25     It's cross.

1            MR. SHEPPARD:  It's not cross.  It's

2       harassing the witness.

3            MR. SAWAN:  (Indiscernible) like it any

4       more than you do, man.

5            MR. SHEPPARD:  Now he's mouthing off to

6       me.  It's inappropriate.

7            THE ARBITRATOR: Gentlemen.  Gentlemen.

8       Hold it.  Hold it.  Both of you.  Stop arguing

9       with one another.  The process here is the lawyer

10      asks questions and the witness answers them.  Why

11      don't we try to stick with that.  It will make it

12      go a lot better.

13           MR. SAWAN:  I'd love that.  Mr. Sheppard

14      is telling me I'm harassing somebody when he

15      isn't telling the truth under oath.

16           MR. SHEPPARD:  Now he's calling my

17      witness a liar.

18           MR. SAWAN:  Yeah.  It's credibility.

19      That's the point.

20           THE WITNESS:  Did Bill Tigner work for

21      you guys --

22           MR. SAWAN:  You're not -- I'm not here

23      to answer your questions, sir.  So, no, don't ask

24      me any questions.

25           THE ARBITRATOR:  Mr. Sawan, please stop

1         arguing with the witness.  And I would ask the

2         witness to listen to the question and answer it.

3                   THE WITNESS:  I'm trying.

4                   THE ARBITRATOR:  The question that is

5         asked.  And so let's start over again and see if

6         we can get some questions asked and answered.

7              Q.    So my question, according to Exhibit 4,

8         on September 18, 2020, an inspection request for

9         the same shredder that sold to the same guy, in

10        March of this year, was sent to you through the

11        Dade Auctions website, correct?

12             A.    That's what this documentation looks

13        like, yes --

14             Q.    But you testified --

15             A.    -- but there's more to it than this.

16             Q.    Well, hold on.  Answer my question.

17        Now, you said --

18                   MR. SHEPPARD:  Mr. Cooper, if I may,

19        Mr. Smith was still answering the question and

20        Mr. Sawan continues to cut him off.

21                   MR. SAWAN:  It's cross.  I want him to

22        just answer the question I'm asking him.

23                   MR. SHEPPARD:  He's entitled to finish

24        his answer.

25                   THE ARBITRATOR:  Next question.

1              MR. SAWAN:  Thank you.

2         Q.    You testified on direct that Dade was

3    never anywhere close to selling this piece of

4    machinery; is that correct?

5         A.    That is totally correct.

6         Q.    There was never anyone who came from

7    South America to see you?

8         A.    There is a person or two that came by

9    but they're just tire kickers.  I didn't pay any

10   attention to who they were.  They don't got any

11   money to pay for it so I just shrugged them off.

12              I never had a document that said, "I'm

13   willing to pay X dollars for this machine."  So

14   to me, without a signed document that means

15   something or a down payment check or something

16   like that, they're a dime a dozen.

17        Q.    How do you know that they didn't have

18   the financial wherewithal to pay for it?

19        A.    I've been doing this stuff for 40

20   something years and I know -- I feel like I can

21   separate somebody that's -- well, I don't want to

22   say what I'm about to say.  But somebody that

23   doesn't have blah, blah, blah, blah, I can tell

24   -- pick them out of a crowd like nothing.

25              And all these -- anybody that came by,

1       whether they had anything to do with Dade or just

2       Joe Blow that heard I needed to sell this

3       shredder and everything, none of them -- none of

4       them had the money to pay for it anyway.  So --

5           Q.    How do you know that?  I want to know

6       how you know that --

7           A.    Because I just do.  I can look at you

8       and figure what you make.  Okay.

9           Q.    Maybe you do, maybe you don't.  What if

10      you're wrong?

11          A.    It's crazy.  I mean, you know what I'm

12      saying.  I've got thousands and thousands of

13      things to keep up with around that company right

14      there.  And when I've got a piece of equipment

15      sitting down there that isn't doing anything for

16      me.  Where do you think I'm going to spend my

17      time?  I'm going to spend it on something that's

18      bringing cash in the door, and not screw around

19      with --

20          Q.    Well, correct me if I'm wrong.  I think

21      what you're going to do is you're going to try to

22      pull the contract and then you go sell it to one

23      of the guys that they found you.  Am I wrong?

24          A.    That's wrong.

25          Q.    Yeah, that's not right?  It's not

1          exactly what happened?

2                A.    That's not exactly what happened.

3                Q.    But Bill Tigner --

4                A.    I'm going to --

5                      (Simultaneous speaking.)

6                      THE COURT REPORTER:  I'm so sorry.  I

7          don't have the last couple of questions and

8          answers.  I apologize.

9                      MR. SAWAN:  That's okay.  I'll take

10         responsibility.

11               Q.    How many buyers do you think that Dade

12         -- potential buyers, whether you felt them out or

13         eyeballed them from across the room and thought

14         that they didn't have the money.  How many people

15         do you think that Dade tried to send you?

16               A.    I don't think they sent hardly any.

17               Q.    What about Marty Feinberg?

18               A.    As a matter of fact, I don't think they

19         sent anybody there to look at it.  I may have

20         gotten a phone call or two.  But how am I going

21         to -- they don't identify themselves being

22         connected with Dade Capital, so how am I supposed

23         to know whether they are or not, if you want to

24         know the real facts of it.

25               Q.    What about Marty Feinberg?

1          MR. SHEPPARD:  Objection.  Relevance.

2     It doesn't matter, Mr. Cooper, who the buyers

3     are.  They're not seeking damages or liquidated

4     damages based on buyers or potential buyers.

5     They're seeking damages based on the early

6     termination.

7          MR. SAWAN:  I'm not asking for it for

8     damages purposes, Mr. Cooper.  I'm asking about

9     it because this man is sitting here saying he

10     never knew certain things.  And we're trying to

11     rely on his credibility, and I just don't think

12     he has much.

13          MR. SHEPPARD:  Objection to the sidebar

14     comment.

15          THE ARBITRATOR:  Yeah.  The objection

16     will be overruled.  You want to rephrase your

17     question, please, or we can have the court

18     reporter --

19          MR. SAWAN:  Yeah.  The question was,

20     literally, who is Marty Feinberg?

21          THE ARBITRATOR:  I think, gentlemen, if

22     you wish to make a record, I ask you to slow down

23     and one person talk at a time.  I think I've

24     asked that about a half a dozen times, and you

25     keep talking over each other.

1                    You may proceed.  Re-ask -- restate the

2            question or have the court reporter read it back.

3            Which do you want?

4                    MR. SAWAN:  The question was literally,

5            who is Marty Feinberg.

6                    THE ARBITRATOR:  Go ahead.  Can you

7            answer the question, Mr. Smith?

8                    THE WITNESS:  Okay.  I will.

9        A.    He's called me a few times on the phone

10           after I had -- well after I had already canceled

11           the contract with Dade.  And I can just tell -- I

12           mean, I'm not stupid.

13                   Like I said, I've been doing this for 40

14           years and dealing with a bunch of crooks and you

15           name it.  I could tell this guy was trying to get

16           information out of me for Dade so he can set me

17           up for a lawsuit like this.

18                   So I told him I was not interested in

19           selling the thing.  I wasn't going to sell it.

20       Q.    What was your feeling, your sense of

21           Bill Tigner?

22       A.    Well, he was a nice guy, to be honest

23           with you.  And I'll tell you, right now, who he

24           works for, the company you mentioned right there

25           is the company that manufactured the control

1    system for this machine.  And that's who he works

2    for.

3            And I guess he knew that I was trying to

4    sell the machine, so he had somebody to sell it

5    to so here we go.  So I sold it to him.

6        Q.    Let me ask you this:  It's your

7    understanding of the contract that had that same

8    machine sold to that same individual, around the

9    same time that email was sent, that Dade Auctions

10   would have recognized a fee from that.

11           MR. SHEPPARD:  Objection.  Vague.

12   Confusing.  I couldn't understand that question.

13           THE ARBITRATOR:  Overruled.  You may

14   answer.

15       A.    Would you ask the question again?

16       Q.    Bill Tigner, back in September of 2020,

17   when that first inquiry came through, had bought

18   it back then, Dade would have been entitled to a

19   fee?

20       A.    Back then, yes.  If they had come

21   through with it and the listing was in place.

22   But, to be honest with you, two years --

23       Q.    That's all I need.

24           (Simultaneous speaking.)

25       Q.    That's all I need.  I don't need --

1          MR. SHEPPARD:  Mr. Cooper, can he please

2     finish his answer?  I was afforded -- or

3     Mr. Fournier was afforded the courtesy of being

4     able to answer his -- or respond to his answer,

5     even on cross.  And Mr. Sawan continues to cut

6     off Mr. Smith.

7          MR. SAWAN:  Mr. Cooper, whether he

8     remembers me or not is entirely unresponsive to

9     anything we're doing here.

10          MR. SHEPPARD:  Mr. Fournier was allowed

11     the courtesy of answering.

12          THE ARBITRATOR:  Let the witness answer

13     the question.  Don't interrupt him.  Let him

14     finish.  I'll be able to tell the difference of

15     what's going on here, I think, if I can hear it.

16          It would be a lot better for me to judge

17     whether the response is in response to your

18     question or not.  So don't cut him off.  Let him

19     finish.

20     Q.    Sir, on the email in which you responded

21     that you wanted to terminate the listing, there

22     was something mentioning assets.  Does that

23     sound familiar?

24     A.    Not really.

25     Q.    Never seen an asset management report

1          from Dade Auctions?

2               A.    I honestly don't think I've ever seen

3          one.  I mean, if Dade sent me something like

4          that, the way I looked at it was my listing

5          agreement was over with with them, so I don't

6          give a damn about anything they send me.  I'm

7          done --

8               Q.    Hold on.  Hold on.  Hold on.  I'm saying

9          during the time you had an active listing with

10         them, isn't it true that they sent you monthly

11         asset management reports that showed how many

12         times your listing had been clicked on, what kind

13         of inquiries you received, all of that?

14              A.    I honestly do not remember getting any

15         of those.  Now, maybe I'm brain dead or

16         something.  I don't know.  But I do not remember

17         getting any reports like that from Dade Capital,

18         at any point in time, from day one.

19              Q.    That's fine.  And it's your testimony,

20         also, that you never looked at the listing on the

21         internet; is that correct?

22              A.    I've never done that.

23              Q.    Lastly, it's your testimony that

24         separate and apart, anything that Dade did, the

25         ultimate sale to Bill Tigner was completely

1          independent of Dade Auctions' efforts?

2                A.    It's completely independent.

3                      MR. SAWAN:  All right.  No further

4          questions.

5                      MR. SHEPPARD:  I've got a couple of

6          follow-up, if I may, Mr. Cooper.

7                      THE ARBITRATOR:  Any further redirect?

8          Any redirect?

9                      MR. SHEPPARD:  Yes, sir.  May I proceed?

10                     THE ARBITRATOR:  Yes.

11                     MR. SHEPPARD:  Thank you.

12              REDIRECT EXAMINATION OF BENJIE SMITH

13         BY MR. SHEPPARD:

14               Q.    Can you hear me okay?

15               A.    Yeah.

16               Q.    Good.  Thank you.  If -- and let me ask

17         it kind of in a global perspective.  Do you have

18         folks that work for you at Oak Cliff?

19               A.    Do I have people working for me at Oak

20         Cliff?

21               Q.    Yes.

22               A.    Yes.

23               Q.    And I know you're the president and the

24         owner, as you've testified to.  But do you have

25         other people within your organization, such as

1           your son or accounting people or salespeople,

2           dealing with the day-to-day and who is talking to

3           whom?

4                A.    Well, yeah.  You know, everybody has got

5           their, pretty much, areas of responsibility that

6           they take care of.  But, you know, it's a small

7           company.  And like myself, I have to wear every

8           hat.  I have to be the banker, be the lawyer.

9           I'm not a very good one of those, I guess.  But

10          be the accountant, whatever, operations manager.

11                  I have to do it all.  Whatever has to be

12          done to turn the wheel, I got to do it, so is my

13          son and maybe a couple more people in the office.

14               Q.    Okay.  And so if you've got other people

15          working for you and you sold this piece of

16          equipment, this shredder, are other people within

17          the company, aside from yourself, handling the

18          day-to-day dismantling and shipping of that

19          equipment?

20               A.    Yes.  I hardly do any of it.  I have

21          someone over there right now.

22               Q.    And so at the end of the day, did you

23          specifically have any communications with this

24          buyer or was that handled by other folks within

25          the company?

1      A.    The transaction of the sale?

2      Q.    Yes, sir.

3      A.    Yes.  I did that.

4      Q.    And then the day-to-day sale -- or

5      excuse me.  Let me ask it this way:  The

6      day-to-day communications about shipping and

7      dismantling, is that dealt with -- or is that

8      dealt -- let me ask it this way:  Is it handled

9      by somebody else at the company?

10     A.    Yes.

11     Q.    You're not handling the day-to-day

12     dismantling and shipping, right?

13     A.    As long as things are moving, that's all

14     the involvement I have in it.

15     Q.    Was your conversation with this buyer in

16     any way lengthy?

17     A.    Not -- not really.  No.

18     Q.    Okay.  Does that person who bought it,

19     this Mr. Tigner fellow, did he contact you or did

20     Oak Cliff contact him?

21     A.    No, he contacted me.

22     Q.    And when was that?

23     A.    Well, I mean, I don't know.  About 60

24     days ago.  Or no, wait.  It was back -- I don't

25     know.  I mean, in the spring sometime.  I mean, I

1      have no idea.

2            Q.    Spring of 2022?

3            A.    Yes.

4            Q.    Okay.  And that was well after the

5      September 1 termination of the Dade --

6            A.    Right.  Nowhere near that.

7            Q.    Hang on.  Hang on.  Let me finish my

8      question.  I know what you want to tell me.  But

9      just so we have a clear record.

10           That was well after your September 1

11     termination of the Dade agreement, correct?

12           A.    Correct.

13           Q.    Okay.  And so going back to Mr. Sawan's

14     exhibit that he presented to you and tried to

15     call you a liar with, that was an email from

16     September 18 of 2021; is that correct?

17           MR. SAWAN:  Objection.  It was 2020.

18           A.    Yeah, it was 2020.

19           Q.    2020.  At that point, you had never

20     received a written contract from anybody,

21     correct?

22           A.    None.

23           Q.    And even if Mr. Tigner was interested

24     well back in 2020, nobody ever made an offer,

25     nobody sent a contract, nobody said "I'm buying

1           this for 675K," correct?

2              A.    I've never had an offer from anyone.

3           Not Dade, not myself, not anybody has ever made

4           an offer, outside of this Tigner deal.

5              Q.    All right.  And it wasn't until the

6           spring of this year that Bill Tigner reaches back

7           out to you, correct?

8              A.    That's correct.  Yes.

9              Q.    Did you have any idea, until the email

10          was presented to you today by Mr. Sawan, that

11          Bill Tigner had contacted Oak Cliff previously in

12          2020?

13             A.    I'm sorry to ask this, but would you

14          repeat that one more time, please?

15             Q.    Yes, sir.

16                   Did you have any idea, until Mr. Sawan

17          presented you with this exhibit, this email, that

18          Mr. Tigner had made an inquiry back in September

19          of 2020?

20             A.    No.

21             Q.    Okay.

22             A.    And if he did, I sure don't remember it.

23          So I still say no.

24             Q.    Did Mr. Tigner, when you dealt with him

25          in the spring of 2022, ever discuss with you how

1     he found out the shredder was for sale?

2          A.    No.  I don't think he did.

3          Q.    You didn't ask -- and you all never

4     talked about it.  You just wanted it sold, I

5     guess, right?

6          A.    Exactly.

7          Q.    In this situation, where you've sold the

8     shredder for $375,000, and it's going to cost you

9     anywhere from, what did you say, 250 to $300,000

10    to dismantle and ship?

11         A.    I think so, yes.

12         Q.    If you were required to pay Dade

13    $135,000 or even 67, 5, which is the amount of

14    their ten percent commission, do you feel like

15    you would be making any money off of this, or

16    would you, in fact, be losing money?

17              MR. SAWAN:  Objection.  Relevant.  Scope

18    of cross.

19              THE ARBITRATOR:  Objection sustained.

20              THE WITNESS:  Do I answer that?

21              MR. SAWAN:  No.

22              THE ARBITRATOR:  Next question.

23              MR. SHEPPARD:  Yes, sir.  Just one

24    moment.  Thank you.

25              I have nothing further.

1                    THE ARBITRATOR:  Sorry?

2                    MR. SHEPPARD:  I have nothing further.

3                    THE ARBITRATOR:  Thank you.  Mr. Sawan,

4          anything further?

5                    MR. SAWAN:  No, sir.

6                    THE ARBITRATOR:  Mr. Sheppard, any

7          further witnesses?

8                    MR. SHEPPARD:  Yes, sir.  I would call

9          myself for attorney's fees.

10                   THE ARBITRATOR:  Yeah.  I'll tell you

11         what we're going to do with respect to attorneys'

12         fees.  I understand the agreement provides that

13         the prevailing party would be entitled to fees.

14                   I'm going to withhold any testimony or

15         presentation of that question until after the

16         decision is made.  And if attorneys' fees are

17         going to be awarded to either side, we will take

18         up that issue separately.

19                   MR. SHEPPARD:  I would just say that

20         Mr. Sawan rested, and he's not called himself as

21         a witness with respect to attorneys' fees.  So we

22         will object to any attorneys' fees being

23         presented, at this point, by Dade.

24                   THE ARBITRATOR:  Well, we're going to do

25         it the way I just suggested.

1            MR. SHEPPARD:  Okay.  Understood.  I

2       just needed to make the objection.

3            THE ARBITRATOR:  You have your

4       objections reserved, at that time --

5            MR. SAWAN:  Mr. Cooper, just for sake of

6       clarity of the record, I would also move to

7       admit, I think it was Exhibit 4.  I don't know

8       that I moved to admit that.  That's the Tigner

9       email.

