```
1              AMERICAN ARBITRATION ASSOCIATION

2      DADE AUCTIONS, INC.          )
                                    )
3          Claimant,                ) CASE NO.
                                    )
4      VS.                          ) 01-21-0016-7725
                                    )
5      OAK CLIFF RECYCLING, INC.  ) CASE ORDER NO. 1
                                    )
6          Respondent.              )

7      ************************************************************

8              ORAL AND VIDEOTAPED DEPOSITION OF

9                   DAVID J. FOURNIER, SR.

10                       June 28, 2022

11                    (Reported Remotely)

12     ************************************************************

13         ORAL AND VIDEOTAPED DEPOSITION OF DAVID J.

14     FOURNIER, SR., produced as a witness at the instance of

15     the Respondent, and duly sworn, was taken in the

16     above-styled and numbered cause on June 28, 2022, from

17     9:58 a.m. to 10:48 a.m., before Michelle Kelley, CSR in

18     and for the State of Texas, reported by machine

19     shorthand, via Videoconference, pursuant to the Texas

20     Rules of Civil Procedure and the provisions stated on

21     the record or attached hereto.

22

23

24

25
```



```
 1                          APPEARANCES

 2

 3   FOR THE CLAIMANT:

 4        Dennis E. Sawan
          SAWAN & SAWAN
 5        416 N. Erie Street
          Suite 200A
 6        Toledo, Ohio 43640
          419.900.0955
 7        des@sawanandsawan.com

 8   FOR THE RESPONDENT:

 9        Jonathon W. Austin
          GALLOWAY
10        1301 McKinney Street
          Suite 1400
11        Houston, Texas 77010
          713.599.0700
12        713.599.0777
          jaustin@gallowaylawfirm.com

13

14   THE VIDEOGRAPHER:

15        Michael Bender

16

17

18

19

20

21

22

23

24

25
```



1                          I N D E X

2                                                        Page

3     Appearances                                          2

4     Changes and Signature                               38

5     Reporter's Certification                            40

6

7    Examinations                                         Page

8     David J. Fournier, Sr.

9              By Mr. Austin                               4

10             By Mr. Sawan                               32

11

12                    E X H I B I T S

13   No.       Description                               Page

14    1        Arbitration Demand                         9

15    2        Signed Auction Listing Agreement          13

16    4        Interrogatory Responses                   26

17

18

19

20

21

22

23

24

25



1            THE VIDEOGRAPHER:  Good morning.  We are

2    now on the record.  The current time is 9:58 a.m.

3    Today's date is June 26, 2022.  This begins the

4    videotaped deposition of David Fournier, Sr., in the

5    matter of DADE Auctions, Inc. versus Oak Cliff

6    Recycling, Inc.  My name is Michael Bender.  I'm your

7    remote videographer.  Your court reporter is Michelle

8    Kelley.  Counsel, will you please introduce yourselves,

9    and the witness will be sworn.

10           MR. AUSTIN:  Jonathon Austin on behalf of

11   Oak Cliff Recycling.

12           MR. SAWAN:  Dennis Edward Sawan on behalf

13   of DADE Auctions.

14               DAVID J. FOURNIER, SR.,

15   having been first duly sworn, testified as follows:

16                    EXAMINATION

17   BY MR. AUSTIN:

18     Q.  Good morning, Mr. Fournier.  How are you doing

19   today?

20     A.  I am doing well.

21     Q.  Okay.

22     A.  Well, that's kind of -- I have COVID.

23     Q.  Oh, I'm sorry.  I just recently had a bout with

24   that myself so I understand how crappy that can be.  So

25   I hope you're doing okay.

1      A.  Yeah, I've got my door shut and everybody is
2   out of the office because it's better to do it in the
3   office than at home.  So let's get it underway.
4      Q.  Well, I appreciate you hanging with me today.
5   Like I said, it won't take too much of your time.
6          I'll just start.  Can you please state your
7   full name for the record.
8      A.  David J. Fournier, Sr.
9      Q.  And what is your date of birth, sir?
10     A.  11/9/46.
11     Q.  And have you ever given a deposition before?
12     A.  I have.
13     Q.  What type of proceedings have you given
14  depositions in?
15     A.  Define what type of proceedings.
16     Q.  Well, how many have you given, how about that?
17     A.  Five or six.
18     Q.  Okay.  And out of those five or six, what types
19  of cases were those in?
20     A.  Home warranty, business lawsuits, and primarily
21  that, about divorce.
22     Q.  So primarily for personal reasons these
23  depositions have been given?
24     A.  Well, there's business.  Business relations as
25  well, yes.



EXHIBIT A

1     Q.  Okay.  I'll just give -- we'll give a few quick
2  rules before we get started.  Since you have done
3  depositions before, you probably understand.  But just
4  so we can kind of agree, can we agree not to talk over
5  each other so I get my full question out, you get your
6  full answer out?  Can we agree on that?
7     A.  I have no problem with that.
8     Q.  Okay.  And can we agree that all of your
9  responses will be verbal in nature, no head nodding and
10  things like that?  Can we agree on that?
11     A.  We agree that if I do, you'll remind me.
12     Q.  Okay.  And are you on any type of medication
13  that might affect your testimony today?
14     A.  Just took an Advil.
15     Q.  Okay.  And can -- what is your position at DADE
16  Auctions?
17     A.  Chairman of the board.
18     Q.  And you're the designated corporate
19  representative as well?
20     A.  In this case, yes.
21     Q.  Okay.  And can you talk a little bit about
22  exactly what DADE Auctions does as a business?
23     A.  We sell equipment for the salvage, recycling,
24  and waste industry in that aspect of our business.
25     Q.  And y'all are based in Ohio?