10           THE ARBITRATOR:  Do you have any further

11      evidence, Mr. Sawan?

12           MR. SAWAN:  No, sir.

13           MR. SHEPPARD:  We do, though, Judge.

14           THE ARBITRATOR:  I'm sorry?

15           MR. SHEPPARD:  We do.  We would just

16      ask, if it's appropriate now, if you want to

17      address it later.  Again, I'm more inclusive than

18      not inclusive, in these kind of situations.

19           We would just ask that our Exhibit R-4

20      be admitted, which is Galloway billing records.

21           THE ARBITRATOR:  Well, I'm not going to

22      admit it -- well, I guess if -- no.  There are

23      many questions with respect to attorneys' fees

24      that I have to take into consideration in the

25      State of Ohio when considering your fees.

1          I don't think that -- well, we're not

2     going to have that hearing today because I have

3     to look at this and answer several questions for

4     myself before making the decision.  And I don't

5     have that information in front of me right now.

6          And whether that exhibit is presented

7     now or later, there may be a need for it, there

8     may not be.  I'm going to reserve further action

9     on attorneys' fees from either side.  And you may

10    have your objection to the record, but that's

11    what my ruling is going to be.

12              MR. SHEPPARD:  Yes, sir.

13              THE ARBITRATOR:  I think it's consistent

14    with, generally, the way these matters are

15    handled.  That's what I'm going to do.

16          I have a couple of questions.  One, are

17    you going to have this -- the record transcribed,

18    or have you decided that, at this point?

19              MR. SHEPPARD:  I think we would need to.

20              THE ARBITRATOR:  You will or will not?

21    I'm sorry.

22              MR. SHEPPARD:  I think we would.

23    Assuming you want it to make your ruling.

24              THE ARBITRATOR:  Yeah, I would

25    appreciate it.  It shouldn't be that long.

1              MR. SAWAN:  Famous last words.

2              THE ARBITRATOR:  Why don't we do that.

3      I'm going to leave the record open -- the hearing

4      open on the unanswered question on fees.  And I

5      will proceed expeditiously, as soon as I get the

6      transcript.

7              Ms. Green, how long do you think it will

8      take you?  I assume you'll need more than until

9      tomorrow morning.

10             (Discussion held off the record.)

11             THE ARBITRATOR:  And the other thing I

12     would appreciate -- well, it will be in the

13     transcript when I get it.  But I just want to

14     make sure I have all the exhibits, the ones that

15     were offered and admitted.  I made pretty good

16     notes.  I think we'll be able to pull them out.

17     We can just wait for the transcript and I can

18     figure that one out myself.

19             MR. SHEPPARD:  Yes, sir.  And we had

20     R-5, R-6, and R-7 that were admitted, and we can

21     email those this afternoon, in the forms of those

22     three exhibits, just by themselves.

23             THE ARBITRATOR:  Okay.  I already have

24     copies.

25             MR. SHEPPARD:  You would have copies, I

1    think, within Dade's documents.  But not all of

2    Dade's documents were admitted, so I don't think

3    that you can consider those in and of themselves.

4    I don't think that since they were -- I know they

5    weren't all admitted.

6              MR. SAWAN:  They definitely were not.  I

7    can try to provide an abbreviated version of them

8    that only relates to those that --

9              MR. SHEPPARD:  So I think that --

10   frankly, I think, Mr. Cooper, that you ought to

11   not look at those at all, and just look at the

12   documents that Dade actually sought to admit, in

13   addition to R-5, R-6, and R-7.

14              (Discussion held off the record.)

15              THE ARBITRATOR:  I have -- Mr. Sheppard,

16   I wrote down R-3, which was a September 1, 2021

17   email.

18              MR. SHEPPARD:  Yes.

19              THE ARBITRATOR:  Exhibit 1, the

20   agreement, which is R-2.  R-1, the demand.  R-7,

21   Pages 48, 49.  R-6, which is Page 3.

22              MR. SHEPPARD:  Yes, sir.  And R-5, which

23   was the listing that was -- the one that we were

24   fighting about, that it was incomplete on the

25   right-hand side.  That was Dade listing.

1        And then R-2, we don't need two listing

2        agreements in evidence.  So Petitioner's Exhibit

3        1 will be the only listing agreement.  And we

4        don't need R-2.

5              THE ARBITRATOR:  Okay.  Well, gentlemen,

6        I'd like to thank you.  I think the -- I

7        appreciate the pleadings.  I think that both

8        sides did a great job with presentation of the

9        briefs and things were pretty clear to me.

10        And clear in the sense that I could

11        understand each side's decision fairly well.  And

12        I appreciate your help very much.  I look forward

13        to hearing from you when I get the transcript.

14        And I would encourage the parties to

15        (indiscernible) the opportunity for any mediation

16        that you may have, to resolve this amongst

17        yourselves.  And I know that these kinds of

18        situations bring out the most in people.

19        But I will encourage you to think about

20        mediation, if that's a possibility.  I look

21        forward to hearing further when the transcript is

22        available.  And I will, at that time, be back in

23        touch with everyone.  I'll make a brief record of

24        what we did today and that we're waiting for the

25        transcript.  And we will proceed to close up the

1       hearing once I get that.

2               MR. SHEPPARD:  Yes, sir.  Do you want

3       the parties to submit my post-hearing briefing on

4       the issues?

5               THE ARBITRATOR:  I would -- well, let's

6       talk about that.  I don't need a repetition of

7       what you've already submitted.  And why don't we

8       do this, why don't we wait until you get the

9       transcript and take a look at it.  And let's

10      decide, promptly, at that point, whether you wish

11      to submit anything further or not.

12              If that makes sense to you.  I don't

13      think I need to repeat anything that you've

14      previously given me.  But if you have anything --

15      I feel pretty comfortable right now that I have

16      seen most of -- well, hopefully all of the law

17      that you have, along those lines.

18              What do you think?  Do you want to

19      submit something now?  I mean, I will certainly

20      look at anything that you want to do.

21              MR. SHEPPARD:  Well, you have the law,

22      at least from our perspective, on our prehearing

23      brief.  We wanted to make sure we squeezed

24      everything in that we could in the ten pages.

25              With respect to post-hearing, I don't

1           think there's necessarily any law that we need to

2           address.  I don't think the law has certainly

3           changed based on any of the testimony.  The law

4           is the law.

5                     But at least parsing through some of the

6           testimony that's been given, I don't know if we

7           want to apply some on that testimony to the law,

8           if that makes sense.

9                     THE ARBITRATOR:  Okay.

10                    MR. SAWAN:  From my part, Mr. Cooper,

11          I'm confident that you're more than capable of

12          applying the facts, as they are, to the law as we

13          presented.  So my preference, in the interest in

14          economy and efficiency, is to allow you to do

15          your thing.

16                    THE ARBITRATOR:  Do you want to take a

17          look at the transcript and make your decision,

18          Mr. Sheppard?

19                    MR. SHEPPARD:  Yes, sir.  That would be

20          helpful.

21                    THE ARBITRATOR:  Pardon me?

22                    MR. SHEPPARD:  Yes, sir.  That would be

23          helpful.

24                    THE ARBITRATOR:  Okay.  Let's do that.

25          Once you get the transcript, you can decide if

1          you want to -- I mean, I appreciate all the help

2          I can get.  I'm not a wizard here.  So I do

3          appreciate it.

4                    With that, I guess we're done with

5          today's proceeding.  If something comes up in the

6          meantime, please feel free, you can shoot me an

7          email, as long as you copy the other side.  If

8          you get any bright ideas, want to do something,

9          let me know.

10                   MR. SAWAN:  Thank you, sir.

11                   MR. SHEPPARD:  Thank you.

12                   (Hearing concluded at 2:46 p.m.)

13                              - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    REPORTER'S CERTIFICATE

3

4

5            I, Christine Zarife Green, do hereby

6      certify that as such Reporter I took down in

7      Stenotypy all of the proceedings had in the

8      foregoing transcript; that I have transcribed my

9      said Stenotype notes into typewritten form as

10     appears in the foregoing transcript; that said

11     transcript is the complete form of the

12     proceedings had in said cause and constitutes a

13     true and correct transcript therein.

14

15

16

17

18

19            _____

20            Christine Zarife Green, RPR, CRI

21            Notary Public, State of Ohio

22            Commission expiration:  10-29-22

23

24

25

| $ | 1 | | 2 |
|---|---|---|---|

**$135,000**
90:15 94:10
95:2 99:8
117:1 152:1
153:3 181:13

**$300,000**
148:1 181:9

**$375,000**
146:22
148:8,10
149:25
150:11
161:10 181:8

**$525,000**
80:8

**$67,500**
152:12

**$675,000**
51:10,16
90:16 152:9,
20

**$70,000**
148:25

**$750,000**
43:23

**0**

**0038**
163:5

**040**
26:16 27:18

**041**
26:22

**046**
27:18

**1**
26:23 27:23
28:1,4,11
34:14 35:23
83:19,23,24
84:1,10
85:15 95:18
99:12,14,15
115:9 116:3,
9,22 118:20
119:2 123:1
128:19
131:18 135:1
140:17,21
141:4,10,13
149:16
156:20
179:5,10
186:16,19

**1.2**
106:13

**10**
113:3 147:17

**100**
59:1,9

**104**
81:9

**10:26**
12:19

**12**
147:17

**13**
52:12,16
53:14

**14**
93:4,7,14
105:7,22

**15**
28:14 29:4

72:11 75:14,
24 100:8
105:8,23
106:19 107:7
108:16
116:13
127:19
133:21
135:25

**15-day**
28:22

**16**
52:12,17
53:15 127:19

**18**
113:2
164:14,16
167:8 179:16

**18-wheeler**
138:4

**180**
28:22 99:20
100:2,9
105:7 107:4,
5 112:14
132:11
133:25
134:5,12
141:17

**180-day**
35:21,24
36:2 136:6

**19**
119:5

**1985**
17:14

**1999**
126:14

**2**
40:25 41:11
42:11,14,18
89:12 151:25

**20**
16:7,19,24
32:13,21,22
33:8 38:22
43:22 46:5
47:10 51:10,
16 90:11,16
91:5 92:3
94:11,12
95:6,14
96:13 97:21
98:22 99:3,8
102:18,24
103:10
105:10,14
108:16,24
109:10,16,19
110:15
113:18
116:18
117:1,15
132:19
137:10
140:22
144:23
149:21 152:1

**20/20**
141:6

**2000**
20:4 126:13

**2012**
129:6

**2020**
28:14 29:4
116:13
164:14,16

167:8 173:16
179:17,18,
19,24
180:12,19

**2021**
42:1,18
72:7,11
75:14 79:13
115:10
116:3,10
135:1
140:17,21
141:4 179:16
186:16

**2022**
35:24 156:20
179:2 180:25

**21**
40:25 41:12,
13,18 75:22

**22**
151:19

**23**
93:4,7,14

**25**
72:7 93:4,5,
6,14

**250**
148:1 181:9

**26**
141:10

**28,000**
18:7

---

**3**

**3**
36:20 71:21
72:5,21,24
186:21

**35**
139:2 146:16
151:8 165:13

**3500**
81:3

**375**
150:18

**38**
14:7 162:15,
19,20

**39**
162:20 163:5

---

**4**

**4**
34:13 36:20
75:11,22
162:16
163:1,9
167:7 183:7

**40**
139:2 168:19
172:13

**48**
76:24 77:10
78:10,12,15,
25 186:21

**49**
76:24 77:16
78:10,12,15
186:21

---

**5**

**5**
30:14 36:20
42:1,18
75:20 96:3,4
102:17,22
104:19 105:1
108:19

132:19
149:17
181:13

**50**
148:24

**500,000**
108:20

**55,000**
17:23

---

**6**

**6**
36:20

**60**
81:13 148:24
164:6 178:23

**60-second**
154:18

**650**
150:5

**67**
181:13

**67,5**
153:5

**67,500**
152:21

**675**
40:16 149:8,
13 150:5

**675,000**
149:8

**675K**
180:1

---

**7**

**7**
113:3

**74**
81:9

**750**
40:17

**750,000**
29:22,23
149:11

---

**9**

**9**
79:13

**90**
81:13 164:6

**9:26**
12:19

---

**A**

**AAA**
53:18 56:9
88:9,15

**abbreviated**
186:7

**able**
32:10 52:24
53:4 72:20
76:10 87:14
95:22 124:8
128:21 130:2
132:7 138:22
146:15
150:21
174:4,14
185:16

**above**
80:22

**absolutely**
19:14 22:7
23:5,15
30:12 32:15

68:17 101:16
114:21
124:14

**accept**
75:25

**accomplish**
21:9

**account**
105:2

**accountant**
177:10

**accounting**
177:1

**accuracy**
35:12

**accurate**
34:12 42:5
64:4,11
90:25 146:1
149:4,9

**acknowledgment**
93:2,15

**across**
70:16 78:6
108:2,7,21
129:19
170:13

**act**
160:3

**action**
184:8

**active**
22:12 28:20
61:3,18
64:3,16
65:1,6
66:11,16,19,
21 175:9

**activities**
63:9

**actual**
64:16 99:16
103:8,12,17,
18,21 104:1,
3,11,19,22
105:2

**add**
101:5 112:12
143:13,14

**addition**
186:13

**additional**
40:20 43:13
52:13 55:1
56:19 59:6
64:20 68:16
98:25 114:2
121:7,10
125:9

**additionally**
18:3 40:17

**address**
12:10 61:19
98:6 183:17

**admissible**
59:5,9

**admission**
71:20 72:1,4
74:14,24
76:23 77:10
82:10 93:19

**admit**
27:23 42:11
52:12 53:14,
19 56:2
74:16,17
78:14 83:16
115:6,18,20,
23 131:5
183:7,8,22
186:12

**admitted**
27:20 28:2
41:9 42:15
53:20 54:20
56:3 59:24
60:1 72:16
75:5 82:11
115:25 121:6
123:2 183:20
185:15,20
186:2,5

**admonishment**
158:5

**ads**
101:24

**advance**
50:22 51:2,3

**advantage**
144:23 145:4

**adverting**
39:17

**advertise**
101:11
129:17

**advertised**
39:19,21

**advertisements**
18:10

**advertising**
18:3 31:17
38:13 50:21,
23 51:4

**afforded**
174:2,3

**afraid**
159:3

**afternoon**
185:21

**age**
13:17 125:22

**ago**
14:18 96:25
97:8 98:14
146:16
151:8,9
165:13
178:24

**agree**
34:10 73:17
89:17 94:3
95:5 114:9

**agreed**
37:19 40:17
73:20 89:15,
18 91:11
150:13

**agreeing**
150:22

**agreement**
16:23 27:9
28:5 33:8
34:16,18,20
37:10,14
75:3 84:3
85:15,24
95:19 96:12,
21 97:23
98:5,21
99:16,20
100:8 102:23
109:9 117:3
119:6,8,10
120:25 121:1
122:4,11
128:10,20
129:1,9
130:4,5,24
131:2,14,17,
22 132:11,18
133:5,7,17,
18 135:8,25
136:24,25
137:9,17
140:18

143:7,10,12
144:16
149:20
152:5,18
153:2 175:5
179:11
182:12
186:20

**ahead**
13:1 23:19
30:23 33:3
41:16 45:5
48:4 49:9
51:19 59:20
63:2 67:11
76:10 103:5
110:10
124:9,12
127:15 135:6
139:21
148:17
153:12
162:24 172:6

**Alabama**
146:24
156:24 157:9
158:24

**alleged**
38:22

**allocated**
50:24

**allow**
28:19

**allowable**
98:21

**allowed**
174:10

**allows**
95:9

**ambiguous**
141:19

**America**
168:7

**American**
18:3,10
33:24 88:10

**amount**
16:24 39:23
51:15 98:24
110:15
112:15 140:9
152:24
181:13

**amounts**
102:21 103:1

**Andrew**
29:12,13,15

**annual**
31:16

**answer**
19:7 25:7,10
39:10 45:4,6
47:23 48:5,
11,12 51:20
67:7,20
69:22 82:17
85:11 86:1
104:16 106:3
107:12,14
110:11,12
113:7 114:14
115:3 120:2
123:4
124:10,12,14
125:3
127:14,16
135:6 142:12
145:1,2
148:14,15,19
153:12,24
155:20 158:1
159:13,14
160:25
165:10

166:23
167:2,16,22,
24 172:7
173:14
174:2,4,12
181:20 184:3

**answered**
62:23 117:18
167:6

**answering**
18:11 155:25
161:5 167:19
174:11

**answers**
62:25 166:10
170:8

**anticipation**
113:5

**anybody**
26:7 57:24
157:4 168:25
170:19
179:20 180:3

**anybody's**
150:6

**anymore**
160:3

**anyone**
106:10 168:6
180:2

**apart**
175:24

**apologize**
170:8

**apparently**
99:11

**appears**
54:6 163:21

**application**
79:6

**apply**
120:18

**appreciate**
14:16 38:15
81:7 149:6
157:19
184:25
185:12

**approach**
71:18 151:7,
9

**approached**
151:12,15

**appropriate**
183:16

**approve**
23:8

**approved**
23:7 89:10,
17

**approximately**
35:17

**April**
151:16

**arbitrate**
117:12

**arbitrated**
33:23

**arbitration**
33:24 38:20
43:21 47:9
66:7 68:7,13
73:23 75:16
76:6,7,8
87:3,17
88:4,8,10,
11,18 89:11,
12,19 90:20
91:1,12
93:10 94:12
95:5 98:19