1      A.  We are.

2      Q.  Let's see.  Let me share my screen.  I'm just

3   going to share the deposition notice that was given out

4   to you today.  Can you see that, sir?

5      A.  I can.

6      Q.  Okay.  So this is a deposition notice that --

7   sent to your counsel, and this a list of topics here, 1

8   through 17.  Can you see these?

9      A.  I can.

10     Q.  Have you reviewed this list of topics?

11     A.  No, I have not.

12     Q.  But are you able -- can you read through them

13  for me just generally and see if you are able to testify

14  on each of these?

15     A.  For the most, yes.

16     Q.  Okay.  And did you -- how did you prepare for

17  this deposition today?

18     A.  My attorney and I have had some discussion

19  about the pertinent items that he felt would be

20  discussed today.

21     Q.  Okay.

22     A.  I've looked through -- I've looked through some

23  of the discovery that has been provided previously, and

24  I reviewed the contracts and some of the timing of the

25  contracts.



EXHIBIT A

1        Q.   Okay.   Thank you.

2             So you are the person who would have the most

3    knowledge about the transaction with Oak Cliff; right?

4        A.   That's -- that's questionable, but yes, I have

5    a lot of knowledge about it.  We have five salespeople

6    here that all have bits and pieces of information so I

7    try to gather those information -- that information and

8    I will try to consolidate all of that for you today.

9        Q.   Okay.   I appreciate that.

10            So has DADE worked with Oak Cliff in past deals

11   before this -- before this instance?

12       A.   On the finance side of things, yes.  Not on the

13   equipment sales.

14       Q.   So this is the first transaction that involved

15   selling a piece of equipment?

16       A.   That's correct.

17       Q.   Can you kind of describe the other financial

18   transactions?

19       A.   Those transactions -- we've been in -- DADE

20   Capital, American Recycler Newspaper, and DADE Auctions

21   has been in the salvage, recycling, and waste business

22   since 1985, about 37 years.  And the majority of the

23   time we have done financial work for all of the vendors

24   in the industry.  And at some point, probably 10 to

25   12 years ago, we met Oak Cliff, Benjie Smith, and he was

1   brought to us, I believe, through a vendor.  And the

2   vendor asked us to finance some equipment for him.  And

3   we probably have done five or six transactions for

4   Mr. Smith on the finance side of things over the years.

5        Q.  Okay.  Move along here.  We can go to -- I'll

6   stop sharing this one, and we can go to Exhibit 1, which

7   is the demand for arbitration.  We'll just talk about

8   that for a second.

9             (Exhibit No. 1 marked for identification)

10       Q.  (BY MR. AUSTIN)  And have you reviewed this

11  demand before, Mr. Fournier?

12       A.  Yes.  Yeah.  Yes.

13       Q.  And you're familiar with its contents?

14       A.  Yes.

15       Q.  And you agree with its contents?

16       A.  Yes.

17       Q.  Okay.

18       A.  Yeah, in that contract.

19       Q.  Is there anything that you would like to change

20  in the demand?

21       A.  No.

22             MR. SAWAN:  Except that we're specifically

23  reserving our right to do so.

24             MR. AUSTIN:  Fair enough.

25       Q.  (BY MR. AUSTIN)  Did you request that this



1    demand be sent out?

2        A.  I did.

3        Q.  Okay.  So we'll just go over it for a few

4    minutes.  It says at the top here -- can you see this

5    okay or is it too small?

6        A.  No, I can see it.  That's just fine.

7        Q.  It says the name at the top here.  The name of

8    the respondent is Oak Cliff Recycling; correct?

9        A.  Correct.

10       Q.  And after that, it just gives some, like,

11   general information about where Oak Cliff is, its

12   contact information, whatnot; is that right?

13       A.  Yes.

14       Q.  And then here in the middle, it says a brief

15   description of the dispute.  So I'll read that for the

16   arbitrator.

17           It says, "The Respondent listed an item for

18   sale on the claimant's auction site, the terms and

19   conditions of which provide for auto listing renewals

20   unless the listing party provides timely notice of its

21   intent to terminate the listing.  The party failed to

22   provide said timely notice.  Early termination of a

23   listing resulted in a penalty equal to 20 percent of the

24   listed value.  In this instance, $135,000, which equals

25   20 percent of the $675,000 list price."