99:8,17
117:9 124:6
126:24 127:2
156:10,13

**arbitrator**
12:2,6,15,22
13:1,11,15,
20 16:11
17:6 23:19
25:6 27:24
28:1 30:23
33:3,24
36:16,21
39:9 41:1
42:14 44:15,
19,22 45:4
46:10 47:18,
22 48:4,10
49:9,11
50:15 51:9,
14,19,23
52:1,6,8,23
53:1,21,24
54:5,11,16,
21 55:2,5,
13,17,21
56:7,25
57:12,25
58:5,10,18,
21 59:12,17,
20,25 62:24
64:8 66:1
67:5,9,12,19
68:9 70:1,5,
9,25 71:5,9,
14 72:10,16
74:10,18
75:7,20,22
77:12 78:9,
14 80:6,18,
24 81:6,18
82:8 87:1
88:5 92:8
94:15,20,23
95:3 97:5,18

103:22
104:15
106:23
107:11
110:2,10
111:11
112:2,11
114:7,13
115:2,20,24
117:19,22
118:3,6,9,
12,15 120:1
121:12
122:2,18
123:9,21,24
124:9,12,22
125:2,5,8,
12,15,19,25
126:5 127:13
135:5 138:14
139:20
142:11
144:25 145:3
148:17,20
151:17
153:10
154:3,8,11,
15,19,21,24
157:13,17,25
158:8,13,18
159:14,21
160:11,12,
15,20 166:7,
25 167:4,25
171:15,21
172:6 173:13
174:12
176:7,10
181:19,22
182:1,3,6,
10,24 183:3,
10,14,21
184:13,20,24
185:2,11,23
186:15,19

**area**
126:8

**areas**
177:5

**arguably**
141:9

**arguing**
166:8 167:1

**argument**
38:2 111:18,
21,25 134:2

**argument's**
152:8

**argumentative**
156:15
157:8,23
158:6,9
165:23

**arguments**
13:5

**Arizona**
45:21

**Arkansas**
80:9 81:9

**arose**
36:5

**around**
14:23 134:2
150:4
169:13,18
173:8

**arrangements**
119:6

**art**
91:24

**asked**
20:19 113:3
117:18
167:5,6
171:24

**asking**
19:9 51:8,14
56:21 71:7,
12,17 86:22
111:12,14
112:4,6,16,
18 115:20
122:24,25
151:10
156:18
160:12,14
167:22
171:7,8

**asks**
55:25 166:10

**aspects**
18:2

**assembled**
39:16

**assesses**
23:9

**asset**
24:12,14
37:11 174:25
175:11

**assets**
174:22

**assigning**
40:2

**Association**
33:25 88:10

**assume**
19:21 88:16,
20 119:14
185:8

**assumed**
133:9

**assuming**
56:11 91:2
147:19
184:23

**assumption**
  57:6 134:15

**assure**
  38:14

**attached**
  34:5

**attempt**
  26:11 38:8
  75:2

**attempted**
  20:11 38:4
  44:24

**attention**
  26:6 168:10

**attorney**
  88:22 117:7

**attorney's**
  182:9

**attorneys**
  91:18

**attorneys'**
  182:11,16,
  21,22 183:23
  184:9

**attracted**
  43:12

**attractive**
  40:15

**auction**
  14:19,20,21
  28:6 30:10
  65:1,16,17
  69:7 70:17
  90:1 100:11,
  14 101:3,4,6
  102:7 112:24
  151:4

**auctioned**
  108:15

**auctions**
  14:4,11,15
  15:4,21,25
  16:2 17:8,9,
  15,20 18:9,
  16 19:16
  22:6 28:4
  29:11,13
  35:18 37:8,
  16 44:25
  49:1,14,19,
  23 50:2
  78:16 95:18
  96:15 108:2
  109:12
  149:23 155:5
  161:20
  162:12
  163:21
  164:23
  165:15
  167:11 173:9
  175:1

**Auctions'**
  14:17 15:2
  16:6 119:16
  137:1 176:1

**audio**
  118:21

**August**
  141:10

**Austin**
  92:11,13,24
  93:4 96:3,5
  113:4

**authenticity**
  27:9,22

**auto**
  28:18,19,22,
  25 29:17
  35:24 36:3,9
  90:2 108:14,
  16,22,23

  112:24

**automatic**
  100:1 110:24
  136:1

**automatically**
  22:17 99:22
  111:16
  132:13

**available**
  22:24 31:6,
  20 45:22
  50:23,25
  62:7 64:22
  68:5

**avenue**
  93:18

**avenues**
  93:12

**avoid**
  155:25

**awarded**
  182:17

**aware**
  113:1 133:6
  137:4

**awful**
  112:17

_____

**B**

**back**
  12:16,19,22
  20:3 33:5,20
  34:13,20
  37:13 47:14
  60:20 67:4,6
  70:7,9,12
  75:14 86:10,
  20 91:19
  99:12 109:4
  110:5 118:7,

  9 123:22,24
  129:6 135:23
  147:15
  149:14,15,18
  156:22
  158:16 172:2
  173:16,18,20
  178:24
  179:13,24
  180:6,18

**background**
  82:11 84:23
  129:3 139:18

**backtrack**
  91:15

**bad**
  128:6 140:10
  147:24

**Baker**
  20:23

**balance**
  66:12 91:3

**banker**
  177:8

**base**
  139:3,10

**based**
  21:11 43:12,
  13 47:11
  82:23 83:2
  94:11 95:1,
  10 99:9
  104:9 108:25
  116:22 117:1
  144:17
  171:4,5

**basic**
  98:9

**basically**
  15:4 129:3,5
  137:25

**basis**
  18:6 19:5
  31:16 38:19,
  20 50:3
  90:19 117:14
  136:15

**Bates**
  26:14,16,21
  27:17 40:21,
  24 41:18
  52:16 53:14
  115:11
  162:15,19
  163:5

**bear**
  73:23
  114:10,17

**beat**
  150:3

**beating**
  117:22

**bed**
  138:4

**began**
  107:5

**behalf**
  32:16 33:15
  88:25 163:18

**belatedly**
  13:3

**believe**
  20:9 27:10
  35:19 36:19
  39:16 55:14
  133:22
  142:4,17,19
  149:24 155:5
  156:12
  162:16
  163:10

**believed**

  110:21
  133:24 134:3

**believes**
  108:25

**bell**
  155:17

**belong**
  31:9

**below**
  99:21 132:13

**beneath**
  55:16

**Benjie**
  19:17,18,20
  20:3,6,11,23
  22:3 27:5
  29:9 41:22
  42:6 43:9,14
  45:9,14,19,
  23 72:11
  73:12 75:25
  81:12 85:6
  86:7 101:19
  125:18,22
  126:2,6
  154:25 164:3
  176:12

**best**
  38:3,6,8,13
  39:15 44:12,
  13 121:22
  122:5 129:13
  147:16
  161:23,25

**better**
  72:3 146:18
  159:24
  166:12
  174:16

**big**
  90:24 138:13

**bigger**
  53:8 143:19

**Bill**
  155:17,18
  156:2 159:2,
  5,16,17,20
  161:15 164:9
  166:20 170:3
  172:21
  173:16
  175:25
  180:6,11

**billing**
  183:20

**bit**
  14:14 48:16
  78:12 84:23
  127:8 139:18
  146:18

**blah**
  168:23

**blast**
  133:15

**blasts**
  101:8,20
  102:11

**blow**
  53:7,8 169:2

**board**
  14:3 70:16
  78:6 108:7,
  22

**bolded**
  28:25 32:13
  33:11

**bottom**
  72:25 77:17
  78:25

**bought**
  129:5 159:8
  160:23

  173:17
  178:18

**box**
  55:9 60:22
  87:20 89:22
  90:24

**brain**
  175:15

**Branch**
  15:11

**Brazil**
  76:18

**Brazilian**
  81:11

**breach**
  91:23 95:9,
  10,17 96:19
  97:1,9,14
  98:13

**break**
  70:4,13
  100:24 118:5
  154:18

**breaks**
  158:22

**brief**
  13:3,6,8
  38:1 90:21
  91:6 93:11
  118:14

**briefly**
  38:1 145:21

**bring**
  45:17,20
  93:20 147:16

**bringing**
  80:12 169:18

**brings**
  23:2

**broad**
49:22

**brochure**
62:13

**brokers**
31:1 124:19,
24

**brought**
124:7

**budgets**
50:22 51:4

**built**
20:17

**bunch**
172:14

**bus**
83:5

**business**
16:7,14
17:13 19:6,
10 133:15
135:17 159:9

**button**
25:24 31:7
43:4,8,18,19
63:11,22
105:17
106:12,13

**buttons**
61:18 63:5,
6,9

**buy**
14:21 15:2
25:21,24
28:6 31:7,22
43:19 61:24
63:5,9,13,17
65:9 66:21,
23,24
105:17,21
106:12,13

107:8,17
126:19
128:14
136:16,18,21
140:10
162:8,9
165:4

**buyable**
32:12

**buyer**
14:20,21
15:6 16:1,3,
14 21:17,19,
21 25:2,23
26:5 34:24
40:15 43:12
44:5 46:25
47:3,4 49:1
50:1,7,12
61:8,9,22
62:4,19 64:2
65:16,18
66:7 68:2,3,
15 69:1,10,
13,20 70:15,
20 76:1,20
77:20 79:14,
23 80:1,2,4,
14 84:6
119:19,22
120:7 122:14
135:19,22,23
136:13,21
137:2 145:25
146:3 150:25
151:1,3,7,9,
10,11
158:24,25
159:1 160:9
177:24
178:15

**buyer's**
22:4,10
23:3,9,13

26:8 32:11
40:19 49:2
57:8 63:4,16
66:18 67:15,
22 68:20,21
69:15 73:24
77:5 81:19
82:1,17,19,
21,25 83:3,
5,10,12
84:13 94:2
120:4,6,9,11
121:19 123:3
130:23

**buyers**
18:25 19:2,8
23:13 24:21
47:13 70:17
101:24 129:8
170:11,12
171:2,4

**buyers'**
82:14

**buying**
66:17 179:25

**buys**
162:8

---

**C**

**calculate**
142:7,20

**call**
13:12,13
20:22,24
46:19 125:18
170:20
179:15 182:8

**called**
36:9 40:10
45:25 79:6
85:6 86:3

129:15,21
172:9 182:20

**calling**
19:9 166:16

**calls**
46:8,15
104:10 114:5
119:24 124:2
142:8 145:14

**campaigns**
51:4

**cancel**
28:23 31:24
137:17

**cancelation**
33:7 96:11,
20 97:10,22
100:5,7
102:22 109:8
113:24 137:8
149:19

**canceled**
105:6 106:19
107:3 111:17
172:10

**canceling**
102:8 106:9

**candor**
149:6

**capacity**
17:15 92:1
97:2 111:7
163:11

**Capital**
14:4,6,7
17:19 18:9
20:4 136:8
161:24
170:22
175:17

care
177:6

carries
78:12

case
12:14 16:4,
18 19:23
49:4,24
67:14 69:18
74:21 80:14
85:5 93:16
111:8,9,23
125:13

cash
169:18

caught
56:18

caused
116:18 134:5

CC'D
12:12

center
38:14

certain
36:25 112:15
158:6 160:21
171:10

certainly
36:10 54:19
57:17 69:15,
22 80:11,25
110:12 118:3
139:19
142:16
149:5,10

cetera
19:20

chance
12:18 13:2

change

40:9 101:3
143:7,11,13

changed
16:13,15
41:24 43:2
64:24 82:21
83:11
101:19,22

changes
42:9 83:12
92:16 102:1,
6,10,13

charge
16:2 29:25

check
168:15

choose
110:14

chose
28:23 30:6
117:12 133:7

Christine
57:1

circumstances
30:3

City
129:10

claim
39:6 58:7

Claimant
74:12

Claimant's
90:1

clarify
81:7 88:24

clarity
14:5 183:6

clarity's
97:20

clause
38:22 47:11
91:6 95:15
97:21 98:23
102:18
103:10 105:1
108:24
109:17
116:19
140:23
144:23
149:18

clear
59:23 93:8
106:24 107:2
179:9

clearly
78:6 80:14

click
22:21 42:8
44:7 63:21
65:4 136:16,
21

clicked
44:4 105:21
175:12

client
13:4 111:23

Cliff
20:3,6 27:5
29:5 32:16
33:15 51:9,
15 64:5
79:23 84:4,
10,24,25
85:3 89:4
95:6 98:20
107:3 108:11
115:10
126:7,11,17
127:10 129:1
153:3,5
162:5,7

163:12,16
164:1
176:18,20
178:20
180:11

Cliff's
112:24 127:5

close
112:17
117:25
120:21
145:10 146:4
168:3

clue
157:5

collect
32:11 70:6
95:8,9
116:25 145:8

collected
32:9

columns
139:4,5

come
12:19 20:18
33:5 49:1,13
65:6,8 70:7
79:20 106:10
118:7 121:24
141:3 161:3
165:2 173:20

comes
49:19 50:1

comment
171:14

commercial
88:10 89:11

commission
32:24 68:23,
25 80:17
84:11,14

113:15
132:24
143:22 144:4
145:7,9,11
152:6 181:14

**commissions**
105:19

**commitment**
30:9,24,25

**communicate**
151:11,13

**communicating**
19:22 158:23

**communication**
18:21 20:2
79:9

**communications**
48:18 177:23
178:6

**company**
45:12 48:6
89:4,6
128:11
137:21
145:10
153:21
155:15
163:18 165:4
169:13
172:24,25
177:7,17,25
178:9

**complaining**
60:23

**complete**
25:16 29:19
54:1 56:9
62:15 73:20

**completed**
99:23 132:15

**completely**
147:13
175:25 176:2

**completeness**
58:15

**complex**
18:13 19:10

**conclusion**
112:5,18
114:6 119:25
142:9 145:15

**concrete**
139:9,10

**conditions**
90:2 119:8,
15,18,21
120:4,6,12,
18,22 121:8,
11,17 123:1

**confidential**
74:8

**confirm**
57:2

**conforming**
135:8

**Confusing**
173:12

**confusion**
32:25 33:2
99:15 134:6

**connected**
170:22

**connection**
112:23

**consider**
186:3

**considerable**
155:9

**consideration**

150:17
183:24

**considering**
183:25

**consignee**
29:10

**Consignment**
28:5

**consistent**
184:13

**constant**
101:23

**consultation**
13:4

**contact**
24:21 84:21
85:3 178:19,
20

**contacted**
178:21
180:11

**contacting**
18:1

**contemplated**
119:11

**contemporaneou
sly**
23:23

**contend**
105:9

**contention**
59:13

**contents**
89:18

**context**
47:16

**continue**
100:22
139:24

**continues**
167:20 174:5

**continuously**
18:1 101:11

**contract**
14:25 16:18
18:19 21:10
22:1 24:3
26:10 27:4,
23 28:11,21
29:1,3 30:22
32:5,14,22,
25 33:6,12,
16,17,20,22
34:5 35:23
36:9 37:19,
22 40:9
46:19,21,23,
24 47:2,3
61:10 76:3
79:19,22,24
80:1 82:18,
20,25 83:14,
23 84:4,5,9,
13 85:10,20
91:9 95:8,
17,22 97:3,4
98:1,2,3,16
105:7 106:9,
16,17,18
107:3 109:5
110:21
113:6,7
116:12
118:19,24
120:19,20
121:19
122:23
124:18 131:4
134:4,9,21
137:6,14
149:16
153:11 161:7
169:22

172:11 173:7
179:20,25

**contracts**
21:3 28:17
83:3 105:24
124:17
130:23
141:25

**contrary**
97:7

**control**
55:8 172:25

**Conveniently**
165:17

**conversation**
21:2,7,8,16,
20,24,25
48:21 85:10
130:18
132:22 133:2
136:8 178:15

**conversations**
48:23 85:23

**Cooper**
17:5 30:16
32:19 38:18
39:3 41:6
44:11 47:9
48:3 52:5,
11,22,24
53:20 56:2,
15 57:6,20
59:5 60:2
67:3,10
68:6,12
69:25 70:24
71:8,25
72:19 74:5
75:4,10
77:11,22
78:8 79:17,
21 80:3,10

81:16 83:15
86:25 88:1,3
93:3,6,9,21
97:4,17
104:14 107:1
111:10
112:10
115:19 118:1
120:16,23
121:21 127:9
128:24 129:3
138:9
139:12,18
148:16,19
154:7,17
158:3,21
159:12
167:18
171:2,8
174:1,7
176:6 183:5
186:10

**cooperation**
114:23

**coordination**
18:8

**copies**
54:12
185:24,25

**copy**
22:11 23:24
24:2 51:7
56:9

**corner**
55:10

**corporate**
88:22 89:1,3
163:12,15

**correct**
15:6,8,10
16:17,20
17:1,3 21:3,

4 22:6,13,14
23:4,14,24
24:3,7 25:4
26:24 29:1,
14 30:4,7,11
32:14 33:9,
10,12,13,25
34:1,2,16
35:15,16,22,
25 36:1,3,4,
6,7 37:5,6,
10 42:4
43:24,25
44:2 48:19
49:3,4,7
51:11,12,21
60:12 62:20,
22 63:23
64:6,25
65:1,2,7,13,
14,20 66:9
67:21 68:3,
24 69:11,12
70:17 72:13
73:5,8,13
74:22 76:20
79:1,7,10,
11,15,16
80:8,21,23
81:20 83:25
84:7,8,11,
12,19,20
85:1,2
86:15,16
87:17,23
88:13,15,19
89:1,8,9,13,
14,19,20
90:20 91:1,
7,13 94:13,
14 95:7
96:22,23
97:24 98:6,
15,23 99:5,
10 100:3,7,

9,10,17
101:6,7,10
102:2,8,9
103:12
104:9,21
105:2,11,12
106:20
107:5,9,19,
24 108:3,12,
18 109:14,17
110:17 111:2
112:25
113:7,9,16,
17,25 114:4,
19,21 115:1
116:13,20,21
117:3,9
118:20,24
119:2,16,19
121:20
125:1,14
126:24 127:3
132:2,15
134:10,17,22
135:10,19,
21,22 138:5
139:24
140:18
141:10
143:23,24
144:5,13,18
148:5 149:8
151:5,6
152:1,15,25
153:5,20
155:10
161:20 162:1
163:13,22,24
164:4 167:11
168:4,5
169:20
175:21
179:11,12,
16,21 180:1,
7,8