EXHIBIT A

1          Do you agree that's what that -- is that -- do
2    you agree that that's an accurate statement as to why
3    DADE demanded arbitration?
4        A.  At a minimum, yes.
5        Q.  Okay.  And you would agree that DADE initiated
6    this arbitration to pursue a 20 percent penalty against
7    Oak Cliff; right?
8        A.  Yes.
9        Q.  And in your mind, as soon as Oak Cliff
10   terminated agreement, that 20 percent penalty
11   automatically kicks in?
12             MR. SAWAN:  Objection.  Lack of capacity.
13       Q.  (BY MR. AUSTIN)  You can go ahead and answer,
14   Mr. Fournier.
15       A.  Let me say that, because I said at a minimum,
16   there is a lot more involved than just what is written
17   there on the piece of paper in front of me.  And the
18   fact of the matter is we were contracted to sell a piece
19   of equipment for Mr. Smith, and this is just one of the
20   functions that he violated in order for us not to be
21   able to sell that piece of equipment.
22       Q.  You would agree with me that probably the main
23   reason is because it was early terminated; right?
24       A.  No, I wouldn't actually.
25       Q.  Okay.  Well, what would you say the main reason



1   for this dispute is then?

2       A.  Because he failed to work with us with engaging

3   sellers -- or buyers that were interested in -- during

4   his undisputed contract term and the disputed contract

5   term, which is what we're talking about right now, he

6   failed to engage with buyers that we sent to him and

7   tried to get in to see him to purchase this piece of

8   equipment.

9       Q.  And in what ways did he fail to engage with

10  them?  Can you expound on that a little bit?

11      A.  Yes.  In the case of a $675,000 piece of

12  equipment, I can guarantee you that there isn't anybody

13  that buys it sight unseen.  And, therefore, a potential

14  buyer through our system requests an opportunity to

15  inspect the system and make arrangements to go in.  And

16  when we had prospective buyers, those requests were

17  ignored.

18      Q.  If I recall, wasn't there some buyers who -- or

19  prospective buyers who did go inspect the equipment?

20      A.  There was one.  That's correct.  Marty

21  Feinberg.

22      Q.  Marty Feinberg; right?

23      A.  Uh-huh.  Yes.

24      Q.  Okay.  Let's move on to Exhibit 2.  Just bear

25  with me one second.



EXHIBIT A

1       A.   If I may, I am going to ask you to just give me

2  one minute.

3       Q.   Sure.

4                 (Recess from 10:11 a.m. to 10:12 a.m.)

5                 (Exhibit No. 2 marked for identification)

6       Q.   (BY MR. AUSTIN)  So I think where we left off I

7  was going to share with you Exhibit 2, which is the

8  actual listing agreement.  So let me pull that up.

9            Can you see that, sir?

10      A.   Yes.

11      Q.   Okay.  So the way I read this is that the

12 listing agreement calls for a 10 percent commission if

13 DADE sells the shredder.

14      A.   That's correct.

15      Q.   Right?  But if -- but it calls for a 20 percent

16 penalty of the sales price based on early termination;

17 true?

18      A.   Correct.

19      Q.   Okay.  And so can you tell me a little bit

20 about how this got -- how this agreement was agreed to?

21 I mean, how did you -- can you just kind of expound on

22 how you came into contact with Benjie and how this

23 agreement was agreed to?

24      A.   Yes.  I believe I got a call from one of the

25 salespeople for Sierra, which is a manufacturer of



 1   equipment for the salvage industry, Frank Baker.  Frank
 2   Baker said -- and Frank works the Texas area for Sierra
 3   International.  And Frank Baker called and said, "Hey,
 4   don't know if you're aware of this or not, but Benjie is
 5   selling his shredder, his Harris shredder because he had
 6   another fire."  I contacted Benjie to see if we could
 7   provide selling service for him, and he was agreeable.
 8        Q.  Okay.  To the best of your knowledge, in the
 9   last five years, can you tell me how many lawsuits or
10   arbitration proceedings DADE has been involved with that
11   have come out of this agreement?
12        A.  None.  Other than we're involved in one right
13   now.
14        Q.  So this is the only one?
15        A.  Yes.
16        Q.  Okay.  I'll just go over a few aspects of the
17   agreement.  So you see that first paragraph --
18              MR. SAWAN:  Real quick, Jonathon.
19              MR. AUSTIN:  Yeah.
20              MR. SAWAN:  Jonathon, not to interrupt, but
21   I want to make sure that the answer was clear.  He was
22   saying other than one that's going on right now.  He did
23   not intend that this is the one.  That was not what he
24   was referencing.
25              MR. AUSTIN:  Oh, okay.  So --



1           MR. SAWAN:  You might want to clarify that.

2           MR. AUSTIN:  I'll ask it again.

3     Q.  (BY MR. AUSTIN)   Mr. Fournier, other than this

4  arbitration proceedings, in the last five years, can you

5  tell me how many other arbitration proceedings or legal

6  proceedings, in general, have come based off of this

7  contract?

8     A.  We have two contracts right now that are in

9  dispute.  Yours and another contract.

10    Q.  Okay.  So there is one other more -- one other

11  dispute?

12    A.  That's correct, yes.

13    Q.  And that's ongoing?

14    A.  It is.

15    Q.  Okay.  Thank you.

16           MR. AUSTIN:  Thanks, Dennis.

17           MR. SAWAN:  Yeah.

18    Q.  (BY MR. AUSTIN)   So we'll just go over a few

19  aspects of this agreement.  So we'll just go over the

20  first paragraph here.

21    A.  Yes.

22    Q.  And are you familiar with the contents of this

23  first paragraph?