**correctly**
74:1 90:7,13
96:16 99:24

**cost**
16:25 40:18
43:13,15
73:22 76:11
147:21 181:8

**counsel**
37:23 52:11
54:4 58:25
71:23 73:1
75:12 77:1
83:24 120:20
122:12

**country**
129:19

**couple**
17:7 18:15
46:3 81:15
83:6,7
102:14 170:7
176:5 177:13
184:16

**course**
77:14 118:3
130:18 141:5
150:16

**court**
53:18 67:3
76:15 110:5
124:23
145:16
153:17
154:14 170:6
171:17 172:2

**courtesy**
174:3,11

**cover**
119:21

**covered**
13:7

**crane**
43:15

**crazy**
141:2 155:13
169:11

**create**
35:4 101:17

**credibility**
78:7 97:15
165:24
166:18
171:11

**crooks**
172:14

**cross**
123:15 128:3
158:5 165:25
166:1 167:21
174:5 181:18

**cross-examination**
53:2 122:3
124:4 154:25
157:25

**cross-examine**
52:2

**crowd**
168:24

**cursor**
55:12

**customer**
21:5 22:1
25:22 26:2,3
34:8 45:10,
16,20,24,25
47:24 81:11
106:8,13
109:2

**customers**
17:23 18:2,
7,11 106:12

**crane**
162:9

**cut**
54:8 55:3
58:7 95:23
167:20
174:5,18

---

**D**

**D-A-G-O-S-T-I-N**
76:16

**D-A-V-I-D**
13:25

**dad's**
12:10

**Dade**
14:3,4,6,7,
10,15,17
15:2,4,21,25
16:2,6,23
17:8,9,15,19
18:9,16
19:16 20:3
21:3 22:6
23:9 28:4
29:11,13
35:18 37:8,
15 38:22
39:1 44:25
49:1,13,19,
22,23 50:2,6
54:4,9 55:17
62:17 64:12
70:16,20
72:4 74:12
75:13,16,25
77:20 78:16
79:22 80:1
84:4 85:22
86:14 88:17,
25 89:1,4,10
90:25 93:11

94:10 95:5,
18 96:14
98:4,19
99:2,9,14,15
100:15 102:7
104:9,20
108:1,6,15,
25 109:12,16
110:14,20
112:7,23
113:14
114:10,17
115:10
116:24
119:16
126:23
127:1,5,10
128:11 129:1
132:18,24
136:5,8
137:1,5,11,
17 140:16,21
142:4,17
144:1,11
146:8 149:22
151:5,25
152:5,19
153:2 155:5
161:20,24
162:12
163:21
164:23
165:15
167:11 168:2
169:1
170:11,15,22
172:11,16
173:9,18
175:1,3,17,
24 176:1
179:5,11
180:3 181:12
182:23
186:12,25

**Dade's**
  53:14 60:4,
  12,17 71:21
  72:21 76:25
  77:11 87:16
  90:20 98:2,
  3,20,22
  111:14
  116:15 137:1
  186:1,2

**dadeauctions.
com**
  121:5,18

**Dagostin**
  76:14 77:19,
  21 79:9

**daily**
  19:4

**Dallas**
  126:8

**damages**
  77:6,8
  93:13,18,23,
  24 94:5,9
  97:12 103:8,
  11,12,17,18,
  19,21 104:1,
  3,8,12,20,
  23,25 105:2,
  9,13,23
  110:20,25
  111:1,5,14,
  19,25 112:7
  113:19
  116:19
  117:1,11,15
  142:5,6,17,
  18,19 143:6
  171:3,4,5,8

**damn**
  175:6

**database**

  17:24

**date**
  41:25 62:6,7
  64:22,23
  99:21 132:12
  135:25
  156:21

**dated**
  116:9 140:17

**dates**
  36:19,25

**Dave**
  13:14 15:15,
  21 23:22
  26:12 27:1
  28:9,13
  34:18 37:3,
  25 40:21
  42:21 44:24
  46:4,20
  48:15 73:2,
  4,6,7 75:12,
  24 79:1 93:5
  129:15,21

**David**
  13:17,21,25
  53:2 118:16

**day**
  105:8,16,17,
  22 107:7
  112:14 148:7
  150:10
  175:18
  177:22

**day-to-day**
  177:2,18
  178:4,6,11

**days**
  28:22 45:25
  99:20 100:2,
  8,9 105:7,8,
  20 106:16,19

  107:4,5
  112:14 113:5
  116:16,24
  124:5 132:12
  133:21
  134:1,5,10,
  12 135:25
  141:11,17
  146:16 151:8
  165:13
  178:24

**de**
  124:6

**dead**
  175:15

**deal**
  43:11,19
  61:12 83:5
  134:13 180:4

**dealers**
  126:20

**dealing**
  93:9 172:14
  177:2

**dealt**
  127:17
  178:7,8
  180:24

**death**
  117:23

**decide**
  48:13

**decided**
  184:18

**decides**
  101:5

**decision**
  182:16 184:4

**defend**
  124:8

**defense**
  58:25

**definitely**
  108:13 186:6

**definition**
  148:24

**delete**
  101:5
  143:13,15

**delisted**
  68:5

**delisting**
  140:23

**delivered**
  135:13
  147:3,18

**delivery**
  126:22

**demand**
  87:3,16,22
  88:4,11
  89:11,18
  90:20 91:12
  94:12 99:7
  117:9 186:20

**demanded**
  88:18

**Dennis**
  12:16 19:2
  21:18,23
  22:7 24:10
  25:9 37:24
  155:4

**denying**
  54:14,17

**Depending**
  58:3

**depiction**
  42:6

**deposition**
89:16 92:12,
22 93:6
94:15 113:2
117:8

**derive**
16:24

**describe**
114:2

**description**
25:16,19
43:3 62:6,14
64:23 65:3,
10,12,14
66:23 77:17
89:21 90:21
91:7,12
93:11

**designed**
32:2

**detail**
64:17 130:22

**detailed**
24:16 131:6

**details**
62:10

**determination**
92:2

**determine**
30:20 91:25
104:22

**determined**
31:4 96:14
109:12
137:11
147:11,21
149:22

**deviate**
70:20

**difference**

103:18,25
141:12
174:14

**different**
19:12 46:18
58:14 74:25
77:23 80:3,
4,5,6,20,25
81:2,10,14,
20 82:4,5,6
96:24 101:20
108:8 109:23
110:1
112:11,21
129:18
146:23 148:3
153:8 156:19
162:9

**difficult**
140:8

**digital**
51:6 99:21
132:12

**digitally**
31:18 40:1

**dime**
165:5 168:16

**dimensions**
62:13

**dinner**
160:1

**direct**
13:21 24:17,
25 25:13
48:18 122:3
126:2 168:2

**directed**
73:12

**directly**
15:3 22:20
25:15 50:11

**disagree**
164:25 165:1

**disappointed**
142:2

**disappointing**
153:20 154:1

**disassemble**
43:16 140:8
146:22
147:22 148:2
150:23

**disassembling**
147:8

**disassembly**
43:1 150:17

**discount**
81:19

**discovery**
56:16

**discuss**
63:16 162:11
180:25

**discussed**
43:10 118:23

**discussing**
86:6

**discussion**
12:25 41:23
42:25 85:7
118:22
185:10
186:14

**dismantle**
40:18 148:5
181:10

**dismantling**
177:18
178:7,12

**disproportiona
te**
46:6

**dispute**
33:23 91:7

**disregards**
104:8,19

**divide**
112:14

**document**
26:25 30:17,
19 41:17
54:2 55:18
56:19 59:13
62:17,19,21
63:20 65:19
68:1 71:20,
22 72:4,21
74:20 76:25
77:11 81:1,
18 86:23
120:16,17
121:14,23
122:9 123:5
141:16,18
168:12,14

**documentation**
167:12

**documents**
23:18 36:11
44:17 55:19
56:20 64:20,
21 74:11
186:1,2,12

**doing**
68:22 131:10
135:1,7
136:4 141:8
168:19
169:15
172:13 174:9

**dollar**

110:14

**dollars**
38:7 106:14
108:19 130:2
168:13

**door**
169:18

**dotted**
107:23
165:11

**doubt**
146:25

**downstream**
29:18

**dozen**
165:6 168:16
171:24

**drop**
66:19 102:13

**dropped**
61:11

**due**
37:18 67:15

**duly**
13:18 125:23

**dump**
146:17

**dust**
147:1

**duties**
17:16

---

**E**

---

**earlier**
85:18

**early**
20:4 30:9
32:2,23

38:21 47:11
90:10 95:10,
15 97:10
98:14 99:3,9
104:9,20
113:24
132:20
143:25
144:16,17
171:5

**earn**
38:7

**earned**
105:18

**easy**
142:6,20

**edification**
77:13

**effect**
95:15 110:22
116:19 119:9
121:17

**effort**
18:8 38:3
39:15 44:25
93:17,20

**efforts**
38:7,8,13
59:6 155:9
176:1

**either**
15:5 38:4
48:13 57:13
73:11 109:16
122:3,19
160:2 182:17
184:9

**elaborate**
127:8 138:11

**electronically**
33:18 34:15

**elevations**
62:12

**email**
12:10 35:7
41:20,22
42:6,18
72:7,24
85:4,7 92:13
102:7 115:10
116:3,9,15,
22 140:16
163:1,20
173:9 174:20
179:15
180:9,17
183:9 185:21
186:17

**emailed**
12:11

**emails**
19:19 48:24

**employee**
164:1

**encapsulate**
95:4 140:5

**encouraged**
35:11

**encouragement**
76:4

**end**
60:24 62:6
64:22 118:1
146:25 148:7
150:10
177:22

**endeavor**
56:13

**ended**
55:3,15
60:24 61:4,
15,23

**ends**
28:16

**enforceability**
92:3

**English**
98:10

**enter**
55:13

**entered**
26:11 28:13
29:3 94:16
116:12 128:9

**entering**
129:1

**entire**
62:5 95:22
98:1 119:6,
10

**entirely**
81:13 117:4
174:8

**entitled**
30:8 66:8
99:2 112:19
113:15 120:7
152:5,11,19,
23 167:23
173:18
182:13

**equal**
16:24 51:16
90:11 108:7

**equals**
90:16

**equipment**
14:8,10,13,
22 15:1,3
17:23 18:12
19:4 20:10,
13 22:9,15
24:18 28:4

31:2,5,8,12,
17,19 32:4,
10,11 38:3,
9,12 40:4,7,
12,18,19
43:16 45:8,
11 46:14
49:16 50:17,
23,25 61:24
62:10 64:15,
21 65:9
66:10 68:18
78:1,3 80:4,
7,21 81:2
82:4 83:1
101:25
103:14,16
107:18,23
108:2,8,21
114:11,18
120:10
126:21
127:22,25
128:12,14
129:18
130:9,12
132:25
133:12
135:12,16
138:11,12
139:15 140:6
144:12,18
147:13
150:1,22
159:25 161:1
169:14
177:16,19

**equitable**
47:15

**essentially**
134:9 161:11

**estate**
80:17 145:9

**estimation**
144:20

**et**
19:19

**event**
21:22 25:3
31:23 46:19
48:25 97:13
121:14
132:24

**events**
128:24

**everybody**
60:23 177:4

**everyone**
26:18 30:25

**evidence**
32:21 36:22
37:1 44:13,
14 59:6,24
83:17,18
94:16
120:14,24
121:4,22,23
122:5,15
125:10
140:13
183:11

**exact**
60:11 61:16
156:21

**exactly**
75:19 86:20
126:17
127:18
170:1,2
181:6

**EXAMINATION**
13:21 118:16
126:2 176:12

**examined**

13:18 125:23

**exclusive**
30:24 31:13

**exclusivity**
30:9

**excuse**
30:15 38:21
47:10 96:19
99:19 178:5

**exhibit**
26:23 27:14
28:1,4,11
34:4,6,13
40:25 42:11,
14,18 52:13
53:18,19
57:5 58:1,22
59:9,23 60:4
71:20 72:5,
7,16,21
74:13,16,23
76:23 77:10,
24 78:15,19
83:19,21,23,
24 84:1,10
85:14 87:3,
7,13 89:12
95:18 99:12
115:6,13,19,
21,23,24
116:3 118:20
119:2 121:2,
6 123:1
128:18,19
131:18
140:12
149:16
151:20
162:15,16
163:1,9
167:7 179:14
180:17
183:7,19
184:6 186:19

**exhibits**
26:13 27:11
40:22 52:14
54:22 76:25
115:12
185:14,22

**exist**
94:6

**existence**
126:12

**expect**
46:13

**expeditiously**
185:5

**expense**
73:21

**expenses**
112:23
113:10

**expensive**
40:4

**expiration**
31:25 33:8
96:12,22
97:23 100:9
102:24 105:7
109:10 137:9
149:20

**expire**
100:4

**expires**
99:20 132:11

**explain**
129:2
132:18,23

**explained**
136:5

**explanation**
24:16

**explore**
47:5

**expose**
91:3

**extensions**
35:20

**extent**
78:5 158:7,
10

**eyeballed**
170:13

---

**F**

**F-O-U-R-N-I-E-R**
14:1

**Facebook**
40:2 101:9,
13

**fact**
34:14 43:10
44:10 59:1
61:7 67:25
75:15,16
76:1,19 82:1
83:8 84:23
88:17 89:10,
15,17 91:8
93:16,22
100:15
102:13 104:7
105:15 106:9
110:22,24
111:4,12
112:4 113:2
116:16,24
128:4 131:14
133:6,19
136:10
142:22
144:2,15

146:19
150:2,15
170:18
181:16

**facts**
111:25 112:7
170:24

**factual**
142:5

**factually**
142:10

**failed**
90:9

**failure**
142:1

**fair**
85:13 96:14
109:1,11,15,
22 110:16
137:10
149:22,25
155:6

**fairly**
29:19 38:9
149:3

**familiar**
26:25 174:23

**Famous**
185:1

**far**
21:10,19
23:6 33:14
86:20

**fashion**
65:5

**fast**
43:3 150:19

**fast-forward**
146:14

**faster**
40:14 44:19
92:19

**fee**
22:5 30:1
32:1,2,9,11,
13,21 33:8
43:22 49:3
51:10 92:3
96:13 102:25
109:11,20
117:11
137:10
149:21
173:10,19

**feel**
144:22 149:3
168:20
181:14

**feeling**
172:20

**fees**
182:9,12,13,
16,21,22
183:23,25
184:9 185:4

**Feinberg**
47:7,19,24
48:19,22,24
49:6,13
73:17,19,23
75:13
170:17,25
171:20 172:5

**fell**
82:23

**fellow**
178:19

**felt**
170:12

**ferrous**
62:15

**fighting**
102:5 186:24

**figure**
104:5 169:8
185:18

**figures**
74:7

**filed**
75:20 76:8
87:23 88:15,
19

**filing**
73:23 99:1

**final**
50:10 73:22

**finally**
51:8 146:16

**financed**
14:8

**financial**
168:18

**financing**
20:7,14
86:12 127:21

**find**
56:13 127:21
151:10

**fine**
12:7 27:13
41:7,14 43:7
53:10 70:6
80:10 117:21
118:6 119:7
130:6 139:20
156:4 175:19

**finer**
16:21

**finish**
48:4,12
62:25 74:18

165:9 167:23
174:2,14,19
179:7

**finished**
51:24 106:5
125:12

**firm**
89:5

**first**
13:12,18
20:9 22:15
38:7 42:24
45:6 68:17
86:13 88:7
99:18,19
119:7 125:23
129:24
132:6,7,10
141:21
149:7,12
151:7,11,13,
15 161:17
173:17

**fish**
143:19

**fit**
36:14

**five**
14:18 70:6
73:24 76:1,
19 77:20
79:14 108:14
116:24
118:1,5,7
134:1,9
147:4

**five-minute**
70:4

**flow**
158:4

**fluctuate**
108:25

**folks**
45:7 158:14
176:18
177:24

**follow-up**
176:6

**following**
53:11

**follows**
13:19 125:24

**foot**
139:2

**forever**
100:12

**Forget**
135:14

**form**
65:25 73:24
121:23

**formation**
18:19 79:19
85:23

**formed**
85:10

**forms**
50:3 94:9
185:21

**forward**
13:10 26:23

**found**
46:1 169:23
181:1

**foundation**
133:13 139:5

**foundational**
17:7

**four**
53:21 116:24
141:24

**four-page**
63:19

**Fournier**
13:14,15,17,
21,25 29:12
53:2,4,12
60:8,11
64:14 66:6
67:21 68:13
70:12 72:20
73:2,4,7
75:12,24
78:5,22 79:2
82:2,13 87:7
92:1 93:6
94:8,10
95:20 96:9
107:2 112:22
116:6 117:17
118:16,18,23
121:24
123:16 133:3
150:13
174:3,10