24    A.  I am.

25    Q.  Okay.  So we'll just read it for the record.



1    I'll read it out loud.

2              "This agreement is made and entered into as of

3    September 15, 2020, by and between Oak Cliff and DADE

4    Auctions.  This agreement expires 180 days after your

5    digital signature date, per terms below, and shall

6    automatically renew for the same term until the sales

7    transaction is completed, or cancellation notification

8    from the seller, whichever occurs earlier.  Cancellation

9    notice from the seller must occur 15 days prior to the

10   end of the agreement to effectively cancel the contract

11   renewal."

12             Would you agree with me that that's what this

13   says?

14        A.  I would.

15        Q.  So this is what's considered an automatic

16   renewal clause; right?

17        A.  It is.

18        Q.  And the agreement only expires when proper

19   cancellation is given; right?

20        A.  Yes.

21        Q.  So it could effectively be an indefinite

22   agreement if cancellation is not given in the proper

23   time frame?

24        A.  Correct.

25        Q.  Okay.  And that cancellation must occur 15 days



1   prior to the expiration of the 180 days.

2       A.  Correct.

3       Q.  Right?  Okay.  And so we -- let's go down here

4   to Section 5.  And so -- and see where my cursor is.

5   This is what I'm about to read.

6               So Section 5 here, the second paragraph, says

7   "Any cancellation or termination prior to the listing

8   agreement expiration for any reason will incur a

9   20 percent fee of the listed value of the fair market

10  value as determined by DADE Auctions to you as the

11  seller."

12              And you would agree with me that that is what

13  this contract says; right?

14      A.  That is what it says.

15      Q.  And wouldn't you agree that that penalty is

16  a -- is a punishment for default?

17      A.  I wouldn't say that it's a punishment.  It's

18  part of the contract.  It's a way to recover our

19  expenses for what we -- the work that we put forward and

20  also to recover the portion of the fee that we would

21  have received from a buyer.  It's not a penalty.

22      Q.  But doesn't it kind of disregard the damages

23  you actually suffered during that termination period?

24      A.  How so?

25      Q.  Well, since -- in this instance, right, so



1    Benjie was -- under this contract, was supposed to give

2    you notice August 26th; right?

3        A.  Yes.

4        Q.  But he actually gave you notice September 1st;

5    right?

6        A.  Yes.

7        Q.  So really it would be six days of anticipation

8    of having the contract when you don't actually have the

9    contract; right?

10       A.  Correct.

11              MR. SAWAN:  Objection.  That's actually not

12   correct.

13       Q.  (BY MR. AUSTIN)  So wouldn't it be just those

14   six days' worth of damages?

15              MR. SAWAN:  Jonathon, it expired on the

16   10th.  And if you look at the section here, it says DADE

17   Auction reserves the right to sell the equipment up to

18   the end date of the listing, which includes the

19   notification period.

20              MR. AUSTIN:  Well, regardless -- let's let

21   Mr. David Fournier answer the question.

22              MR. SAWAN:  I just want to make sure you're

23   getting it right.  You're not asking questions that are

24   not true.

25       Q.  (BY MR. AUSTIN)  What I'm trying to get at is



EXHIBIT A

1   the difference in time between when you expect to have
2   the contract and when you -- when the contract is
3   terminated; right?  So wouldn't the damages be limited
4   to that finite period of time?
5           MR. SAWAN:  Objection.  Lack of capacity.
6   Go ahead, Dave.
7       A.  I don't understand why you would say that,
8   because what we have been prevented from doing during
9   that period of time is selling a piece of equipment.
10  And for the sale of that piece of equipment, we would
11  have gotten 10,000 -- 10 percent from the seller and 10
12  percent from the buyer, in this instance.  And who is to
13  say what's going to happen in the last few days of the
14  contract if it's terminated.  We can't determine that.
15  We don't know whether a buyer is going to step in and
16  buy it at that point in time.  He terminated the
17  contract.
18          So no, the damages aren't just for the period
19  of time.  It's an unknown damage.  We don't know what --
20  it's the same thing that -- I'm going to tell you again.
21  I'm working with -- I'm working with a known buyer who I
22  cannot get in to inspect the equipment.  How can I sell
23  something for a seller, how can I earn a commission by
24  selling something if I have a noncooperative seller who
25  will not give me the opportunity to learn that -- earn

EXHIBIT A

1   that commission from people that are coming in from

2   Brazil, people that are coming in from Montreal, Canada,

3   or want to come in, want to inspect it.

4        Q.  So how would the -- how would your damage model

5   change exactly?  So you said it's a -- it's a number you

6   can't put -- you can't put a number on it is what you

7   said; right?

8        A.  I cannot put a number on it.  I can't.

9        Q.  You wouldn't be able to calculate that?

10       A.  Absolutely.  Liquidated damages.

11       Q.  What --

12       A.  Those are unknown.  If your seller would have

13  cooperated with us, he would have probably had this

14  piece of equipment sold, even though he sold it himself.

15  It is sold now.  But the fact of the matter is he would

16  have had it sold through DADE Auctions.  He chose not to

17  cooperate with us.

18       Q.  Okay.

19            MR. AUSTIN:  Objection.  Nonresponsive.

20       Q.  (BY MR. AUSTIN)  In the last five years, how

21  many auto shredders has DADE auctioned off?

22       A.  In the last five years, it would be a guess,

23  but I would say 20.

24       Q.  And can you give me a median sales price on

25  those for how much they would usually go for?