**Fournier's**
81:25 111:22
123:7 127:4
143:2 145:22

**fourth**
73:15 75:24
96:5

**frame**
82:6

**Frank**
20:23

**frankly**
81:24 104:23
186:10

**free**
68:21,22

**freight**
150:18

**front**
26:16 38:14
40:22 184:5

**front-facing**
23:12

**fry**
143:19

**full**
133:15 146:7

**fully**
59:5

**functions**
17:22

**fundamentally**
74:25

**funny**
146:3

**furthest**
146:24

---

G

**gain**
46:7,13

**Galloway**
183:20

**gap**
107:8

**gathering**
17:22

**gave**
54:12,14,17
145:5

**gears**
84:22 145:21

**general**
56:5

**generally**
38:15 48:25

184:14

**generate**
35:7

**generated**
22:23 35:14

**generates**
22:17

**gentleman**
76:14 160:13
164:11

**gentlemen**
123:10 166:7
171:21

**get-go**
126:14

**getting**
45:9,15
68:23 80:16
117:25
127:20
175:14,17

**give**
12:18 20:24
69:24 75:18
87:20 92:24
132:11
162:21 175:6

**given**
24:8,10
25:17 33:15
35:3 100:5
122:2

**giving**
32:3

**global**
176:17

**goes**
18:6 24:12
35:7 39:8
77:15 78:7

86:10 95:15
97:15 165:24

**going**
21:12 23:16
25:6 26:11
30:16 31:3,4
32:19 33:1
34:8,13,17,
25 38:18
40:24,25
41:1 44:11,
23 48:16
52:21 57:7
58:24 61:7,
11 68:2
69:19 72:18
74:3,16 75:7
76:22 78:14
79:17 80:19
82:9 84:18,
22 86:19
87:6 88:1
91:21 92:5
99:12 102:19
115:5 117:19
123:10,12
131:2
133:15,19,24
137:22
138:18,21
139:12
140:11
147:12,15,22
148:9
150:12,19,20
151:1
154:12,16
155:13 157:5
158:6 160:17
161:10,13
162:14,15
163:9
169:16,17,21
170:4,20
172:19

174:15
179:13 181:8
182:11,14,
17,24 183:21
184:2,8,11,
15,17 185:3

**good**
26:19 31:5
43:18 53:12
86:15 96:1
119:12
129:14 150:7
154:14
176:16 177:9
185:15

**goodness**
59:10

**Google**
39:22,24
40:2

**Gotcha**
73:11 140:11

**govern**
119:18

**graduated**
82:22 83:10

**granted**
154:5

**great**
124:15 128:1
129:16

**Green**
154:13
157:19
158:15 185:7

**gross**
148:10

**ground**
147:4

**grounds**

42:13

**guess**
19:11 55:24
56:4 58:14,
17 77:15
128:6 131:16
132:4 134:15
135:5 159:3,
20 160:17,19
173:3 177:9
181:5 183:22

**guessing**
160:17

**guy**
39:25 128:1
131:8 156:6
159:2 160:2
164:17 167:9
172:15,22

**guys**
12:20 141:20
160:8 166:21
169:23

**H**

**half**
108:19 134:9
145:6 171:24

**hand**
13:16

**handled**
177:24 178:8
184:15

**handling**
177:17
178:11

**Hang**
179:7

**happen**
128:7

**happened**
24:16 37:20
38:24 61:15
77:7 129:13
143:5 170:1,
2

**happy**
45:19

**harassing**
157:24
158:10
166:2,14

**hard**
51:7 130:10
141:19 149:2

**harm**
124:6

**Harris**
20:17 23:2
25:3 29:17
35:14 38:17
39:13 50:3
62:13 81:13
129:6 155:10
164:6

**hat**
177:8

**hate**
25:9 85:7

**haul**
140:9
147:12,22
148:2 150:23

**hear**
12:24 48:16
125:20,21
174:15
176:14

**heard**
84:25 127:4
143:2 155:21

169:2

**hearing**
56:17 94:17
184:2 185:3

**hearsay**
48:9 122:7

**heavily**
39:19,21
40:3

**heavy-haul**
147:18

**held**
12:25 21:25
118:22
185:10
186:14

**Hello**
164:3

**help**
127:20

**hesitated**
147:6

**highlight**
96:7 102:19

**highlighted**
73:16 102:22
104:19 109:5
137:7

**highlighting**
96:7

**hindsight**
141:6

**hiring**
43:15

**history**
14:15 61:15
62:1,8 63:7,
12 64:18
65:22 66:20,
25

**hit**
31:7 43:19
106:12,13
107:8

**hits**
105:17

**hold**
41:16 62:9
74:2 86:3
91:20 123:9
151:14
157:10 160:6
166:8 167:16
175:8

**holding**
154:13

**honest**
129:12
164:18
172:22
173:22

**honestly**
127:25
132:21
148:21
155:20
175:2,14

**Honor**
47:14 59:16
74:14 91:20
153:24

**hope**
89:16 156:6
159:18

**house**
18:3

**Houston**
155:16 159:1

**HP**
81:3

**hundred**
94:4

**hypothetical**
105:18

**hypothetically**
105:6

_____

**I**

**ID**
62:10

**idea**
91:17 140:24
156:2,10
157:3 179:1
180:9,16

**identification**
28:7 42:19
60:5 72:8
78:20 87:4
116:4 163:2

**identify**
170:21

**idiot**
161:3

**ignored**
50:11

**imagine**
22:2

**immediately**
22:25 25:24

**impact**
132:18

**impeachment**
78:7 97:16

**important**
50:16

**impose**
92:10

**impossible**
64:18

**improper**
93:18

**inaccurate**
146:2

**inadmissible**
122:6

**inappropriate**
166:6

**incentive**
40:20

**inclined**
15:18

**include**
22:5 44:7
56:24 137:2

**included**
13:5 25:1,
13,16 27:10
43:1 44:2,9
120:19
121:19

**includes**
23:13 148:4

**including**
66:17

**inclusive**
183:17,18

**incomplete**
54:7 58:21
186:24

**incompleteness**
56:5 57:11
58:4,20

**inconsequence**
91:23

**increase**
113:23

**incur**
33:8 96:13
102:24
109:10
112:23 137:9
142:4 149:21

**incurred**
73:22 104:4
111:2,6
113:11
142:17,18

**indefinite**
100:14

**independent**
176:1,2

**indicate**
43:3 71:15

**indication**
24:20 25:20
35:8 148:9

**indiscernible**
33:23 75:2
127:18 143:4
166:3

**individual**
173:8

**industrial**
108:3 155:23

**industry**
14:9,10,12,
23 17:25
18:5,7,14
20:22 31:2
108:4

**inequitable**
39:7

**information**
34:10,11,23,
24 35:1 43:2
44:10 55:1
56:14 58:6

61:1,25
66:13,20,22
67:23 69:4
82:11 87:12
91:3 95:23
172:16 184:5

**initial**
43:23 85:9
136:9

**initially**
20:5 21:13
27:5 74:20

**initiated**
75:16 95:5
98:19

**initiating**
88:8

**inquiries**
175:13

**inquiry**
173:17
180:18

**insisted**
37:21

**inspect**
164:6

**inspection**
26:4 63:10
167:8

**installed**
133:14

**instance**
23:1 24:1
35:13 69:16
70:19 90:15
98:18 101:18
106:18

**instituted**
116:25
126:23 127:1

**instruct**
159:12

**intelligible**
13:9

**intended**
47:25

**intent**
90:4

**intention**
135:4 140:22

**intentions**
140:19

**interactive**
63:6

**interest**
13:8 16:1

**interested**
45:11 47:25
86:5 101:24
158:24
172:18
179:23

**interests**
15:5

**interject**
15:17

**intermediary**
18:25

**internal**
83:12

**internally**
100:15,22

**Internationally**
17:11

**internet**
32:12 39:22
82:19 175:21

**interpretation**
98:10

**interpreting**
30:18

**interrupt**
48:11 63:1
174:13

**introduce**
126:4

**introduced**
58:22 67:14
121:2

**invoked**
144:1

**involved**
12:14 37:23
45:15 98:25

**involvement**
178:14

**irrelevant**
97:11

**Irrespective**
74:19

**issue**
16:22 29:16
36:5 47:9,13
51:9 76:6
79:20 118:19
182:18

**item**
29:16 62:9,
14 64:22
65:4 86:5
90:1 108:6
164:12

**items**
109:1,3

---

### J

**Joe**
169:2

**John**
13:25

**joke**
147:25

**Jonathon**
53:16 72:1
92:11,12,22
96:2

**Jr**
73:2,7
75:12,25

**judge**
23:16 30:15
56:2 71:18
174:16
183:13

---

### K

**keep**
70:21 71:7,
12 133:15
135:17
154:16
169:13
171:25

**kickers**
165:2 168:9

**kind**
43:5 47:12
77:16 87:9
101:9 128:3
131:9,10
141:19 144:8
147:6,14
175:12
176:17

183:18

**kinds**
74:9

**knew**
30:21 31:2
45:14 49:16
130:16
134:17
171:10 173:3

**know**
12:13 23:6
31:19 33:14
35:17 40:3
41:11 54:1
55:15,23
56:11 57:21
58:8,9,11,
12,13 59:3,
15 77:6 92:7
94:1,2 97:12
103:17
104:11,22
105:15
109:20
111:4,8
122:24
128:7,15
129:17
130:13,23
131:7 133:10
139:15
140:20
141:9,15,21
142:4,16
145:8 147:17
148:23
151:2,15
153:25
154:12
155:16,20
156:6,9
159:23
160:2,15,16,
23 161:14

165:16
168:17,20
169:5,6,11
170:23,24
175:16
176:23
177:4,6
178:23,25
179:8 183:7
186:4

---

### L

**labeled**
72:15

**labelled**
27:14

**labor**
43:15 148:4

**lacks**
92:1 97:2

**language**
95:25 98:10

**large**
20:16 38:9
40:3,13
139:14 140:6

**larger**
38:12 40:6

**largest**
18:4

**Lastly**
175:23

**late**
105:8 116:16
117:2 130:14

**law**
39:4 89:5
112:1,3,4,18

**lawful**

13:17 125:22

**lawsuit**
111:19
172:17

**lawyer**
111:24 166:9
177:8

**layout**
62:11,12

**lead**
25:8 49:12

**leading**
17:2 25:5,
10,12 36:15
44:6 48:20
49:8 51:17,
18 119:20
152:13,14
153:6

**leave**
36:13 48:13
185:3

**left**
82:25

**legal**
92:2 111:18,
20 112:5
114:6 119:25
141:20 142:9
145:15

**legality**
98:7,8

**legitimate**
146:9

**lengthy**
178:16

**lesser**
152:24

**letter**
88:8

**liar**
158:12
166:17
179:15

**lie**
156:8

**lieu**
103:7

**life**
69:17 126:8
161:9

**light**
27:21

**limit**
73:21 75:2

**limited**
108:12
111:15 133:4
136:10 140:9

**line**
23:17 50:9
77:13 80:22
81:8 92:4,25
107:23
123:11,19
150:7 165:11

**lines**
39:12 93:7,
14 94:4
113:3

**link**
22:20 24:17,
23,25 25:13,
15 35:11
42:7 44:2,8

**liquidated**
77:8 93:23
94:5 103:11,
18 104:1,25
113:19
116:18

117:1,15
171:3

**liquidating**
77:5

**list**
19:4 62:6
64:23 90:16
109:23
129:23
130:17

**listed**
22:5,9,15
23:6 24:15
27:6 29:21
31:3,6 32:24
43:23 50:8
62:15 65:17,
18 68:19
86:14 89:25
90:11 91:6,
14 93:10
96:13 101:14
102:25
105:10,20
109:2,11,15,
20 110:17
117:8 137:10
146:8 149:21
151:4

**listen**
167:2

**listing**
22:8,12,18,
19,20,21,22,
24 23:3,7,
12,22,23,24
24:2,4,6
25:14,16
26:7 27:4,9
28:5,20,24
29:25 30:10
31:24 33:7,
19 34:9,12,

25 35:4,5,9,
11,13,18,20
37:4,14
41:24 44:2,
4,9,13 50:5,
8,18 59:3
60:4,12,17,
19 61:2,17,
25 62:3,5
63:3,7,18,
20,22,24,25
64:1,12,17,
19 65:5,16
66:15 67:15,
17 84:3
85:15,24
90:3,5,10
95:19 96:12,
21 97:23
98:5 101:3,
4,17,19
102:8,23
108:17,18
109:9 112:25
117:3 120:25
121:1,5
122:4
128:10,19
136:9,16,24,
25 137:1,8
143:7,10,12
146:10
149:20
165:17
173:21
174:21
175:4,9,12,
20 186:23,25

**listings**
28:6 66:15
101:17

**literally**
171:20 172:4

**litigation**

45:16 50:4
61:7,13
64:6,13 69:9

**little**
14:14 23:21
48:16 60:22
78:12 84:23
116:23 127:8
129:8 139:18
146:18
158:22

**live**
35:5,9

**lived**
126:8

**load**
40:19 43:16
140:9 146:22
148:2

**loading**
43:2 150:17

**located**
137:23

**location**
62:10 64:21

**locations**
146:23 148:3

**long**
17:12 35:17
85:9 131:1
151:9 154:12
178:13
184:25 185:7

**long-time**
131:8

**long-winded**
144:8

**longer**
50:25 61:3,
5,12 64:16

66:10,21

**look**
12:1 26:15
36:11 54:7
60:22 61:10
62:4 66:14
83:9,13
86:21 89:21
118:2 141:14
162:18 165:3
169:7 170:19
184:3 186:11

**looked**
120:22
134:14
162:22
175:4,20

**looking**
52:11 54:12
61:20 84:3
86:18,19
103:21
110:21 111:1
127:22
141:12
147:14

**looks**
26:7 54:18
77:22 138:13
167:12

**loosey-goosey**
130:19

**lose**
161:13

**losing**
181:16

**loss**
106:17
161:10

**losses**
103:13

**lost**
23:20 66:24
106:8 138:19

**lot**
18:11 20:20
26:10 31:1,
16 44:19
65:8 76:11
92:18,20
94:4 108:8
130:11,22
134:5 142:25
147:1,13
166:12
174:16

**love**
166:13

**lower**
43:20,22

**lowered**
101:21

---

**M**

**machine**
35:2 81:20
129:5 133:14
135:11
137:20
168:13
173:1,4,8

**machinery**
17:13 80:9
161:6 168:4

**Madam**
153:17

**made**
24:21,22
42:9 83:11
102:2,6
107:17 124:3
132:5 134:15

179:24
180:3,18
182:16
185:15

**majority**
28:18

**make**
23:21 26:1
31:11 32:2,6
35:4 40:14
43:4,8,17
45:19 46:23
53:17 57:1,3
61:23 63:10
72:2 92:2,16
93:8 102:13
111:24 129:9
142:13 145:6
161:2 163:7
166:11 169:8
171:22 183:2
184:23
185:14

**makes**
141:24

**making**
31:10 129:14
181:15 184:4

**malicious**
135:9

**man**
124:7 159:13
166:4 171:9

**management**
24:12,14
37:12 174:25
175:11

**manager**
19:5,6 35:3,
4 177:10

**manifestly**
39:7

**manner**
  65:7

**manufactured**
  172:25

**manufacturers**
  20:21

**manufacturing**
  137:20

**March**
  141:13
  151:16
  156:20
  167:10

**mark**
  163:9

**marked**
  28:7,10
  42:19 60:5
  72:8 78:20
  87:4 94:16
  116:4 118:19
  140:12
  162:14,16
  163:1,4

**market**
  96:14 108:12
  109:11,15,22
  110:16
  135:14
  137:11
  149:22,25

**markets**
  162:8

**Marty**
  47:7,19,24
  75:13
  170:17,25
  171:20 172:5

**massive**
  140:6

**material**
  58:6 59:1

**mathematics**
  141:8

**matter**
  33:23 83:8
  91:8 93:22
  127:12
  129:20
  136:10
  139:16 151:2
  160:24
  170:18 171:2

**mattered**
  58:16

**matters**
  57:11 77:3
  97:13 109:21
  119:11 135:4
  148:13
  184:14

**mean**
  19:21 32:7
  56:2 81:24
  89:4 94:3
  100:8,21
  105:17
  111:13
  128:2,4,13
  130:10
  133:8,10
  139:25
  141:2,18,19
  142:25 147:3
  148:1 149:3
  150:3,18
  151:8
  155:14,25
  156:1,6
  159:1,3,6,16
  160:3,4
  161:3 164:17
  165:2,5,19