1       A.   I can tell you all the way from $5.5 million on

2   down to 350,000.  The $5.5 million one was sold to

3   Saudi.

4       Q.   So that -- this 20 percent fee, that can

5   fluctuate based on what DADE lists the item at; right?

6       A.   No.  That fluctuates based on what the seller

7   lists the item at.

8       Q.   Okay.  So -- but it can fluctuate, obviously?

9       A.   Certainly.

10      Q.   Okay.  Just give me one second.

11           Wouldn't you agree with me that both sides bear

12  risk in this transaction, though?  I mean, wouldn't the

13  seller also bear as much risk as DADE does?

14      A.   In what aspect?

15      Q.   Well, a seller doesn't get paid, just like you

16  don't get paid, right, so what -- why would the seller

17  not work with you on this, if they agreed to have you

18  list the item?

19      A.   Why, that's the $24,000 question here, isn't

20  it?

21      Q.   So what I'm saying is that no sides get paid if

22  the item doesn't get sold.  So, you know, doesn't the

23  seller also bear risk?

24      A.   No.

25      Q.   Well, I think they do --



1       A.  Well, the seller -- the seller doesn't get
2   paid.  If that's bearing risk, I guess that's bearing
3   risk.  But the fact of the matter is I have no idea
4   what's in the seller's mind if he decides to withhold --
5   let's just take this for an example.
6            Suppose that at some point in time during the
7   second renewal of this -- of this contract, Benjie finds
8   somebody that will buy this piece of equipment, and
9   somebody walks in his door and he says, "I'd buy that
10  equipment."
11           And Benjie says, "No, I'm under contract, but
12  if you wait until the contract is over, then I save 10
13  percent and you're going to save your buyer's fee too."
14           Okay.  At that point in time, where is the
15  incentive for the seller to be cooperative with DADE
16  Capital when he, over here, has someone else where he
17  can save a lot of money and he can save the buyer a lot
18  of money too.  So put it in perspective.  There's the
19  reason that a seller can become not cooperative.
20       Q.  So are you saying that's what happened here?
21       A.  I'm saying that that's what happened when
22  Mr. Feinberg approached Benjie.
23       Q.  So --
24       A.  And that Benjie made a -- in the conversation
25  with Marty Feinberg, indicated that he would walk around



1   DADE Auctions.  Mr. Feinberg was just a little bit more
2   honest about this with us.
3        Q.  Were you present physically for that
4   conversation?
5        A.  I absolutely was not.
6        Q.  Were you on the phone?
7        A.  I was not.
8        Q.  So you just heard that from Mr. Feinberg?
9        A.  I heard that from Mr. Feinberg.
10       Q.  Okay.
11       A.  And I believe that you have a deposition from
12   Mr. --
13            THE WITNESS:  Help me out here, Dennis.
14   What was it?
15            MR. SAWAN:  Affidavit.  An affidavit.
16       A.  Affidavit.  Thank you.
17       Q.  (BY MR. AUSTIN)  There is an affidavit in this
18   case.  That's correct.  And we'll -- can go over that
19   with Mr. Feinberg whenever that time comes.  Okay.  So
20   like I said, I'm going to go quickly, so I've only got a
21   couple more exhibits left.  So this is -- I'm going to
22   move on to one more exhibit, Exhibit 3, if I can find
23   it.
24            So this, I believe, is the email that is the
25   subject of this dispute.  Wouldn't you agree with me?



1   Wait.  No, this is the wrong one.

2        A.  No, I don't think so.  Yeah.  It's the wrong

3   one.

4        Q.  My mistake.  I actually don't need it as an

5   exhibit.

6             So Benjie emailed you on September 1, 2021.

7        A.  Yes.

8        Q.  Have you seen that email?

9        A.  I know that.

10       Q.  Yes.  And he said he wanted to remove the

11  shredder from the listing agreement.  Do you remember

12  that?

13       A.  That's correct.

14       Q.  And so this is the email that you contend was

15  an early termination of the contract; right?

16       A.  Yes.  I will contend that that is one factor of

17  a default, yes.

18       Q.  Okay.  And were there -- and there was another

19  email, right, subsequent to that where you followed up,

20  and he said, "No.  Remember, we don't have an

21  agreement"; right?

22       A.  I believe that was an email that was delivered

23  from our in-house attorney at the time.

24       Q.  And so prior to September 1st, the contract

25  automatically renewed on what date?



1           MR. SAWAN:  If you know, Dave.

2       A.  I have it written down here some place for

3   Christ's sake, but --  September 10th.

4       Q.  (BY MR. AUSTIN)   September 10th.  So what date

5   should Benjie have terminated the contract under your

6   eyes?

7       A.  April 26th.

8       Q.  So from April 26th to -- to August 10th, that

9   is the period of damages; right?

10      A.  Absolutely not.

11      Q.  So you're saying that all the work that went

12  into this prior to that, that's the damages in this?

13          MR. SAWAN:  Objection.

14          MR. AUSTIN:  I'm just trying to get -- I'm

15  honestly just trying to get a measurement of damages,

16  Dennis.  That's all.

17          MR. SAWAN:  You read the liquidated damages

18  provision.

19          MR. AUSTIN:  So that's it?  That's the

20  whole basis of damages that we're seeking in this?

21          MR. SAWAN:  The contractual obligation to

22  pay damages, yes.