**169:11**
  172:12 175:3
  178:23,25

**meaningful**
  148:10

**means**
  25:22 31:18
  32:8 165:20
  168:14

**measure**
  103:7 110:20
  112:7

**media**
  51:6 101:9

**meet**
  19:16
  161:20,23

**member**
  14:3 37:8

**mention**
  122:13

**mentioned**
  172:24

**mentioning**
  174:22

**message**
  35:7 79:8
  85:4

**messages**
  77:19 78:19
  79:5 81:25
  87:10

**met**
  19:18,20,21

**metal**
  20:16 29:17
  126:19,20

**metric**
  111:19

**microphone**
  12:24

**mill**
  126:22

**million**
  106:14
  108:19

**mind**
  69:25 98:20
  110:6 118:4
  153:18

**minimis**
  124:6

**minus**
  63:24

**minute**
  54:21 62:9
  98:14 162:21

**minutes**
  12:3,15 70:6
  118:2,5,7

**mischaracteriz es**
  16:10 123:19
  157:11,23

**mischaracteriz ing**
  32:20

**misinformed**
  145:23

**missed**
  107:14

**misstatement**
  91:10

**mistake**
  132:5

**misunderstandi ng**
  98:16

mitigate
45:18

mixed
112:4

Mobile
146:24
156:24 157:9
158:24

model
16:7,14

molehill
57:4

moment
15:16 27:16
52:19 62:24
69:24 75:18
76:13 96:25
97:8 181:24

money
31:16 39:23
129:14
130:12
135:15 150:4
168:11 169:4
170:14
181:15,16

month
24:13,17,19
37:12 39:23
116:23,24

monthly
18:6 19:5
31:16 175:10

months
133:23,25
134:10
141:15 147:4
160:2

mood
147:25

morning
93:2 185:9

Motion
154:4

motor
81:4

mountain
57:3

mouth
123:7 158:11
159:4

mouthful
114:20

mouthing
166:5

move
13:9 15:13
27:23 34:17
36:22 37:2
40:14 42:10
44:21,23
50:9 53:19
76:22 77:9
83:16 87:19
95:4 106:25
113:11
115:6,18
117:24
123:13 138:4
139:16 147:2
153:23 154:2
157:1 160:8,
9 183:6

moved
183:8

moving
26:22 115:23
156:24 157:3
178:13

multiple
26:4 66:16

**N**

name
13:23 76:14
126:6 150:6
155:4,15,21
159:6,22
160:13
161:17 164:9
172:15

nature
21:6,8 58:18

nauseam
122:11

necessarily
13:6 14:20
54:1 56:12
103:11

necessary
37:2 45:13
67:4

need
30:18 31:19
40:13 44:16
51:2 63:15
67:5 71:2,14
83:22 91:24
94:25 101:11
124:15
129:22 132:3
139:25 140:1
159:8
160:23,24
173:23,25
184:7,19
185:8

needed
41:24 131:9
133:11,12
135:11
137:24 139:8
143:18 169:2

183:2

needs
39:6 47:15
94:22

negate
58:25

negligible
148:22

negotiable
46:17 69:14,
15,17 70:15
76:2 82:2,15
83:4 84:17

negotiate
69:23

negotiations
75:1 79:25
80:13

net
148:9

never
12:11,13
19:18,20
31:2 57:10
122:16,17
124:3,7
127:23 128:2
130:25
131:10 133:8
135:23 136:5
141:2 146:3
168:3,6,12
171:10
174:25
175:20,22
179:19 180:2
181:3

newspaper
18:4

nice
172:22

non-negotiable
77:25

nonexistent
136:11

nonresponsive
65:24 67:2
106:2 115:1
124:21
153:24

notably
43:21

note
37:13 40:25
53:17 72:2

notes
118:2 185:16

notice
37:9 90:4,10

notification
22:16 28:23
37:18 51:3

notified
57:10

notify
50:16 101:20

November
79:13

number
27:14,18
36:20 40:25
41:18 53:14
62:9,16
64:22 72:5
91:21,22
104:4
109:16,19
112:14
115:11

numbered
26:14,16

40:22

---

**O**

---

Oak
20:3,6 27:4
29:5 32:16
33:15 51:9,
15 64:5
79:23 84:4,
10,24,25
85:3 89:4
95:6 98:20
107:3 108:11
112:24
115:10
126:7,11,17
127:5,10
128:25
153:3,4
162:5,7
163:12,16
164:1
176:18,19
178:20
180:11

oath
149:3 156:3,
8 159:19
160:24
166:15

object
23:17 30:16
32:20 36:14
38:19 42:12
44:6,12
56:16,19
65:25 74:3
75:5,6 77:2
79:18 88:2
91:21 92:4
93:19 139:13
182:22

objecting
59:18

objection
15:7,18,20
16:9 17:2,6
25:5,7
27:24,25
36:15 45:3
46:8,15,22
47:8,20,22
48:2,9,20
49:8,21
50:14,15
51:17,18
53:24 54:5,
19 55:22,25
56:4 57:13,
20 58:2,19
59:19 64:7
65:23 67:1
71:22 72:17
75:8 77:1
78:16 80:19
82:10 88:5
92:8 97:2,18
103:3,20
104:10
106:1,21
107:10
109:18 110:8
111:3,7
114:5,7,12,
25 115:2,17
117:10,20
119:20,24
120:14
122:20
123:2,18
124:2,20
125:2 135:3
142:8 144:24
145:14
148:12
152:13 153:6
156:14

objecting (cont.)
157:7,14,21,
22 159:11,12
165:22
171:1,13,15
173:11
179:17
181:17,19
183:2 184:10

objections
48:17 115:7
157:14 183:4

obligated
21:11 50:6,7

obligations
49:18 50:1

obtain
49:2

obviously
12:14 64:25
133:25 156:8

occasion
19:16 162:11

occupation
14:2

occurred
128:24

October
72:7,11
75:14,20,22,
23

offer
24:22 26:1
31:10,11
43:4,8,17
57:16,19
61:23 63:10
74:3,23
107:17,21,22
146:9,13
149:13
179:24

180:2,4

**offered**
25:17 57:9
58:14 59:1
74:12,20,24
76:19 81:22
185:15

**offering**
57:15,17,18,
21 77:21
78:9 94:23

**offers**
150:3

**office**
177:13

**offices**
34:21

**Ohio**
39:4 91:16
183:25

**okay**
12:17 16:6
17:7 19:15,
24 22:4 24:8
25:12 27:21
30:8 35:21
36:21 41:4,
6,10,13,15,
25 42:23
44:18 47:5
51:8 52:20,
21 55:13
59:11 64:1
65:3,14
67:19 69:13
70:19 71:6,
12 79:4
83:13,20
84:9,14 85:9
86:25 87:13
88:24 90:23
91:19 94:7

95:3,13
98:18 99:7
100:1,23
102:1,16
104:3,7,24
106:25
107:7,16
109:15
110:19
113:10
114:1,22
115:24
125:20
126:10
127:17
131:25
132:23 136:5
137:5,15
138:16,24
142:13
144:6,10
145:2
146:14,19
147:21
148:21
149:10
153:14
154:15 155:7
159:16
160:20
161:18
163:23
164:8,10,13
169:8 170:9
172:8 176:14
177:14
178:18
179:4,13
180:21 183:1
185:23

**once**
34:18 64:15
66:10,19
68:5 101:14
153:14

**one**
12:8 18:14
19:9 30:6
31:11 34:17
36:2 38:11
39:20 52:19
56:13 57:1
58:19 62:17
64:25 66:2,
14 74:2,11
75:18 76:13
87:20 91:22
98:9 105:8
107:13,15,
17,20,25
117:23
128:10
132:11
136:23
138:19,20
146:9,12
153:15
157:20
158:14,20
159:7 160:22
165:20 166:9
169:22
171:23
175:3,18
177:9 180:14
181:23
184:16
185:18
186:23

**ones**
185:14

**online**
51:6

**open**
185:3,4

**operate**
48:7

**operating**

18:8 129:11

**operation**
127:23 140:3

**operations**
18:9 177:10

**opinion**
98:22 134:6
142:6

**opportunities**
66:11

**opportunity**
24:8,11
25:21 26:1,
2,3 32:3,17
33:15 61:22
65:9 66:16,
22 69:23
103:15
106:8,10
155:6

**opposed**
153:3

**opposing**
120:20
122:12

**opposition**
52:15

**order**
33:17 39:4
43:4 51:9,15
114:24

**organization**
19:3 40:1
176:25

**original**
29:20 40:9
44:9

**originally**
64:24

**originated**
165:14

**outline**
120:6

**outside**
98:21 180:4

**overnight**
138:4

**overrule**
25:6 75:7
80:19 82:9

**overruled**
16:11 17:4,6
23:19 30:23
39:9 42:14
47:23 51:19
88:6 92:9
97:18 104:15
107:11
110:11
114:13 115:2
120:1 122:20
124:22 125:3
127:13
142:11
144:25 158:1
171:16
173:13

**oversee**
19:12

**overseeing**
17:21 18:18

**owner**
126:7,15
176:24

---

**P**

---

**page**
34:13 41:11
64:12,17
71:21 72:5,

12,21,24
76:23,24
77:10,16,18
78:25 88:7,9
89:12 92:12
93:4,5,6,14
113:2 137:1,
2,3 151:24
186:21

**pages**
52:12 53:21
78:10,15
94:24 186:21

**paid**
77:4 124:16

**paper**
67:13

**paragraph**
42:24 73:15
75:11,24
99:18

**parse**
48:17

**part**
52:13 77:16
82:5 91:9
117:4 130:19
132:10 133:2
161:9 165:1

**particular**
16:22 22:9,
24 24:1
28:21 29:25
31:14 39:18
45:19 65:3,4
67:18 77:13
86:5 108:5,9

**parties**
30:21 50:16
75:3 76:5,11
119:10

**party**
90:3,9 105:6
182:13

**pass**
20:18

**past**
127:10
129:16

**pause**
15:16

**pay**
15:23 21:11
25:2 39:23
50:7 51:10,
15 66:23
84:6,10,18
114:4 143:21
145:12
150:8,12
168:9,11,13,
18 169:4
181:12

**payment**
49:18 168:15

**pays**
21:21

**PDFS**
64:20

**penal**
120:9

**penalty**
38:22 39:1,5
47:11 90:11
91:6,9,10,
14,16,22,24
94:13 95:6,
14 97:21
98:23 99:3,8
103:10
108:24
109:17
110:15 114:3

116:19
140:22
144:1,23
149:18 152:1
153:3

**pending**
103:23
107:21

**people**
24:20 31:21
86:2 101:20
129:18
130:11 140:9
157:18 160:4
170:14
176:19,25
177:1,13,14,
16

**percent**
15:24 16:5,
7,19,24
21:22 22:5
25:2 26:8
32:13,21,22,
24 33:8
38:22 43:22
44:5 46:5
47:10,11
49:2 51:10,
16 57:8
59:2,9 61:21
62:4,18 66:8
68:2,14,23,
25 69:10,19
70:15,20
73:21,24
76:1,20
77:20 78:6
79:14 80:13,
16 82:14,20
84:11,14
90:11,16
91:5 92:3
94:4,11,12

95:6,14
96:13 97:21
98:23 99:3,8
102:18,25
103:10
105:10,14
108:24
109:11,17,20
110:15
113:15,18,23
114:3 116:18
117:1,15
120:13
121:20
122:13 123:3
132:20 133:1
136:12
137:10
140:22
143:22
144:4,11,12,
23 149:21
152:1,6,23
181:14

**perfect**
152:3,9,18

**perfectly**
53:10

**perform**
124:15

**period**
14:9 16:16
18:17 28:23
35:24 36:3
37:4,18 42:3
107:19,24
111:2,6
112:8,13,22
113:14 136:6
142:20,25
149:12,13

**periods**
35:21

**permit**
15:17

**person**
47:23 57:1
85:22 89:7,8
168:8 171:23
178:18

**personally**
142:19

**perspective**
176:17

**Petitioner's**
128:19

**phone**
19:19 85:4,
16 170:20
172:9

**physical**
19:24 26:15
51:7

**physically**
31:18

**pick**
168:24

**picture**
61:14

**pictures**
22:23 25:18
34:22 35:2
45:23,24
51:5 61:16
138:10

**piece**
20:10 22:9
24:17 31:7,
11 32:4,9
38:9 40:7,
11,18 45:8
49:16 50:17,
25 61:24
65:9 66:10

67:13 68:18
77:25 78:3
80:4,7,8,21
81:2 82:4
83:1 101:24
103:14,15
107:18
114:11,18
120:10
127:24
128:12,14
130:12
133:12
139:14 140:6
144:12 145:9
161:5 168:3
169:14
177:15

**pieces**
14:21 38:12
40:4,5,6
127:21 130:9

**pillars**
139:10

**place**
137:22
173:21

**placing**
18:10

**plan**
51:3 94:18,
21

**plant**
62:11,12

**play**
134:3

**please**
13:12,16,23
25:8 39:11
42:23 46:11
48:10,14
49:12 51:12

52:8,23
62:25 63:1
66:2 69:4,25
70:10 71:5
104:17 106:3
110:3 114:15
123:25
124:13 126:4
144:7
153:15,18
157:15
158:16
159:12,15,22
165:10
166:25
171:17 174:1
180:14

**pleasure**
12:23

**point**
12:13 16:12,
13,21 35:6
40:8 59:8
61:22 63:15
76:8 77:5
87:24 93:25
104:12
106:15
109:24
123:12
153:7,12
166:19
175:18
179:19
182:23
184:18

**pointing**
54:25

**policy**
81:8

**portion**
115:1 124:21
137:6

position
116:15

possession
87:12

possibly
140:2

post
34:9,11,25
38:4

posted
22:18

potential
18:25 19:8
23:12 26:5
34:23 46:14,
25 50:1,12
74:13 162:12
170:12 171:4

potentially
32:3

power
45:13 48:7

pre
38:4

prefer
26:15

prehearing
13:3,6,7
37:25

premiered
14:17

premium
22:10 23:3,
9,10,13 25:2
26:8 44:5
50:8 57:8
62:4,19
63:4,16 64:2
65:17,18
66:8,18

67:15,22
68:3,15,20,
21 69:11,15,
20 70:15,21
73:25 76:1,
20 77:5,20
79:14,23
80:2,14
81:19 82:1,
18,19,21
83:1,3,6,11,
12 84:6 94:2
120:9,11
121:19
122:14 123:3
136:13 137:3

premiums
69:13 82:14

present
121:22
146:14

presentation
182:15

presented
74:6 179:14
180:10,17
182:23 184:6

president
17:18,19
18:16 19:15
29:15 126:7,
11,14 176:23

presume
21:1 30:4

pretty
43:11,18
106:23 108:7
128:13
130:18
153:11 177:5
185:15

prevailing

182:13

previous
105:19

previously
31:1 34:21
137:18 151:5
180:11

price
16:8 29:20
40:8,9,16
41:23 43:1,
9,13,23 62:6
64:23 73:18,
20,22 80:25
84:15,17
90:16 101:21
102:13
105:10,11
130:7 143:22
144:13
146:18,21
149:8 152:7,
20

prices
108:17

pricing
21:13 82:23,
24

primarily
17:25

principal
125:13

prior
31:24 32:17
33:7 46:2
96:11,21
97:22 102:23
109:9 119:6
127:5 137:8
149:19

prioritize
38:12 40:3,6

private
151:2

probably
20:4 78:11
92:20 120:21
129:12 131:5
141:23

problem
45:17 54:23
57:4 93:22
97:6 129:8
130:20

procedure
85:19

proceed
13:20 56:8
75:8 81:16
120:8 126:1
154:22,24
172:1 176:9
185:5

proceeding
58:23 116:25
126:24 127:2

process
138:2 156:23
166:9

processes
126:22

processing
129:18

produce
24:12 59:7
64:16

produced
54:9 56:6
59:14 62:18
64:5,13
65:18 66:7
67:25 68:1,4
69:8 72:2

74:15,21,22
80:11 122:16

**produces**
61:1

**production**
51:7 52:12
62:19,21
71:22 72:5,
22 76:25
77:11

**profitable**
140:3

**projects**
20:7

**proper**
100:7

**properly**
37:22

**prove**
57:9 93:24

**proven**
39:6 47:15

**provide**
20:7 48:7
66:13 90:2,9
186:7

**provided**
23:24 24:2
25:19 35:10
37:12,17
39:16,22
45:23

**provides**
47:16 90:4
182:12

**providing**
145:12

**provision**
33:11 77:6
93:23 104:7,

18 117:11
132:19

**provisions**
94:6

**publication**
18:5 39:20

**publications**
31:21 39:19

**publicly**
23:22

**publish**
71:19 162:17

**published**
23:22

**pull**
76:24 92:21,
23 169:22
185:16

**pulling**
95:18 148:21

**punishment**
103:1

**punitive**
145:13,19,20

**purchase**
47:25 50:6
66:12 120:10

**purchasing**
45:11

**purpose**
34:5 57:17,
18

**purposes**
28:7 42:19
60:6 72:8
74:8 78:8,20
87:4 116:4
138:12 158:4
163:2 171:8

**pursue**
95:6

**pursues**
70:16

**pursuing**
77:8 97:12
140:22

**push**
25:23 40:5

**put**
16:21 41:5
76:3 87:6
109:16
115:14 123:6
124:18
127:23 130:7
135:16
138:4,15,18
140:2

**puts**
147:24

**putting**
109:19 147:2
158:11 159:4

---

**Q**

**quantity**
62:7 64:22

**question**
21:18 25:7,
10 33:5
39:11 41:2
46:11 47:18
49:12 50:10
55:25 56:3
62:23 63:10
64:9 66:3
67:2,6,8,13,
16 69:22
71:11 74:19
75:11 92:6

103:9,22,25
104:13,16,25
110:3 111:12
112:3,4
113:3 114:15
121:15
122:23
123:14,24
124:10,11,14
142:14 144:9
145:17,18
146:7 150:21
153:13 154:4
156:1 158:1,
15,20
159:13,15
160:12,25
161:4,5
167:2,4,7,
16,19,22,25
171:17,19
172:2,4,7
173:12,15
174:13,18
179:8 181:22
182:15 185:4

**questioning**
23:17 36:23
50:10 92:4
94:5

**questions**
15:19 17:8
18:12,15
19:8 26:3
28:10 44:16
46:4 51:22
63:14 81:16
86:23 112:12
118:13
123:11,20
125:4 154:9
166:10,23,24
167:6 170:7
176:4 183:23

184:3,16

**quick**
12:1 92:14,
23

**quit**
129:10

**quite**
138:6

---

**R**

---

**R-1**
84:1 87:3,7,
13 89:12
151:20
186:20

**R-2**
83:21 99:13
186:20

**R-3**
72:14 115:6,
8,9,19,23
116:3,6
140:12
186:16

**R-4**
183:19

**R-5**
53:18,19,21
59:23 60:4
121:2,6
185:20
186:13,22

**R-6**
71:21 72:5,
7,15,21
185:20
186:13,21

**R-7**
76:23 77:10
78:13,15,19

185:20
186:13,20

**raise**
13:16

**ratified**
89:11

**re-ask**
25:9 152:16
172:1

**re-list**
73:18

**re-reading**
153:18

**reached**
84:24

**reaches**
180:6

**read**
22:22 37:25
42:23,24
44:16,19
67:3,5 74:1
90:7,13,17
96:16 97:3
99:24 110:5,
7 119:4
123:22,24
124:1 131:6,
22 141:20,24
153:10,19
158:15,17
163:6 172:2