23          MR. AUSTIN:  Okay.

24      Q.  (BY MR. AUSTIN)   All right.  And one last

25  exhibit.  I am telling you I am going through.

EXHIBIT A

```
 1              (Exhibit No. 4 marked for identification)
 2        A.  And I'm okay with it.
 3              MR. SAWAN:  Appreciate it.  Yeah, that's
 4   great.
 5              MR. AUSTIN:  I know.  This is my style.  I
 6   like to get it -- get it done.
 7        Q.  (BY MR. AUSTIN)   So -- and this is just going
 8   to be -- I'm just going to ask you a little bit about
 9   some of your expert qualifications.  Because in one of
10   your interrogatory responses you were listed as an
11   expert.  So I am just going to go over that with you for
12   a little bit.  All right.
13              So this is Interrogatory No. 20.  We asked to
14   identify any experts that DADE might appoint, and the
15   answer was Dave Fournier, Sr.; is that correct?
16        A.  Yeah.  I guess I'm an expert if they say so.
17        Q.  Did you assist in answering these questions?
18        A.  I probably had some input.  But I suspect that
19   my son, who is also David Fournier, Jr., and Dennis
20   provided a lot of the answers.
21        Q.  Okay.
22        A.  And my son also is an attorney, by the way.
23        Q.  Okay.  Okay.  Can you just talk about generally
24   your knowledge and expertise in the used heavy equipment
25   business?
```



1      A.   Like I stated in the beginning, 1985, we

2    started this.  All we do is salvage, recycling, and

3    waste equipment.  We don't deviate.  In early 1990 -- in

4    1997, I started American Recycler Newspaper for the

5    salvage, recycling, and waste industry.  It is the

6    largest production newspaper.  All it deals with is

7    industry news.  And it goes out to -- and it is funded

8    by all the vendors in the industry, the advertisers.

9    And we heavily advertise used equipment in that.  And --

10              (Phone Interruption)

11      A.   And so we have been dealing in this industry

12   exclusively.  For that period of time, we financed the

13   industry.  We work with about ten lenders and we work

14   with them as brokers.  We present them transactions for

15   our vendors and for our customers that come to us

16   directly.

17              And by doing that, we are financing equipment.

18   We are financing new equipment.  We are financing used

19   equipment of all types, of all values.  Therefore, we

20   understand the value of the equipment from the finance

21   side.  If you understand the value of the equipment from

22   the finance side because you're financing a lot of used

23   and new equipment, you know the value on the other side

24   when a customer brings you used equipment and you want

25   to sell it.

1          Now, from the aspect of equipment itself, we

2   have been -- we have been doing -- prior to putting DADE

3   Auctions together, we sold used equipment for ten years

4   in a different manner.  We sold equipment used for

5   vendors and we sold it for individuals in the recycling

6   industry as a broker.

7          About five years ago, I decided to do something

8   different, and we started DADE Auctions, which is more

9   of a direct route to financing thing.  We took a lot of

10  the mystery out of it.  We took a lot of the pain out of

11  it.  And we allowed 24/7 purchasing and offers on our

12  website.  It's totally different, totally new, totally

13  unique in the industry of brokers.

14         So with that said, we sell millions of dollars'

15  worth of equipment every year to all countries around

16  the world.  I shouldn't say to all the countries.  To

17  around the world.  And so we have a very good knowledge

18  of the values of equipment and even more so on specific

19  pieces of equipment because we traffic in them more so

20  than others.

21         You have to understand that in this industry

22  there are thousands and thousands and thousands of

23  products.  So knowing each one in detail is very

24  difficult.  We maintain a vendor library on both of our

25  sites and in our computers so any piece of equipment

EXHIBIT A

1   that we touch, we have already talked to the

2   manufacturer about it.  We've gotten brochures.  We've

3   gotten information and we discuss it internally.  We are

4   a valuable asset in this industry because we know

5   equipment very well or we can put our fingers on the

6   descriptions, the use, and the values of this equipment,

7   new and used.  That's all we do.  We don't do anything

8   else very well at all.  But we do this really well.

9        Q.   Okay.  I appreciate that.

10            One of the -- one of the items here that I have

11  my mouse over is -- hold on.  Let me find it -- DADE's

12  Policies, Procedures, and Practices Related to Client

13  Management.

14            Can you talk about some of those policies,

15  procedures, and practices?

16       A.   We have a system -- we have a system set up

17  that all calls coming in are addressed by one of our

18  salespeople as best they can.  If the customer was

19  sourced, if the seller was sourced by -- in other words,

20  a question comes in on a piece of equipment that we have

21  listed on our website, if the -- one of our salespeople

22  has -- is affiliated with that customer and a question

23  comes in, we like that salesperson who has the product

24  listed to address it.  But at any point in time, we --

25  our goal is to answer the phones immediately and to

 1   address all issues as quickly as we can.

 2            If you see in some of your information that

 3   we've sent to you, the phone logs, especially in all of

 4   the information from our CRM system, it's deep.  We

 5   have -- we have systems here in place that help us

 6   determine by notes who we've contacted, who's called in,

 7   who's asked what questions.  So our policies internal --

 8   internally are we must follow up quickly and promptly

 9   with these customers, primarily the owner of the

10   customer who he's listed it for, if there is a question

11   or any conversations back and forth between that

12   customer that come in regarding the sale of his

13   equipment.