**reading**
87:9

**real**
12:1 80:17
92:13,23
135:13 145:9
170:24

**reason**
31:14 75:1

96:12 97:23
98:19 99:2
102:24
109:10
117:5,6
124:16,17
136:21 137:9
149:20,24

**reasonable**
47:16,17
148:24

**reasonableness**
39:8

**reasons**
58:14 139:15

**recall**
20:13 36:8
75:15 76:13,
17,21 85:13,
17 113:8
132:21
145:23
155:14
156:21 158:2

**receive**
12:5 16:7
132:24
143:23
144:2,3,11
152:19

**received**
12:17 20:22
24:19 34:20,
22 35:1 37:8
67:23 175:13
179:20

**receiving**
87:9

**recess**
12:21 70:8
118:8 154:20

**recognize**
41:17

**recognized**
173:10

**recollection**
161:23,25

**record**
12:22,25
13:24 15:16
19:25 33:21
44:17 53:13
59:23 70:7,
9,12 71:15
83:22 88:25
94:16 107:3
110:7 118:7,
9,22 119:5
120:15,24,25
121:3,10
122:1,8,9,
16,18,21
123:12 124:1
153:19
157:18,21
158:17
171:22 179:9
183:6
184:10,17
185:3,10
186:14

**records**
183:20

**recount**
19:25 21:16

**recover**
112:3,19

**Recycler**
18:4,10

**recycling**
14:8,12,23
17:13,24
29:5 126:7,

19

**redirect**
118:16
176:7,8,12

**reduced**
40:16 42:25
43:9 149:7

**reducing**
41:23

**refer**
26:22

**reference**
27:17 28:10
64:2 99:14
137:2

**referenced**
28:12 123:1

**references**
81:3 120:17
121:7 122:10

**referencing**
70:21 102:10

**referring**
36:17 55:12
77:12

**regard**
18:12

**regarding**
79:23

**registered**
15:1

**relate**
36:24

**related**
23:1 36:19
96:18,19,20

**relates**
186:8

**relationship**
45:1 86:7,8,
10,15 127:5,
9 128:1
129:16 131:8
153:22

**relationships**
127:24

**relevance**
38:19 42:12
45:3 47:8,21
49:21 50:14
77:3 79:18
88:2 106:21
107:10
109:18 110:9
114:12
127:11 135:3
139:13
148:12 171:1

**relevant**
16:16 18:17
34:23 35:2
38:25 78:2,4
79:24 81:22
181:17

**reliability**
97:16

**rely**
68:7,13,17
171:11

**remain**
28:20 29:23

**remaining**
106:16

**remember**
21:23
155:14,22,24
156:17
164:17
175:14,16
180:22

**remembers**
174:8

**remind**
156:3

**remove**
140:7

**removed**
61:2

**render**
17:9

**renew**
28:19,22,25
35:24 36:9
37:4 99:22
132:13 136:7

**renewal**
28:18 36:6
37:7 42:3
100:1 101:4
102:2,4,5,12
110:24
133:21,22
134:21 136:1
143:15 149:7

**renewals**
90:3

**renewed**
36:3 107:4
111:16
134:16,17

**renews**
101:10

**rep**
20:23

**repeat**
39:11 64:9
68:10 104:17
114:15
121:15
142:14
153:14

158:20
180:14

**repeatedly**
112:9

**rephrase**
49:11 171:16

**replace**
40:12

**reply**
93:3

**report**
12:16 24:12,
14 37:12
174:25

**reporter**
53:18 67:3
76:16 110:5
124:23
145:16
153:17
154:14 170:6
171:18 172:2

**reports**
175:11,17

**represent**
15:5 155:4

**representation**
64:5,11
124:3

**representative**
29:7 89:1,3
163:12,15

**represented**
29:11

**represents**
15:21 16:1
119:10

**reps**
20:20

**request**
  26:4 41:5
  86:21 167:8

**requested**
  45:22

**required**
  181:12

**requires**
  33:22 121:22

**requiring**
  51:9,15

**reserve**
  184:8

**reserved**
  183:4

**resolve**
  45:17 76:5,
  10

**respect**
  35:14 38:16,
  24 39:13,18
  47:2 77:23,
  25 82:3
  119:11
  128:24
  182:11,21
  183:23

**respecting**
  122:4

**respond**
  38:2 39:4
  174:4

**responded**
  174:20

**Respondent**
  89:25

**Respondents**
  39:6

**response**
  37:15 45:9

  174:17

**responsibility**
  170:10 177:5

**responsible**
  18:18,21,24

**restate**
  25:10 46:10
  51:13 110:2
  172:1

**rested**
  182:20

**restrictions**
  62:11

**restructuring**
  101:23

**result**
  31:25 151:4

**resulted**
  90:10 128:25

**results**
  43:6

**return**
  38:10

**reverts**
  64:18

**review**
  12:18 13:3,4
  24:9,11,23
  32:17 33:16
  34:9,10
  35:11 37:8
  69:4 86:24

**reviewed**
  33:17 87:19,
  22 88:14

**reviewing**
  87:9

**rid**
  129:22

**right**
  12:6 13:16
  15:12 22:8
  23:11 24:5
  28:9 41:16
  44:23 54:2
  55:4,7,10
  58:7 61:11,
  14 68:15,18
  69:3,16
  71:25 73:6
  75:23 78:22
  79:6 82:8,15
  83:9 84:15,
  21 86:10
  87:8 88:7,
  11,17 89:15
  90:17 95:11,
  16 97:1
  98:2,5 99:12
  100:2,5,12,
  25 101:15
  102:4,14,15,
  17 103:8
  104:5 105:5,
  14,23 109:4,
  6,8,13 111:6
  113:7,19,24
  116:7,16
  117:16
  119:13
  124:18
  126:15,16
  127:2,6
  128:5,18
  131:15,19,
  21,23
  132:10,17
  134:18
  136:20,22
  137:25
  141:1,6,21
  143:3,4,7,9,
  12,17 147:25
  148:11,19

  150:13
  151:24
  152:3,10,24
  155:7 156:7,
  25 162:2
  163:10,20
  165:7,12
  169:13,25
  172:23,24
  176:3 177:21
  178:12 179:6
  180:5 181:5
  184:5

**right-hand**
  186:25

**ring**
  155:17

**risk**
  114:10,17

**role**
  18:16 19:15
  126:11

**roles**
  17:16

**rolling**
  135:17

**room**
  170:13

**roughly**
  139:1

**rule**
  44:13 121:22
  122:6

**ruled**
  48:11

**rules**
  88:11 89:11

**ruling**
  184:11,23

**run**
  106:20
  126:21

---

**S**

---

**sake**
  14:5 15:15
  26:13,17
  27:7 59:10
  97:20 139:13
  152:8 183:5

**sale**
  15:23 16:8
  21:10,12,17,
  19,22 25:3
  27:6 31:8
  32:12 38:24
  43:3 46:7,
  14,20 61:19,
  24 66:8
  73:17,20,22
  84:15,17
  86:14 90:1
  100:6
  105:10,11
  108:17
  132:14
  143:22
  144:13 145:6
  146:21
  148:10
  152:7,20
  162:12 165:7
  175:25
  178:1,4
  181:1

**sales**
  17:22 19:5
  20:20 22:1
  35:3 99:23
  137:1

**salespeople**
  19:7 85:20

  177:1

**salvage**
  14:8,12
  17:13,24
  45:1 108:4

**save**
  92:11

**Sawan**
  12:4,12,17,
  23 13:2,13,
  22 15:9,11,
  14 27:7,16,
  21 30:20
  33:2,3,4
  36:18,24
  39:3 41:7,
  12,14 42:10,
  16 44:18,21
  46:12 47:1,
  5,14,19
  51:22,24,25
  52:16,19
  53:25 54:6,
  14,17,24
  55:3,7,14,
  20,23 56:4,
  11,21 57:6,
  15,22,25
  58:3,8,12,
  20,24 59:11,
  12,15,19
  62:3 64:7
  65:15,25
  71:24 74:2,
  13,17,22
  77:2,22
  79:17 80:3,8
  82:3 83:18,
  25 88:1
  91:20 92:15,
  18 93:16,21
  97:2,11
  103:3,5,20
  104:10

  106:3,6,21
  107:10 108:1
  109:18,25
  110:8 111:3,
  7,18,22
  112:9 114:5,
  8,12 115:7,
  8,11,14,17
  117:10,18
  118:12,14,17
  120:16 121:7
  122:10,25
  123:8 124:5
  125:4,9,11,
  14 127:11
  135:3 139:12
  142:8 144:24
  145:14
  148:12,16
  152:13
  153:6,23
  154:2,9,10,
  21,22,23
  155:1,4
  158:3,19,21
  159:11
  162:23
  165:24
  166:3,13,18,
  22,25
  167:20,21
  168:1 170:9
  171:7,19
  172:4 174:5,
  7 176:3
  179:17
  180:10,16
  181:17,21
  182:3,5,20
  183:5,11,12
  185:1 186:6

**Sawan's**
  71:21 89:5
  95:1 179:13

**saying**
  43:18 64:14
  65:6 78:5
  80:7 102:7
  121:25
  128:15 140:5
  169:12 171:9
  175:8

**says**
  32:22 33:6
  42:24 55:13,
  14 58:5,6,
  11,12 59:13
  60:24 61:15
  62:18 67:14
  69:10 73:11
  81:9 82:2
  84:5 89:25
  97:5,6,25
  98:12 120:17
  121:25 122:6
  131:18 164:3

**scale**
  82:23 83:10

**Scope**
  181:17

**scrap**
  126:19,20,21
  127:23
  128:16
  129:18
  137:20
  146:18
  162:8,9
  165:3

**screen**
  26:12,18
  40:23 41:6
  52:4,7,22
  53:8,11 60:9
  61:14 67:24
  70:23 71:1,
  10 72:14

78:23 86:18,
22 87:6,8
99:13 105:1
115:15 116:7
119:1 128:20
132:7 137:7
138:19,21
140:11
149:17
151:21 163:7

**screenshot**
60:25

**screw**
169:18

**screws**
157:17

**scriptor**
34:7

**scroll**
36:11 55:6
60:19 96:1

**scrolling**
163:8

**sec**
138:19

**second**
42:3 74:2
87:20 88:9
99:19 102:2,
12 132:11
134:17
138:18,20
149:12

**section**
30:8,14 96:2
102:17,22
104:19 105:1
109:5 119:5,
15 132:6,8,
19 149:17

**security**

103:7

**see**
22:22 26:8,
18 34:4
35:19 42:9,
21 43:5
44:16 45:8,
18 52:25
53:4,7,8,9
54:1 55:3,9
60:8 61:17
70:19 72:20
75:21 77:3,
15 78:22
81:11 83:10
87:14 89:23
95:19,22,24,
25 96:8
109:5 116:6
119:1 123:8
128:21 132:7
138:22
140:13 143:5
151:21
163:5,7,8
167:5 168:7

**seek**
39:2 53:14
71:20 72:1,4
74:14,24

**seeking**
38:23 43:22
56:1 91:1
94:10 95:2
113:18
117:11
171:3,5

**seeks**
58:4 99:9
110:15
151:25

**sees**
36:14

**self-help**
14:24

**sell**
14:25 19:4
20:11 21:14
30:9,24 32:4
38:3 39:15
40:11 46:16
63:13 100:22
103:14,15
108:8,11
114:24
129:2,17
130:10
133:11
136:18
146:15,20
149:10 153:1
155:12
159:25 161:1
169:2,22
172:19 173:4

**seller**
14:25 15:3,
5,22,23
22:15,19
23:23 25:18,
19 26:6
29:4,5 30:25
33:20 34:22
35:8 46:24
68:23 80:16
82:6 85:21
96:15 101:5
109:13
113:16,17
114:3,10,17,
24 119:19,22
133:20
136:15,20
144:3,17
152:6

**seller's**
32:9 39:1

84:12
113:21,22,23
114:1

**sellers**
14:22 18:19,
22 19:1,3
24:13 28:19

**selling**
14:11,19
20:15,19,23
32:9 34:8
84:25 127:24
128:12 146:4
156:24 168:3
172:19

**sells**
84:11 108:6
114:11,18

**send**
53:17 56:9
101:8 131:4
160:9,10
170:15 175:6

**sense**
19:21 141:24
172:20

**sentence**
90:6 96:5
98:9 99:11,
20 119:7

**separate**
56:18 168:21
175:24

**separately**
182:18

**September**
28:14 29:4
35:23 115:9
116:3,9,13,
22 135:1
140:17,21
141:4,10,13

164:14,16
167:8 173:16
179:5,10,16
180:18
186:16

**serial**
62:16

**service**
124:15,16
155:23

**services**
17:10

**set**
14:18,19
28:9,21
50:22 142:1
172:16

**settle**
147:7

**settlement**
74:4,7,8,9
75:1

**settles**
147:1

**several**
45:7 184:3

**shaded**
89:22

**shading**
96:8

**share**
26:12 52:4,
7,21 70:23
71:1,3,4,7,
8,9,13,19
72:13,19
128:20
138:17,21
140:11
149:17
151:21

**sharing**
71:16 87:13
149:15

**shearer**
40:13
137:19,21
147:3

**shedders**
108:16

**Shelton**
162:3 164:1

**shelton@
oakcliffmetals
.com**
163:22

**Sheppard**
12:8 15:7,
12,17 16:9
17:2,4 23:16
25:5 27:8,
13,19,25
30:15 32:19
36:14,15
38:18 41:5,
10,13,15
42:12 44:6,
11 45:3
46:8,15,22
47:2,8,20
48:2,9,20
49:8,21
50:14 51:17
52:2,3,7,10,
18,21,24
53:3,16,23
54:3,9 55:11
56:1,9,15,23
57:20,23
59:4,21,22
60:2 62:25
63:2 64:9,10
65:23 66:4,5
67:1,10,17

68:11 69:24
70:2,10,11,
23 71:1,6,
11,17,25
72:13,18
74:5,15
75:4,9,10,21
76:15,22
77:9,14
78:4,11,17
79:21 80:10,
23 81:3,15,
24 82:12
83:15,20
84:2 86:25
88:3 92:5,
10,17,21
93:1,5
94:18,21,25
96:4,6 97:3,
7,15,19
103:24
104:13
106:1,4,25
109:22 110:4
111:9,13,20,
24 112:6,20
114:25
115:5,9,13,
16,18,22
116:1
117:21,24
118:4,10,11,
18,21,24
119:20,24
120:14,23
121:9,21
122:5,15
123:4,18,23
124:2,20
125:6,7,15,
17,25 126:3
138:9,16
139:17,22
148:18

152:16
153:8,17
154:6,17
156:14
157:7,10,16,
22 158:5,9
160:6
162:17,21,24
165:9,22
166:1,5,13,
16 167:18,23
171:1,13
173:11
174:1,10
176:5,9,11,
13 181:23
182:2,6,8,19
183:1,13,15
184:12,19,22
185:19,25
186:9,15,18,
22

**ship**
181:10

**shipping**
62:12 177:18
178:6,12

**short**
70:13 134:10
142:24

**shot**
63:12

**show**
31:3 41:1,8,
14 52:4
57:19 62:3
67:22 81:1
82:1 86:24
115:4 128:18
140:12
162:14,23

**showed**
175:11

**showing**
  26:21 59:2,
  14 119:2
  163:4

**shown**
  44:5

**shows**
  57:13 66:7
  68:1 81:18

**shredder**
  16:22 20:16,
  19,24 21:14
  23:2 25:3
  27:6 29:17,
  18 35:14
  38:17 39:14,
  18 43:1 50:3
  60:4 62:11,
  13 66:9
  73:18 81:10,
  12,13 85:1
  107:18
  108:10
  112:24
  113:13
  128:25 129:2
  137:23
  138:25
  140:23
  143:20
  146:15 148:8
  152:4,22
  155:9,10
  164:7 167:9
  169:3 177:16
  181:1,8

**shredders**
  108:15,22,23
  130:16

**shredding**
  62:15

**shrugged**
  168:11

**side**
  16:14 21:17,
  19 40:6
  54:2,8 55:4
  86:12 95:24
  113:21,22,24
  114:1 165:21
  182:17 184:9
  186:25

**sidebar**
  171:13

**Sierra**
  20:22 40:13
  137:19 147:3

**sign**
  15:2 31:1
  34:14 107:23

**signature**
  99:21 132:12
  165:11

**signed**
  24:3 27:5
  33:18,20
  34:15,18
  131:18,22
  132:17
  133:5,17
  168:14

**significant**
  38:10

**signing**
  32:18

**signs**
  22:1

**similar**
  128:10

**similarly**
  15:25

**simpler**
  23:21

**simplicity**
  26:13,17
  27:7

**simply**
  54:25 56:21
  120:22
  122:25

**simultaneous**
  170:5 173:24

**single**
  62:17 79:22
  84:5 146:9,
  12,13 149:13

**sir**
  30:20 42:16
  44:3 52:3
  53:25 60:13,
  14,15,16
  62:20 63:2,4
  64:10 67:11
  68:11 69:7,
  14,17 71:24
  76:1 77:14
  78:17,23
  81:17 84:7,
  16 86:17
  87:10 88:12
  91:16 94:13,
  18,25 95:7,
  11,12 96:22
  97:24 98:8,
  11,23,24
  99:6,24
  100:13,18,20
  103:2,4,6,24
  104:18,25
  109:6 110:19
  111:13 112:6
  113:20
  114:9,16,20
  116:7 125:7,
  11,14,17
  131:15
  132:15

**simplicity**
  135:10 140:4
  142:16
  151:17 152:1
  153:16
  154:23
  156:19
  157:16,22
  159:7,25
  161:4 166:23
  174:20 176:9
  178:2 180:15
  181:23
  182:5,8
  183:12
  184:12
  185:19
  186:22

**sit**
  139:24

**site**
  14:11,19,20,
  24 15:2
  22:10,25
  24:15,23
  31:5,17 60:5
  61:12 90:1

**sitting**
  128:5 130:20
  131:11
  133:13 139:4
  140:1,25
  147:4 169:15
  171:9

**situation**
  39:1 45:19
  124:19,24
  140:25 142:2
  181:7

**situations**
  183:18

**six-day**
  107:8,19,24
  110:23

111:2,6,15
112:8,22
113:14 117:2
134:1 142:20

**six-month**
130:3,5
134:4,8,13

**sky**
148:22

**slightly**
16:13

**slow**
138:2 171:22

**small**
177:6

**Smith**
16:23 19:17,
18,20 20:6,
19 21:21
22:11 23:7,8
24:2,13,19
27:5 29:9
32:16 33:14
34:14,15
37:9,11,21
38:5 40:10
42:8 44:24
45:23 50:11
72:11 73:12
75:25 82:24
85:15,23
86:3,9,13
102:6,12
107:22
110:22
111:17
125:18,19,22
126:2,6
128:21
131:13
138:22
139:24
140:14