14        Q.  Does DADE have policies and procedures for this

15   particular type of situation when there is an alleged

16   early termination of a contract?  Are there certain

17   policies and procedures when that happens?

18        A.  No, we all huddle.

19        Q.  What do you mean by that?

20        A.  We all get together and say, "Now what do we

21   do?"

22        Q.  Got you.

23        A.  I mean, we just don't have -- we just don't

24   have that many defaults.

25        Q.  Okay.



1      A.  And people follow the rules in most cases.  And
2   so -- and so when we have an issue, we get together and
3   say, "Okay, is Dennis going to get this one?"
4      Q.  About how many defaults have you had on these
5   listing agreements in the last five years?
6      A.  Five or six, seven.  You know, something in the
7   very low range.
8      Q.  So about one a year or so?
9      A.  Yeah.  Roughly.
10     Q.  So in your experience, are these, you know,
11  20 percent penalty clauses, are these standard in your
12  industry?
13     A.  Yes.
14     Q.  Okay.
15     A.  Let me just define that even further.
16     Q.  Okay.
17     A.  A good majority of the language that's in there
18  was presented to my son David and to Dennis in the
19  beginning when we put this together.  But don't believe
20  that anybody re-created the wheel here.  The information
21  and the language in the clauses came from my competitors
22  out there.  And I say competitors only in the aspect
23  that there are leasing companies with similar types of
24  platforms.
25             So we gathered all of that, put some of this



EXHIBIT A

1    together, and that's the language that they're using so

2    that's the language that we're using because I didn't

3    want to spend $200,000 with Dennis to have him do

4    something from the get.

5        Q.  Okay.  I understand.  And that answers my

6    question.

7                MR. AUSTIN:  And with that, I'll pass the

8    witness.

9                MR. SAWAN:  I'll ask a couple questions,

10   Dave.

11                THE WITNESS:  Sure.

12                        EXAMINATION

13   BY MR. SAWAN:

14       Q.  Dave, there was a conversation about the

15   difference in damages, 10 and 20 percent.  I think you

16   did explain it to a certain extent, but I want to give

17   you the opportunity to clearly explain why there's a

18   difference there.

19       A.  Ask me that question again, Dennis.

20       Q.  So the contract calls for 10 percent from the

21   seller in the event that you sell, but the liquidated

22   damages provision includes an amount in the amount of

23   20 percent.  There was a question as to whether or not

24   that was a punishment.  Can you explain the difference

25   between 10 and -- 10 percent if the seller just sells it

1  through you versus 20 percent in the event that they

2  wrongfully terminate the contract or default in some

3  way.

4      A.  I understand.  All right.  There's two aspects

5  of the sale.  When we contract with a seller, we charge

6  a fee for that.  We're going to sell your piece of

7  equipment for 10 percent, as the contract so stated.

8  But when we list that piece of equipment on our website,

9  we also have a buyer's premium.  That means when the

10  buyer makes an offer or buys it now, in that case, that

11  he also pays a premium.

12          In this case, 10 percent premium.  So if he'd

13  have gone out and pushed the button or he negotiated a

14  purchase price, with Benjie in this case, he would have

15  paid whatever he negotiated plus 10 percent.  So we have

16  10 percent buyer's fee.  We have 10 percent seller's

17  fee.  And, therefore, if we'd have had the opportunity

18  to actually culminate a deal with Benjie, we would have

19  received 20 percent in the transaction.

20          Now, why did we do it this way?  You probably

21  didn't ask the question.  You're going to get the answer

22  anyway.  It's because -- it's because on other major

23  sites the burden is put on -- the burden of cost or

24  premium is put on the seller and most sites are 17 to

25  22 percent buyer's premium.

EXHIBIT A

1      Q.  Would you say that that percentage range is
2   commercially reasonable in your opinion?
3      A.  Well, certainly, it is because they get it all
4   the time.  And those are other websites that have
5   obviously been operating for a lot longer than we have.
6   So is it commercially reasonable?  Absolutely.  What I
7   did and what my thinking was we all know that if a buyer
8   is looking at a piece of equipment for $100,000 and he
9   knows he's going to have to put $20,000 on top of that,
10  it's a little bit of a turnoff.  And so he's either
11  going to make a much lower offer for it, or he's not
12  going to buy it.
13         So by charging a buyer's premium and seller's
14  premium, we split the difference between buyer and
15  seller and make it more affordable and more practical
16  for buyer and seller to do business.
17     Q.  Okay.  You talked a little bit about policies
18  and procedures, and you said that in the event that
19  something like this happens you, quote/unquote, huddle.
20  But I do want to ask some more specific questions about
21  that because I think there may be more to that.
22         So there is a client management report sent out
23  on a monthly basis; is that correct?
24     A.  Yes.  For each and every transaction or each
25  and every customer.



EXHIBIT A

1     Q.  And that client management report goes from

2  DADE Auctions to -- directly to the seller; is that

3  correct?

4     A.  Yes.

5     Q.  And in that report, it includes certain data

6  related to the listing, and then at the bottom, it

7  states something along the lines of you've got to inform

8  us at least 15 days prior to the termination date in

9  order for the termination to be effective; is that

10  correct?