151:22
152:17
153:13
154:25 155:2
159:14
160:11,22
162:3 163:5,
11 164:4
167:19 172:7
174:6 176:12

**Smith's**
40:7

**social**
51:6 101:9

**sold**
14:10 16:22
20:10 45:2
46:1,2 94:1
105:16
107:24
113:13
130:16
132:25 133:9
143:21
144:3,12,18
145:25 148:8
150:11,22
151:8 152:4,
8,17,20,22
155:9
156:10,20
159:7 161:5,
9,14 164:11,
23 167:9
173:5,8
177:15
181:4,7

**solely**
68:13 96:20
108:25
116:25 117:2

**Solutions**
155:23

**son**
37:24 73:9,
10 75:12
87:25 88:16,
20 162:4
177:1,13

**sorts**
108:2

**sought**
186:12

**sound**
174:23

**sounds**
112:17
160:19

**South**
168:7

**space**
31:20 50:24
51:1

**speak**
19:13 23:18
66:1 81:5
89:6 122:23
131:14
163:18

**speaking**
48:25 81:10
85:16 88:25
89:7 139:6
157:14 170:5
173:24

**speaks**
30:17 123:2,
5

**specific**
18:14,15
21:24 23:1
24:6 29:16
44:15 50:2
85:14 106:10

**specifically**
17:12 20:12
29:18 36:8,
10,18 38:16
39:13 49:25
69:7 82:3
85:17 88:18
177:23

**spectrum**
108:3

**speculation**
46:9,16
104:11 124:3

**speculative**
48:3 85:12

**spell**
13:23
159:21,24

**spells**
160:13

**spend**
31:15 130:11
169:16,17

**spoken**
86:4

**spot**
25:25 137:22

**spring**
178:25 179:2
180:6,25

**squeeze**
93:12,17
94:8

**Sr**
13:14,17,21
53:2 73:4,7
79:2 118:16

**Sr.'s**
93:6

stamped
  26:22

stand
  115:3 125:3

start
  62:6 64:22
  158:19 167:5

started
  35:23 82:18,
  20 106:19
  129:7 132:16
  147:8 154:11

state
  13:23 183:25

stated
  22:8 50:5
  75:13 85:18
  86:8

statement
  25:1 90:25
  119:14
  122:12

states
  17:25 39:4
  73:16 82:5
  94:11 98:1
  110:18 137:7

stating
  25:1

stays
  100:16,20,24

steel
  139:4

stellar
  43:11

stick
  166:11

stipulate
  27:8 84:1
  92:20 109:25

139:14

stipulated
  28:17 36:12
  106:22 117:7

stipulation
  27:22 36:16,
  19,22 93:15
  95:2

stood
  46:6

stop
  149:15
  157:13 163:6
  166:8,25

stories
  138:24

street
  126:20 130:8

strictly
  113:22

stride
  158:22

strike
  33:5 48:13
  144:21
  153:23
  154:2,4

String
  163:1

stuck
  83:6,7

stuff
  130:24
  131:10,11
  140:10 147:7
  160:8 162:9
  168:19

stupid
  172:12

subject
  16:22 54:20
  68:2 161:6

submit
  58:10 72:14

submitted
  54:22 55:18
  57:14 58:1
  59:4

subordinates
  19:13

subsequent
  37:7 45:15
  82:22

substantial
  39:23 98:24

success
  21:12

successful
  15:23 16:3
  21:12,22
  46:20

successfully
  152:4

suffered
  104:8,20

suggested
  124:5 182:25

suggesting
  58:15 160:22

suggestion
  123:15

suppose
  37:1

supposed
  170:22

sure
  21:18 33:21
  46:23 82:7

115:6 121:14
122:22 135:4
148:13
156:18
157:20 163:7
180:22
185:14

surprise
  56:18

surprising
  128:5

sustain
  117:20
  123:10

sustained
  50:15 114:7
  181:19

switch
  84:22 145:21

sworn
  13:18 125:23

system
  21:9 22:16
  29:19 31:13
  35:6 61:1
  62:15 64:18
  173:1

**T**

T-I-G-N-E-R
  160:18

table
  107:22

tag
  130:7

take
  12:3,15
  14:14 43:7
  44:25 66:14
  67:20 70:6

105:1 118:4,
7 130:13
131:11
135:13
138:14
147:12,19
150:16
154:12
158:13 160:1
161:10
164:18,20,
21,22 165:5
170:9 177:6
182:17
183:24 185:8

**taken**
12:21 61:6
63:8 64:15
70:8 118:8
144:22
154:20

**takes**
40:5 138:6

**taking**
43:17 145:4

**talk**
44:20 84:22
95:13 99:16
102:20 105:5
122:8 151:1,
20 155:6
171:23

**talked**
19:19 93:2
102:17
118:18
122:11
130:25 131:1
133:9 156:4,
11 157:4
181:4

**talking**
21:15 24:5

26:10 27:20
39:25 46:23
49:22,23
65:11 69:6,7
79:12,14
80:24 93:1
106:7
108:21,22
113:22 122:7
141:1 157:18
171:25 177:2

**talks**
121:4

**tall**
139:1

**tell**
21:24 27:15
36:13 38:6
50:11 57:22,
23 75:18
86:20 92:19
127:9 128:23
135:5 136:12
147:16
158:12 159:8
161:13
168:23
172:11,15,23
174:14 179:8
182:10

**telling**
75:25 156:7
159:19
166:14,15

**tells**
34:7 160:10

**ten**
12:3,15
15:24 16:5
21:21 22:5
25:2 26:8
32:24 44:5
47:10 49:2

57:8 61:20
62:4,18 66:8
68:2,14,23,
25 69:10,19
70:15,20
73:21 78:5
80:13,16
82:14,20
84:10,14
113:15,23
114:3 120:13
121:19
122:13 123:3
133:1 136:12
143:21
144:4,11,12
152:6,23
181:14

**term**
28:16,25
30:13 32:5
84:5 91:22,
24 99:22
132:14
152:4,18

**terminate**
31:24 37:9,
14 90:4
133:6,10,19
135:25 136:7
142:23
143:17
174:21

**terminated**
37:22 98:21
105:22
110:23,25
133:18
135:18 141:4
142:22
143:25
144:15
145:24 146:6
153:2 165:18

**terminating**
134:25
140:17

**termination**
30:10 31:15
32:1,2,23
33:7 38:4,
20,21 44:24
47:12 90:10
95:11,16
96:11,18,21
97:10,22
98:15 99:1,
4,9 102:23
104:9,20
109:9 117:2,
16 132:20
137:8 141:9
144:1,17
149:19 171:6
179:5,11

**terms**
21:14,16
22:4 32:14
85:14,20
90:2 91:11
99:21 119:8,
15,18,21
120:4,6,12,
18,22 121:8,
10,17 123:1
127:20
132:1,13

**testified**
13:19 91:13
96:25 98:14
99:4 108:1
112:9 113:11
122:19
125:23
137:15
149:11 155:8
157:12
161:19

167:14 168:2
176:24

**testify**
86:9 121:24

**testifying**
153:7

**testimony**
16:10 44:14
62:2 65:15
68:8,14
69:2,9,20
70:14 77:24
80:12 82:13
87:10 89:16
93:19 94:7
97:8 113:8
121:13
122:3,6
123:19 127:4
143:3
145:22,23
157:11,24
160:23
175:19,23
182:14

**Texas**
29:6 62:10

**text**
79:5,8 81:25
85:4

**thank**
13:11,13
22:19 28:2
35:7 42:16
44:22 48:14
52:1,3,9,23
53:23 59:20,
22 60:2
70:2,11
71:18 72:17,
18,19 75:10
78:17 82:12
84:2 90:19

95:3 102:16
107:16 114:8
116:1 118:15
125:5,8,19
131:13
139:22 149:5
154:8,16
160:20
161:16,18
168:1
176:11,16
181:24 182:3

**theoretically**
77:4

**thing**
13:9 20:5
31:10,15
32:22 40:11
45:1 62:17
68:6,12
79:22 84:9
87:11 93:9
95:24 117:8
129:8,13,22
130:8,17
131:1,6
133:11,13
137:13 138:7
140:3 145:7
147:1,5
172:19
185:11

**things**
16:14 26:5
38:11 39:14
66:17 68:16
91:21 101:21
102:14
109:23 110:1
128:6 129:8
130:17
141:20
169:13
171:10

178:13

**think**
13:5,8 20:5
27:13 32:25
36:13 40:16
43:20 46:5
48:16 52:13
56:25 57:3,
17 59:16,17
65:15 69:21
74:25 77:18
80:11 83:16,
21 85:18
86:9 92:18
94:22 105:24
106:23
108:15
117:25
123:6,17
124:7 126:13
127:19 129:6
130:1 131:7,
9,12 132:3
134:25
137:15
139:18,20
142:3,24
143:5 145:4,
13,18,20,22
147:17
148:18
149:6,9
153:10 154:3
155:13
158:25
159:6,10,24
162:13
169:16,20
170:11,15,
16,18
171:11,21,23
174:15 175:2
181:2,11
183:7 184:1,
13,19,22

185:7,16
186:1,2,4,9,
10

**third**
36:5,9 37:4
88:9 102:4
134:20
143:15

**thought**
23:20 43:11
106:4 111:16
132:1 134:24
135:6,7
136:4 141:2
158:18
170:13

**thoughts**
70:7

**thousands**
169:12

**three**
157:18
185:22

**throw**
150:4

**thrown**
83:5

**tighten**
48:15

**Tigner**
155:17,19
156:2 159:2,
5,16,17,20
160:22
161:15,20
164:9 166:20
170:3 172:21
173:16
175:25
178:19
179:23
180:4,6,11,

18,24 183:8

**time**
14:9 16:12,
16 17:18
18:17 20:9
24:11 29:8
31:21 35:6
36:9 37:4,
18,23 43:11
51:2 57:1
61:22 63:16
70:18,22
75:8 76:3,11
80:5 82:6,
16,17 86:13
87:24 88:23
91:2 95:1
106:15 107:7
110:24
112:13
121:18
131:21,25
133:7,21,22
134:17,20
135:18
139:14
140:20
141:21
142:21,22,25
146:5 148:2
153:15
157:19,20
158:14
169:17
171:23 173:9
175:9,18
180:14 183:4

**timely**
90:4,9 100:5
135:2

**times**
19:19 22:12
83:7 171:24
172:9 175:12

**timing**
83:2

**tire**
165:2 168:9

**title**
145:10

**today**
23:2 34:2
89:17 102:5
121:13
122:1,19
130:20
131:11
180:10 184:2

**told**
45:21 46:1
129:23 130:4
157:6 172:18

**tomorrow**
185:9

**top**
26:14 54:7
55:9 60:20
72:10

**total**
16:6,8,19,24

**totality**
98:17

**totally**
81:10 168:5

**track**
39:24

**train**
23:20

**transaction**
15:22 16:2,
3,8,25 17:18
99:23 132:14
178:1

**transcribed**
184:17

**transcript**
185:6,13,17

**triggered**
38:21 98:22

**truck**
138:15

**truckloads**
138:6 147:12

**trucks**
40:19
147:15,18

**true**
34:12 42:5
49:5 64:2
65:19
110:19,25
117:4 122:14
159:20
175:10

**trust**
165:20,21

**trusted**
124:19,25

**truth**
166:15

**try**
15:19 38:3
44:25 56:13
93:17 100:22
101:24 131:3
143:13,14
158:21
166:11
169:21 186:7

**trying**
39:2 41:8
56:25 57:3,
18 81:21
91:14 93:12

94:8 96:7
108:11
109:24 122:8
123:6 135:14
136:18 138:1
139:17
155:25
158:11
161:2,13
167:3 171:10
172:15 173:3

**turn**
177:12

**two**
12:8,9
35:20,21
83:22 109:23
110:1 112:11
146:23 148:3
160:2 168:8
170:20
173:22

**type**
20:12 39:14

**typical**
16:8

**typing**
85:8

---

**U**

**ultimate**
175:25

**ultimately**
128:25
164:11,23

**unanswered**
185:4

**underneath**
55:1,2

**understand**

19:11 23:11
55:5,20 56:5
64:8 67:6,7
70:13 76:9
78:1 81:21,
23 82:9 97:5
103:9 111:11
122:22
124:10,11
134:12
135:24
141:21
153:11
173:12
182:12

**understanding**
28:15 30:13,
17 37:3
54:20 80:20
98:1 133:17
173:7

**understands**
129:3

**understood**
30:21 67:12
103:25 132:1
134:16
143:20,21
183:1

**undertaking**
140:7

**undeterminable**
106:17

**unenforceable**
39:5 91:23

**unexpected**
13:6

**unfortunate**
141:6

**United**
17:25 82:5

**Universal**
81:9

**unlawful**
91:16

**unreasonable**
39:7 123:16

**unresponsive**
174:8

**update**
101:3

**upfront**
28:18

**upstream**
29:19

**USA**
80:9 81:9

**user**
14:21

**users**
15:1

**utility**
45:12 48:6

---

**V**

---

**vague**
123:23
173:11

**value**
90:12 96:13,
14 102:25
109:11,12,
15,16,20,22,
23 110:16,17
111:8
137:10,11
149:21,22,25

**various**
18:2 20:7
22:12 31:18

**vary**
108:17

**verbiage**
63:19

**verifiable**
104:5

**vernacular**
91:22

**version**
26:16 56:22,
23 59:7
186:7

**versus**
111:17

**vice**
29:15

**view**
22:22

**viewed**
24:20

**views**
51:5

**virtually**
21:25

**voice**
89:7

---

**W**

---

**wait**
54:21 55:24
148:16 156:5
178:24
185:17

**waiting**
147:5

**want**
13:12 20:24
27:11 28:20
31:21 36:24

37:13 41:10
43:20 46:3,
22 52:4
53:12 71:4,
6,7,12,20
86:23 91:19
92:15 93:8
96:1 125:17
128:18
129:25
130:12
138:17
140:10
145:21
151:14,20
156:7,12
159:4,18
160:21
162:23 163:6
164:19,20
167:21
168:21 169:5
170:23
171:16 172:3
179:8 183:16
184:23
185:13

**wanted**
21:9,14
25:23 37:9
45:7,10,17
131:3 143:17
174:21 181:4

**waste**
14:9,12,23
17:24

**wasted**
51:1

**wasting**
31:20

**water**
150:4

**Waxahachie**
29:6 129:10

**way**
19:12 21:2
25:13 46:18
54:3 58:3
61:19 63:5,
13 64:19
71:2 73:11
95:14 100:23
105:3 106:11
112:21 114:2
117:14
130:4,22
132:16
133:16
134:14,25
135:16
137:16
143:14
145:11 146:1
147:5 150:21
153:9 156:19
160:18
164:22 175:4
178:5,8,16
182:25
184:14

**wear**
177:7

**website**
14:15,17
22:6,8 24:6,
25 25:14
35:18 49:2,
14,20,23
50:2,6
60:12,18
61:2 63:21
65:5 66:15
68:18,19
69:5,6 73:19
83:9 100:16,
17,20,24

101:2,13
119:16
165:15
167:11

**weekly**
19:4

**weights**
62:12

**well-written**
90:6

**went**
35:24 36:2
61:13 66:20
85:14 86:20
101:20

**whatnot**
130:8

**Whatsapp**
77:18,19
78:19 79:6,8

**whatsoever**
121:4 122:13

**wheel**
177:12

**wherewithal**
168:18

**whoops**
96:7

**William**
76:14 77:19,
21 79:9

**willingness**
81:19

**window**
98:22 110:23
111:15

**withdraw**
50:17 59:19

**withhold**

182:14

**witness**
13:12 25:8
44:14 49:12
70:3 71:18
81:5,8 97:16
124:11
125:1,21
145:2 148:14
151:19
157:24
158:10
159:23
160:14,16
166:2,10,17,
20 167:1,2,3
172:8 174:12
181:20
182:21

**witnesses**
125:10,16
182:7

**wonder**
38:1

**word**
124:21
138:15

**wording**
61:16

**words**
31:6 39:22,
24 40:2
123:6 128:3
140:4 158:11
159:4 185:1

**work**
20:20 21:3
43:14 129:23
160:4 166:20
176:18

**worked**
21:9,11

49:17 136:6

**working**
18:11 45:7,
12 48:6
118:21
176:19
177:15

**works**
29:13 162:5
172:24 173:1

**world**
14:23 129:19
152:3,9,18

**worry**
132:4 161:12

**worth**
80:12,19
84:18 109:1
112:15
150:7,11

**wrestling**
134:2

**writing**
107:17

**written**
107:21
133:25 134:5
141:16,25
146:9 179:20

**wrong**
143:1,3
169:10,20,
23,24

**wrote**
98:4 141:16
186:16

**www.
dadeauctions.
com**
119:9

**Y**

**yard**
137:22

**yeah**
33:4 46:12
54:11 70:5
77:2 81:6
83:6 88:5
92:24 111:11
117:19 126:6
127:17 129:5
131:16 154:3
160:15
166:18
169:25
171:15,19
176:15 177:4
179:18
182:10
184:24

**year**
120:21
126:13 145:5
146:7
151:17,18,19
167:10 180:6

**year-long**
161:6

**years**
14:7,18 20:4
86:10,15
108:14
127:18,19
153:22 156:9
168:20
172:14
173:22

**Z**

**zero**

80:15

**Zoom**
87:20 95:23
113:4