11     A.  That statement is on the bottom of each and

12  every report that goes out, as well as the termination

13  date.  And I believe actually what it says is you have

14  so many days left on your contract to renew.  So if you

15  look at the renewal information that's in the report and

16  the statement that's at the bottom, it certainly should

17  be obvious that there is a point in time you need to

18  make a decision.

19     Q.  Okay.  And that -- and that -- in this case,

20  Benjie and/or Oak Cliff was notified of the renewal date

21  several times throughout the process; is that correct?

22     A.  Yes.  Correct.  It's on a continuous basis,

23  Dennis.  That date -- that renewal date keeps dropping

24  every month that the information is sent to them on the

25  report.  So they have a time block on there basically



1   that says here's what's happening with your contract.

2       Q.  Okay.  And similarly, Oak Cliff and/or Benjie

3   have been notified repeatedly of the necessity to

4   terminate within a certain period of time for it to be

5   effective?

6       A.  Yes.

7       Q.  Okay.  Am I correct that there was an email at

8   one point from Benjie saying that he had actively

9   ignored Marty Feinberg?

10      A.  Yes.

11      Q.  In your experience of about 42 years in this

12  industry, how difficult is it to sell something to

13  somebody who actively ignores your buyers?

14      A.  You'll never get it done.  It is an impossible

15  situation.  If you have a seller who does not want to

16  sell something and completely ignores, I cannot -- I

17  cannot make him sell something he does not wish to sell.

18      Q.  Do you believe that Mr. Smith had a contractual

19  obligation to use his best efforts to meet with buyers

20  and not ignore them?

21      A.  Undoubtedly.  Undoubtedly.  If you are going to

22  sell something, especially something that's that

23  expensive, there is no one in the world who would go --

24  not go and take a look at something and spend that kind

25  of money.  So as a member of this community, he knows



```
 1   that in order to sell something, he has got to
 2   accommodate inspections and negotiate.
 3                   MR. SAWAN:  Okay.  I have no further
 4   questions.
 5                   MR. AUSTIN:  No further questions.
 6                   THE VIDEOGRAPHER:  Going off the record.
 7   The time is 10:48 a.m.
 8                   (Deposition concluded at 10:48 a.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



1                      CHANGES AND SIGNATURE

2

WITNESS NAME:  DAVID J. FOURNIER, SR.
3   DATE OF DEPOSITION:  June 28, 2022

4

PAGE       LINE    CHANGE          REASON
5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____



```
 1            I, DAVID J. FOURNIER, SR., have read the
 2   foregoing deposition and hereby affix my signature that
 3   same is true and correct, except as noted above.
 4
 5            _____
 6                  DAVID J. FOURNIER, SR.
 7
 8
 9   THE STATE OF _____)
10   COUNTY OF _____)
11            Before me, _____, on
12   this day personally appeared DAVID J. FOURNIER, SR.,
13   known to me (or proved to me under oath or through
14   _____) (description of identity
15   card or other document) to be the person whose name is
16   subscribed to the foregoing instrument and acknowledged
17   to me that they executed the same for the purposes and
18   consideration therein expressed.
19            Given under my hand and seal of office this
20   _____ day of _____, _____.
21
22
23
24                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
25
```



```
 1              AMERICAN ARBITRATION ASSOCIATION

 2    DADE AUCTIONS, INC.         )
                                  )
 3        Claimant,               ) CASE NO.
                                  )
 4    VS.                         ) 01-21-0016-7725
                                  )
 5    OAK CLIFF RECYCLING, INC.   ) CASE ORDER NO. 1
                                  )
 6        Respondent.             )

 7
                       REPORTER'S CERTIFICATION
 8          DEPOSITION OF DAVID J. FOURNIER, SR.
                         June 28, 2022
 9

10        I, Michelle Kelley, Certified Shorthand Reporter in

11    and for the State of Texas, hereby certify to the

12    following:

13        That the witness, DAVID J. FOURNIER, SR., was duly

14    sworn by the officer and that the transcript of the oral

15    deposition is a true record of the testimony given by

16    the witness;

17        That the deposition transcript was submitted on

18    _____ to the witness or to the

19    attorney for the witness for examination, signature and

20    return to me by _____;

21        That the amount of time used by each party at the

22    deposition is as follows:

23        Dennis E. Sawan.....00 HOURS:07 MINUTES
          Jonathon W. Austin.....00 HOURS:41 MINUTES
24

25
```



EXHIBIT A

1        That pursuant to information given to the

2   deposition officer at the time said testimony was taken,

3   the following includes counsel for all parties of

4   record:

5        Dennis E. Sawan, Attorney for Claimant;
         Jonathon W. Austin, Attorney for Respondent.

6

7        I further certify that I am neither counsel for,

8   related to, nor employed by any of the parties or

9   attorneys in the action in which this proceeding was

10  taken, and further that I am not financially or

11  otherwise interested in the outcome of the action.

12

13       Certified to by me this 29th day of June, 2022.

14

15                  *Michelle Kelley*

16       _____

17       Michelle Kelley
         Texas CSR No. 9326

18       Expiration Date:  10/31/2023
         Firm Registration No. 164

19       Reliable Court Reporting
         2626 Calder, Suite 205

20       Beaumont, Texas 77702
         (409) 832-1776

21

22

23

24

25

